## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| **GOLDMAN SACHS BANK USA,** | |
| **Claimant,** | **ARBITRATION PROCEEDING** |
| **v.** | |
| **MICHEL B. MORENO AND TIFFANY C. MORENO,** | |
| **Respondents.** | |

### GOLDMAN SACHS BANK USA'S ARBITRATION DEMAND AGAINST MICHEL B. MORENO AND TIFFANY C. MORENO

Goldman Sachs Bank USA ("Goldman Sachs" or "Claimant") submits this Arbitration Demand against Michel B. Moreno and Tiffany C. Moreno (collectively, the "Respondents").

### I.    PARTIES

1.    Claimant is a New York state-chartered bank with its principal place of business in New York.

2.    Respondents are two natural persons:

(a)    Michel B. Moreno, who is over the age of majority and who may be served at 4425 Highland Drive, Highland Park, Texas 75205 or wherever he may be found;

(b)    Tiffany C. Moreno, who is over the age of majority and who may be served at 4425 Highland Drive, Highland Park, Texas 75205 or wherever she may be found.

### II.    FACTUAL BACKGROUND

#### A.    The Loan

1.    In April 2013, Michel Moreno approached Goldman through his wealth advisors seeking potential multimillion dollar business loans. The ostensible purpose of the loans was to

invest in the expansion of an oil and gas firm, Green Field Energy Services, Inc. ("Green Field"), which was owned and/or controlled by Mr. Moreno.

2.     As part of Goldman Sachs's due diligence on the transactions, the Defendants provided information on their assets. This information showed a net worth in excess of $300 million, with limited liquidity of approximately $4,000,000. Mr. Moreno further provided general information regarding Green Field, including projected growth in the Eagle Ford shale with Shell Oil, a major oil and gas explorer in the Eagle Ford shale, as a major purchaser of Green Field's services. Mr. Moreno also provided information on the potential for GE Capital to invest in technology in which Green Field held an interest. All of such information supported the planned loan from Goldman Sachs.

### (1) The Tranche 1 Loan

3.     Based, in large measure, on this information, Goldman Sachs approved the loan and the disbursement of funds. Goldman Sachs and Defendants entered into a Loan Agreement, which was executed on May 15, 2013 (the "May 15 Loan Agreement"). A copy of the May 15 Loan Agreement is attached hereto as **Exhibit A** and incorporated by reference.

4.     Section 2.9 of the May 15 Loan Agreement states that:

> The Borrower shall use the proceeds of the Loan to make an equity investment in (i) Green Field Energy Services, Inc. ("Green Field") which shall be used as working capital to fulfill equipment orders and to make and [sic] equity investment in Turbine Generation Services, L.L.C. **The Borrower will not, directly or indirectly, use any part of such proceeds for the purpose of (a) purchasing, improving, or otherwise investing in residential real estate, whether a primary residence of the Borrower or otherwise … .** (emphasis added).

5.     Pursuant to the May 15 Loan Agreement, Goldman Sachs provided to Defendants a loan in the aggregate amount of $25,000,000, which was advanced to Defendants on May 15, 2013 (the "Tranche 1 Loan"). The Tranche 1 Loan was secured by, among other things, a pledge

DAL:930430.4

of "any and all amounts, benefits, remittances or rights to payments relating to the applicable pledgor's rights under" MBM 2011 DOH Grantor Retained Annuity Trust ("MBM DOH Trust"), TCM 2011 DOH Grantor Retained Annuity Trust ("TCM DOH Trust"), MBM 2011 MGH Grantor Retained Annuity Trust ("MBM MGH Trust"), TCM 2011 MGH Grantor Retained Annuity Trust ("TCM MGH Trust") (collectively, the "Trusts").

6.    Also on May 15, 2013, Michel Moreno and Tiffany Moreno each executed and delivered a series of irrevocable letters of direction, including the Irrevocable Letters of Direction to the Trustee of each of the Trusts, confirming that the Tranche 1 Loan was secured by "all of the undersigned's right, title and interest in and to all annuity payments and amounts payable by you pursuant to the Trust Agreement," and instructing that all annuity payments were to be sent to an account for the benefit of Goldman Sachs.

**(2) The Tranche 2 Loan**

7.    The second tranche of indebtedness ($15,000,000) was a loan made by Goldman Sachs to two of the Moreno trusts—MBM-DOH Trust and TCM-DOH Trust—pursuant to a Term (Committed Loan) Loan Agreement (the "July 5, 2013 Loan Agreement") dated July 5, 2013. This indebtedness was evidenced by two notes, one executed by MBM-DOH Trust in the original principal amount of $7,500,000 and one executed by TCM-DOH Trust in the original principal amount of $7,500,000 (collectively, the "Tranche 2 Loan"). The Tranche 2 Loan was secured by the same collateral securing the Tranche 1 Loan. A copy of the July 5, 2013 Loan Agreement is attached as **Exhibit B**.

8.    Section 2.9 of the July 5, 2013 Loan Agreement states that:

> The Borrowers shall use the proceeds of the Loan to make an equity investment in Turbine Generation Services, L.L.C. ("Turbine Generation"). ***The Borrowers will not, directly or indirectly, use any part of such proceeds for the purpose of (a) purchasing, improving, or***

3

> *otherwise investing in residential real estate, whether a primary residence of the Borrowers or otherwise . . . .*  (emphasis added).

9.    At the time of the second tranche, an Omnibus Amendment to Loan Documents ("Omnibus Amendment") was entered into by and among, *inter alia,* Goldman Sachs,[1] Michel Moreno, and Tiffany Moreno. The Omnibus Amendment provided, *inter alia*, that any breach of the July 5 Loan Agreement was also a breach of the May 15 Loan Agreement, and provided that the security for the Tranche 1 Loan was also security for the Tranche 2 Loan.

### (3)  The Tranche 3 Loan and Loan Consolidation

10.    On October 11, 2013, Goldman Sachs, Defendants, and five additional entities[2] (the "Other Borrowers") executed a Consolidated, Amended and Restated Note in favor of Goldman Sachs (the "Note") in the original amount of $52,370,000.00 (the "Principal Balance"). The Note is attached hereto as **Exhibit C**.

11.    The Note provides that it is issued pursuant to, and is entitled to the benefits of, an Amended and Restated Loan Agreement, dated October 11, 2013 (the "Consolidated Loan Agreement"), which consolidated, amended, and restated certain previous loan agreements between Goldman Sachs, the Defendants, and the Other Borrowers, including the May 15 Loan Agreement and the July 5 Loan Agreement. A copy of the Consolidated Loan Agreement is attached hereto as **Exhibit D**.[3] Pursuant to the Consolidated Loan Agreement, a third tranche of funds closed in October 2013 (the "Tranche 3 Loan").

---

[1] As well as Goldman & Sachs & Co. as the Securities Intermediary and Moreno Properties, L.L.C.

[2] MBM-DOH Trust, MBM-MGH Trust, TCM-MGH Trust, TCM-DOH Trust, and Moreno Properties Two, L.L.C.

[3] The Consolidated Loan Agreement was later amended and modified pursuant to the First Amendment to the Amended and Restated Loan Agreement, dated June 30, 2014 (the "First Amendment," and, together with the Consolidated Loan Agreement, the May 15, 2013 Loan Agreement, the July 15, 2013 Loan Agreement and, collectively with all aforementioned agreements, the "Loan Documents"). A copy of the First Amendment is attached hereto as **Exhibit E**. The First Amendment did not restate the Consolidated Loan Agreement; it merely modified the maturity date and added certain collateral, and did not otherwise change the Consolidated Loan

4

12. Pursuant to the terms of the Consolidated Loan Agreement, the unpaid portion of the Principal Balance and all accrued and unpaid interest was to be repaid in full, in cash, on the "Maturity Date." *See* Exh. D § 2.1(c).

13. Defendants, among others, agreed to be jointly and severally liable with respect to the Principal Balance and all applicable interest. *See* Exh. D § 8.14(b) & Schedule II; Exh. C.

14. Section 2.9 of the Consolidated Loan Agreement states that:

> The Borrowers shall use the proceeds of the Loan[4] to make an equity investment in (i) Green Field Energy Service, Inc. ("Green Field") which shall be used as working capital to fulfill equipment orders and to make and equity investment in Turbine Generation Services, L.L.C. ("Turbine Generation") and (ii) to refinance the current indebtedness secured by the real properties located in Baton Rouge, Louisiana. ***The Borrowers will not, directly or indirectly, use any part of such proceeds for the purpose of (a) purchasing, improving, or otherwise investing in residential real estate, whether a primary residence of the Borrowers or otherwise … .*** (emphasis added).

15. The Morenos represented and warranted that "[n]o Borrower is and after giving effect to this Agreement shall be, in default in the payment or performance of any contractual obligation." Exh. D § 4.8; *see* Exh. A § 4.8; Exh. B § 4.8.

16. The Morenos also represented and warranted that complete financial disclosure would be made, including that the information provided would "not [be] incomplete by omitting to state any fact necessary to make such information not misleading … ." Exh. D § 4.5; *see* Exh. A § 4.5, Exh. B § 4.5.

17. Each of the three loan agreements described above also contained covenants that Goldman Sachs would be given "prompt written notice of any Event of Default under this

---

Agreement. Particularly pertinent here—the limitations on use of proceeds, covenants, and representations and warranties—were confirmed.

[4] The definition of Loan in the Consolidated Agreement includes the Tranche 1 Loan, the Tranche 2 Loan, and the Tranche 3 Loan.

DAL:930430.4

Agreement or any other default under any other Loan Document or any other agreement … ." Exh. D. § 5.1; Exh. A § 5.1; Exh. B § 5.1.

18.    Pursuant to the Note and the Consolidated Loan Agreement, before default, interest accrues on the Note at a per annum rate equal to the sum of: (i) LIBOR for the then-current LIBOR Reset Period (as defined in the Loan Agreement) plus (ii) a rate equal to 8% per annum.

19.    Under the Consolidated Loan Agreement, after default, the unpaid Principal Balance, all accrued and unpaid interest due, and all other obligations, interest, fees, charges and expenses of the Defendants and the Other Borrowers to Goldman Sachs arising in connection with the Loan Documents (the "Obligations") bear interest at a rate that is 15% per annum in excess of the interest rate otherwise applicable to such Obligations from time to time until paid (the "Default Interest"), to the extent permitted by applicable law. Further, if any such Default Interest is not paid when due, it may be added to the outstanding balance owed and itself bears interest accordingly, to the extent permitted by applicable law.

20.    The Note also provides that the Defendants and the Other Borrowers shall pay all of Goldman Sachs' costs and expenses, including (without limitation) all reasonable attorneys' fees and expenses incurred in connection with the enforcement or preservation of its rights under the Loan Documents.

### B.    Defendants Default Under The Loan Documents

21.    In 2013, the Defendants, in violation of their ongoing representations and warranties in the Loan Documents, failed to advise Goldman Sachs of changing circumstances directly relevant to the information previously provided to Goldman Sachs. Among other things, the businesses related to Green Field were quickly unraveling during and after the advance of the final tranche of Loan proceeds. Additionally, in August and September of 2013, shortly before

Defendants received the Tranche 3 Loan, Shell Oil began shutting down its North American operations. The Defendants did not reveal these changing circumstances to Goldman Sachs, which had relied on Defendants representations and ongoing obligations under the Loan Documents.

22.     The Note originally had a maturity date of April 11, 2014. The First Amendment changed the maturity date to July 11, 2014.

23.     Under the terms of the Loan Documents, the failure to pay the outstanding amount due under the Note in full by the Maturity Date of July 11, 2014 was a default.

24.     Despite amicable demand, the total outstanding amount due under the Loan Documents is $68,357,637.21, comprised of the following, as of April 18, 2016:

        a.      Unpaid original balance in the amount of: $47,401,003.16; and

        b.      Accrued interest, including Default Interest, in the amount of: $20,956,634.05.

25.     Under the terms of the Loan Documents, interest continues to accrue on the principal balance due.

### C.      Defendants' Improper Use of Loan Proceeds

26.     As set forth above, Defendants represented and agreed that the proceeds loaned pursuant to Defendants' Loan Agreement *would not* be used to purchase residential real estate. *See supra* ¶ 17. Rather, the proceeds of such loan were to be used to make an equity investment in Green Field Energy Services, Inc. and/or Turbine Generation. *See id.* This was a material term of Defendants' Loan Agreement, and Goldman Sachs relied on this representation by Defendants when entering into the Loan Documents.

27.     Each of the three Loan Agreements also contained covenants that the proceeds of the Loan would be used "only as permitted under Section 2.9 hereof." Exh. D § 5.13; Exh. A §

7

5.11; Exh. B § 5.11. As noted above, Section 2.9 of each of the loan agreements forbade Defendants from "directly or indirectly us[ing] any part of such proceeds for the purpose of (a) purchasing, improving, or otherwise investing in residential real estate, whether a principal residence of the Borrowers or otherwise." Further, this equity investment itself served as collateral for the Loan proceeds under the Loan Documents, meaning that the diversion of these funds to the Highland Park Mansion further damaged Goldman Sachs by depriving it of its expected collateral for the Loan.

28.     After execution of the Consolidated Loan Agreement, Goldman Sachs discovered an article in the Dallas Morning News regarding the Defendants' purchase of the Highland Park Mansion for $14,000,000 on July 8, 2013. When questioned, Mr. Moreno admitted (including to Goldman Sachs representative, Tom Fruge) that he financed the purchase of the Highland Park Mansion by channeling the money advanced by Goldman Sachs under the Loan Document through trusts that owed him money. The misuses of loan proceeds was further confirmed via an email dated April 1, 2014, from Mr. Moreno's office manager Torie Laprairie to Goldman Sachs analyst Will Skelton. Ms. Laprairie's email indicated that at least $10,740,927 of the proceeds of the second tranche of loan funds was used to purchase the Highland Park Mansion.

29.     The admission of misuse of funds is confirmed by the fact that, based on the information provided at the time of the original disbursement of funds in May 2013, the Defendants had insufficient liquid assets to purchase the property by any means other than through the use of Goldman Sachs's loan proceeds. Further, the first two tranches of loan proceeds were disbursed on May 15, 2013 and July 8, 2013, respectively. Defendants closed on the Highland Park Mansion on July 8, 2013—a highly suspicious sequence of events. Upon information and belief, at all times (including throughout the negotiation and execution of the

8

Loan Agreement) the Defendants intended to use proceeds of their loan from Goldman Sachs to purchase the Highland Park Mansion.

30.   Moreover, Defendants manipulated the structure, debts, and obligations of the various entities whose interests were pledged to Goldman Sachs to secure execution of Loan Documents. Defendants also misrepresented material facts regarding these pledged interests when negotiating and executing Loan Documents and are now attempting to obfuscate such actions by withholding required documentation and refusing to provide it to Goldman Sachs.

**D.   Goldman Sachs Files for Arbitration**

31.   The Consolidated Loan Agreement contains a binding arbitration provision. *See* Exh. D § 8.9(a), which states as follows:

> THE PARTIES HERETO HEREBY WAIVE ALL RIGHTS TO A COURT TRIAL OR TRIAL BY JURY WITH RESPECT TO ANY DISPUTE, CONTROVERSY OR CLAIM UNDER THIS AGREEMENT AND THE BORROWERS AGREE TO SETTLE BY ARBITRATION ANY CONTROVERSY BETWEEN THE BORROWERS AND THE LENDER OR ITS AFFILIATES ARISING OUT OF OR RELATING TO THIS AGREEMENT. THE ARBITRATION WILL BE CONDUCTED IN ACCORDANCE WITH THE RULES THEN IN EFFECT OF THE AMERICAN ARBITRATION ASSOCIATION. ANY DISPUTE OR CLAIM INVOLVING A DOLLAR AMOUNT OF $50,000 OR LESS WILL BE BEFORE ONE ARBITRATOR, AND ALL OTHER DISPUTES AND CLAIMS WILL BE BEFORE A PANEL OF AT LEAST THREE ARBITRATORS. THE AWARD OF THE ARBITRATOR OR A MAJORITY OF THE ARBITRATORS, AS THE CASE MAY BE, WILL BE FINAL, AND JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT HAVING JURISDICTION.

32.   Pursuant to this provision, Goldman Sachs files this arbitration on April 21, 2016 before the AAA. That Arbitration remains pending as of the present time

### III.   <u>LAFAYETTE HOUSE LITIGATION</u>

33.   Michel Moreno and Tiffany Moreno pledged a single-family home, located at 409 Worth Avenue, Lafayette, Louisiana pursuant to the (i) Second Lien Mortgage dated May 15, 2013 and recorded on May 20, 2013 and the (ii) Supplement to Second Lien Mortgage on October 11, 2013 and recorded on October 18, 2013.  A true and correct copy of said Second Lien Mortgage is attached as **Exhibit F**, and a true and correct copy of said Supplement to Second Lien Mortgage is attached as **Exhibit G**.

34.   There is currently pending a consolidated action styled Michel Moreno et al v. Wayne J. Herbert, Inc., et al, Docket No. 20113102A and 20130530 om the 15th Judicial District Court for LaFayette Parish, Louisiana (the "Louisiana State Court Action.)"  This action involves claims by the Morenos against a contractor relating to construction at the 409 Worth Avenue, Lafayette, Louisiana.

35.   Section 11 of the Second Lien Mortgage provides that "[a]ll Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender."  "Miscellaneous Proceeds" is defined to mean "any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 55) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property."  Thus, any settlement proceeds from the Louisiana State Court Action have been assigned to Goldman Sachs.  Any retention or use of such funds by the Morenos without the approval of the lender is in violation of the Second Lien Mortgage.

---

[5]   Section 5 as to insurance policies obtained by the Borrower (i.e., the Morenos) requires all insurance policies to "include a standard mortgage clause" and to "name Lender as mortgagee and/or as an additional loss payee."

## IV.   CAUSES OF ACTION

### A.   Breach of Contract Against Respondents

36.   Goldman Sachs and Respondents entered into valid, enforceable agreements in the form of the Loan Documents. Goldman Sachs performed its obligations under the Loan Documents by, *inter alia*, advancing loan proceeds to Respondents. Respondents materially breached, *inter alia*, their promises to pay the outstanding amounts due on the stated "Maturity Date," July 11, 2014.

37.   Respondents further breached the Loan Documents by misusing proceeds, including by using proceeds for the purpose of "purchasing, improving or otherwise investing in residential real estate, whether a primary residence of the Borrower or otherwise," to wit, the Highland Park Mansion.

38.   Respondent further breached the Loan Documents by receiving and not delivering any amounts received in connection with the Louisiana State Court Action.

39.   As a direct and proximate result of Respondents' breach of its obligations under the Loan Documents, Goldman Sachs has suffered and will suffer damages. Goldman Sachs seeks the recovery of all damages, fees, and costs in the arbitration. Goldman Sachs seeks interim relief in this Court.

40.   All conditions precedent to the claims have occurred or have been waived.

### B.   Fraud and Fraudulent Inducement Against Respondents

41.   Respondents represented and agreed to restrictions of the use of loan proceeds received under the Loan Documents, including that such proceeds would not be used to purchase residential real estate. Further, Respondents made representations regarding the interests pledged in connection with the all of the other Loan Documents, including the Consolidated Loan Agreement. These representations were material to the Loan Documents, and Respondents knew

11

DAL:930430.4

that they were false and intended for Goldman Sachs to rely on them. Goldman Sachs did actually and justifiably rely on Respondents false representations.

42.   As a direct and proximate result of Respondents' knowingly-false material representations intentionally made to induce Goldman Sachs to enter into the Loan Documents, Goldman Sachs advanced funds which were improperly used to purchase the Highland Park Mansion. Goldman Sachs has suffered and will suffer damages and has been forced to incur attorneys' fees and costs.

43.   As stated above, Respondents belatedly admitted their fraud in connection with the Highland Park Mansion purchase.

44.   Yet before admitting to their fraud, Respondents misrepresented not only the intended use of the funds, but also the financial viability and prospects of their various companies. Ultimately, Respondents used these misrepresentations to induce Goldman Sachs to consolidate Respondents' various loan disbursements and advance additional funds. The aggregate principal balance of the loan proceeds under the Consolidated Loan Agreement exceeded $52,000,000.00, for which Respondents agreed to be jointly and severally liable. Respondents fraudulently manipulated the structure, debts, and obligations of the various entities whose interests were pledged to Goldman Sachs to secure the consolidation.

45.   All conditions precedent to the pursuit of these have occurred or have been waived.

**C.   Constructive Trust**

46.   Respondents' retention of the unjust profits obtained through their fraud and prohibited use of proceeds would be inequitable; thus, a constructive trust should be imposed against the Highland Park Mansion, which was purchased using the proceeds of the Loan

Documents and any property purchased using such proceeds because, in equity and good conscience, those proceeds should be held by Goldman Sachs.

47.    Additionally, a constructive trust should be imposed on any proceeds from the Louisiana State Court action.

48.    All conditions precedent to the pursuit of these claims in the Arbitration and to seek interim relief in this Court have occurred or have been waived.

## V.    REQUEST FOR RELIEF

WHEREFORE, Goldman Sachs respectfully requests that the panel enter an award in its favor granting it the following relief:

a)  An award of the principal owed;

b)  Accrued interest through the date of any award;

c)  Default interest from the date of Respondents' default through the date of any award;

d)  Post-judgment interest at the default rates contained in the parties' agreements;

e)  A constructive trust on the Highland Park Mansion and any proceeds from the Louisiana State Court action; and

f)  All other and further relief to which Plaintiff may show itself to be justly entitled;

13

Respectfully Submitted,


  /s/ Marc D. Katz
Marc D. Katz
State Bar No. 00791002
marckatz@andrewskurth.com
Charles L. Perry
State Bar No. 15799900
charlesperry@andrewskurth.com
James C. Bookhout
State Bar No. 24087187
jamesbookhout@andrewskurth.com
**ANDREWS KURTH LLP**
1717 Main Street, Suite 3700
Dallas, Texas 75201
Telephone:  (214) 659-4400
Facsimile:   (214) 659-4401

**ATTORNEYS FOR PLAINTIFF
GOLDMAN SACHS BANK USA**

14

# EXHIBIT A



**TERM (COMMITTED LOAN)**

**LOAN AGREEMENT**

between

GOLDMAN SACHS BANK USA,
as Lender

and

**MICHEL B. MORENO and TIFFANY C. MORENO, jointly and severally,**
as Borrower

# LOAN AGREEMENT

This Loan Agreement (this "**Agreement**"), is between GOLDMAN SACHS BANK USA (together with its successors and permitted assigns, the "**Lender**"), and the Borrower or Borrowers identified on the signature pages hereto (the "**Borrower**"), and is dated as of the date first written on the Lender's signature page hereto (the "**Effective Date**").

ARTICLE I

DEFINITIONS

As used in this Agreement:

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.

"**Agreement**" has the meaning given to that term in the Preamble of this Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"**Applicable Margin**" means a rate equal to five percent (5.00%) per annum.

"**Bank Official**" means an executive officer, director, or principal shareholder of the Lender or any Company of which the Lender is a subsidiary or any other subsidiary of such Company.

"**Base Rate**" means the rate of interest quoted in the print edition of The Wall Street Journal, Money Rates Section as the U.S. Prime Rate, as in effect from time to time.  The Base Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.  The Lender may make commercial loans or other loans at rates of interest at, above or below the Base Rate.

"**Base Rate Loan**" means a Loan which bears interest at a rate determined by reference to the Base Rate.

"**Borrower**" has the meaning given to that term in the Preamble of this Agreement.

"**Business Day**" means, with respect to any borrowing or payment, a day other than Saturday or Sunday on which banks are open for business in New York, New York.

"**Co-Borrower**" has the meaning given to that term in Section 8.14 of this Agreement.

"**Collateral**" has the meaning given to such term in the applicable Security Document.

"**Company**" means any corporation, partnership, trust (business or otherwise), association, joint venture, pool syndicate, sole proprietorship, unincorporated organization, or any other form of business entity not specifically listed, provided that "Company" does not include: (1) an insured depository institution (as defined in 12 U.S.C. 1813); or (2) a corporation the majority of the shares of which are owned by the United States or by any State.

"**Constituent Instruments**" means the certificate of incorporation and by-laws of a corporation; the certificate of limited partnership and agreement of limited partnership of a limited partnership; the partnership agreement of a general partnership; the certificate of formation and operating or comparable agreement of a limited liability company; and the comparable instruments for any other entity, including, with respect to a trust, any agreement or instrument creating such trust.

"**Default Interest**" has the meaning given to that term in Section 2.2 of this Agreement.

"**Effective Date**" has the meaning given to that term in the Preamble of this Agreement.

"**Event of Default**" has the meaning given to that term in Section 6 of this Agreement.

"**Goldman Affiliated Group**" means the Lender and GS&Co., together with their present and future Affiliates.

"**GS&Co.**" means Goldman, Sachs & Co., a broker-dealer registered with the United States Securities and Exchange Commission, acting in its capacity as Securities Intermediary and custodian with respect to the Securities Account.

"**Indemnified Liabilities**" has the meaning given to that term in Section 8.10 of this Agreement.

"**Indemnified Person**" has the meaning given to that term in Section 8.10 of this Agreement.

"**Interest Payment Date**" means with respect to any Loan (whether a Base Rate Loan or a LIBOR Loan), the tenth (10th) day of each month commencing on the tenth (10th) day of the month immediately following the month in which the Effective Date occurs.

"**Lender**" has the meaning given to that term in the Preamble of this Agreement.

"**Lending Office**" means the Lender's office at 200 West Street, New York, NY 10282-2198, or such other office as Lender may designate in writing from time to time to Borrower.

"**LIBOR**" means, with respect to any LIBOR Reset Period, the rate of interest at which deposits in U.S. dollars are offered to major banks in the London interbank market for a **thirty (30)** day period on the day that is two (2) LIBOR Business Days prior to the commencement of such LIBOR Reset Period, based on information presented by any interest rate reporting service of recognized standing selected by the Lender, or if Lender determines that no interest rate reporting service has presented such information, the rate of interest at which deposits in Dollars are offered to major banks in the London interbank market for a **thirty (30)** day period on the day that is two (2) LIBOR Business Days prior to the commencement of such LIBOR Reset Period by any bank reasonably selected by Lender. Under the terms of this Agreement, the applicable "LIBOR" rate is used by the Lender as a reference rate. The use of **thirty (30)** day LIBOR as a reference rate does not mean the Borrower will actually pay interest on the Loan pursuant to a **thirty (30)** day contract or any other interest rate contract. Instead, the effective interest rate under this Agreement will adjust at the beginning of each LIBOR Reset Period as described further in Section 2.2.

"**LIBOR Business Day**" means a Business Day on which commercial banks are open for dealings in U.S. dollar deposits in the London interbank market.

"**LIBOR Loan**" means any Loan which bears interest at a rate determined by reference to LIBOR.

"**LIBOR Reset Period**" means (i) as to the initial LIBOR Loan and any other LIBOR Loan made during the same month as the initial LIBOR Loan, the period commencing on the date the first LIBOR Loan is made under this Agreement and ending on the last calendar day of the month during which such initial LIBOR Loan is made, and (ii) as to any LIBOR Loan made or continued after such month, the period commencing on the first calendar day of the month during which such subsequent LIBOR Loan is made or, with respect to a LIBOR Loan that is continued, the period commencing on the first calendar day of the month immediately following the end of the prior LIBOR Reset Period, and ending on the earlier of (a) the last calendar day of the month during which such LIBOR Loan is made or most recently continued and (b) the Maturity Date.

"**Loan**" has the meaning given to that term in Section 2.1 of this Agreement.

"**Loan Documents**" means this Agreement, the Note, each of the agreements listed on Schedule I hereto (if any), any other Security Documents and each certificate, agreement or document made or entered into by the Borrower with or in favor of the Lender in connection with or pursuant to any of the foregoing.

"**Loan Party**" means any Borrower or Pledgor under this Agreement or any other Loan Document.

"**Maintenance Value**" has the meaning given to such term in the applicable Security Document.

"**Maturity Date**" means the earlier to occur of (i) February 15, 2014 and (ii) the date the Obligations become due and payable pursuant to Section 7.1 hereof.

"**Note**" has the meaning given to that term in Section 2.1 of this Agreement.

"**Notice of Borrowing**" has the meaning given to that term in Section 3.1(a)(iv) of this Agreement.

"**Obligations**" means all unpaid principal of, and accrued and unpaid interest due on, the Note and all other obligations, interest, fees, charges and expenses of the Borrower to the Lender arising under or in connection with the Loan Documents.

"**OFAC**" has the meaning given to that term in Section 4.7 of this Agreement.

"**Person**" means any corporation, natural person, firm, joint venture, partnership, trust, unincorporated organization, enterprise, government or any department or agency of any government.

"**Pledgor**" means the one or more Persons, if any, that executes and delivers a Security Agreement in connection with this Agreement. See Schedule I for the definition of "Security Agreement".

"**Regulation U**" means Federal Reserve Board Regulation U, 12 CFR Part 221, as amended from time to time, and any successor regulation or statute.

"**Returned Payment**" has the meaning given to that term in Section 8.15 of this Agreement.

"**Securities**" means stocks, bonds, securities entitlements, financial assets or other securities or investment property (as such terms are defined in the UCC).

"**Securities Account**" has the meaning given to the term "Brokerage Account" in the applicable Security Document, if any.

"**Securities Intermediary**" has the meaning given to such term in the applicable Security Document, if any.

"**Security Documents**" means, collectively, each of the agreements listed on Schedule I hereto and any other agreements, instruments, documents, financing statements, notices of assignment of accounts, schedules of accounts assigned, mortgages and other written matter necessary or reasonably requested by the Lender to perfect, and maintain perfected, the Lender's security interest in the Collateral.

"**Solvent**" means, when used with respect to any Person, that at the time of determination: (i) the fair value of the assets of such Person, at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise, (ii) the present fair saleable value of the property of such Person will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, and (iii) such Person will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured.  For the purposes of determining whether a Person is Solvent, the amount of any contingent liability shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that reasonably can be expected to become an actual or matured liability.

"**Trust**" means collectively, MBM 2011 MGH Grantor Retained Annuity Trust, MBM 2011 DOH Grantor Retained Annuity Trust, TCM 2011 MGH Guarantor Retained Annuity Trust and TCM 2011 DOH Grantor Retained Annuity Trust.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York.

"**USA Patriot Act**" has the meaning given to that term in Section 4.7 of this Agreement.

All undefined terms contained in this Agreement shall, unless the context indicates otherwise, have the meanings provided for by the UCC to the extent the same are used or defined therein.  The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole, including the Exhibits and Schedules hereto, as the same may from time to time be amended, modified or supplemented, and not to any particular section, subsection or clause contained in this Agreement.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter.

ARTICLE II

THE LOAN

2.1      Loan.  Subject to satisfaction of the conditions set forth in Article III hereof, the Lender agrees, on the terms and conditions set forth in this Agreement, to make a term loan in the principal amount up to $25,000,000 (each advance of such principal amount or amounts, a "**Loan**" and collectively, the "**Loans**") to the Borrower with an initial advance of $25,000,000 on the date hereof.  On the Maturity Date the Borrower shall repay in full in cash the then outstanding balance of the Loan.  The obligation of the Borrower to repay the principal amount of the Loan, and any and all interest which accrues thereon, shall be evidenced by a promissory note executed and delivered by the Borrower in the form of Exhibit A hereto (the "**Note**").  Amounts of the Loan prepaid may not be reborrowed.  The Loan hereunder shall be made upon submission by Borrower to Lender of a completed Notice of Borrowing.

2.2      Interest.  Except as otherwise expressly set forth herein, all Loans hereunder shall be LIBOR Loans.

(a)  Interest on LIBOR Loans shall accrue at a per annum rate equal to the sum of (i) LIBOR for the then-current LIBOR Reset Period plus (ii) the Applicable Margin.

(b)      To the extent any LIBOR Loan is converted to a Base Rate Loan or any Base Rate Loan is made to any Borrower, in each case, whether pursuant to Sections 2.2(e) or 2.6 or by mutual agreement between the Lender and such Borrower, interest on such Base Rate Loans shall accrue at a per annum rate equal to (i) the Base Rate Plus (ii) the Applicable Margin.

(c)      Notwithstanding the foregoing, during any period in which an Event of Default shall exist, the principal balance of all Obligations shall bear interest at a rate that is four percent (4%) per annum in excess of the interest rate otherwise

applicable to such Obligations from time to time until such Event of Default is cured or waived as provided for herein.  Any interest payable pursuant to the foregoing proviso ("**Default Interest**") which is not paid when due may be added to the outstanding principal sum of the Loans and itself bear interest accordingly to the extent permitted by applicable law.

(d)  Accrued interest on the Loans shall be payable in arrears on (i) each applicable Interest Payment Date and (ii) on the Maturity Date, underlined provided that any time an Event of Default exists, all accrued interest on the Loans, including, without limitation, Default Interest, shall be payable on demand by the Lender.  Each determination made by the Lender pursuant to the provisions hereof shall be conclusive and binding on the Borrower in the absence of manifest error.  Provided no Event of Default exists at the end of a LIBOR Reset Period, each LIBOR Loan shall automatically continue as a LIBOR Loan for an additional LIBOR Reset Period.  Interest shall be calculated for actual days elapsed on the basis of a 360-day year. Notwithstanding anything contained herein to the contrary, Lender shall never be entitled to receive, collect or apply as interest on the Loans any amount in excess of the maximum rate of interest permitted to be charged by applicable law.

(e)  If the Lender determines that for any reason adequate and reasonable means do not exist for determining LIBOR for any LIBOR Reset Period, the Lender will promptly so notify the Borrower.  Thereafter, the obligation of the Lender to make or maintain LIBOR Loans hereunder shall be suspended until the Lender revokes such notice in writing and all LIBOR Loans, on the Interest Payment Date, shall automatically convert into Base Rate Loans.  Upon the revocation of such notice by the Lender, unless there then exists an Event of Default, all such Base Rate Loans shall automatically convert into LIBOR Loans on the Interest Payment Date following the revocation of such notice.

2.3  Method of Payment.  All payments hereunder for principal, interest and other amounts shall be made in lawful money of the United States of America and in immediately available funds to the Lending Office, or such other account as Lender may designate in writing from time to time to Borrower no later than noon (New York City time) on the date when due.  The Borrower and Lender agree that on each Interest Payment Date, Lender shall debit the amount of accrued interest due hereunder from the Securities Account, or such other account designated by the Lender from time to time and apply such amounts in payment and satisfaction of such amounts due.  In the event that there are insufficient funds on deposit in the Securities Account (or such other designated account) on any Interest Payment Date, the Borrower shall make such funds immediately available to the Lending Office or such other account as Lender may designate.  If any principal payment hereunder becomes due and payable on a day other than a Business Day, such payment date shall be extended to the next succeeding Business Day, and interest thereon shall be payable at the then applicable rate during such extension. The Borrower agrees that interest amounts payable hereunder which are not paid when due may be added to the outstanding principal sum of the Loans and itself bear interest accordingly to the extent permitted by applicable law.

2.4  [Intentionally Omitted].

2.5  Optional Prepayments.  The Borrower may, at its option, upon notice as provided below, prepay at any time, or from time to time, in whole or in part, the Loan in an amount not less than $100,000.

The Borrower will give the Lender written notice of each optional prepayment under this Section 2.5 not less than two (2) Business Days prior to the proposed date of such prepayment.  Each such notice shall specify such requested prepayment date and the aggregate principal amount of the Loan to be prepaid on such date.   Once such notice is given, the payment amount specified in such notice shall be due and payable on the date specified, together with any other amounts then due, if any.

2.6  Illegality.  If the Lender determines that the introduction of any requirement of law, or any change in any requirement of law, or in the interpretation or administration of any requirement of law, has made it unlawful, or that any central bank or other governmental authority has asserted that it is unlawful, for the Lender to make LIBOR Loans, then the Borrower shall, upon its receipt of notice of such fact and demand from the Lender, prepay in full such LIBOR Loans then outstanding, together with interest accrued thereon, either on the last day of the LIBOR Reset Period thereof, if the Lender may lawfully continue to maintain such LIBOR Loans to such day, or immediately (together with any amount payable pursuant to Section 2.7), if the Lender may not lawfully continue to maintain such LIBOR Loans.  If the Borrower is required to so prepay the LIBOR Loans, then concurrently with such prepayment, the Lender shall make available to the Borrower a Base Rate Loan in the amount of such repayment.  Each Base Rate Loan shall remain a Base Rate Loan until the Borrower receives notice to the contrary from the Lender.

2.7  Funding Costs.  Without limiting any other provisions contained herein, the Borrower shall reimburse the Lender and hold it harmless from any loss, increased costs or expense which the Lender may sustain or incur as a consequence of:

(a)  the failure by the Borrower to make on a timely basis any payment of principal of the Loan;

(b)  the prepayment or other payment (including after acceleration thereof) of all or part of any LIBOR Loan to the extent the Lender actually incurs any breakage costs associated with such prepayment or payment; or

(c)  the introduction of or any change in the interpretation of any law or regulation (other than in each case any introduction or change in interpretation relating to withholding taxes, which is governed by Section 2.8) or the compliance by the Lender with any guideline or request from any central bank or other governmental authority (whether or not having the force of law), including, without limitation, the introduction of, change of, change by any central bank or other governmental authority in the interpretation or administration of, or compliance by the Lender or corporation or other entity controlling the Lender with, any capital adequacy regulation.

4

2.8     Taxes.  All payments by the Borrower under this Agreement shall be made free and clear of any restrictions or conditions, without set off or counterclaim, and free and clear of, and without any deduction or withholding whether for or on account of tax or otherwise.  If any such deduction or withholding is required by law to be made by the Borrower or any other Person (whether or not a party to, or on behalf of a party to this Agreement) from any sum paid or payable by, or received or receivable from, the Borrower, the Borrower shall pay in the same manner and at the same time such additional amounts as will result in the Lender's receiving and retaining (free from any liability other than tax on its overall net income) such net amount as would have been received by it had no such deduction or withholding been required to be made.

2.9     Purpose.  The Borrower shall use the proceeds of the Loan to make an equity investment in Green Field Energy Services, Inc. ("**Green Field**") which shall be used as working capital to fulfill equipment orders and to make and equity investment in Turbine Generation Services, L.L.C.  The Borrower will not, directly or indirectly, use any part of such proceeds for the purpose of (a) purchasing, improving, or otherwise investing in residential real estate, whether a primary residence of the Borrower or otherwise; or (b) purchasing or carrying any margin stock within the meaning of Regulation U or to extend credit to any Person for the purpose of purchasing or carrying any such margin stock in contravention of Regulation U.  THE BORROWER MUST OBTAIN THE PRIOR APPROVAL OF THE LENDER IF THE INTENDED PURPOSE OF THE FACILITY IS DIFFERENT FROM THE PURPOSE DISCLOSED BY THE BORROWER IN THIS SECTION 2.9 OR IN ANY FEDERAL RESERVE FORM U-1 SUBMITTED BY THE BORROWER TO THE LENDER.

(b) Unless disclosed to the Lender in the Notice of Borrowing and approved by the Lender, the Borrower agrees that the funds received from the Lender hereunder shall not be used for the benefit of, or transferred to, any affiliate of the Lender and, in particular, that such funds shall not be used for the acquisition of equity or the refinancing of the indebtedness of companies in which affiliates of the Lender hold debt or equity positions.

2.10     Application of Payments.  All payments received by or on behalf of the Borrower with respect of the Obligations shall be applied thereto in the order and manner Lender determines in its sole discretion.

2.11     Loan Accounts.  In accordance with ordinary procedures, the Lender shall record on its books and records the amount of the Loan made, the interest rate applicable, all payments of principal and interest thereon and the principal balance thereof from time to time outstanding.  Such record shall, absent demonstrable error, be conclusive evidence of the amount of the Loan made by the Lender to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder (and under the Note) to pay any amount owing with respect to the Loan or provide the basis for any claim against the Lender.

ARTICLE III

CONDITIONS PRECEDENT

3.1     Deliveries.     (A)     The obligation of the Lender to make the initial Loan hereunder shall be subject to satisfaction of the following conditions precedent:

(a)     The Borrower shall have furnished to the Lender, or caused to be furnished to the Lender (unless otherwise waived by the Lender in writing), the following, each in form and substance satisfactory to the Lender and its counsel, each dated as of the Effective Date (or such other date as shall be acceptable to the Lender) and duly executed by each Loan Party that is a party thereto:

this Agreement;

the Note;

each of the Security Documents;

a written notice of borrowing substantially similar to the form of Exhibit B attached hereto signed by the Borrower (a "**Notice of Borrowing**");

if the Loan is to be secured directly or indirectly by margin stock, the appropriate "Federal Reserve Form, Statement of Purpose for an Extension of Credit Secured by Margin Stock," completed in a manner satisfactory to the Lender; and

such other documents and information as the Lender or its counsel may reasonably request to enable Lender to obtain final credit approval.

(b)     The Lender shall have received a favorable opinion of counsel addressed to the Lender covering such matters relating to the transactions contemplated hereby as reasonably requested by the Lender and substantially in a form acceptable to the Lender.

(c)     The Lender shall be satisfied with its review of the Constituent Instruments of each Loan Party (if applicable).

5

3.2     Fees and Expenses.  On the Effective Date, the Borrower shall have paid all fees and expenses incurred or payable by the Lender (including, without limitation, reasonable fees and expenses of counsel for the Lender), arising in connection with the negotiation, preparation and execution of this Agreement and the other Loan Documents and all other instruments and documents to be delivered hereunder or thereunder or arising in connection with the transactions contemplated hereunder or thereunder, and the Borrower hereby authorizes the Lender to deduct all such amounts from the aggregate proceeds of the Loan. The structuring fee due at closing shall be $625,000 (which equals 2.5% of the maximum principal amount of Loan which is $25,000,000).

ARTICLE IV

REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lender that on the date hereof:

4.1     Name, Etc.  The Borrower's legal name is correctly set forth on the signature page hereto and the other information regarding the Borrower set forth in this Agreement, including without limitation, below Borrower's signature hereto is true, correct and complete on the date hereof.

4.2     Enforceable Obligations.  The Borrower (a)  if an individual, is competent to enter into this Agreement and the other Loan Documents to which the Borrower is a party and to perform the Borrower's obligations hereunder and thereunder and (b) if a corporation, limited liability company, partnership, trust or other legal entity, is duly organized and validly existing in good standing under the laws of its jurisdiction of formation, is duly qualified and in good standing in all such foreign jurisdictions where its business or property so requires and has the power and authority to enter into this Agreement and the other Loan Documents to which it is a party.  The execution, delivery and performance by the Borrower of the Loan Documents to the extent it is a party thereto and the consummation of the transactions contemplated by this Agreement and the other Loan Documents have been duly authorized by all necessary action, including necessary actions by directors, members, shareholders or trustees, as the case may be and: (i) will not violate any law or regulation, or any order or decree of any court or governmental instrumentality (including Regulations U and X of the Board of Governors of the Federal Reserve System); (ii) if the Borrower is a corporation, limited liability company, partnership, trust or other legal entity, will not violate any Constituent Instruments of the Borrower, (iii) will not conflict with or result in the breach or termination of, constitute a default under, or accelerate any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which the Borrower is a party or by which the Borrower or any of its property is bound; (iv) will not result in the creation or imposition of any lien upon any of the property of any Loan Party other than those in favor of the Lender, all pursuant to the Loan Documents; and (v) do not require the consent or approval of any governmental body, agency, authority or any other Person, except such consents as have been obtained.  Each of the Loan Documents to which the Borrower is a party when delivered hereunder shall constitute a legal, valid and binding obligation of the Borrower, enforceable against it in accordance with its terms.

4.3     Taxes; Compliance with Laws.  The Borrower has filed or caused to be filed all federal, state and local tax returns that are required to be filed by the Borrower, which returns were true, accurate and complete in all material respects, and has paid or caused to be paid all taxes shown to be due and payable on such returns or on any assessments received by the Borrower.  The Borrower is not in violation in any material respect of any applicable law, rule, regulation, order, judgment, writ or decree of any governmental authority applicable to Borrower or its property.

4.4     Solvency.  After giving effect to the Loan, the Borrower shall be Solvent.

4.5     Complete Disclosure.  All factual information including, without limitation, all financial statements, furnished by or on behalf of the Borrower to the Lender for purposes of or in connection with this Agreement and the other Loan Documents is, and all other such factual information hereafter furnished by or on behalf of the Borrower will be, true and accurate in all material respects on the date as of which such information is furnished and not incomplete by omitting to state any fact necessary to make such information not misleading at such time in light of the circumstances under which such information is provided. Since the date of the Borrower's most recent financial statements, tax returns or other financial representations delivered or made to the Lender, there has been no material adverse change in the business, condition (financial or otherwise), obligations, performance, properties, or prospects of the Borrower.

4.6     Absence of Undisclosed Liabilities.  The Borrower has no material liabilities or obligations, either accrued, absolute, contingent or otherwise, other than (a) the Obligations and (b) the liabilities and obligations set forth in the financial statements and financial representations previously delivered or made to the Lender.

4.7     Foreign Assets Control Regulations, Etc.  The Borrower is not (i) in violation of the Trading with the Enemy Act of the United States of America (50 U.S.C. App. §§ 1 et seq.), as amended; (ii) on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("**OFAC**"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation; (iii) in violation of the USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 ("**USA Patriot Act**"); (iv) a Person designated under Section 1(b), (c) or (d) or Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders; or (v) to the best of its knowledge, engaging in any dealings or transactions, or is otherwise associated, with any of the foregoing blocked Persons.

4.8     No Default.  The Borrower is not, and after giving effect to this Agreement shall not be, in default in the payment or performance of any contractual obligation.

4.9     No Litigation.  There are no actions, suits, litigations, arbitrations, administrative or other legal proceedings, or investigations, pending or threatened, against the Borrower or any of the Collateral in which the Borrower has rights that will or could (a) have a material adverse effect on the business or affairs, condition (financial or otherwise), obligation, operations, performance, properties or prospects of the Borrower, or (b) affect the Borrower's ability to enter into and perform its obligations under this Agreement or any of the transactions contemplated by this Agreement.  There have not been any judgment(s) or other legal proceedings against the Borrower in the past seven (7) years.

4.10     Investment Company Act.  If the Borrower is organized as a corporation, limited liability company, partnership or other legal entity, the Borrower is not an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.  The Borrower is not subject to regulation under any federal or state statute or regulation which limits its ability to borrow money.

4.11     Transact Business.  If the Borrower is organized as a corporation, limited liability company, partnership or other legal entity, the Borrower has all the necessary right, power and authority to own Borrower's property and assets and to transact the business in which the Borrower is engaged.

4.12     Employee Retirement Income Security Act of 1974.  No Loan Party is (x) an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), subject to Title I of ERISA or a "plan" subject to the prohibited transaction provisions of Section 4975 of the Internal Revenue Code of 1986, as amended (an "ERISA Plan"), (y) a Person acting on behalf of any ERISA Plan, or (z) a Person the assets of whom constitutes assets of any ERISA Plan.

4.13     Bank Official.

(a)     The Borrower is not (i) a Company controlled by a Bank Official or by the spouse or child of a Bank Official, (ii) a political or campaign committee that benefits or is controlled by a Bank Official or by the spouse or child of a Bank Official or (iii) the spouse or child of a Bank Official.

(b)     If the Borrower is organized as a trust or an estate vehicle, neither the trustee nor the beneficiary of such trust or estate vehicle is a Bank Official or the spouse or the child of a Bank Official.


ARTICLE V

COVENANTS

For so long as the Loan remains outstanding under this Agreement, unless the Lender shall otherwise consent in writing, the Borrower shall:

5.1     Events of Default.  Give the Lender prompt written notice of any Event of Default under this Agreement or any other default under any other Loan Document or any other agreement that could, in the opinion of the Lender, have a material adverse effect on the Borrower.

5.2     Execution of Supplemental Instruments.  Execute and deliver to the Lender from time to time, upon demand, such supplemental agreements, statements, assignments, transfers, instructions, instruments or documents as the Lender may reasonably request, in order that the full intent of this Agreement may be carried into effect.

5.3     Obligations and Taxes.  Pay and discharge promptly when due all taxes, assessments and governmental charges or levies imposed upon it or upon its income or assets before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise, which, if unpaid, might give rise to liens or charges upon such assets or any part thereof; provided, however, that the Borrower shall not be required to pay and discharge or to cause to be paid and discharged any such tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings.

5.4     Litigation.  Give the Lender prompt written notice of the filing or commencement of any action, suit or proceeding against the Borrower, whether at law or in equity or by or before any court or any governmental authority, in each case, that could, in the opinion of the Lender, have a material adverse effect on the Borrower or where the amount demanded is in excess of $250,000.

5.5     USA Patriot Act, OFAC Compliance.  Provide such information and take such actions as are reasonably requested by the Lender in order to assist the Lender with compliance with the USA Patriot Act; and the Borrower shall at all times comply with OFAC and the USA Patriot Act.

5.6     Solvency.  At all times be Solvent.

5.7     Indebtedness.  Not, nor shall it permit any Trust to, create, incur, assume, guarantee or be or remain liable for, contingently or otherwise, or suffer to exist any indebtedness, except the Obligations and the existing indebtedness described in the financial statements and financial representations previously delivered or made to the Lender and other indebtedness not exceeding $1,000,000 in aggregate principal amount at any one time outstanding unless the prior written consent of the Lender is obtained.

5.8     No Permitted Pledges.  (a) Not permit the sale, transfer, assignment, exchange, pledge or other conveyance of any of the Collateral, including, without limitation, outstanding shares in Green Field.

(b)     Not permit, either directly or indirectly the assignment, pledge or other encumbrance of any of the Borrower's direct or indirect ownership interest in Integrated Pro Services, LLC ("**Integrated**").

5.9     Securities Accounts.  If applicable, except as permitted by the applicable Security Document, without the prior consent of the Lender, not close or cause to be closed, the Securities Account or withdraw, or cause to be withdrawn, any securities or other funds from the Securities Account.

5.10     Name, Etc.  Without the prior written consent of the Lender, such consent not to be unreasonably withheld, not change (a) Borrower's legal name, (b)  Borrower's address or (c) if the Borrower is an individual, his or her principal residence, or if the Borrower is a corporation, limited liability company, partnership, trust or other legal entity, its principal place of business, chief executive office, jurisdiction of organization or situs for administration.

5.11     Use of Proceeds.  Use all proceeds of the Loan only as permitted under Section 2.9 hereof.

5.12     Compliance with Laws.  Comply in all material respects, with all applicable laws, statutes, codes, ordinances, regulations, rules, orders, awards, judgments, decrees, injunctions, approvals and permits.

5.13     Financial Information.  Promptly upon the request of the Lender, but in any event no later than thirty (30) days after receipt of such request, deliver to the Lender copies of Borrower's most recently filed federal tax returns, bank and brokerage statements and other financial statements or information reasonably requested by Lender.

5.14     Green Field Operating Statements.  Borrower shall deliver to Lender copies of the monthly operating statements of Green Field within 10 days of the end of each calendar month.

5.15     Sale or Transfer.  Shall not sell or transfer, either directly or indirectly, any direct or indirect ownership interest in Integrated, unless such sale or transfer is on an arms' length basis, as determined by the Lender in its commercially reasonable discretion.  The Borrower shall provide at least fifteen (15) day's prior written notice of any proposed sale or transfer and upon the consummation of any transfer or sale of such interests, the Borrower shall deposit the net proceeds into a designated account, where such proceeds shall be held by the Lender as additional Collateral and upon the occurrence and continuance of an Event of Default, the Lender may, in its sole discretion, apply such proceeds in repayment of the Obligations hereunder.

ARTICLE VI

EVENTS OF DEFAULT

The occurrence of any one or more of the following events shall constitute a default hereunder (each, an "**Event of Default**"):

6.1     The Borrower (a) shall fail to pay any principal of any Loan hereunder or under the Note when due and payable; or (b) shall fail to pay any accrued interest on any Loan or any other amount owed hereunder or under any other Loan Document when due and such failure under this clause (b) continues for a period of five (5) days after such interest or other amount becomes due and payable.

6.2     The breach by any Loan Party of any other covenant contained in any Loan Document.

6.3     Any representation or warranty made in any Loan Document by any Loan Party shall be materially false or misleading as of the date such representation or warranty was made.

6.4     The occurrence of any default under any of the other Loan Documents or any other agreement between any Loan Party, on the one hand, and any member of the Goldman Affiliated Group, on the other hand or any other agreement that could have a material adverse effect on any Loan Party.

6.5     Any Loan Party shall (i) have an order for relief entered with respect to it under the Federal bankruptcy laws as now or hereafter in effect, (ii) make an assignment for the benefit of creditors, (iii) become insolvent or admit in writing its inability or refusal to pay debts as they become due, (iv) apply for, seek, consent to, acquiesce in, or have appointed for it or any substantial

8

portion of its property a receiver, custodian, trustee, examiner, liquidator or similar official, or (v) institute, or have commenced against it, any proceeding seeking an order for relief under the Federal bankruptcy laws as now or hereafter in effect or seeking to adjudicate it bankrupt or insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it.

6.6     The Security Documents shall for any reason fail to create a valid lien and security interest in the Collateral, or this Agreement or any of the other Loan Documents shall fail to remain in full force or effect, or any action shall be taken to discontinue or to assert the invalidity or unenforceability thereof.

6.7     An attachment or garnishment writ or the like is levied against all or any portion of the Securities Account or any Collateral.

6.8     Any indebtedness of any Loan Party to any entity, lender or other person (including any member of the Goldman Affiliated Group) to whom such Loan Party is indebted:  (i) is not paid when due nor within any applicable grace period in any agreement relating to such indebtedness, or (ii) becomes due and payable before its normal maturity by reason of a default or event of default, however described.

6.9     Final judgment for the payment of money is rendered against any Loan Party and within thirty (30) days from the entry of such judgment has not been discharged or stayed pending appeal or has not been discharged within thirty (30) days from the entry of a final order of affirmance on appeal.

6.10    The Lender otherwise deems its security interest in any of the Collateral insufficient, invalid or otherwise unenforceable or the Lender believes in good faith that the prospect of payment or other performance by any Loan Party is impaired, whether due to market volatility or liquidity of the Collateral or otherwise.

6.11    With respect to any Loan Party that is an individual, such Loan Party dies or becomes or is declared (by an appropriate legal authority) incompetent or of unsound mind. With respect to any Loan Party that is a corporation, limited liability company, partnership, trust or other legal entity, any event or circumstance shall occur which could reasonably result in the dissolution or liquidation of such Loan Party.

ARTICLE VII

ACCELERATION, WAIVERS, AMENDMENTS AND REMEDIES

7.1     Acceleration.  If any Event of Default described in Section 6.5 or Section 6.11 occurs with respect to the Borrower, the Obligations shall immediately become due and payable without any election, notice or action on the part of the Lender.  If any other Event of Default occurs, the Lender may declare the Obligations to be due and payable, whereupon the Obligations shall become immediately due and payable, without presentment, demand, protest or notice of any kind, all of which the Borrower hereby expressly waives.

7.2     Other Remedies.  Upon the occurrence and during the continuance of an Event of Default, the Lender (i) shall have, in addition to all other rights of the Lender, the rights and remedies of a secured party under the UCC, (ii) may proceed to protect and enforce the Lender's rights by suit in equity, action of law and/or other appropriate proceeding either for specific performance of any covenant or condition contained in this Agreement, any other Loan Document or in any instrument or document delivered to the Lender pursuant hereto or thereto, and (iii) in the exercise of any rights, remedies or powers granted in this Agreement, any other Loan Document and/or any such instrument or document, may proceed to declare the Obligations to be due and payable pursuant to Section 7.1 hereof and the Lender may proceed to enforce payment of such Obligations as provided herein or in any Loan Document, and may offset and apply toward the payment of such amount any indebtedness of the Lender to the Borrower.

Upon the occurrence and during the continuance of an Event of Default, the Lender in its discretion may also set-off any or all of the Obligations against any securities, cash or other property of the Borrower in the possession of the Lender or any other member of the Goldman Affiliated Group and against any obligations owed to the Borrower by the Lender or any other member of the Goldman Affiliated Group to the extent that it does not impact the Lender's ability to recover amounts owed to the Lender.  THE BORROWER UNDERSTANDS THAT PURSUANT TO THE TERMS OF THIS AGREEMENT THE BORROWER IS ALLOWING THE LENDER TO SET-OFF ANY OR ALL OBLIGATIONS OF THE BORROWER TO THE LENDER OR ANY OTHER MEMBER OF THE GOLDMAN AFFILIATED GROUP AND BY ALLOWING FOR SUCH AFFILIATE SET-OFF, THE BORROWER IS WAIVING ALL OF ITS RIGHTS TO LIMIT SET-OFF TO THOSE OBLIGATIONS WHICH ARE MUTUAL AS BETWEEN THE LENDER AND THE BORROWER.

7.3     Amendments.  The Lender and the Borrower may enter into written agreements supplemental hereto or the Loan Documents for the purpose of adding or modifying any provisions to the Loan Documents or changing in any manner the rights of the Lender or the Borrower hereunder or waiving any Event of Default hereunder.  To be effective, any such amendment or waiver must be in writing and signed by the Lender and the Borrower.

7.4     <u>Preservation of Rights; No Adverse Impact</u>.  No delay or omission of the Lender to exercise any right under this Agreement or any of the Loan Documents shall impair such right or be construed to be a waiver of any Event of Default or an acquiescence therein.  Any single or partial exercise of any such right shall not preclude other or further exercise thereof or the exercise of any other right.  All remedies contained in the Loan Documents, or afforded by law, shall be cumulative and all shall be available to the Lender until the Obligations have been indefeasibly paid in full in cash.

ARTICLE VIII

GENERAL PROVISIONS

8.1     <u>Survival of Representations</u>.  All representations and warranties of the Borrower contained in this Agreement shall survive delivery of the Loan Documents and the making of the Loan.

8.2     <u>Headings</u>.  Section headings in the Loan Documents are for convenience of reference only and shall not govern the interpretation of any of the provisions of the Loan Documents.

8.3     <u>Entire Agreement</u>.  The Loan Documents embody the entire agreement and understanding between the Borrower and the Lender and supersede all prior agreements and understandings between the Borrower and the Lender relating to the subject matter thereof.

8.4     <u>No Third Party Beneficiary</u>.  This Agreement shall not be construed so as to confer any right or benefit upon any Person other than the parties to this Agreement and their respective successors and assigns.

8.5     <u>Expenses</u>.  Upon the occurrence of an Event of Default, the Borrower shall pay to the Lender on demand all expenses reasonably incurred in connection with the collection and enforcement of all Obligations under the Loan Documents and in connection with any proceeding commenced by or against the Borrower under Title 11 of the U.S. Code including, without limitation, all attorneys' fees and expenses.

8.6     <u>Severability of Provisions</u>.  Any provision in any Loan Document that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions of the Loan Documents in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction, and to this end the provisions of all Loan Documents are declared to be severable.

8.7     <u>Nonliability of the Lender</u>.  The relationship between the Borrower and the Lender shall be solely that of borrower and lender.  The Lender shall have no fiduciary responsibilities to the Borrower under this Agreement, any other Loan Document or in connection with the transactions contemplated hereby or thereby.

8.8     <u>CHOICE OF LAW</u>.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN THOSE CONTAINING A CONTRARY EXPRESS CHOICE OF LAW PROVISION) SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF NEW YORK.

8.9     <u>BINDING ARBITRATION</u>.

(a)     THE PARTIES HERETO HEREBY WAIVE ALL RIGHTS TO A COURT TRIAL OR TRIAL BY JURY WITH RESPECT TO ANY DISPUTE, CONTROVERSY OR CLAIM UNDER THIS AGREEMENT AND THE BORROWER AGREES TO SETTLE BY ARBITRATION ANY CONTROVERSY BETWEEN THE BORROWER AND THE LENDER OR ITS AFFILIATES ARISING OUT OF OR RELATING TO THIS AGREEMENT.  THE ARBITRATION WILL BE CONDUCTED IN ACCORDANCE WITH THE RULES THEN IN EFFECT OF THE AMERICAN ARBITRATION ASSOCIATION.  ANY DISPUTE OR CLAIM INVOLVING A DOLLAR AMOUNT OF $50,000 OR LESS WILL BE BEFORE ONE ARBITRATOR, AND ALL OTHER DISPUTES AND CLAIMS WILL BE BEFORE A PANEL OF AT LEAST THREE ARBITRATORS.  THE AWARD OF THE ARBITRATOR OR A MAJORITY OF THE ARBITRATORS, AS THE CASE MAY BE, WILL BE FINAL, AND JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT HAVING JURISDICTION.

(b)     NO PARTY HERETO WILL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST THE OTHER PARTY WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION OR WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL:  (I) THE CLASS CERTIFICATION IS DENIED; (II) THE CLASS IS DECERTIFIED; OR (III) THE OTHER PARTY IS EXCLUDED FROM THE CLASS BY THE COURT.  SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

(c)     THE BORROWER AGREES TO HOLD HARMLESS THE SECURITIES INTERMEDIARY AND ITS AFFILIATES AND ITS DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS FROM ANY AND ALL CLAIMS, LIABILITIES, AND/OR DAMAGES, IN ANY WAY RELATED TO, OR ARISING OUT OF, OR IN CONNECTION WITH, THE BORROWER'S GRANTING OF THE SECURITY INTEREST OR THE LENDER'S EXERCISE OF RIGHTS UNDER THIS AGREEMENT OR THE

10

SECURITY DOCUMENTS, INCLUDING ANY ACTION OR INACTION BY THE SECURITIES INTERMEDIARY IN FOLLOWING THE LENDER'S INSTRUCTIONS REGARDING THE SECURITIES ACCOUNT IN ACCORDANCE WITH THIS AGREEMENT OR ANY OTHER SECURITY DOCUMENT.

(d)     THE BORROWER AND THE LENDER HEREBY FURTHER AGREE AS FOLLOWS:

THE BORROWER AND THE LENDER ARE EACH GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT, INCLUDING THE RIGHT TO A TRIAL BY JURY, EXCEPT AS PROVIDED BY THE RULES OF  THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED.

ARBITRATION AWARDS ARE GENERALLY FINAL AND BINDING; A PARTY'S ABILITY TO HAVE A COURT REVERSE OR MODIFY AN ARBITRATION AWARD IS VERY LIMITED.

THE ABILITY OF THE PARTIES HERETO TO OBTAIN DOCUMENTS, WITNESS STATEMENTS AND OTHER DISCOVERY IS GENERALLY MORE LIMITED IN ARBITRATION THAN IN COURT PROCEEDINGS.

THE ARBITRATOR(S) DO NOT HAVE TO EXPLAIN THE REASON(S) FOR THEIR AWARD UNLESS, IN AN ELIGIBLE CASE, A JOINT REQUEST FOR AN EXPLAINED DECISION HAS BEEN SUBMITTED BY ALL PARTIES TO THE PANEL AT LEAST 20 DAYS PRIOR TO THE FIRST SCHEDULED HEARING DATE.

ANY PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES AND/OR BANKING INDUSTRY.

THE RULES OF SOME ARBITRATION FORUMS MAY IMPOSE TIME LIMITS FOR BRINGING A CLAIM IN ARBITRATION. IN SOME CASES, A CLAIM THAT IS INELIGIBLE FOR ARBITRATION MAY BE BROUGHT IN COURT.

THE RULES OF THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED, AND ANY AMENDMENTS THERETO, SHALL BE INCORPORATED INTO THIS AGREEMENT.

8.10     Indemnity.  The Borrower hereby agrees to indemnify, defend and hold harmless the Lender and its officers, directors, employees, agents, representatives, successors and assigns (each, an "**Indemnified Person**") in connection with any losses, claims, damages, liabilities, obligations, penalties, actions, suits, costs, charges and expenses, including reasonable attorneys' fees, (i) of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement and any other Loan Document, or the transactions contemplated hereby or thereby, and with respect to any investigation, litigation or proceeding (including any bankruptcy, insolvency or appellate proceeding) related to this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby or the use of the proceeds of the Loan, whether or not any Indemnified Party is a party thereto and (ii) which may be incurred by or asserted against such Indemnified Person in connection with or arising out of any pending or threatened investigation, litigation, or proceeding (including any bankruptcy or insolvency proceeding) or any action taken by any Person, with respect to any environmental claim or suit arising out of or related to any property of the Borrower (all of the foregoing, the "**Indemnified Liabilities**").  Notwithstanding the foregoing, the Borrower shall have no obligation to any Indemnified Person for any Indemnified Liabilities to the extent arising from the gross negligence or willful misconduct of such Indemnified Person as determined in a final, non-appealable decision of a court of competent jurisdiction or of an arbitration panel. The Borrower hereby acknowledges and agrees that any member of the Goldman Affiliated Group that grants a security interest in any of its assets as collateral security for the Loan shall have all rights of subrogation against the Borrower.

8.11     Assignment, Etc.

(a)     The Lender may sell, assign, transfer or negotiate its rights and obligations under this Agreement and the other Loan Documents, in whole or in part at any time (i) to any other member of the Goldman Affiliated Group without notice to or consent of Borrower or any other Person or (ii) to any other bank or entity with net assets in excess of $100,000,000 so long as the Borrower consents to such sale, assignment, transfer or negotiation in writing (which consent shall not be unreasonably conditioned, withheld or delayed); provided that any such consent shall not be required if an Event of Default is then continuing. Borrower agrees to execute any additional or replacement Notes requested by Lender to further document any such sale, assignment, transfer or negotiation.  Any assignee or transferee of the Lender's rights and/or obligations shall be entitled to the full benefit of this Agreement to the same extent as if it were an original party in respect of the rights or obligations assigned or transferred to it.

(b)     The Lender may sell participating interests in the Loan owing to Lender, any Note held by such Lender or any other interest of such Lender under this Agreement and the other Loan Documents to one or more banks or other entities with net assets in excess of $100,000,000 ("**Participants**").  In the event of any such sale by the Lender of participating interests to a Participant, the Lender's obligations under this Agreement and the other Loan Documents shall remain unchanged, the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, the Lender shall remain the owner of its Loan and the holder of any Note issued to it in evidence thereof for all purposes under the Loan Documents, all amounts payable by the Borrower under this Agreement shall be determined as if the Lender had not sold such participating

interests, and the Borrower shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under the Loan Documents.

(c)        The Borrower may not assign its rights or obligations under this Agreement.  This Agreement shall be binding upon and inure to the benefit of the respective heirs, successors and permitted assigns of all the parties to this Agreement.  The Lender may at any time change the office through which it is acting for the purpose of this Agreement and may at any time act for this purpose through more than one office.  The Lender may disclose to an assignee or transferee permitted by this Agreement such information about the Borrower and the Loan Documents as it may deem appropriate.

(d)        Nothing herein shall prohibit Lender from pledging or assigning Loans to any Federal Reserve Bank in accordance with applicable law.

8.12    Giving Notice.  Unless otherwise provided herein, all notices and other communications provided to any party hereto under this Agreement or any other Loan Document shall be in writing or by facsimile and addressed or delivered to such party at its address as follows (unless otherwise designated in writing to the other parties):  (i) if to the Borrower, at the address set forth below the Borrower's name on the signature page hereto and (ii) if to the Lender, at the address set forth below the Lender's name on the signature page hereto.  Unless otherwise provided herein, any notice, if mailed and properly addressed with postage prepaid, shall be deemed given three (3) Business Days after being sent; any notice, if transmitted by facsimile, shall be deemed given when transmitted; any notice, if hand delivered, shall be deemed given on the date of such delivery; any notice, if mailed by overnight courier, shall be deemed given on the date of such delivery.

8.13    Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart.  Facsimiled and photocopied signatures to this Agreement shall be valid.  This Agreement shall be effective when it has been executed by the Borrower and the Lender.

8.14    Joint and Several Liability.  If the Borrower consists of more than one individual (each a "**Co-Borrower**"), references herein to "the Borrower" shall be read as "each Co-Borrower", "all Co-Borrowers", or "any or all Co-Borrowers", jointly and severally, whichever reading maximizes the Lender's rights and the Co-Borrowers' Obligations under this Agreement.  Each Co-Borrower agrees that each Co-Borrower will have authority on behalf of all Co-Borrowers to deal with the Lender as fully and completely as if each was the sole Borrower under this Agreement, all without notice to the other Co-Borrower(s).  Notwithstanding the foregoing, each Co-Borrower agrees that the Lender may, at its discretion, (a) require joint instruction from some or all of the Co-Borrowers before taking action under this Agreement and (b) if the Lender received instructions from any Co-Borrower that are, in the Lender's opinion, in conflict with instructions received from any other Co-Borrower, comply with any of these instructions and/or advise each Co-Borrower of the apparent conflict and/or take no action as to any of these instructions until it receives instructions from any or all of the Co-Borrowers that are satisfactory to the Lender.  Notice provided by the Lender to any Co-Borrower will be deemed notice to all Co-Borrowers.  Each Co-Borrower further agrees that he or she will be jointly and severally liable for the Obligations with each other Co-Borrower.

8.15    Reinstatement of Obligations.  If and to the extent the Lender or the Securities Intermediary receives any payment with respect to the Obligations or this Agreement and all or any part of such payment is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid by the Lender or the Securities Intermediary or paid over to a trustee, receiver, or any other entity, whether under any bankruptcy law or otherwise (any such payment is referred to as a "**Returned Payment**"), then this Agreement shall continue to be effective or shall be reinstated, as the case may be, to the extent of such payment or repayment by the Lender or the Securities Intermediary, and the indebtedness or part thereof intended to be satisfied by such Returned Payments shall be revived and continued in full force and effect as if the Returned Payment had not been made.

8.16    Certain Risks and Potential Conflicts of Interest.

(a)        (This Section 8.16(a) is applicable to the extent the Collateral includes "Funds" and "Fund Interests" (as such terms are defined in the Security Document) and such "Fund Interests" are issued by a member of the Goldman Affiliated Group.)  There are certain risks and potential conflicts of interest relating to the various capacities in which the Lender and its affiliates are acting in connection with the Funds (as defined in the applicable Security Document), the Collateral and acting as Lender, a summary description of which is set forth on Exhibit 8.16.  Borrower acknowledges that it has received, read and understood the disclosure set forth on Exhibit 8.16.

(b)        The Borrower acknowledges that, to the extent the Collateral includes municipal securities, shares of municipal bond funds or shares of mutual funds invested in municipal securities, a ratable portion of otherwise tax deductible interest expense incurred on the Loans may not be tax deductible.

8.17    USA Patriot Act.  The Lender hereby notifies the Borrower that, pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the USA Patriot Act.

8.18    Other Disclosures.

(a)        Each Loan Party acknowledges that it has received, read and understood the privacy notice set forth on Annex I.

(b)        Each Loan Party acknowledges that it has received, read and understood the notice of potential conflicts of interest set forth on Annex II.

[Remainder of page intentionally left blank; signature page follows]

13

IN WITNESS WHEREOF, the Borrower and the Lender have executed this Agreement as of the date set forth below the Lender's signature.

**LENDER:**

**GOLDMAN SACHS BANK USA**

By: _Chairperson_ _____

    Name: Gosia Lewis

    Title : Vice President

Effective Date: _May 15, 2013_

Address:  200 West Street
           New York, NY 10282-2198

Facsimile: 212-428-1474

**BORROWER:**

By: _____

Name:  Michel B. Moreno

Notice Address: 4023 Ambassador Caffery Pkwy

Suite 200

Lafayette, LA 70503

Facsimile: _337 - 988 - 6693_

By: _____

Name:  Tiffany C. Moreno

Notice Address: 4023 Ambassador Caffery Pkwy

Suite 200

Lafayette, LA 70503

Facsimile: _337 - 988 - 6693_

Signature Page to Term (Committed Loan) Loan Agreement

**SCHEDULE I**

Security and Pledge Agreement dated as of the Effective Date between the Pledgors party thereto and the Lender, as amended, restated, supplemented or otherwise modified from time to time, securing the Obligations, substantially in the form of Exhibit D hereto (the "Security Agreement").

Second Lien Mortgage dated as of the Effective Date between Borrower and Lender to be recorded in the Parish of Lafayette in the State of Louisiana.

Second Lien Deed of Trust dated as of the Effective Date between Borrower and Lender to be recorded in Harris County in the State of Texas.

Acknowledgment and Consent dated as of the Effective Date between ("Managing Trustee") and Borrower and acknowledged and agreed to by Lender.

Irrevocable Direction Letter regarding MBM 2011 MGH Grantor Annuity Trust, dated as of the date hereof, by Michel B. Moreno ("MBM"), as settlor, and acknowledged and agreed by Lender and Managing Trustee.

Irrevocable Direction Letter regarding MBM 2011 DOH Grantor Annuity Trust, dated as of the date hereof, by MBM, as settlor, and acknowledged and agreed by Lender and Managing Trustee.

Irrevocable Direction Letter regarding TCM 2011 MGH Grantor Annuity Trust, dated as of the date hereof, by Tiffany C. Moreno ("TCM"), as settlor, and acknowledged and agreed by Lender and Managing Trustee.

Irrevocable Direction Letter regarding TCM 2011 DOH Grantor Annuity Trust, dated as of the date hereof, by TCM, as settlor, and acknowledged and agreed by Lender and Managing Trustee.

Irrevocable Direction Letter regarding Notes Receivable, dated as of the date hereof, by MBM, and acknowledged and agreed to by Lender and MOR MGH Holdings, L.L.C ("MOR MGH Holdings").

Escrow Agreement , dated as of the date hereof, by Lender and acknowledged and agreed to by Borrowers and MOR MGH Holdings

**EXHIBIT A**

**(see attached)**

**NOTE**

Principal Amount:  $25,000,000.00                                                                                      May 15, 2013

       FOR VALUE RECEIVED, each of the undersigned Borrowers (jointly and severally if more than one Borrower) (the "**Borrower**") promises to pay to Goldman Sachs Bank USA (the "**Lender**"), at the Lending Office or such other place as the Lender or any holder hereof may from time to time designate, the principal sum of TWENTY-FIVE MILLION AND 00/100 DOLLARS ($25,000,000.00), or such lesser principal amount which has been advanced and remains outstanding from time to time, in United States Dollars and in immediately available funds as provided in that certain Loan Agreement of even date herewith between the Borrower and the Lender (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), together with interest on the unpaid principal amount hereof from time to time outstanding, at the rates and on the dates set forth in the Loan Agreement.  Interest shall be calculated on the basis of a three hundred sixty (360) day year and actual days elapsed.

       This Note is issued pursuant to, and is entitled to the benefits of, the Loan Agreement.  Reference hereby is made thereto for a statement of the terms and conditions under which this Note may be prepaid or its maturity date accelerated.  This Note is secured pursuant to the terms of the Loan Agreement and certain other Loan Documents and reference is made thereto for a statement of the terms and provisions thereof.  Capitalized terms used herein and not otherwise defined herein are used with the respective meanings attributed to them in the Loan Agreement.

       If any payment of principal or interest is not made when due hereunder (after giving effect to any applicable grace period), or if any other Event of Default shall occur for any reason, or if the Loan Agreement shall be terminated or not renewed for any reason whatsoever, then and in any such event, in addition to all rights and remedies of the Lender under the Loan Agreement or any other Loan Document, applicable law or otherwise, all such rights and remedies being cumulative and enforceable alternatively, successively and concurrently, the Lender may, at its option, declare any and all of the Borrower's obligations, liabilities and indebtednesses owing by Borrower under this Note, the Loan Agreement and any other Loan Document (collectively, the "**Obligations**") to be due and payable, whereupon the then unpaid balance thereof, together with all interest accrued thereon or expenses incurred in connection therewith shall forthwith become due and payable, together with all interest accruing thereafter at the rate set forth in the Loan Agreement until the Obligations, plus all costs and expenses of collection hereof, including, without limitation, reasonable attorneys' fees and expenses, are indefeasibly paid in full in cash.

       The Borrower shall pay all of the Lender's costs and expenses (including, without limitation, all reasonable attorneys' fees and expenses) incurred in connection with the enforcement of or preservation of rights under this Note on the terms provided in the Loan Agreement.

       No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Lender, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion.  The Borrower and every indorser or guarantor of this Note regardless of the time, order or place of signing waives presentment, demand, protest and notices of every kind and assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of Collateral, and to the addition or release of any other Person primarily or secondarily liable.

       None of the terms or provisions of this Note may be excluded, modified, or amended except by a written instrument duly executed on behalf of the Lender expressly referring hereto and setting forth the provision so excluded, modified or amended.  This Note shall be binding upon the successors and assigns of the Borrower and inure to the benefit of the Lender and its successors, endorsees and assigns.  If any term or provision of this Note shall be held to be invalid or unenforceable, in whole or in part in any jurisdiction, then such invalidity or unenforceability shall only effect such term or provision, and shall not effect such term or provision in any other jurisdiction or any other term or provision of this Note.

       All rights and obligations hereunder shall be governed by the laws of the State of New York (without giving effect to principles of conflicts or choice of laws) and this Note shall be deemed to be made under seal.

       IN WITNESS WHEREOF, the Borrowers have executed this Note as of the date first above written.

LEGAL_US_E # 104007571.9

**BORROWER:**

By: _____

Name:   Michel B. Moreno

By: _____

Name:   Tiffany C. Moreno

**EXHIBIT B**

**Notice of Borrowing**

Goldman Sachs Bank USA
222 S. Main Street
Salt Lake City, Utah 84101
Facsimile: 212-428-1474
Attention: Private Lending Services

Re:      Michel B. Moreno and Tiffany C. Moreno (jointly and severally, the "**Borrower**")

Reference is made to that certain Loan Agreement dated as of May 15, 2013 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**") between the Borrower and Goldman Sachs Bank USA ("**Lender**").  Capitalized terms used herein and not otherwise defined herein are used herein as defined in the Loan Agreement.

This is a Notice of Borrowing being delivered in accordance with the Loan Agreement.  The Borrower requests that Lender make an advance under the Loan Agreement in the amount of $minimum of $100,000] to be advanced on [May 15, 2013] [must be a Business Day at least two (2) Business Days from the date of this notice if a LIBOR Loan is requested] and that the proceeds be paid to the following account:

Bank Name:         _____

ABA Number:        _____

Account Name:      _____

Account #:          _____

For Credit To:       _____

Purpose of the Funding:

_____

_____

To the best of my knowledge, these funds will not be used to benefit the Lender or any of its affiliates.
☐ I Agree        ☐ I Disagree

If the purpose of draw is real estate related, please provide the name of the seller and/or the address of the property:

_____

The undersigned hereby certifies that no Event of Default currently exists under the Loan Agreement or any other Loan Documents and all representations and warranties under the Loan Agreement and such other Loan Documents are true and correct as of the date hereof.  If any portion of the advance requested is being used to purchase or carry margin stock, a revised Federal Reserve Form U-1 is attached hereto.

Date: _____, 2013

By: _____        By: _____

Name:  Michel B. Moreno                        Name:  Tiffany C. Moreno

**EXHIBIT C**

**Form of Guaranty**

**and/or**

**Form of Guaranty and Security Agreement**

N/A

**EXHIBIT D**

**Form of Security Agreement**

See Attached



## SECURITY AND PLEDGE AGREEMENT
## (COMMITTED LOAN)

**THIS SECURITY AND PLEDGE AGREEMENT** (this "**Agreement**") is made by and among the Pledgors identified on the signature pages hereto and each other Person that becomes a party hereto pursuant to Section 9(n) (each a "**Pledgor**"; and collectively, jointly and severally, the "**Pledgors**"), GOLDMAN SACHS BANK USA ("**Secured Party**"), and GOLDMAN, SACHS & CO. ("**Securities Intermediary**"), and dated as of the date first written on the Secured Party's signature page hereto.

### RECITALS:

A.     WHEREAS, each Pledgor has entered into the Loan Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), dated as of the date hereof, with Secured Party, as lender, pursuant to which the Secured Party has agreed to make certain advances to or for the account of each Pledgor;

B.     WHEREAS, each Pledgor is the legal and/or beneficial owner of the Collateral to be pledged by it hereunder;

C.     WHEREAS, it is a condition to the obligation of the Secured Party to make the loan under the Loan Agreement that each Pledgor execute and deliver this Agreement;

D.     WHEREAS, this Agreement is given by each Pledgor in favor of the Secured Party to secure the payment and performance of all of the Secured Obligations (as hereinafter defined); and

E.     WHEREAS, each Pledgor will derive benefit from the extension of credit pursuant to the Loan Agreement.

**NOW, THEREFORE**, in consideration of the foregoing premises, of the mutual covenants contained in this Agreement, and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties to this Agreement, intending to be legally bound, hereby agree as follows:

1.     **Definitions**.

(a)     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

(b)     The following terms shall have the following meanings:

"**Account Agreement**" means, as the context may require, that certain Account Agreement (as amended, restated, supplemented or otherwise modified from time to time in accordance with its terms) by and between the applicable Pledgor and the Securities Intermediary relating to such Pledgor's Brokerage Account.

"**Agreement**" has the meaning given to that term in the Preamble of this Agreement.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto, as hereafter amended.

"**Brokerage Account**" means, individually and collectively, as the context may require, the one or more Brokerage Accounts established with the Securities Intermediary pursuant to Section 3(a) of this Agreement, which shall be a securities account, including those certain accounts identified on Schedule A hereto, together with any and all subaccounts thereof, segregated accounts thereunder and cash or other accounts linked or related thereto, and any and all of their respective successor, replacement or substitute accounts.

"**Collateral**" has the meaning given to that term in Section 2 of this Agreement.

"**Consent Agreement**" means the one or more consent agreements, if any, entered into by and among the Secured Party, the applicable Pledgor, each Fund listed on Schedule A hereto (as such Schedule A may be amended, supplemented or otherwise modified from time to time) and the applicable manager of such Fund.

"**Dollars**" and the sign "**$**" each means the lawful currency of the United States of America.

"**Exchange Act**" means the United States Securities Exchange Act of 1934, as amended from time to time.

"**Excluded Property**" means the assets and property specified as "Excluded Property" on Schedule C, if any, and any other equity interest in a hedge fund or other type of alternative investment fund held in a Brokerage Account owned by a Pledgor if such fund has not executed and delivered to the Secured Party a consent agreement (in form and substance satisfactory to the Secured Party) acknowledging and agreeing to, among other things, the Lien in favor of the Secured Party.

"**Foreign Securities**" shall mean, unless otherwise agreed, Securities that are principally cleared and settled outside the United States.

"**Fund**" has the meaning given to that term in Schedule A hereto (as such Schedule A may be amended, supplemented or otherwise modified from time to time).

"**Fund Interests**" has the meaning given to that term in Section 2 of this Agreement.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any such encumbrance arising out of or pursuant to any conditional sale or other title retention agreement, any financing or similar statement or notice filed under any recording or notice statute, and any capital lease having substantially the same effect as any of the foregoing).

"**Loan Agreement**" has the meaning given to that term in the Recitals of this Agreement.

"**Notice of Exclusive Control**" has the meaning given to that term in Section 3(c)(iii) of this Agreement.

"**Permitted Liens**" means:

(a)     Liens for taxes, assessments, governmental charges or levies or statutory Liens for sums not yet due or being contested in good faith by appropriate proceedings;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business securing obligations that are not overdue for a period of more than thirty (30) days or that are being contested in good faith and by appropriate proceedings;

(c)     Liens securing judgments; *provided* that no Lien securing any judgment shall be a Permitted Lien to the extent such judgment is in an amount and for a period that would result in an Event of Default under the Loan Agreement; and

(d)     Securities Intermediary's Liens;

*provided* that the term "Permitted Liens" shall not include any Lien securing the Secured Obligations.

"**Pledged Interests**" means (i) the limited partnership interests, limited liability company membership interests and corporate stock of each Pledgor listed on Schedule D hereto, both separately and together as the context allows or requires, together with all limited partnership interest certificates, membership interest certificates, share certificates, options or rights of any nature whatsoever which may be issued or granted to or by the applicable Pledgor while this Agreement is in effect; (ii) any and all amounts, benefits, remittances or rights to payments relating to the applicable Pledgor's rights under the Trusts as identified on Schedule E, attached hereto and (iii) any and all amounts, benefits, remittances or rights to receivables relating to the applicable Pledgor's rights under those certain promissory notes by MOR MGH Holdings, LLC in favor of the applicable Pledgor as identified on Schedule F, attached hereto.

"**Pledgors**" has the meaning given to that term in the Preamble of this Agreement.

"**Proceeds**" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC in effect on the date hereof and, in any event, shall include, without limitation, all dividends or other income from the Pledged Interests, collections thereon or distributions with respect thereto.

"**Rule 144**" means Rule 144 promulgated under the Securities Act, as amended from time to time, and any successor regulation or statute.

"**Secured Obligations**" has the meaning given to that term in Section 2 of this Agreement.

"**Secured Party**" has the meaning given to that term in the Preamble of this Agreement.

"**Securities**" has the meaning given to that term in Section 2 of this Agreement.

"**securities account**" means a "securities account" as such term is defined in Section 8-501 of the UCC.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time.

"**Securities Intermediary**" has the meaning given to that term in the Preamble of this Agreement.

"**Securities Intermediary's Liens**" means Liens in favor of the Securities Intermediary incurred in the ordinary course of business of settling trades and to otherwise secure payment for property purchased or securities or property sold for the Brokerage Account and for commissions and fees owing to the Securities Intermediary in respect of the Brokerage Account.

"**Security Interest**" has the meaning given to that term in Section 2 of this Agreement.

"**UCC**" means the Uniform Commercial Code, as in effect from time-to-time.

2.      **Grant of Security Interest.**

As security for the full payment and performance of the Secured Obligations, each Pledgor hereby assigns, pledges, grants and conveys to the Secured Party a continuing first priority lien and security interest (the "**Security Interest**") on and in the following (collectively, the "**Collateral**"):

(a)      such Pledgor's Brokerage Account and all stocks, bonds, security entitlements, financial assets or other securities or investment property (as such terms are defined in the UCC) now or hereafter in the possession, custody or control of the Secured Party, including, without limitation, any of the foregoing from time to time deposited in or credited to such Brokerage Account (the "**Securities**");

(b)      all Pledged Interests;

(c)      all securities, moneys or property representing dividends, investment property, annuities, cash receivables or interest on any of the Pledged Interests, or representing a distribution in respect of the Pledged Interests, or resulting from a split-up, revision, reclassification or other like change of the Pledged Interests or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Interests;

(d)      all right, title and interest of Pledgor in, to and under any policy of insurance payable by reason of loss or damage to the Pledged Interests and any other Collateral,

(e)      all "accounts", "general intangibles", "instruments", "securities" and "investment property" (in each case as defined in the UCC) constituting or directly relating to the foregoing; and

(f)      all Proceeds of any of the foregoing (including, without limitation, any proceeds of insurance thereon).

Notwithstanding the foregoing, the "Collateral" shall not include any Excluded Property, if any.

For purposes of this Agreement, the term "Secured Obligations" shall mean, collectively, (i) all Obligations and (ii) all other obligations, interest, fees, charges and expenses of each Pledgor to any member of the Goldman Affiliated Group pursuant to any agreement between any Pledgor and any member of the Goldman Affiliated Group.

3.      **Brokerage Account; Control.**

(a)      **Establishment of the Brokerage Account**.  Each Pledgor directs the Securities Intermediary, and the Securities Intermediary agrees, subject to the terms of the Account Agreement, to establish a Brokerage Account, which shall be known by a title acceptable to the Secured Party to reflect the Secured Party's Security Interest in, and control over, such Brokerage Account pledged to the Secured Party pursuant to this Agreement as Collateral for the Secured Obligations.  Each Pledgor, the Secured Party, and the Securities Intermediary each acknowledge and agree that (a) in establishing and maintaining the Brokerage Account, the Securities Intermediary is acting as a securities intermediary, and (b) all property now or in the future in or credited to the Brokerage Account will be treated as financial assets under Article 8 of the UCC.  For purposes of perfecting the Secured Party's Security Interest in any Collateral not constituting security entitlements, the Secured Party hereby appoints the Securities Intermediary as its agent and the Securities Intermediary hereby accepts such appointment and acknowledges that any such Collateral in its possession is being held for the benefit of the Secured Party.  The parties hereto further agree that all securities or other property underlying any financial assets credited to the Brokerage Account shall be registered in the name of the Securities Intermediary, indorsed to the Securities Intermediary or indorsed in blank or credited to another securities account maintained in the name of the Securities Intermediary, and in no event will financial assets be registered in the name of any Pledgor, payable to the order of any Pledgor or specially indorsed to any Pledgor except to the extent that the foregoing shall have been indorsed to the Securities Intermediary or in blank.  The Pledgors and the Securities Intermediary each agree that, so long as this Agreement is in effect and Secured Obligations are outstanding, they shall not enter into any control or similar agreement with any third party with

3

respect to the Brokerage Account.  Notwithstanding any other agreement, New York shall be the Securities Intermediary's jurisdiction within the meaning of Section 8-110 of the UCC.

(b)      **Control; Certain Rights in the Brokerage Account.**

(i)      The Secured Party may give either oral or written entitlement orders and other instructions of any kind or character to the Securities Intermediary in regard to the Brokerage Account.  The Secured Party's instructions may include instructions to liquidate Collateral and other property in the Brokerage Account, to pay credit balances from the Brokerage Account to the Secured Party or its designees, or to move the Collateral from the Brokerage Account to the Secured Party or into an account in the Secured Party's name or the name of its designees.  The Securities Intermediary shall comply with the Secured Party's entitlement orders and other instructions in regard to the Brokerage Account without further consent by any Pledgor.  In following the Secured Party's instructions, the Securities Intermediary is under no duty to any Pledgor to determine whether an Event of Default or any other event has occurred or is continuing.  The Securities Intermediary shall neither accept nor comply with any entitlement orders or instructions from any Pledgor in regard to the Brokerage Account unless such entitlement orders or instructions have been given in accordance with Sections 3(c)(i) or 3(c)(ii) below or have been consented to in writing by the Secured Party.  The Secured Party is entitled to receive directly from the Securities Intermediary and, to the extent permitted by law and the internal policies of the Secured Party and the Securities Intermediary, each Pledgor irrevocably authorizes the Securities Intermediary to provide to the Secured Party, duplicates of any and all notices, confirmations, and statements of account that such Pledgor is entitled to receive with respect to the Brokerage Account and any and all information in its possession or control relating to the Brokerage Account.

(ii)      Notwithstanding the provisions of Section 3(b)(i), as between the Secured Party and the Pledgors, the Secured Party agrees that it will not issue an entitlement order or other instruction with respect to the Brokerage Account or deliver a Notice of Exclusive Control to the Securities Intermediary unless: (i) such entitlement order or instruction has been approved or authorized by the Pledgors having record ownership of the Brokerage Account, or (ii) an Event of Default has occurred and is continuing.  This Section 3(b)(ii) is intended solely for the benefit of the Pledgors and in no way constitutes a limitation on the Secured Party's control over the Brokerage Account, including the Secured Party's right, at any time, to issue entitlement orders or otherwise instruct the Securities Intermediary in accordance with the provisions of Section 3(b)(i).

(ii)      Notwithstanding the foregoing or any other provision of this Agreement to the contrary, so long as no Event of Default has occurred and is continuing, upon request from any Pledgor, the Secured Party, may permit such Pledgor to withdraw funds or assets from the Brokerage Account.

(iii)      Upon receipt by the Securities Intermediary of a notice from the Secured Party that the Secured Party shall have exclusive control over the Brokerage Account, which notice may be written or oral and in any form reasonably acceptable to the Securities Intermediary, but which Secured Party shall endeavor to conform to the form attached hereto as Annex I (any such notice, a "**Notice of Exclusive Control**"), the Securities Intermediary will not comply with any entitlement orders or other instructions concerning the Brokerage Account originated by any Pledgor or its representatives and will cease distributing interest or dividends on property in the Brokerage Account to the Pledgors.

(iv)      Without limiting any other right or remedy available to the Secured Party under this Agreement or at law or in equity, including, without limitation, the rights and remedies contemplated in Section 8, the Secured Party may, upon the occurrence and during the continuance of an Event of Default, (a) buy or sell any or all Securities or other property which may be in the Brokerage Account; (b) cancel any open orders; and (c) exercise or refrain from exercising, terminate, liquidate or close, modify, extend, obtain or reestablish, any or all outstanding contracts or options and any or all hedges, related or associated positions, securities, or transactions.

(c)      **Other Account Agreement Provisions; Subordination.**

(i)      Each Pledgor acknowledges that no credit card, funds transfer services or wire transfer, check writing or margin capabilities exist or will be permitted with respect to the Brokerage Account pledged by it hereunder.  This Agreement does not create any obligations or duties on the Securities Intermediary to any Pledgor greater than or in addition to the obligations and duties of the Securities Intermediary under the Account Agreement, except to the extent expressly provided in this Agreement.  If applicable, each Pledgor agrees to pay customary brokerage fees and commissions and other fees and expenses established by the Securities Intermediary pursuant to the Account Agreement in connection with any transactions in a Brokerage Account made in accordance with this Agreement and authorizes the Securities Intermediary to debit the Brokerage Account for such fees, commissions and expenses.

(ii)      So long as this Agreement is in effect and Secured Obligations are outstanding, the Securities Intermediary subordinates in favor of the Secured Party any security interest, Lien, or right of setoff it may have, now or in the future against the Brokerage Account and the property in the Brokerage Account, except for the Securities Intermediary's Liens.

4.      **[Intentionally omitted]**

5.      **[Intentionally omitted]**

4

6.	**Representations and Warranties**.  The Pledgors hereby jointly and severally represent and warrant to Secured Party that:

(a)	Each Pledgor's legal name is correctly set forth on the signature page hereto and the other information regarding such Pledgor set forth in this Agreement, including without limitation, below such Pledgor's signature hereto is true, correct and complete on the date hereof.  Each Pledgor has not changed such Pledgor's name, or, if applicable, principal residence in the past five (5) years or, if applicable, its jurisdiction of organization (which is correctly identified on the signature page hereto) in the past five (5) years.

(b)	Each Pledgor is and at all times will continue to be the sole direct, legal and beneficial owner of the Collateral pledged by it hereunder.  All Collateral is and shall be free and clear of any and all Liens, security interests, encumbrances and claims (other than the Lien and Security Interest created by this Agreement or any other Loan Document and any Permitted Liens).  Other than those delivered to the Secured Party, or its designee, no certificates, shares or other instruments evidencing the legal and/or beneficial interests in the Collateral exist or have been issued.

(c)	None of the Pledgors have authorized the filing of, and no Pledgor is aware of, any financing statements against any Pledgor that includes a description of collateral covering any part of the Collateral, other than any financing statements relating to the Security Interest granted to the Secured Party hereunder.

(d)	This Agreement creates a valid, perfected first priority Lien on and security interest in the Collateral in favor of Secured Party upon (i) in the case of Collateral in which a security interest may be perfected by filing a financing statement under the UCC, the completion of the filings and other actions specified on Schedule B, (ii) the delivery to the Secured Party of all Collateral consisting of certificated securities (as defined in the UCC), in each case properly endorsed for transfer to the Secured Party or in blank, (iii) in the case of Collateral in which a security interest may be perfected by control under the UCC,  the execution of this Agreement and (iv) the execution of a deposit account control agreement with respect to all deposit accounts of any Pledgor.

(e)	None of the Pledgors have consented to any Person complying with entitlement orders of any Person other than the Secured Party.

(f)	Except as otherwise provided by this Agreement, no consent, authorization, approval, license or other action by, and no notice to or filing with, any governmental authority or other Person, other than those that have been received or completed is required for (x) the execution, delivery or performance of this Agreement by the Pledgors (including, without limitation, the grant of the Lien hereunder), (y) the exercise by the Secured Party of the rights provided for in this Agreement or (z) the exercise by the Secured Party of the remedies in respect of the Collateral pursuant to this Agreement.  In the event that the Secured Party desires to exercise any remedies, voting or consensual rights or attorney-in-fact powers set forth in this Agreement and determines it necessary to obtain any approvals or consents of any governmental authority or any other Person therefor, then, upon the reasonable request of the Secured Party, each Pledgor agrees to assist and aid the Secured Party to obtain as soon as practicable any necessary approvals for the exercise of any such remedies, rights and powers.

(g)	In connection with the transfer and/or pledge of the Collateral to the Secured Party, all required notices to third parties have been given and any required consents or approvals from third parties have been obtained.

(h)	There are no actions, suits, litigations, arbitrations, administrative or other legal proceedings, or investigations, pending or threatened by or against any Pledgor in connection with, or arising out of, the Collateral.

(i)	None of the Securities included in the Collateral are entitled to the benefits of any registration rights agreement or similar agreement.

(j)	Either none of the Collateral consists of "restricted securities" within the meaning of Rule 144, or, with respect to any Collateral comprised of "restricted securities" as determined in accordance with Rule 144, such restricted securities are eligible for sale by such Pledgor under Rule 144 as of the date of the agreement without restriction.

(k)	Such Pledgor is not, within the preceding three months has not been, and during the term of this Agreement will not become, an Insider (as defined below) with respect to the issuer of any of the Securities.  "Insider" means a person who is an officer, director or beneficial owner of more than 10% of any class of equity securities of an issuer required to file reports pursuant to Section 16(a) of the Exchange Act or otherwise an affiliate of an issuer within the meaning of the Securities Act.

(l)	All Collateral which consists of equity interests has been validly acquired and validly issued, and is fully paid, to the extent such equity interests consist of stock, and non-assessable and no Collateral is evidenced or represented by any certificate, note or chattel paper other than such as has been delivered to and is in the possession of the Securities Intermediary.

(m)	If any Pledgor is organized as a corporation, limited liability company, partnership, trust or other legal entity, such Pledgor has all necessary right, power and authority to own such Pledgor's property and assets, to transact the business in which such Pledgor is engaged and to grant to the Secured Party a security interest in the Collateral, and has taken all

5

necessary action to authorize such Pledgor's execution, delivery and performance of this Agreement, including all necessary actions by directors, members, shareholders or trustees, as the case may be, and all filing and recordations.

(n)        If any Pledgor is organized as a corporation, limited liability company, partnership, trust or other legal entity, such Pledgor is not an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.  No Pledgor is subject to regulation under any federal or state statute or regulation which limits its ability to borrow money.

(o)        With respect to any Pledgor organized as a trust, the duly appointed and acting trustee of such Pledgor is set forth below such Pledgor's signature hereto and such trustee is not subject to the direction of any other person or persons except such person or persons as are also set forth below such Pledgor's signature hereto.

(p)        To the extent there are any Funds or Fund Interests listed on Schedule A hereto, (i) the Fund Interests constitute 100% of the Pledgor's interests in the Funds and such Fund Interests are not evidenced by certificates, (ii) no Pledgor has caused or requested any Fund to recognize or register any pledge of a Fund Interest, except in connection with the pledge of the Fund Interests hereunder and (iii) each Fund has opted into Article 8 of the UCC so that the Fund Interests are uncertificated securities within the meaning of Section 102(a)(18) of Article 8 of the UCC.

7.        **Covenants**.  During the term of this Agreement, each Pledgor hereby covenants as follows:

(a)        To the extent not already obtained, such Pledgor will promptly request and obtain executed consents required by the Secured Party in connection with the pledge of any limited liability company, limited partnership or other interests included in the Collateral.

(b)        Such Pledgor will promptly execute and deliver, and hereby authorizes the Secured Party to execute on behalf of such Pledgor, such further instruments and take such further actions as Secured Party may deem necessary or desirable to maintain or perfect the Security Interest, including without limitation, stock powers indorsed in blank, control agreements and UCC financing statements.

(c)        Such Pledgor will notify the Secured Party promptly of any changes in the Collateral that would affect the representations and will update all Schedules accordingly.

(d)        Such Pledgor will not sell, transfer or assign or create or permit to exist any Lien whatsoever created or arising, over any of its right, title, benefit or interest in and to the Collateral, except for any Lien or Security Interest granted by such Pledgor in favor of the Secured Party and Permitted Liens.

(e)        Such Pledgor will not issue any certificates, shares or other instruments evidencing the legal and/or beneficial interests in the Collateral.

(f)        Such Pledgor shall immediately notify the Secured Party as soon as it has knowledge or reasonable belief that the value of any Collateral has been or may be impaired, other than a de minimus change in the value of the Collateral.  Such Pledgor shall at all times act in good faith and in a lawful manner with respect to the Collateral and the discharge of its responsibilities hereunder in order to preserve and protect the Lien of the Secured Party in and to the Collateral.

(g)        Promptly upon the request of the Secured Party, but in any event no later than thirty (30) days after receipt of such request, deliver to the Secured Party copies of such Pledgor's most recently filed federal tax returns, bank and brokerage statements and other financial statements reasonably requested by the Secured Party.

8.        **Remedies in Case of Event of Default.**

(a)        Upon the occurrence and during the continuance of any Event of Default the Secured Party may exercise from time to time, any and all rights and remedies of a secured party under the UCC (whether or not in effect in the jurisdiction where such rights are exercised) or any applicable laws in effect in any jurisdiction where any rights and remedies may be asserted and any and all rights and remedies available to it as a result of this Agreement or any other Loan Document including, without limitation, (i) its right to instruct the Securities Intermediary to cancel any open orders and close any and all outstanding contracts; (ii) its right to liquidate any or all of the Collateral; (iii) its right to withdraw and/or sell any or all of the Collateral; (iv) its right to apply any or all of the Collateral as well as the proceeds of any such Collateral to the Secured Obligations; and (v) its rights under the Account Agreement; provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect to any Pledgor under the Bankruptcy Code, the Secured Obligations shall automatically become due and payable without further act of the Secured Party.  The Pledgors shall be jointly and severally responsible for any decrease in the value (determined by the Secured Party, in its commercially reasonable discretion) of the Collateral occurring prior to or during liquidation.  Upon the occurrence of an Event of Default the Secured Party in its discretion may also set-off any or all of the Secured Obligations against any securities, cash, or other property of any Pledgor in the possession of the Secured Party (directly or through the Securities Intermediary as the Secured Party's agent) or any other member of the Goldman Affiliated Group and against any obligations owed to any Pledgor by the Secured Party or any other member of the Goldman Affiliated Group to the extent that it does not impact the Secured Party's ability to recover amounts owed to the Secured Party.  **EACH PLEDGOR UNDERSTANDS THAT PURSUANT TO**

6

THE TERMS OF THIS AGREEMENT SUCH PLEDGOR IS ALLOWING THE SECURED PARTY TO SET-OFF ANY OR ALL SECURED OBLIGATIONS OF SUCH PLEDGOR TO THE SECURED PARTY OR ANY OTHER MEMBER OF THE GOLDMAN AFFILIATED GROUP AND BY ALLOWING FOR SUCH AFFILIATE SET-OFF, SUCH PLEDGOR IS WAIVING ALL OF ITS RIGHTS TO LIMIT SET-OFF TO THOSE SECURED OBLIGATIONS WHICH ARE MUTUAL AS BETWEEN THE SECURED PARTY AND SUCH PLEDGOR.

(b)        Upon the occurrence and during the continuance of any Event of Default the Secured Party may upon ten (10) days' prior written notice to the Pledgors of the time and place, with respect to the Collateral or any part thereof that shall then be or shall thereafter come into the possession, custody or control of the Secured Party or any of its agents, sell, lease, assign or otherwise dispose of all or any part of the Collateral, at such place or places as the Secured Party deems best, and for cash or for credit or for future delivery, at public or private sale, without demand of performance or notice of intention to effect any such disposition or of the time or place thereof (except such notice as is required above or by applicable statute and cannot be waived, and the Secured Party or any one else may be the purchaser, lessee, assignee or recipient of any or all of the Collateral so disposed of at any public sale (or, to the extent permitted by law, at any private sale) and thereafter hold the same absolutely free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise) of any Pledgor, any such demand, notice (other than the notice specified above) and right or equity being hereby expressly waived and released.  The Secured Party may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the sale may be so adjourned.  With respect to that portion of the Collateral that is perishable, threatens to decline speedily in value or is of a type customarily sold on a recognized market, the parties acknowledge and agree that the Secured Party need not furnish any Pledgor with notice of its intention to sell such Collateral.

(c)        Each Pledgor recognizes that, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws, or other laws, the Secured Party, in the exercise of its rights and remedies hereunder may, with respect to any sale of all or any part of the Collateral, limit purchasers to Persons who are not United States Persons and/or who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof and who otherwise satisfy applicable legal and contractual restrictions on the transfer of such Collateral.  Each Pledgor acknowledges that any such restricted or private sales may be at prices and on terms less favorable to such Pledgor than those obtainable through a public sale without such restrictions, but agrees that such sales are commercially reasonable so long as sales to the Secured Party or any of its affiliates are based on arm's length terms consistent with industry practice. Each Pledgor further acknowledges that any specific disclaimer of any warranty of title or the like by the Secured Party, will not be considered to adversely affect the commercial reasonableness of any sale of Collateral.

(d)        The Secured Party shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to this Section 8 conducted in a commercially reasonable manner. Each Pledgor hereby waives any claims against the Secured Party arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the indebtedness under the Loan Agreement, even if the Secured Party accepts the first offer received and does not offer the Collateral to more than one offeree.

9.        **General Provisions.**

(a)        **No Release.**  Nothing set forth in this Agreement shall relieve any Pledgor from the performance of any term, covenant, condition or agreement required on such Pledgor's part to be performed or observed under or in respect of any of the Collateral or from any liability to any Person under or in respect of any of the Collateral or shall impose any obligation on the Secured Party to perform or observe any such term, covenant, condition or agreement on such Pledgor's part to be so performed or observed or shall impose any liability on the Secured Party for any act or omission on the part of any Pledgor relating thereto or for any breach of any representation or warranty on the part of any Pledgor contained in this Agreement or under or in respect of the Collateral or made in connection herewith or therewith.

(b)        **Voting of Collateral**.  So long as no Event of Default has occurred and is continuing, the Secured Party agrees that each Pledgor shall retain their respective right to vote any of the assets constituting the Collateral and that it will use commercially reasonable efforts to notify each Pledgor with respect to voting any of the assets constituting Collateral, but any failure by the Secured Party to do so shall not subject the Secured Party to any liability of any kind whatsoever to any Pledgor or any other Person. Upon the occurrence and during the continuance of an Event of Default or as Secured Party may otherwise deem necessary in its sole discretion in connection with the exercise of its remedies hereunder, the Secured Party may vote or consent to actions in respect of Collateral without the need for any notice to, or consent of, any Pledgor. Prior to the occurrence of an Event of Default, the Secured Party agrees to accept voting instructions from each Pledgor; provided, however, that each Pledgor agrees that it will not instruct the Secured Party to vote in any way that is inconsistent with the terms of this Agreement, the Loan Agreement and the other Loan Documents and that, if in its commercially reasonable discretion, the Secured Party determines that any such instruction is inconsistent with any such Loan Document, the Secured Party need not follow such instruction and may vote in any manner the Secured Party deems appropriate.

(c)        **Reasonable Care.**  The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if such Collateral is accorded treatment substantially equivalent to that which the Secured Party, in its individual capacity, accords its own property consisting of similar instruments or interests, it being understood that the Secured Party shall have no responsibility for (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Collateral, whether or not the Secured Party has or is deemed to

7

have knowledge of such matters, or (ii) taking any necessary steps to preserve rights against any Person with respect to any Collateral.

(d)     **Expenses**.  Each Pledgor will pay promptly all amounts payable by it pursuant to the Loan Agreement. All such amounts shall be part of the Secured Obligations.

(e)     **No Waiver; Cumulative Remedies.**

(i)     No failure or delay on the part of the Secured Party in exercising any right, power or privilege hereunder and no course of dealing between any Pledgor and the Secured Party shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.  The rights, powers and remedies herein expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Secured Party would otherwise have.  No notice to or demand on any Pledgor in any case shall entitle such Pledgor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Secured Party to any other or further action in any circumstances without notice or demand.

(ii)     In the event that the Secured Party shall have instituted any proceeding to enforce any right, power or remedy under this Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Secured Party, then and in every such case, the Pledgors and the Secured Party shall be restored to their respective former positions and rights hereunder with respect to the Collateral, and all rights, remedies and powers of the Secured Party shall continue as if no such proceeding had been instituted.

(f)     **Application of Collateral**.  Secured Party shall apply Collateral received by it in the order prescribed in the Loan Agreement.

(g)     **Secured Party**.  The actions of the Secured Party hereunder are subject to the provisions of the Loan Agreement.  The Secured Party shall have the right hereunder to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking action (including, without limitation, the release or substitution of Collateral), in accordance with this Agreement and the Loan Agreement.  The Secured Party may employ agents and attorneys-in-fact in connection herewith and shall not be liable for the negligence or misconduct of any such agents or attorneys-in-fact selected by it in good faith.

(h)     **Secured Party May Perform; Secured Party Appointed Attorney-in-fact**.  If any Pledgor shall fail to do any act or thing that it has covenanted to do hereunder after notice or if any representation or warranty on the part of the Pledgors contained herein shall be breached, the Secured Party may (but shall not be obligated to) do the same or cause it to be done or remedy any such breach, and may expend funds for such purpose.  Each Pledgor hereby appoints the Secured Party its attorney-in-fact, with full authority in the place and stead of such Pledgor and in the name of such Pledgor, or otherwise, from time to time in the Secured Party's discretion, to take any action and to execute any instrument consistent with the terms of this Agreement and the other Loan Documents which the Secured Party may reasonably determine to be necessary or advisable to accomplish the purposes of this Agreement.  The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term of this Agreement.  Each Pledgor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof.

(i)     **Continuing Security Interest; Assignment**.  This Agreement shall create a continuing security interest in the Collateral and shall (i) be binding upon each Pledgor and its successors and permitted assigns and (ii) inure, together with the rights and remedies of the Secured Party hereunder, to the benefit of the Secured Party and its successors, transferees and assigns; no other Persons (including, without limitation, any other creditor of any Pledgor) shall have any interest herein or any right or benefit with respect hereto.  Without limiting the generality of the foregoing clause (ii), the Secured Party may assign or otherwise transfer any indebtedness held by it secured by this Agreement to any other Person, and such other Person so long as such assignment or transfer is consistent with the provisions of the Loan Agreement, shall thereupon become vested with all the benefits in respect thereof granted to the Secured Party, herein or otherwise, subject however, to the provisions of the Loan Agreement.

(j)     **Termination**.  When all the Secured Obligations have been indefeasibly paid in full and the commitment of the Secured Party to make any advance pursuant to any Loan Agreement has terminated or expired, this Agreement and the Lien noted hereunder shall terminate.  Upon termination of this Agreement, the Secured Party shall, upon the request and at the sole cost and expense of the Pledgors, assign, transfer and deliver to the Pledgors, against receipt and without recourse to or warranty by the Secured Party, such of the Collateral to be released (in the case of a release) as may be in possession of the Secured Party and as shall not have been sold or otherwise applied pursuant to the terms hereof, and, with respect to any other Collateral, proper documents and instruments (including UCC-3 termination statements) acknowledging the termination of this Agreement and the Lien noted hereunder or the release of such Collateral, as the case may be.

(k)     **Notices**.  Unless otherwise provided herein, all notices and other communications provided to any party hereto under this Agreement shall be in writing or by facsimile and addressed or delivered to such party at its address as set forth below.  Unless otherwise provided herein, any notice, if mailed and properly addressed with postage prepaid, shall be deemed given three (3) Business Days after being sent; any notice, if transmitted by facsimile, shall be deemed given when transmitted; any

8

notice, if hand delivered, shall be deemed given on the date of such delivery; any notice, if mailed by overnight courier, shall be deemed given on the date of such delivery.

|  |  |
|---|---|
| If to any Pledgor: | To the applicable address set forth on the signature pages hereto. |
| If to Secured Party: | Goldman Sachs Bank USA<br>222 S. Main Street<br>Salt Lake City, Utah 84101<br>Facsimile: 212-428-1474<br>Attention: Private Lending Services |

(l)        **Severability**.  Any provision in this Agreement that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions of the Agreement in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction.

(m)        **Payment of Costs**.  The Pledgors shall jointly and severally pay, on demand, any and all costs of collection and reasonable attorneys' fees and costs paid or incurred by Secured Party in enforcing this Agreement after an Event of Default, whether or not any suit or other legal proceedings shall be instituted.

(n)        **Additional Pledgors**.  Any new Person who becomes a Pledgor shall execute a joinder agreement in form and substance satisfactory to the Secured Party.

(o)        <u>**APPLICABLE LAW.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.**</u>

(p)        **Miscellaneous**.  No amendment, modification, supplement, termination or waiver of or to any provision of this Agreement, nor consent to any departure by any Pledgor therefrom, shall be effective unless the same shall be made in accordance with the terms of the Loan Agreement and unless in writing and signed by each of the Secured Party and the Pledgors.  No amendment, modification, supplement, termination or waiver of or to any provision of this Agreement, nor consent to any departure by any Pledgor therefrom which affects the obligations of the Securities Intermediary, shall be made unless consented to in writing and signed by the Securities Intermediary. The captions in this Agreement are for convenience of reference only and shall not define or limit the provisions hereof.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.  Execution and delivery of this Agreement by facsimile shall be sufficient for all purposes and shall be binding on any party who so executes.  This Agreement constitutes the exclusive agreement of the parties with respect to the matters addressed herein.

(q)        **Consent Agreements; Fund Interests.**    To the extent there are any Funds or Fund Interests listed on Schedule A hereto:

(i)        the parties hereto acknowledge and agree that, with respect to any Collateral consisting of Fund Interests, this Agreement is subject to the terms of the applicable Consent Agreement, and that notwithstanding anything contained in any notice or entitlement order to the contrary, if any Pledgor desires to cause the redemption, liquidation or transfer of any interests in any Fund which are held in the Brokerage Account, it shall be required to effect such redemption, transfer or liquidation in accordance with the Consent Agreement and the Securities Intermediary shall have no obligation to do so on behalf of such Pledgor.

(ii)        each Pledgor shall instruct each Fund pledged by it hereunder to provide copies of all notices, reports and other information, including calculations of the net asset value, regarding such Fund to the Secured Party at the same time as such Fund provides them to such Pledgor.  In addition, each Pledgor hereby authorizes the Secured Party to request any and all such information from each such Fund directly.

(iii)        each Pledgor shall cause each Fund pledged by it hereunder to pay and/or transfer any and all distributions in respect of any Fund Interests directly to the applicable Brokerage Account or to such other account as the Secured Party shall notify such Pledgor, to be held as Collateral.  If any Pledgor shall, as a result of its ownership of any Collateral, receive any Fund Interests or any other property, whether in addition to, in substitution for, or in exchange for any Fund Interests, then such Pledgor shall accept the same as agent for the Secured Party, hold the same in trust for the Secured Party and forthwith cause the same to be credited to the applicable Brokerage Account (or deliver certificates, instruments or any other writings evidencing the same, indorsed in blank, or assignments of such Fund Interests or property in blank), as additional collateral security for the Secured Obligations.  Any sums paid upon or in respect of any Fund Interests upon the redemption of such Fund Interests or the liquidation or dissolution of any Fund and any distribution of capital made on or in respect of such Fund Interests or any property which is distributed upon or with respect to such Fund Interests pursuant to the recapitalization or reclassification of the capital of the applicable Fund or pursuant to the reorganization thereof, shall be deposited and credited to a Brokerage Account (or distributed and delivered forthwith to the Secured Party to be held) as Collateral and applied in accordance with this Agreement and the other Loan Documents.  All distributions or payments on or with respect to Collateral not otherwise referred to in this clause (iii) which are received by any Pledgor contrary to the provisions of the Loan Documents shall be received in trust for the benefit of the Secured Party, shall be segregated from other funds of

9

any Pledgor and shall be forthwith paid over to the Secured Party in the same form as so received (with any necessary indorsement) to be held as Collateral.

[remainder of page intentionally left blank; signature page follows]

Security and Pledge Agreement (Committed) 10.25.2011
LEGAL_US_E # 104044145.6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth below

**SECURED PARTY:**

GOLDMAN SACHS BANK USA

By: _____

Name:    Gosia Lewis

Title:    Vice President

Date: _____

Address:    200 West Street
            New York, NY 10282-2198

Facsimile:    212-428-1474

**SECURITIES INTERMEDIARY:**

GOLDMAN, SACHS & CO.

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**PLEDGORS:**

Principal Residence (if an individual):                    By: _____

_____                    Name: <u>Michel B. Moreno</u>

_____

_____


Notice Address (if different from above):

4023 Ambassador Caffery Pkwy
Suite 200
Lafayette, LA 70503

Principal Residence (if an individual):                    By: _____

_____                    Name: <u>Tiffany C. Moreno</u>

_____

_____


Notice Address (if different from above):

4023 Ambassador Caffery Pkwy
Suite 200
Lafayette, LA 70503

Jurisdiction of Organization (if an entity):               Name:  **MORENO PROPERTIES, L.L.C.**

Louisiana

Chief Executive Office or Place of Business (if an entity):    By: _____

4023 Ambassador Caffery Pkwy                         Name: _____
Suite 200
Lafayette, LA 70503                                  Title (if applicable): _____

Notice Address (if different from above):

_____

_____

_____

**Annex I**

NOTICE OF EXCLUSIVE CONTROL

[NAME AND ADDRESS OF THE SECURITIES INTERMEDIARY]

**Re: Notice of Exclusive Control for Brokerage Account No. _____ and No. _____ (collectively, the "<u>Brokerage Account</u>")**

Ladies and Gentlemen:

This Notice of Exclusive Control is being sent pursuant to the Security and Pledge Agreement dated as of _____, 20\_\_ by and among _____ (the "<u>Pledgors</u>"), Goldman Sachs Bank USA, (the "<u>Secured Party</u>") and Goldman, Sachs & Co. (the "<u>Securities Intermediary</u>").

Pursuant to the above-referenced agreement, the Securities Intermediary is hereby instructed as follows:

\_\_\_\_\_ (a)    The Securities Intermediary shall freeze all assets and activity in the Brokerage Account pending further instructions from the Secured Party.

\_\_\_\_\_ (b)    Notwithstanding the foregoing, the Securities Intermediary shall liquidate assets in the Brokerage Account which are needed to yield $_____ in proceeds, and transfer such proceeds to the Secured Party.  If the assets contained in the Brokerage Account have a liquidation value exceeding $_____, the Securities Intermediary shall have the sole discretion to determine which assets are liquidated.   If the liquidation of all assets in the Brokerage Account shall yield less than $_____, the Securities Intermediary shall liquidate all assets and transfer all proceeds to the Secured Party.

\_\_\_\_\_ (c)    Without limiting the foregoing, the Securities Intermediary shall not comply with any instructions received by any Pledgor after receipt of this notice but shall continue to comply with all instructions of the Secured Party without the consent of any other person.

Any proceeds transferred to the Secured Party are to be wired by the Securities Intermediary to the following account:

[wiring instructions]

Very truly yours,

GOLDMAN SACHS BANK USA

By: _____
    Name:
    Title:

**Schedule A**
**Brokerage Account**

| Account Number | Name of Account Holder |
|---|---|
| 042-55444-4 | Tiffany C. Moreno (Tiffany C. Moreno Collateral Account FBO GS Bank USA) |
| 042-55443-6 | Michel B. Moreno (Michel B. Moreno Collateral Account FBO GS Bank USA) |

**Fund Interests**

**(each a "Fund"; collectively, the "Funds")**

| Name of Fund | Type of Entity | Registered Owner | Account Number |
|---|---|---|---|
| None | | | |

**Schedule B**

**Filings**

| Name of Debtor | Filing Jurisdiction |
|---|---|
| Michel B. Moreno | Texas Secretary of State<br>Lafayette Parish Clerk's Office, Lafayette, Louisiana |
| Tiffany C. Moreno | Texas Secretary of State<br>Lafayette Parish Clerk's Office, Lafayette, Louisiana |
| Moreno Properties, L.L.C. | Lafayette Parish Clerk's Office, Lafayette, Louisiana |

**Schedule C**

**Excluded Property**

**None**

| Name of Fund | Type of Entity | Registered Owner | Account Number |
|---|---|---|---|

**Schedule D**

DESCRIPTION OF PLEDGED MEMBERSHIP INTERESTS

| Issuer | Owner | Class of Security | Certificate No. (if any) | Percentage Interest |
|---|---|---|---|---|
| Moreno Properties, L.L.C. | Michel B. Moreno | Membership Interest | | 50% |
| Moreno Properties, L.L.C. | Tiffany C. Moreno | Membership Interest | | 50% |
| Southern Equine Stables, L.L.C. | Michel B. Moreno | Membership Interest | | 90% |
| Southern Equine Stables, L.L.C. | Tiffany C. Moreno | Membership Interest | | 10% |
| Elle Investments, L.L.C. | Michel B. Moreno | Membership Units | | 99% |
| Elle Investments, L.L.C. | Tiffany C. Moreno | Membership Units | | 1% |
| Casafin II, LLC | Michel B. Moreno | Membership Interest | | 50% |
| Casafin II, LLC | Tiffany C. Moreno | Membership Interest | | 50% |
| Moreno Properties Two, L.L.C. | Moreno Properties, L.L.C. | Membership Units | | 100% |

Schedule E

1.  MBM 2011 MGH Grantor Retained Annuity Trust (the "**MBM MGH Trust**"), evidenced by that certain Trust Instrument and Agreement , dated as of July 1, 2011, by and between Michel B. Moreno ("**MBM**"), as Settlor, and the Managing Trustee.

2.  MBM 2011 DOH Grantor Retained Annuity Trust (the "**MBM DOH Trust**"), evidenced by that certain Trust Instrument and Agreement, dated as of July 1, 2011, by and between MBM, as Settlor, and Managing Trustee.

3.  TCM 2011 MGH Grantor Retained Annuity Trust (the "**TCM MGH Trust**"), evidenced by that certain Trust Instrument and Agreement, dated as of July 1, 2011, by and between Tiffany C. Moreno ("**TCM**"), as Settlor, and Managing Trustee.

4.  TCM 2011 DOH Grantor Retained Annuity Trust (the "**TCM DOH Trust**"), evidenced by that certain Trust Instrument and Agreement, dated as of July 1, 2011, by and between TCM, as Settlor, and Managing Trustee.

The MBM MGH Trust, MBM DOH Trust, TCM MGH Trust and TCM DOH Trust shall collectively be referred to as the "**Trusts**".

<u>Schedule F</u>
Promissory Notes

1. Promissory Note in the principal amount of $1,336,750.00, dated as of August 31, 2011, given by MOR MGH Holdings, L.L.C. ("**Maker**") to Michel B. Moreno ("**Holder**").

2. Promissory Note in the principal amount of $501,000.00, dated as of September 13, 2011, given by Maker to Holder.

3. Promissory Note in the principal amount of $34,639.00, dated as of December 8, 2011, given by Maker to Holder.

4. Promissory Note in the principal amount of $400,000.00, dated as of January 6, 2012, given by Maker to Holder.

5. Promissory Note in the principal amount of $250,000.00, dated as of January 25, 2012, given by Maker to Holder.

6. Promissory Note in the principal amount of $350,000.00, dated as of February 3, 2012, given by Maker to Holder.

7. Promissory Note in the principal amount of $100,000.00, dated as of April 23, 2012, given by Maker to Holder.

8. Promissory Note in the principal amount of $500,000.00, dated as of April 27, 2012, given by Maker to Holder.

9. Promissory Note in the principal amount of $200,000.00, dated as of May 25, 2012, given by Maker to Holder.

10. Promissory Note in the principal amount of $2,000,000.00, dated as of September 19, 2012, given by Maker to Holder.

11. Promissory Note in the principal amount of $100,000.00, dated as of June 14, 2012, given by Maker to Holder.

12. Promissory Note in the principal amount of $885,000.00, dated as of July 30, 2012, given by Maker to Holder.

13. Promissory Note in the principal amount of $2,000,000.00, dated as of September 21, 2012, given by Maker to Holder.

14. Promissory Note in the principal amount of $200,000.00, dated as of June 22, 2012, given by Maker to Holder.

**EXHIBIT 8.16**

**DISCLOSURE STATEMENT FOR
LOANS MADE BY GOLDMAN SACHS BANK USA THAT ARE
SECURED BY INTERESTS IN CERTAIN GOLDMAN SACHS-MANAGED INVESTMENT FUNDS**

This disclosure statement (this "Disclosure Statement") identifies, in general terms, certain of the risks and other information related to Goldman Sachs Bank USA ("Lender") making a loan to you that is secured by interests in one or more hedge funds, funds of hedge funds or similar investment vehicles (each, a "Fund") managed, directly or indirectly, by Goldman Sachs Asset Management, L.P. or Goldman Sachs Hedge Fund Strategies, L.L.C. (each, a "Manager"), each of which is an affiliate of Lender (collectively, a "Financed Investment").  This Disclosure Statement does not purport to identify risks associated with a Financed Investment in any particular Fund and you should carefully review the offering document for the each Fund in which you will be making a Financed Investment before making a decision to do so.

Entering into a Financed Investment involves a high degree of risk, including the risk that any losses with respect to your investment in the Fund will be greater than if no leverage was used.  No guarantee or representation is made that entering into a Financed Investment will be successful.

Before entering into a Financed Investment, you should ensure that you fully understand the terms of the financing transaction, relevant risks associated with the transaction, the nature and extent of your risk of loss and the nature of the contractual relationship into which you are entering.  You should also carefully evaluate whether the transaction is appropriate for you in light of your experience, objectives, financial resources, and other relevant circumstances.

You are urged to consult with your own advisers to determine the suitability of a Financed Investment and the relationship of such an investment to your overall investment program and financial and tax positions.

**CERTAIN RISKS**

In determining whether a Financed Investment in a Fund is a suitable investment, you should consider, among others, the following risks in addition to the risks regarding an investment in the Fund that are described in the offering document for the applicable Fund.

**Risk Associated with Increased Leverage**

Although the increased leverage provided by a Financed Investment in a Fund may result in a total return as a percentage of your equity in the interests in such Fund ("Fund Interests") that is greater than an unleveraged investment in such Fund Interests, it may also result in a total loss as a percentage of your equity in such Fund Interests that is greater than that of an unleveraged investment.  In addition, the interest expense that you bear in connection with the Financed Investment will reduce the returns on your investment.  Moreover, should the Fund Interests decline in value, you may be required to either deposit additional funds or securities with Lender or one of its affiliates as collateral for your loan or suffer mandatory liquidation of the Fund Interests in order to compensate for the decline in value.  In the event of a sudden precipitous drop in the value of the Fund Interests, you may be required to liquidate the Fund Interests more quickly than otherwise desirable in order to satisfy your obligation to Lender, which may result in adverse tax or other consequences to you.

In addition to the leverage obtained through the making of a Financed Investment, a Fund may employ leverage in furtherance of its investment objective.  This added layer of leverage will result in a higher degree of overall leverage and will further increase the potential risk of loss in a Financed Investment, particularly in the event of an economic downturn or underperformance of the Fund's underlying investments.

**Additional Risk Associated with Securing a Loan with Fund Interests**

Fund Interests are subject to significant restrictions on redemption and transfer as described in the offering document provided for each Fund.  You will not receive any additional or special rights of redemption with respect to your Fund Interests which coincide with obligations which may arise under the loan agreement (with all other ancillary documents executed together therewith, the "Loan Agreement") with Lender in connection with your Financed Investment, including the obligation to make interest payments to Lender.  Restrictions on redemption increase the risk that the value of Fund Interests may decrease between an event of default under the Loan Agreement and the disposition of such Fund Interests in order to satisfy a liability under the Loan Agreement.

The fact that Lender has accepted the Fund Interests as collateral under the Loan Agreement should not be taken as an indication that the Fund Interests may not lose value.  You should not make a Financed Investment unless you can sustain a partial or total loss of your investment in the Fund in addition to the obligation to repay the amounts of principal and interest owed to Lender pursuant to the Loan Agreement.

**No Fiduciary Duty**

While the Manager of a Fund has certain fiduciary duties to the investors in a Fund under applicable law in addition to any contractual obligations it may have, Lender will not owe you any fiduciary duties in connection with the loan it will be making to you and it will only be bound by the terms of the Loan Agreement.

**Limits of Risk Disclosure**

The above discussions relating to various risks associated with a Financed Investment are not, and are not intended to be, a complete enumeration or explanation of the risks involved in the purchase of the Financed Investment.  You should read the Loan Agreement, Security Documents, and other agreements related to the Financed Investment, and the Private Placement Memoranda of the Funds and should consult with your own advisers before deciding whether to make a Financed Investment.  In addition, as market conditions change or develop over time, the purchase of the Financed Investment may be subject to risk factors not currently contemplated or described in such documents.

**POTENTIAL CONFLICTS OF INTEREST**

The Goldman Sachs Group, Inc., Lender, the Manager and their affiliates, directors, partners, trustees, managers, members, officers and employees (collectively, for purposes of this "*POTENTIAL CONFLICTS OF INTEREST*" section, "Goldman Sachs"), are engaged in businesses unrelated to the Financed Investment.  Certain potential conflicts of interest may arise, directly or indirectly, from such engagement that you should consider.

The activities of each Fund, and its respective affiliates, directors, trustees, managers, members, partners, officers and employees, may give rise to conflicts of interest that could disadvantage you and the value of the Financed Investment.  A description of certain of such potential conflicts of interest is set forth under *"POTENTIAL CONFLICTS OF INTEREST"* or a similarly titled section in the Fund's offering document.  By making a Financed Investment, you will be deemed to have acknowledged and assented to the existence of potential conflicts of interest relating to a Fund, its Manager, and Lender, and to your purchase of the Financed Investment in the face of these conflicts.

Goldman Sachs and its sales personnel have interests in promoting Financed Investments.  With respect to Goldman Sachs and its sales personnel, the remuneration and profitability of activity relating to the Financed Investments may be greater than the provision of other services and sales of other products that might be provided or offered.  For example, Goldman Sachs and its sales personnel will directly or indirectly receive fees and commissions in connection with your Financed Investment.  Such fees and commissions may be higher than for other products or services, and the remuneration and profitability to Goldman Sachs and such personnel resulting from such transaction may be greater than the remuneration and profitability resulting from other products.  In particular, it is expected that remuneration and profitability to Goldman Sachs and its sales personnel resulting from Financed Investments will be greater than the remuneration and profitability resulting from sales of Fund Interests that are not Financed Investments.

**Annex I**

**Privacy Notice**

*The Goldman Sachs financial services companies endeavor to maintain the highest standards of confidentiality and to respect the privacy of our client relationships. In that regard, we are providing this Privacy Notice to our clients in accordance with Title V of the Gramm-Leach-Bliley Act of 1999 and its implementing regulations. This notice supplements any privacy policies or statements that we may provide in connection with specific products or services.*

**This Privacy Notice is being provided for information purposes only. Individual, Joint and IRA accountholders will shortly be receiving a second copy of this notice which can be used to communicate privacy preferences to us.**

## THE INFORMATION WE COLLECT ABOUT YOU

The non-public personal information we collect about you (your "Information") comes primarily from the account applications or other forms you submit to us. We may also collect Information about your transactions and experiences with us, our affiliates, or others relating to the products or services we provide. Also, depending on the products or services you require, we may obtain additional Information from consumer reporting agencies.

## OUR INFORMATION SECURITY POLICIES

Your privacy is very important to us, and we take the responsibility to safeguard you Information very seriously. We limit access to your Information to those of our employees and service providers who are involved in offering or administering the products or services that we offer. We maintain physical, electronic, and procedural controls that are designed to comply with federal standards to safeguard your information.

If our relationship ends, we will continue to treat your Information as described in this Privacy Notice.

## OUR DISCLOSURE POLICIES

We do not disclose your Information to anyone, except as permitted by law. The types of Information disclosures permitted by law include sharing your Information with non-affiliated companies that perform support services for your account or process your transactions with us or our affiliates, disclosing your Information pursuant to your express consent, disclosing your Information to fulfill your instructions, or disclosures of your information that are required for us to be in compliance with applicable regulations.

Unless you indicate that you would not like us to do so (i.e., unless you "opt out"), federal law also permits us to share your Information with our affiliates for their use in the marketing of their products and services to you.

## USE OF INFORMATION FOR AFFILIATE MARKETING

Sharing your Information with our affiliates enables us to better provide you with the full range of services and products available from Goldman Sachs to its private clients. This is the case because the core private client offering – investment management, brokerage, wealth advisory services, trust services and banking services – is actually delivered through a variety of affiliated legal entities that are all part of the Goldman Sachs family of financial services companies.

Our affiliates use your Information to evaluate whether the products or services they offer match your specific needs and, if so, to subsequently market those products or services to you. The affiliates that we would most often share your Information for marketing purposes are: Goldman Sachs Bank USA, The Goldman Sachs Trust Company, N.A., The Goldman Sachs Trust Company of Delaware, and The Ayco Company, L.P.

## INFORMATION SHARING WITH NON-AFFILIATES

We do not license your Information to anyone. We only disclose your Information to non-affiliated third-parties that perform support services for your account or process your transactions, or as otherwise permitted by the law. We require any non-affiliated third parties to whom we disclose your Information to adhere to confidentiality agreements and to maintain appropriate safeguards to protect your Information.

## HOW TO EXERCISE YOUR OPT-OUT RIGHTS

If you do not want us to share your Information with our affiliates as described above and / or you want to limit its use for marketing, you may either: i) fill out the opt-out form which will be sent to you shortly and return it to us at the address indicated on the form, or ii) opt out via the Client Web at www.goldman.com, at any time.

Once we receive your opt-out election, we will, within a reasonable time, stop sharing the Information, or if applicable, prevent its use for marketing. Your choices will apply until you tell us to change those choices. If you already made choices about the use and sharing of your Information, you do not need to act again.

All opt-outs described above that are exercised by any party to a joint account will apply to all parties on that account.

Please contact your Private Wealth Advisor if you have any questions.

*This notice is being provided on behalf of the following affiliates of The Goldman Sachs Group, Inc.:* Goldman, Sachs & Co., Goldman Sachs Bank USA, The Goldman Sachs Trust Company, N.A. and The Goldman Sachs Trust Company of Delaware.

**Annex II**

**Conflicts of Interest**

GS&Co. is a major participant in global financial markets and as such has activities and interests that include potential multiple advisory, transactional and financial and other interests in accounts, securities, instruments and companies that may be purchased or sold in your GS&Co. accounts (such accounts, the "Account"). GS&Co. acts as an investor, investment banker, research provider, investment manager, financer, advisor, market maker, trader, prime broker, lender, agent and principal, and has other direct or indirect interests, in the global fixed income, currency, commodity, equity and other markets in which your Account may invest. GS&Co. and its personnel, including Private Wealth Advisors assigned to your Account, may take positions in securities or take actions for their own accounts which conflict with positions in your Account, and GS&Co. may act as counterparty to any transaction executed for your Account, subject to applicable law. Additionally, GS&Co. may on a proprietary basis sell, redeem, purchase, take short positions in or take similar actions with respect to securities, currencies, funds or other investments in which your Account may be invested ("underlying assets") without having to notify you of such investment or activity. GS&Co. may also create, write, sell or issue, or act as placement agent or distributor of derivatives and structured investment products whose value may be linked to the value of underlying assets. To the extent permitted by applicable law, GS&Co. may hedge its derivative positions by buying or selling such underlying assets, and reserves the right to sell or redeem some or all of these underlying assets without notice to you. Such actions may have an adverse effect on the amount of fees, expenses and other costs incurred directly or indirectly in connection with your Account. For instance, GS&Co. may for its own account, have long or short positions in, and actively buy or sell, the products or related securities purchased or sold for your Account, or derivatives of these products or related securities. In addition, GS&Co. may act as adviser to clients in investment banking, financial advisory, asset management and other capacities in advisory, transactional, financial or other assignments of all types including those related to instruments that may be purchased, sold or held in your Account. Further, GS&Co. may issue, or be engaged as underwriter, financial advisor or the issuer of, instruments that your Account may purchase, sell or hold. In its market making activities, occasionally, GS&Co. may enter the market in anticipation of a likely client transaction or order to "set up for" or "pre-hedge" the transaction and it is possible that such trading could impact the market price of securities purchased or sold in your Account. Substantially all transactions for brokerage accounts will be effected by GS&Co. Employees will generally receive referral or brokerage compensation in connection with these transactions and GS&Co. and employees each have an interest in recommending brokerage execution with GS&Co. GS&Co. receives compensation when brokerage accounts invest in products managed by GS&Co. such as mutual funds, hedge funds or other alternative investments. GS&Co. and its employees will generally directly or indirectly receive a portion of fees and commissions paid by you. Such fees and commissions vary according to the type of product or service and may be higher for certain products or services. The present and future activities of GS&Co. may give rise to additional conflicts of interest with you. You agree that GS&Co., in its sole discretion, may refrain from recommending or effecting transactions including due to (a) regulatory requirements, (b) GS&Co.'s internal policies and procedures, and (c) its determinations regarding actual or potential conflicts of interest or the appearance of such conflicts. However, you also agree that GS&Co. may determine to recommend or effect transactions notwithstanding the existence of such conflicts. You acknowledge that you understand the risks.

In this Annex II, "GS&Co." means Goldman, Sachs & Co., its present and future affiliates, and their respective partners, officers, directors, employees and agent.

# EXHIBIT B



**TERM (COMMITTED LOAN)**

**LOAN AGREEMENT**

between

**GOLDMAN SACHS BANK USA**,
as Lender

and

**MBM 2011 DOH GRANTOR RETAINED ANNUITY TRUST**

and

**TCM 2011 DOH GRANTOR RETAINED ANNUITY TRUST**,

severally, as Borrowers

## LOAN AGREEMENT

This Loan Agreement (this "**Agreement**"), is between GOLDMAN SACHS BANK USA (together with its successors and permitted assigns, the "**Lender**"), MBM 2011 DOH Grantor Retained Annuity Trust ("**MBM DOH Borrower**") and TCM 2011 DOH Grantor Retained Annuity Trust ("**TCM DOH Borrower**" and together with MBM DOH Borrower, collectively and severally, the "**Borrowers**"), and is dated as of the date first written on the Lender's signature page hereto (the "**Effective Date**").

RECITALS:

WHEREAS, the Borrowers have requested, and the Lender has agreed, subject to the terms and conditions contained in this Agreement, to, among other things, provide a bridge loan in the amount of the Loan (as hereinafter defined) of Fifteen Million Dollars ($15,000,000) and to allocate portions of the Loan to the Borrowers as more particularly described herein;

WHEREAS, in consideration for the Loan, the Borrowers have pledged the collateral as identified on Schedule 1 attached hereto.

NOW, THEREFORE, in consideration of the foregoing premises, of the mutual covenants contained in this Agreement, and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties to this Agreement, intending to be legally bound, hereby agree as follows:

ARTICLE I

DEFINITIONS

As used in this Agreement:

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.

"**Agreement**" has the meaning given to that term in the Preamble of this Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"**Applicable Margin**" means a rate equal to nine percent (9.00%) per annum.

"**Bank Official**" means an executive officer, director, or principal shareholder of the Lender or any Company of which the Lender is a subsidiary or any other subsidiary of such Company.

"**Base Rate**" means the rate of interest quoted in the print edition of The Wall Street Journal, Money Rates Section as the U.S. Prime Rate, as in effect from time to time.  The Base Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.  The Lender may make commercial loans or other loans at rates of interest at, above or below the Base Rate.

"**Base Rate Loan**" means a Loan which bears interest at a rate determined by reference to the Base Rate.

"**Borrowers**" has the meaning given to that term in the Preamble of this Agreement.

"**Business Day**" means, with respect to any borrowing or payment, a day other than Saturday or Sunday on which banks are open for business in New York, New York.

"**Co-Borrower**" has the meaning given to that term in Section 8.14 of this Agreement.

"**Collateral**" has the meaning given to such term in the applicable Security Document.

"**Company**" means any corporation, partnership, trust (business or otherwise), association, joint venture, pool syndicate, sole proprietorship, unincorporated organization, or any other form of business entity not specifically listed, provided that "Company" does not include: (1) an insured depository institution (as defined in 12 U.S.C. 1813); or (2) a corporation the majority of the shares of which are owned by the United States or by any State.

"**Constituent Instruments**" means the certificate of incorporation and by-laws of a corporation; the certificate of limited partnership and agreement of limited partnership of a limited partnership; the partnership agreement of a general partnership; the certificate of formation and operating or comparable agreement of a limited liability company; and the comparable instruments for any other entity, including, with respect to a trust, any agreement or instrument creating such trust.

"**Default Interest**" has the meaning given to that term in Section 2.2 of this Agreement.

"**Effective Date**" has the meaning given to that term in the Preamble of this Agreement.

"**Event of Default**" has the meaning given to that term in Section 6 of this Agreement.

"**Goldman Affiliated Group**" means the Lender and GS&Co., together with their present and future Affiliates.

"**GS&Co.**" means Goldman, Sachs & Co., a broker-dealer registered with the United States Securities and Exchange Commission, acting in its capacity as Securities Intermediary and custodian with respect to the Securities Account.

"**Guaranty**" means that certain Guaranty and Indemnity, dated as of the Effective Date, made by Michel B. Moreno and Tiffany C. Moreno, jointly and severally as Indemnitors, in favor of Lender.

"**Indemnified Liabilities**" has the meaning given to that term in Section 8.10 of this Agreement.

"**Indemnified Person**" has the meaning given to that term in Section 8.10 of this Agreement.

"**Indenture**" means that certain Indenture, dated November 15, 2011, among Green Field Energy Services, Inc., as issuer, HUB City Tools, Inc., as guarantor, and Wilmington Trust, National Association, as trustee and collateral agent, relating to the 13% Senior Notes due 2016.

"**Interest Payment Date**" means with respect to any Loan (whether a Base Rate Loan or a LIBOR Loan), the tenth (10th) day of each month commencing on the tenth (10th) day of the month immediately following the month in which the Effective Date occurs.

"**Lender**" has the meaning given to that term in the Preamble of this Agreement.

"**Lending Office**" means the Lender's office at 200 West Street, New York, NY 10282-2198, or such other office as the Lender may designate in writing from time to time to the Borrowers.

"**LIBOR**" means, with respect to any LIBOR Reset Period, the rate of interest at which deposits in U.S. dollars are offered to major banks in the London interbank market for a **thirty (30)** day period on the day that is two (2) LIBOR Business Days prior to the commencement of such LIBOR Reset Period, based on information presented by any interest rate reporting service of recognized standing selected by the Lender, or if the Lender determines that no interest rate reporting service has presented such information, the rate of interest at which deposits in Dollars are offered to major banks in the London interbank market for a **thirty (30)** day period on the day that is two (2) LIBOR Business Days prior to the commencement of such LIBOR Reset Period by any bank reasonably selected by the Lender. Under the terms of this Agreement, the applicable "LIBOR" rate is used by the Lender as a reference rate. The use of **thirty (30)** day LIBOR as a reference rate does not mean the Borrowers will actually pay interest on the Loan pursuant to a **thirty (30)** day contract or any other interest rate contract. Instead, the effective interest rate under this Agreement will adjust at the beginning of each LIBOR Reset Period as described further in Section 2.2.

"**LIBOR Business Day**" means a Business Day on which commercial banks are open for dealings in U.S. dollar deposits in the London interbank market.

"**LIBOR Loan**" means any Loan which bears interest at a rate determined by reference to LIBOR.

"**LIBOR Reset Period**" means (i) as to the initial LIBOR Loan and any other LIBOR Loan made during the same month as the initial LIBOR Loan, the period commencing on the date the first LIBOR Loan is made under this Agreement and ending on the last calendar day of the month during which such LIBOR Loan is made, and (ii) as to any LIBOR Loan made or continued after such month, the period commencing on the first calendar day of the month during which such subsequent LIBOR Loan is made or, with respect to a LIBOR Loan that is continued, the period commencing on the first calendar day of the month immediately following the end of the prior LIBOR Reset Period, and ending on the earlier of (a) the last calendar day of the month during which such LIBOR Loan is made or most recently continued and (b) the Maturity Date.

"**Loan**" has the meaning given to that term in Section 2.1 of this Agreement.

"**Loan Documents**" means this Agreement, the Note, the Guaranty, each of the agreements listed on Schedule I hereto (if any), any other Security Documents and each certificate, agreement or document made or entered into by the Borrowers with or in favor of the Lender in connection with or pursuant to any of the foregoing.

"**Loan Party**" means any Borrower or Pledgor under this Agreement or any other Loan Document.

"**Maintenance Value**" has the meaning given to such term in the applicable Security Document.

"**Maturity Date**" means the earlier to occur of (i) October [4], 2013 (being ninety (90) days after the Effective Date) and (ii) the date the Obligations become due and payable pursuant to Section 7.1 hereof.

"**MBM DOH Borrower**" has the meaning given to that term in the Preamble of this Agreement.

"**MBM DOH Note**" has the meaning given to that term in Section 2.1 of this Agreement.

"**Note**" has the meaning given to that term in Section 2.1 of this Agreement.

"**Notice of Borrowing**" has the meaning given to that term in Section 2.1 of this Agreement.

"**Obligations**" means all unpaid principal of, and accrued and unpaid interest due on, the Note and all other obligations, interest, fees, charges and expenses of the Borrowers to the Lender arising under or in connection with the Loan Documents.

"**OFAC**" has the meaning given to that term in Section 4.7 of this Agreement.

"**Person**" means any corporation, natural person, firm, joint venture, partnership, trust, unincorporated organization, enterprise, government or any department or agency of any government.

"**Pledgor**" means the one or more Persons, if any, that executes and delivers a Security Agreement in connection with this Agreement. See Schedule I for the definition of "Security Agreement".

"**Regulation U**" means Federal Reserve Board Regulation U, 12 CFR Part 221, as amended from time to time, and any successor regulation or statute.

"**Returned Payment**" has the meaning given to that term in Section 8.15 of this Agreement.

"**Securities**" means stocks, bonds, securities entitlements, financial assets or other securities or investment property (as such terms are defined in the UCC).

"**Securities Account**" has the meaning given to the term "Brokerage Account" in the applicable Security Document, if any.

"**Securities Intermediary**" has the meaning given to such term in the applicable Security Document, if any.

"**Security Documents**" means, collectively, each of the agreements listed on Schedule I hereto and any other agreements, instruments, documents, financing statements, notices of assignment of accounts, schedules of accounts assigned, mortgages and other written matter necessary or reasonably requested by the Lender to perfect, and maintain perfected, the Lender's security interest in the Collateral.

"**Solvent**" means, when used with respect to any Person, that at the time of determination: (i) the fair value of the assets of such Person, at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise, (ii) the present fair saleable value of the property of such Person will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, and (iii) such Person will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured. For the purposes of determining whether a Person is Solvent, the amount of any contingent liability shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that reasonably can be expected to become an actual or matured liability.

"**TCM DOH Borrower**" has the meaning given to that term in the Preamble of this Agreement.

"**TCM DOH Note**" has the meaning given to that term in Section 2.1 of this Agreement.

"**Term Loan Agreement**" means that certain Loan Agreement dated as of May 15, 2013 by and among Goldman Sachs Bank USA, as lender, and Michael B. Moreno and Tiffany C. Moreno, jointly and severally, as borrowers, as may be amended, restated, supplemented or modified from time to time.

"**Turbine Generation**" has the meaning given to that term in Section 2.9 of this Agreement.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York.

"**USA Patriot Act**" has the meaning given to that term in Section 4.7 of this Agreement.

3

All undefined terms contained in this Agreement shall, unless the context indicates otherwise, have the meanings provided for by the UCC to the extent the same are used or defined therein. The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole, including the Exhibits and Schedules hereto, as the same may from time to time be amended, modified or supplemented, and not to any particular section, subsection or clause contained in this Agreement.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter.

ARTICLE II

THE LOAN

2.1     Loan. Subject to satisfaction of the conditions set forth in Article III hereof, the Lender agrees, on the terms and conditions set forth in this Agreement, to make a term loan in the principal amount up to $15,000,000 (each advance of such principal amount or amounts, a "**Loan**" and collectively, the "**Loans**") to the Borrowers with an initial advance of $15,000,000 on the date hereof. The Loan shall be allocated to the Borrowers as follows: (i) Seven Million Five Hundred Thousand ($7,500,000) to MBM DOH Borrower and (ii) Seven Million Five Hundred Thousand ($7,500,000) to TCM DOH Borrower. On the Maturity Date the Borrowers shall repay in full in cash the then outstanding balance of the Loan. The obligation of each Borrower to repay its share of the principal amount of the Loan, and any and all interest which accrues thereon, shall be evidenced by (a) a promissory note executed and delivered by MBM DOH Borrower in the form of Exhibit A hereto (the "**MBM DOH Note**") and (b) a promissory note executed and delivered by TCM DOH Borrower in the form of Exhibit A hereto (the "**TCM DOH Note**" and, together with the MBM DOH Note, collectively, the "**Note**"). Amounts of the Loan prepaid may not be reborrowed. The Loan hereunder shall be made upon submission by the Borrowers to the Lender of a completed written notice of borrowing substantially similar to the form of Exhibit B attached hereto signed by the Borrowers (a "**Notice of Borrowing**").

2.2     Interest. Except as otherwise expressly set forth herein, all Loans hereunder shall be LIBOR Loans.

(a)     Interest on LIBOR Loans shall accrue at a per annum rate equal to the sum of (i) LIBOR for the then-current LIBOR Reset Period plus (ii) the Applicable Margin.

(b)     To the extent any LIBOR Loan is converted to a Base Rate Loan or any Base Rate Loan is made to any Borrower, in each case, whether pursuant to Sections 2.2(e) or 2.6 or by mutual agreement between the Lender and such Borrower, interest on such Base Rate Loans shall accrue at a per annum rate equal to (i) the Base Rate Plus (ii) the Applicable Margin.

(c)     Notwithstanding the foregoing, during any period in which an Event of Default shall exist, the principal balance of all Obligations shall bear interest at a rate that is four percent (4%) per annum in excess of the interest rate otherwise applicable to such Obligations from time to time until such Event of Default is cured or waived as provided for herein. Any interest payable pursuant to the foregoing proviso ("**Default Interest**") which is not paid when due may be added to the outstanding principal sum of the Loans and itself bear interest accordingly to the extent permitted by applicable law.

(d)     Accrued interest on the Loans shall be payable in arrears on (i) each applicable Interest Payment Date and (ii) on the Maturity Date, provided that any time an Event of Default exists, all accrued interest on the Loans, including, without limitation, Default Interest, shall be payable on demand by the Lender. Each determination made by the Lender pursuant to the provisions hereof shall be conclusive and binding on the Borrowers in the absence of manifest error. Provided no Event of Default exists at the end of a LIBOR Reset Period, each LIBOR Loan shall automatically continue as a LIBOR Loan for an additional LIBOR Reset Period. Interest shall be calculated for actual days elapsed on the basis of a 360-day year. Notwithstanding anything contained herein to the contrary, the Lender shall never be entitled to receive, collect or apply as interest on the Loans any amount in excess of the maximum rate of interest permitted to be charged by applicable law.

(e)     If the Lender determines that for any reason adequate and reasonable means do not exist for determining LIBOR for any LIBOR Reset Period, the Lender will promptly so notify the Borrowers. Thereafter, the obligation of the Lender to make or maintain LIBOR Loans hereunder shall be suspended until the Lender revokes such notice in writing and all LIBOR Loans, on the Interest Payment Date, shall automatically convert into Base Rate Loans. Upon the revocation of such notice by the Lender, unless there then exists an Event of Default, all such Base Rate Loans shall automatically convert into LIBOR Loans on the Interest Payment Date following the revocation of such notice.

2.3     Method of Payment. All payments hereunder for principal, interest and other amounts shall be made in lawful money of the United States of America and in immediately available funds to the Lending Office, or such other account as the Lender may designate in writing from time to time to the Borrowers no later than noon (New York City time) on the date when due. The Borrowers and the Lender agree that on each Interest Payment Date, the Lender shall debit the amount of accrued interest due hereunder from the Securities Account, or such other account designated by the Lender from time to time and apply such amounts in payment and satisfaction of such amounts due. In the event that there are insufficient funds on deposit in the Securities Account (or such other designated account) on any Interest Payment Date, the Borrowers shall make such funds immediately available to the Lending Office or such other account as the Lender may designate. If any principal payment hereunder becomes due and payable on a day other than a Business Day, such payment date shall be extended to the next succeeding Business Day, and

4

interest thereon shall be payable at the then applicable rate during such extension. The Borrowers agree that interest amounts payable hereunder which are not paid when due may be added to the outstanding principal sum of the Loans and itself bear interest accordingly to the extent permitted by applicable law.

2.4     [Intentionally Omitted].

2.5     Optional Prepayments.  The Borrowers may, at their option, upon notice as provided below, prepay at any time, or from time to time, in whole or in part, the Loan in an amount not less than $100,000.

The Borrowers will give the Lender written notice of each optional prepayment under this Section 2.5 not less than two (2) Business Days prior to the proposed date of such prepayment.  Each such notice shall specify such requested prepayment date and the aggregate principal amount of the Loan to be prepaid on such date.  Once such notice is given, the payment amount specified in such notice shall be due and payable on the date specified, together with any other amounts then due, if any.

2.6     Illegality.  If the Lender determines that the introduction of any requirement of law, or any change in any requirement of law, or in the interpretation or administration of any requirement of law, has made it unlawful, or that any central bank or other governmental authority has asserted that it is unlawful, for the Lender to make LIBOR Loans, then the Borrowers shall, upon its receipt of notice of such fact and demand from the Lender, prepay in full such LIBOR Loans then outstanding, together with interest accrued thereon, either on the last day of the LIBOR Reset Period thereof, if the Lender may lawfully continue to maintain such LIBOR Loans to such day, or immediately (together with any amount payable pursuant to Section 2.7), if the Lender may not lawfully continue to maintain such LIBOR Loans.  If the Borrowers are required to so prepay the LIBOR Loans, then concurrently with such prepayment, the Lender shall make available to the Borrowers a Base Rate Loan in the amount of such repayment.  Each Base Rate Loan shall remain a Base Rate Loan until the Borrowers receive notice to the contrary from the Lender.

2.7     Funding Costs.  Without limiting any other provisions contained herein, the Borrowers shall reimburse the Lender and hold it harmless from any loss, increased costs or expense which the Lender may sustain or incur as a consequence of:

(a)     the failure by the Borrowers to make on a timely basis any payment of principal of the Loan;

(b)     the prepayment or other payment (including after acceleration thereof) of all or part of any LIBOR Loan to the extent the Lender actually incurs any breakage costs associated with such prepayment or payment; or

(c)     the introduction of or any change in the interpretation of any law or regulation (other than in each case any introduction or change in interpretation relating to withholding taxes, which is governed by Section 2.8) or the compliance by the Lender with any guideline or request from any central bank or other governmental authority (whether or not having the force of law), including, without limitation, the introduction of, change of, change by any central bank or other governmental authority in the interpretation or administration of, or compliance by the Lender or corporation or other entity controlling the Lender with, any capital adequacy regulation.

2.8     Taxes.  All payments by the Borrowers under this Agreement shall be made free and clear of any restrictions or conditions, without set off or counterclaim, and free and clear of, and without any deduction or withholding whether for or on account of tax or otherwise.  If any such deduction or withholding is required by law to be made by the Borrowers or any other Person (whether or not a party to, or on behalf of a party to this Agreement) from any sum paid or payable by, or received or receivable from, the Borrowers, the Borrowers shall pay in the same manner and at the same time such additional amounts as will result in the Lender's receiving and retaining (free from any liability other than tax on its overall net income) such net amount as would have been received by it had no such deduction or withholding been required to be made.

2.9     Purpose.  The Borrowers shall use the proceeds of the Loan to make an equity investment in Turbine Generation Services, L.L.C. ("Turbine Generation").  The Borrowers will not, directly or indirectly, use any part of such proceeds for the purpose of (a) purchasing, improving, or otherwise investing in residential real estate, whether a primary residence of the Borrowers or otherwise; or (b) purchasing or carrying any margin stock within the meaning of Regulation U or to extend credit to any Person for the purpose of purchasing or carrying any such margin stock in contravention of Regulation U.  THE BORROWERS MUST OBTAIN THE PRIOR APPROVAL OF THE LENDER IF THE INTENDED PURPOSE OF THE FACILITY IS DIFFERENT FROM THE PURPOSE DISCLOSED BY THE BORROWERS IN THIS SECTION 2.9 OR IN ANY FEDERAL RESERVE FORM U-1 SUBMITTED BY THE BORROWERS TO THE LENDER.

(b) Unless disclosed to the Lender in the Notice of Borrowing and approved by the Lender, the Borrowers agree that the funds received from the Lender hereunder shall not be used for the benefit of, or transferred to, any affiliate of the Lender and, in particular, that such funds shall not be used for the acquisition of equity or the refinancing of the indebtedness of companies in which affiliates of the Lender hold debt or equity positions.

2.10    Application of Payments.  All payments received by or on behalf of the Borrowers with respect to the Obligations shall be applied thereto in the order and manner the Lender determines in its sole discretion.

2.11    Loan Accounts.  In accordance with ordinary procedures, the Lender shall record on its books and records the amount of the Loan made, the interest rate applicable, all payments of principal and interest thereon and the principal balance

5

thereof from time to time outstanding. Such record shall, absent demonstrable error, be conclusive evidence of the amount of the Loan made by the Lender to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder (and under the Note) to pay any amount owing with respect to the Loan or provide the basis for any claim against the Lender.

2.12    Substitution of Collateral.   If the Lender in its sole and absolute discretion determines that any shares, membership interests, or units pledged by the Borrowers are no longer acceptable Collateral due to limitations or restrictions on, or adverse consequences resulting from, the pledge thereof to the Lender or the ability of the Lender to acquire such interests after an Event of Default, then, in any such case, the Lender may promptly notify the Borrowers thereof and the Borrowers shall, within five (5) Business Days of receipt of such notice from the Lender, substitute alternative Collateral acceptable to the Lender in its sole discretion.

## ARTICLE III

### CONDITIONS PRECEDENT

3.1    Deliveries.         (A)         The obligation of the Lender to make the initial Loan hereunder shall be subject to satisfaction of the following conditions precedent:

(a)         The Borrowers shall have furnished to the Lender, or caused to be furnished to the Lender (unless otherwise waived by the Lender in writing), the following, each in form and substance satisfactory to the Lender and its counsel, each dated as of the Effective Date (or such other date as shall be acceptable to the Lender) and duly executed by each Loan Party that is a party thereto:

this Agreement;

the MBM DOH Note;

the TCM DOH Note;

each of the Security Documents;

a Notice of Borrowing;

if the Loan is to be secured directly or indirectly by margin stock, the appropriate "Federal Reserve Form, Statement of Purpose for an Extension of Credit Secured by Margin Stock," completed in a manner satisfactory to the Lender; and

such other documents and information as the Lender or its counsel may reasonably request to enable the Lender to obtain final credit approval.

(b)         The Lender shall have received a favorable opinion of counsel addressed to the Lender covering such matters relating to the transactions contemplated hereby as reasonably requested by the Lender and substantially in a form acceptable to the Lender.

(c)         The Lender shall be satisfied with its review of the Constituent Instruments of each Loan Party (if applicable).

3.2    Fees and Expenses.   On the Effective Date, the Borrowers shall have paid all fees and expenses incurred or payable by the Lender (including, without limitation, reasonable fees and expenses of counsel for the Lender), arising in connection with the negotiation, preparation and execution of this Agreement and the other Loan Documents and all other instruments and documents to be delivered hereunder or thereunder or arising in connection with the transactions contemplated hereunder or thereunder, and the Borrowers hereby authorize the Lender to deduct all such amounts from the aggregate proceeds of the Loan. The structuring fee due at closing shall be $175,000.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES

Each Borrower represents and warrants to the Lender, solely in respect of itself and not in respect of any other Borrower, that on the date hereof:

4.1    Name, Etc.   Each Borrower's legal name is correctly set forth on the signature page hereto and the other information regarding each Borrower set forth in this Agreement, including without limitation, below each Borrower's signature hereto is true, correct and complete on the date hereof.

6

4.2     Enforceable Obligations.  Each Borrower (a)  if an individual, is competent to enter into this Agreement and the other Loan Documents to which such Borrower is a party and to perform such Borrower's obligations hereunder and thereunder and (b) if a corporation, limited liability company, partnership, trust or other legal entity, is duly organized and validly existing in good standing under the laws of its jurisdiction of formation, is duly qualified and in good standing in all such foreign jurisdictions where its business or property so requires and has the power and authority to enter into this Agreement and the other Loan Documents to which it is a party.  The execution, delivery and performance by each Borrower of the Loan Documents to the extent it is a party thereto and the consummation of the transactions contemplated by this Agreement and the other Loan Documents have been duly authorized by all necessary action, including necessary actions by directors, members, shareholders or trustees, as the case may be and: (i) will not violate any law or regulation, or any order or decree of any court or governmental instrumentality (including Regulations U and X of the Board of Governors of the Federal Reserve System); (ii) if any Borrower is a corporation, limited liability company, partnership, trust or other legal entity, will not violate any Constituent Instruments of such Borrower, (iii) will not conflict with or result in the breach or termination of, constitute a default under, or accelerate any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which any Borrower is a party or by which any Borrower or any of its property is bound; (iv) will not result in the creation or imposition of any lien upon any of the property of any Loan Party other than those in favor of the Lender, all pursuant to the Loan Documents; and (v) do not require the consent or approval of any governmental body, agency, authority or any other Person, except such consents as have been obtained.  Each of the Loan Documents to which each Borrower is a party when delivered hereunder shall constitute a legal, valid and binding obligation of such Borrower, enforceable against it in accordance with its terms.

4.3     Taxes: Compliance with Laws.  Each Borrower has filed or caused to be filed all federal, state and local tax returns that are required to be filed by such Borrower, which returns were true, accurate and complete in all material respects, and has paid or caused to be paid all taxes shown to be due and payable on such returns or on any assessments received by each Borrower.  No Borrower is in violation in any material respect of any applicable law, rule, regulation, order, judgment, writ or decree of any governmental authority applicable to any Borrower or its property.

4.4     Solvency.  After giving effect to the Loan, each Borrower shall be Solvent.

4.5     Complete Disclosure.  All factual information including, without limitation, all financial statements, furnished by or on behalf of each Borrower to the Lender for purposes of or in connection with this Agreement and the other Loan Documents is, and all other such factual information hereafter furnished by or on behalf of each Borrower will be, true and accurate in all material respects on the date as of which such information is furnished and not incomplete by omitting to state any fact necessary to make such information not misleading at such time in light of the circumstances under which such information is provided.  Since the date of each Borrower's most recent financial statements, tax returns or other financial representations delivered or made to the Lender, there has been no material adverse change in the business, condition (financial or otherwise), obligations, performance, properties, or prospects of any Borrower.

4.6     Absence of Undisclosed Liabilities.  No Borrower has any material liabilities or obligations, either accrued, absolute, contingent or otherwise, other than (a) the Obligations and (b) the liabilities and obligations set forth in the financial statements and financial representations previously delivered or made to the Lender.

4.7     Foreign Assets Control Regulations, Etc.  No Borrower is (i) in violation of the Trading with the Enemy Act of the United States of America (50 U.S.C. App §§ 1 et seq.), as amended; (ii) on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("**OFAC**"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation; (iii) in violation of the USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 ("**USA Patriot Act**"); (iv) a Person designated under Section 1(b), (c) or (d) or Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders; or (v) to the best of its knowledge, engaging in any dealings or transactions, or is otherwise associated, with any of the foregoing blocked Persons.

4.8     No Default.  No Borrower is, and after giving effect to this Agreement shall be, in default in the payment or performance of any contractual obligation.

4.9     No Litigation.  There are no actions, suits, litigations, arbitrations, administrative or other legal proceedings, or investigations, pending or threatened, against any Borrower or any of the Collateral in which any Borrower has rights that will or could (a) have a material adverse effect on the business or affairs, condition (financial or otherwise), obligation, operations, performance, properties or prospects of any Borrower, or (b) affect any Borrower's ability to enter into and perform its obligations under this Agreement or any of the transactions contemplated by this Agreement.  There have not been any judgment(s) or other legal proceedings against any Borrower in the past seven (7) years.

4.10     Investment Company Act.  If any Borrower is organized as a corporation, limited liability company, partnership or other legal entity, such Borrower is not an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.  No Borrower is subject to regulation under any federal or state statute or regulation which limits its ability to borrow money.

4.11     Transact Business.  If any Borrower is organized as a corporation, limited liability company, partnership or other legal entity, such Borrower has all the necessary right, power and authority to own Borrower's property and assets and to transact the business in which such Borrower is engaged.

7

4.12    Employee Retirement Income Security Act of 1974.  No Loan Party is (x) an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), subject to Title I of ERISA or a "plan" subject to the prohibited transaction provisions of Section 4975 of the Internal Revenue Code of 1986, as amended (an "ERISA Plan"), (y) a Person acting on behalf of any ERISA Plan, or (z) a Person the assets of whom constitutes assets of any ERISA Plan.

4.13    Bank Official.

(a)    No Borrower is (i) a Company controlled by a Bank Official or by the spouse or child of a Bank Official, (ii) a political or campaign committee that benefits or is controlled by a Bank Official or by the spouse or child of a Bank Official or (iii) the spouse or child of a Bank Official.

(b)    If any Borrower is organized as a trust or an estate vehicle, neither the trustee nor the beneficiary of such trust or estate vehicle is a Bank Official or the spouse or the child of a Bank Official.

ARTICLE V

COVENANTS

For so long as the Loan remains outstanding under this Agreement, unless the Lender shall otherwise consent in writing, the Borrowers shall:

5.1    Events of Default.  Give the Lender prompt written notice of any Event of Default under this Agreement or any other default under any other Loan Document or any other agreement that could, in the opinion of the Lender, have a material adverse effect on any Borrower.

5.2    Execution of Supplemental Instruments.  Execute and deliver to the Lender from time to time, upon demand, such supplemental agreements, statements, assignments, transfers, instructions, instruments or documents as the Lender may reasonably request, in order that the full intent of this Agreement may be carried into effect.

5.3    Obligations and Taxes.  Pay and discharge promptly when due all taxes, assessments and governmental charges or levies imposed upon it or upon its income or assets before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise, which, if unpaid, might give rise to liens or charges upon such assets or any part thereof; provided, however, that the Borrowers shall not be required to pay and discharge or to cause to be paid and discharged any such tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings.

5.4    Litigation.  Give the Lender prompt written notice of the filing or commencement of any action, suit or proceeding against any Borrower, whether at law or in equity or by or before any court or any governmental authority, in each case, that could, in the opinion of the Lender, have a material adverse effect on any Borrower or where the amount demanded is in excess of $250,000.

5.5    USA Patriot Act, OFAC Compliance.  Provide such information and take such actions as are reasonably requested by the Lender in order to assist the Lender with compliance with the USA Patriot Act; and each Borrower shall at all times comply with OFAC and the USA Patriot Act.

5.6    Solvency.  At all times be Solvent.

5.7    Indebtedness.  Not, nor shall it permit any Borrower to, create, incur, assume, guarantee or be or remain liable for, contingently or otherwise, or suffer to exist any indebtedness, except the Obligations and the existing indebtedness described in the financial statements and financial representations previously delivered or made to the Lender and other indebtedness not exceeding $1,000,000 in aggregate principal amount at any one time outstanding unless the prior written consent of the Lender is obtained.

5.8    No Permitted Pledges.  Not permit the sale, transfer, assignment, exchange, pledge or other conveyance of any of the Collateral, including, without limitation, outstanding shares in Turbine Generation.

5.9    Securities Accounts.  If applicable, except as permitted by the applicable Security Document, without the prior consent of the Lender, not close or cause to be closed, the Securities Account or withdraw, or cause to be withdrawn, any securities or other funds from the Securities Account.

5.10    Name, Etc.  Without the prior written consent of the Lender, such consent not to be unreasonably withheld, not change (a) any Borrower's legal name, (b) any Borrower's address or (c) if any Borrower is an individual, his or her principal

8

residence, or if any Borrower is a corporation, limited liability company, partnership, trust or other legal entity, its principal place of business, chief executive office, jurisdiction of organization or situs for administration.

5.11    Use of Proceeds.  Use all proceeds of the Loan only as permitted under Section 2.9 hereof.

5.12    Compliance with Laws.  Comply in all material respects, with all applicable laws, statutes, codes, ordinances, regulations, rules, orders, awards, judgments, decrees, injunctions, approvals and permits.

5.13    Financial Information.  Promptly upon the request of the Lender, but in any event no later than thirty (30) days after receipt of such request, deliver to the Lender copies of each Borrower's most recently filed federal tax returns, bank and brokerage statements and other financial statements or information reasonably requested by the Lender.

5.14    Turbine Generation Operating Statements.  The Borrowers shall deliver to the Lender copies of the monthly operating statements of Turbine Generation within 10 days of the end of each calendar month.

5.15    Further Assurances.  The Borrowers shall cooperate in good faith to perform any action and deliver any documentation within ten (10) Business Days of the date hereof (as such period may be extended by the Lender, in the Lender's sole discretion) as may be reasonably requested by the Lender in connection with pledging additional collateral to the Lender, including, without limitation, shares of stock in Green Field Energy, Inc. and Dynamic Industries, Inc.

ARTICLE VI

EVENTS OF DEFAULT

The occurrence of any one or more of the following events shall constitute a default hereunder (each, an "**Event of Default**"):

6.1    The Borrowers (a) shall fail to pay any principal of any Loan hereunder or under the Note when due and payable; or (b) shall fail to pay any accrued interest on any Loan or any other amount owed hereunder or under any other Loan Document when due and such failure under this clause (b) continues for a period of five (5) days after such interest or other amount becomes due and payable.

6.2    The breach by any Loan Party of any other covenant contained in any Loan Document.

6.3    Any representation or warranty made in any Loan Document by any Loan Party shall be materially false or misleading as of the date such representation or warranty was made.

6.4    The occurrence of any default under any of the other Loan Documents or any other agreement between any Loan Party, on the one hand, and any member of the Goldman Affiliated Group, on the other hand or any other agreement that could have a material adverse effect on any Loan Party.

6.5    Any Loan Party shall (i) have an order for relief entered with respect to it under the Federal bankruptcy laws as now or hereafter in effect, (ii) make an assignment for the benefit of creditors, (iii) become insolvent or admit in writing its inability or refusal to pay debts as they become due, (iv) apply for, seek, consent to, acquiesce in, or have appointed for it or any substantial portion of its property a receiver, custodian, trustee, examiner, liquidator or similar official, or (v) institute, or have commenced against it, any proceeding seeking an order for relief under the Federal bankruptcy laws as now or hereafter in effect or seeking to adjudicate it bankrupt or insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it.

6.6    The Security Documents shall for any reason fail to create a valid lien and security interest in the Collateral, or this Agreement or any of the other Loan Documents shall fail to remain in full force or effect, or any action shall be taken to discontinue or to assert the invalidity or unenforceability thereof.

6.7    An attachment or garnishment writ or the like is levied against all or any portion of the Securities Account or any Collateral.

6.8    Any indebtedness of any Loan Party to any entity, lender or other person (including any member of the Goldman Affiliated Group) to whom such Loan Party is indebted: (i) is not paid when due nor within any applicable grace period in any agreement relating to such indebtedness, or (ii) becomes due and payable before its normal maturity by reason of a default or event of default, however described.

6.9    Final judgment for the payment of money is rendered against any Loan Party and within thirty (30) days from the entry of such judgment has not been discharged or stayed pending appeal or has not been discharged within thirty (30) days from the entry of a final order of affirmance on appeal.

9

6.10    the Lender otherwise deems its security interest in any of the Collateral insufficient, invalid or otherwise unenforceable or the Lender believes in good faith that the prospect of payment or other performance by any Loan Party is impaired, whether due to market volatility or liquidity of the Collateral or otherwise.

6.11    With respect to any Loan Party that is an individual, such Loan Party dies or becomes or is declared (by an appropriate legal authority) incompetent or of unsound mind. With respect to any Loan Party that is a corporation, limited liability company, partnership, trust or other legal entity, any event or circumstance shall occur which could reasonably result in the dissolution or liquidation of such Loan Party.

6.12    The occurrence of any Event of Default (as defined in the Term Loan Agreement) under the Term Loan Agreement.

6.13    The occurrence of (a) the breach of any covenant set forth in Article IV of the Indenture, or (b) any Event of Default (as defined in the Indenture) under the Indenture.

ARTICLE VII

ACCELERATION, WAIVERS, AMENDMENTS AND REMEDIES

7.1     Acceleration.  If any Event of Default described in Section 6.5 or Section 6.11 occurs with respect to the Borrowers, the Obligations shall immediately become due and payable without any election, notice or action on the part of the Lender.  If any other Event of Default occurs, the Lender may declare the Obligations to be due and payable, whereupon the Obligations shall become immediately due and payable, without presentment, demand, protest or notice of any kind, all of which the Borrowers hereby expressly waive.

7.2     Other Remedies.  Upon the occurrence and during the continuance of an Event of Default, the Lender (i) shall have, in addition to all other rights of the Lender, the rights and remedies of a secured party under the UCC, (ii) may proceed to protect and enforce the Lender's rights by suit in equity, action of law and/or other appropriate proceeding either for specific performance of any covenant or condition contained in this Agreement, any other Loan Document or in any instrument or document delivered to the Lender pursuant hereto or thereto, and (iii) in the exercise of any rights, remedies or powers granted in this Agreement, any other Loan Document and/or any such instrument or document, may proceed to declare the Obligations to be due and payable pursuant to Section 7.1 hereof and the Lender may proceed to enforce payment of such Obligations as provided herein or in any Loan Document, and may offset and apply toward the payment of such amount any indebtedness of the Lender to the Borrowers.

Upon the occurrence and during the continuance of an Event of Default, the Lender in its discretion may also set-off any or all of the Obligations against any securities, cash or other property of the Borrowers in the possession of the Lender or any other member of the Goldman Affiliated Group and against any obligations owed to the Borrowers by the Lender or any other member of the Goldman Affiliated Group to the extent that it does not impact the Lender's ability to recover amounts owed to the Lender.  THE BORROWERS UNDERSTAND THAT PURSUANT TO THE TERMS OF THIS AGREEMENT THE BORROWERS ARE ALLOWING THE LENDER TO SET-OFF ANY OR ALL OBLIGATIONS OF THE BORROWERS TO THE LENDER OR ANY OTHER MEMBER OF THE GOLDMAN AFFILIATED GROUP AND BY ALLOWING FOR SUCH AFFILIATE SET-OFF, THE BORROWERS ARE WAIVING ALL OF THEIR RIGHTS TO LIMIT SET-OFF TO THOSE OBLIGATIONS WHICH ARE MUTUAL AS BETWEEN THE LENDER AND THE BORROWERS.

7.3     Amendments.  the Lender and the Borrowers may enter into written agreements supplemental hereto or the Loan Documents for the purpose of adding or modifying any provisions to the Loan Documents or changing in any manner the rights of the Lender or the Borrowers hereunder or waiving any Event of Default hereunder.  To be effective, any such amendment or waiver must be in writing and signed by the Lender and the Borrowers.

7.4     Preservation of Rights; No Adverse Impact.  No delay or omission of the Lender to exercise any right under this Agreement or any of the Loan Documents shall impair such right or be construed to be a waiver of any Event of Default or an acquiescence therein.  Any single or partial exercise of any such right shall not preclude other or further exercise thereof or the exercise of any other right.  All remedies contained in the Loan Documents, or afforded by law, shall be cumulative and all shall be available to the Lender until the Obligations have been indefeasibly paid in full in cash.

ARTICLE VIII

GENERAL PROVISIONS

8.1     Survival of Representations.  All representations and warranties of the Borrowers contained in this Agreement shall survive delivery of the Loan Documents and the making of the Loan.

8.2     Headings.  Section headings in the Loan Documents are for convenience of reference only and shall not govern the interpretation of any of the provisions of the Loan Documents.

10

8.3     Entire Agreement.  The Loan Documents embody the entire agreement and understanding between the Borrowers and the Lender and supersede all prior agreements and understandings between the Borrowers and the Lender relating to the subject matter thereof.

8.4     No Third Party Beneficiary.  This Agreement shall not be construed so as to confer any right or benefit upon any Person other than the parties to this Agreement and their respective successors and assigns.

8.5     Expenses  Upon the occurrence of an Event of Default, the Borrowers shall pay to the Lender on demand all expenses reasonably incurred in connection with the collection and enforcement of all Obligations under the Loan Documents and in connection with any proceeding commenced by or against the Borrowers under Title 11 of the U.S. Code including, without limitation, all attorneys' fees and expenses.

8.6     Severability of Provisions.  Any provision in any Loan Document that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions of the Loan Documents in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction, and to this end the provisions of all Loan Documents are declared to be severable.

8.7     Nonliability of the Lender.  The relationship between the Borrowers and the Lender shall be solely that of borrower and lender.  The Lender shall have no fiduciary responsibilities to the Borrowers under this Agreement, any other Loan Document or in connection with the transactions contemplated hereby or thereby.

8.8     CHOICE OF LAW.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN THOSE CONTAINING A CONTRARY EXPRESS CHOICE OF LAW PROVISION) SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF NEW YORK.

8.9     BINDING ARBITRATION.

(a)     THE PARTIES HERETO HEREBY WAIVE ALL RIGHTS TO A COURT TRIAL OR TRIAL BY JURY WITH RESPECT TO ANY DISPUTE, CONTROVERSY OR CLAIM UNDER THIS AGREEMENT AND THE BORROWERS AGREE TO SETTLE BY ARBITRATION ANY CONTROVERSY BETWEEN THE BORROWERS AND THE LENDER OR ITS AFFILIATES ARISING OUT OF OR RELATING TO THIS AGREEMENT.  THE ARBITRATION WILL BE CONDUCTED IN ACCORDANCE WITH THE RULES THEN IN EFFECT OF THE AMERICAN ARBITRATION ASSOCIATION.  ANY DISPUTE OR CLAIM INVOLVING A DOLLAR AMOUNT OF $50,000 OR LESS WILL BE BEFORE ONE ARBITRATOR, AND ALL OTHER DISPUTES AND CLAIMS WILL BE BEFORE A PANEL OF AT LEAST THREE ARBITRATORS.  THE AWARD OF THE ARBITRATOR OR A MAJORITY OF THE ARBITRATORS, AS THE CASE MAY BE, WILL BE FINAL, AND JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT HAVING JURISDICTION.

(b)     NO PARTY HERETO WILL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST THE OTHER PARTY WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION OR WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL:  (I) THE CLASS CERTIFICATION IS DENIED; (II) THE CLASS IS DECERTIFIED; OR (III) THE OTHER PARTY IS EXCLUDED FROM THE CLASS BY THE COURT.  SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

(c)     THE BORROWERS AGREE TO HOLD HARMLESS THE SECURITIES INTERMEDIARY AND ITS AFFILIATES AND ITS DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS FROM ANY AND ALL CLAIMS, LIABILITIES, AND/OR DAMAGES, IN ANY WAY RELATED TO, OR ARISING OUT OF, OR IN CONNECTION WITH, EACH BORROWER'S GRANTING OF THE SECURITY INTEREST OR THE LENDER'S EXERCISE OF RIGHTS UNDER THIS AGREEMENT OR THE SECURITY DOCUMENTS, INCLUDING ANY ACTION OR INACTION BY THE SECURITIES INTERMEDIARY IN FOLLOWING THE LENDER'S INSTRUCTIONS REGARDING THE SECURITIES ACCOUNT IN ACCORDANCE WITH THIS AGREEMENT OR ANY OTHER SECURITY DOCUMENT.

(d)     THE BORROWERS AND THE LENDER HEREBY FURTHER AGREE AS FOLLOWS:

EACH OF THE BORROWERS AND THE LENDER IS EACH GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT, INCLUDING THE RIGHT TO A TRIAL BY JURY, EXCEPT AS PROVIDED BY THE RULES OF  THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED.

ARBITRATION AWARDS ARE GENERALLY FINAL AND BINDING; A PARTY'S ABILITY TO HAVE A COURT REVERSE OR MODIFY AN ARBITRATION AWARD IS VERY LIMITED.

THE ABILITY OF THE PARTIES HERETO TO OBTAIN DOCUMENTS, WITNESS STATEMENTS AND OTHER DISCOVERY IS GENERALLY MORE LIMITED IN ARBITRATION THAN IN COURT PROCEEDINGS.

11

THE ARBITRATOR(S) DO NOT HAVE TO EXPLAIN THE REASON(S) FOR THEIR AWARD UNLESS, IN AN ELIGIBLE CASE, A JOINT REQUEST FOR AN EXPLAINED DECISION HAS BEEN SUBMITTED BY ALL PARTIES TO THE PANEL AT LEAST 20 DAYS PRIOR TO THE FIRST SCHEDULED HEARING DATE.

ANY PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES AND/OR BANKING INDUSTRY.

THE RULES OF SOME ARBITRATION FORUMS MAY IMPOSE TIME LIMITS FOR BRINGING A CLAIM IN ARBITRATION. IN SOME CASES, A CLAIM THAT IS INELIGIBLE FOR ARBITRATION MAY BE BROUGHT IN COURT.

THE RULES OF THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED, AND ANY AMENDMENTS THERETO, SHALL BE INCORPORATED INTO THIS AGREEMENT.

8.10     Indemnity.  The Borrowers hereby agree to indemnify, defend and hold harmless the Lender and its officers, directors, employees, agents, representatives, successors and assigns (each, an "**Indemnified Person**") in connection with any losses, claims, damages, liabilities, obligations, penalties, actions, suits, costs, charges and expenses, including reasonable attorneys' fees, (i) of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement and any other Loan Document, or the transactions contemplated hereby or thereby, and with respect to any investigation, litigation or proceeding (including any bankruptcy, insolvency or appellate proceeding) related to this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby or the use of the proceeds of the Loan, whether or not any Indemnified Party is a party thereto and (ii) which may be incurred by or asserted against such Indemnified Person in connection with or arising out of any pending or threatened investigation, litigation, or proceeding (including any bankruptcy or insolvency proceeding) or any action taken by any Person, with respect to any environmental claim or suit arising out of or related to any property of the Borrowers (all of the foregoing, the "**Indemnified Liabilities**").  Notwithstanding the foregoing, the Borrowers shall have no obligation to any Indemnified Person for any Indemnified Liabilities to the extent arising from the gross negligence or willful misconduct of such Indemnified Person as determined in a final, non-appealable decision of a court of competent jurisdiction or of an arbitration panel. The Borrowers hereby acknowledge and agree that any member of the Goldman Affiliated Group that grants a security interest in any of its assets as collateral security for the Loan shall have all rights of subrogation against the Borrowers.

8.11     Assignment, Etc.

(a)     The Lender may sell, assign, transfer or negotiate its rights and obligations under this Agreement and the other Loan Documents, in whole or in part at any time (i) to any other member of the Goldman Affiliated Group without notice to or consent of the Borrowers or any other Person or (ii) to any other bank or entity with net assets in excess of $100,000,000 so long as the Borrowers consent to such sale, assignment, transfer or negotiation in writing (which consent shall not be unreasonably conditioned, withheld or delayed); provided that any such consent shall not be required if an Event of Default is then continuing. The Borrowers agree to execute any additional or replacement Notes requested by the Lender to further document any such sale, assignment, transfer or negotiation.  Any assignee or transferee of the Lender's rights and/or obligations shall be entitled to the full benefit of this Agreement to the same extent as if it were an original party in respect of the rights or obligations assigned or transferred to it.

(b)     The Lender may sell participating interests in the Loan owing to the Lender, any Note held by such Lender or any other interest of such Lender under this Agreement and the other Loan Documents to one or more banks or other entities with net assets in excess of $100,000,000 ("**Participants**").  In the event of any such sale by the Lender of participating interests to a Participant, the Lender's obligations under this Agreement and the other Loan Documents shall remain unchanged, the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, the Lender shall remain the owner of its Loan and the holder of any Note issued to it in evidence thereof for all purposes under the Loan Documents, all amounts payable by the Borrowers under this Agreement shall be determined as if the Lender had not sold such participating interests, and the Borrowers shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under the Loan Documents.

(c)     The Borrowers may not assign their rights or obligations under this Agreement.  This Agreement shall be binding upon and inure to the benefit of the respective heirs, successors and permitted assigns of all the parties to this Agreement.  The Lender may at any time change the office through which it is acting for the purpose of this Agreement and may at any time act for this purpose through more than one office.  The Lender may disclose to an assignee or transferee permitted by this Agreement such information about the Borrowers and the Loan Documents as it may deem appropriate.

(d)     Nothing herein shall prohibit the Lender from pledging or assigning Loans to any Federal Reserve Bank in accordance with applicable law.

8.12     Giving Notice.  Unless otherwise provided herein, all notices and other communications provided to any party hereto under this Agreement or any other Loan Document shall be in writing or by facsimile and addressed or delivered to such party at its address as follows (unless otherwise designated in writing to the other parties):  (i) if to the Borrowers, at the address set forth below each Borrower's name on the signature page hereto and (ii) if to the Lender, at the address set forth below the Lender's name on the signature page hereto.  Unless otherwise provided herein, any notice, if mailed and properly addressed with postage

12

prepaid, shall be deemed given three (3) Business Days after being sent; any notice, if transmitted by facsimile, shall be deemed given when transmitted; any notice, if hand delivered, shall be deemed given on the date of such delivery; any notice, if mailed by overnight courier, shall be deemed given on the date of such delivery.

      8.13    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart. Facsimiled and photocopied signatures to this Agreement shall be valid. This Agreement shall be effective when it has been executed by the Borrowers and the Lender.

      8.14    <u>Co-Borrowers and Several Liability</u>.

      (a)    If the Borrowers consist of more than one individual (each a "**Co-Borrower**"), references herein to "the Borrower" shall be read as "each Co-Borrower", "all Co-Borrowers", or "any or all Co-Borrowers", jointly and severally, whichever reading maximizes the Lender's rights and the Co-Borrowers' Obligations under this Agreement. Each Co-Borrower agrees that each Co-Borrower will have authority on behalf of all Co-Borrowers to deal with the Lender as fully and completely as if each was the sole Borrower under this Agreement, all without notice to the other Co-Borrower(s). Notwithstanding the foregoing, each Co-Borrower agrees that the Lender may, at its discretion, (a) require joint instruction from some or all of the Co-Borrowers before taking action under this Agreement and (b) if the Lender received instructions from any Co-Borrower that are, in the Lender's opinion, in conflict with instructions received from any other Co-Borrower, comply with any of these instructions and/or advise each Co-Borrower of the apparent conflict and/or take no action as to any of these instructions until it receives instructions from any or all of the Co-Borrowers that are satisfactory to the Lender. Notice provided by the Lender to any Co-Borrower will be deemed notice to all Co-Borrowers.

      (b)    Notwithstanding anything to the contrary contained in this Agreement, liability between MBM DOH Borrower and TCM DOH Borrower shall be several and not joint.

      8.15    <u>Reinstatement of Obligations</u>. If and to the extent the Lender or the Securities Intermediary receives any payment with respect to the Obligations or this Agreement and all or any part of such payment is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid by the Lender or the Securities Intermediary or paid over to a trustee, receiver, or any other entity, whether under any bankruptcy law or otherwise (any such payment is referred to as a "**Returned Payment**"), then this Agreement shall continue to be effective or shall be reinstated, as the case may be, to the extent of such payment or repayment by the Lender or the Securities Intermediary, and the indebtedness or part thereof intended to be satisfied by such Returned Payments shall be revived and continued in full force and effect as if the Returned Payment had not been made.

      8.16    <u>Certain Risks and Potential Conflicts of Interest</u>.

      (a)    (This Section 8.16(a) is applicable to the extent the Collateral includes "Funds" and "Fund Interests" (as such terms are defined in the Security Document) and such "Fund Interests" are issued by a member of the Goldman Affiliated Group.) There are certain risks and potential conflicts of interest relating to the various capacities in which the Lender and its affiliates are acting in connection with the Funds (as defined in the applicable Security Document), the Collateral and acting as the Lender, a summary description of which is set forth on Exhibit 8.16. Each Borrower acknowledges that it has received, read and understood the disclosure set forth on Exhibit 8.16.

      (b)    Each Borrower acknowledges that, to the extent the Collateral includes municipal securities, shares of municipal bond funds or shares of mutual funds invested in municipal securities, a ratable portion of otherwise tax deductible interest expense incurred on the Loans may not be tax deductible.

      8.17    <u>USA Patriot Act</u>. The Lender hereby notifies the Borrowers that, pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of the Borrowers and other information that will allow such Lender to identify the Borrowers in accordance with the USA Patriot Act.

      8.18    <u>Other Disclosures</u>.

      (a)    Each Loan Party acknowledges that it has received, read and understood the privacy notice set forth on Annex I.

      (b)    Each Loan Party acknowledges that it has received, read and understood the notice of potential conflicts of interest set forth on Annex II.

[Remainder of page intentionally left blank; signature page follows]

13

IN WITNESS WHEREOF, the Borrowers and the Lender have executed this Agreement as of the date set forth below the Lender's signature.

LENDER:

GOLDMAN SACHS BANK USA

By: _____

    Name: Rod Colburn

    Title: Vice President

Effective Date: _____

Address:    200 West Street
             New York, NY 10282-2198

Facsimile:    212-428-1474

**Loan Agreement]**

**MBM DOH BORROWER:**

MBM 2011 DOH GRANTOR RETAINED ANNUITY TRUST

By:

Name: Dalis M. Waguespack

Title: Trustee

Notice Address: 4023 Amb Caffery Ste 200 Lafayette, LA 70503

Facsimile: (337) 988-6693

**TCM DOH BORROWER:**

TCM 2011 DOH GRANTOR RETAINED ANNUITY TRUST

By: _Dalis M Waguespack_

Name: Dalis M. Waguespack

Title: Trustee

Notice Address: 4023 Ambs Caffery Ste 200 Lafayette, LA 70508

Facsimile: (337) 988-0693

**SCHEDULE I**

Security and Pledge Agreement dated as of the Effective Date between the Pledgors party thereto and the Lender, as amended, restated, supplemented or otherwise modified from time to time, securing the Obligations, substantially in the form of Exhibit D hereto (the "Security Agreement").

**EXHIBIT A**

**(see attached)**

LEGAL_US_E # 104948841.2

**NOTE**

Principal Amount:  $7,500,000.00                                                    ***[July 5]***, 2013

      FOR VALUE RECEIVED, the undersigned Borrower (the "**Borrower**") promises to pay to Goldman Sachs Bank USA (the "**Lender**"), at the Lending Office or such other place as the Lender or any holder hereof may from time to time designate, the principal sum of SEVEN MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($7,500,000.00), or such lesser principal amount which has been advanced and remains outstanding from time to time, in United States Dollars and in immediately available funds as provided in that certain Loan Agreement of even date herewith between the Borrower and the Lender (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), together with interest on the unpaid principal amount hereof from time to time outstanding, at the rates and on the dates set forth in the Loan Agreement.  Interest shall be calculated on the basis of a three hundred sixty (360) day year and actual days elapsed.

      This Note is issued pursuant to, and is entitled to the benefits of, the Loan Agreement.  Reference hereby is made thereto for a statement of the terms and conditions under which this Note may be prepaid or its maturity date accelerated.  This Note is secured pursuant to the terms of the Loan Agreement and certain other Loan Documents and reference is made thereto for a statement of the terms and provisions thereof.  Capitalized terms used herein and not otherwise defined herein are used with the respective meanings attributed to them in the Loan Agreement.

      If any payment of principal or interest is not made when due hereunder (after giving effect to any applicable grace period), or if any other Event of Default shall occur for any reason, or if the Loan Agreement shall be terminated or not renewed for any reason whatsoever, then and in any such event, in addition to all rights and remedies of the Lender under the Loan Agreement or any other Loan Document, applicable law or otherwise, all such rights and remedies being cumulative and enforceable alternatively, successively and concurrently, the Lender may, at its option, declare any and all of the Borrower's obligations, liabilities and indebtednesses owing by the Borrower under this Note, the Loan Agreement and any other Loan Document (collectively, the "**Obligations**") to be due and payable, whereupon the then unpaid balance thereof, together with all interest accrued thereon or expenses incurred in connection therewith shall forthwith become due and payable, together with all interest accruing thereafter at the rate set forth in the Loan Agreement until the Obligations, plus all costs and expenses of collection hereof, including, without limitation, reasonable attorneys' fees and expenses, are indefeasibly paid in full in cash.

      The Borrower shall pay all of the Lender's costs and expenses (including, without limitation, all reasonable attorneys' fees and expenses) incurred in connection with the enforcement of or preservation of rights under this Note on the terms provided in the Loan Agreement.

      No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Lender, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion.  The Borrower and every indorser or guarantor of this Note regardless of the time, order or place of signing waives presentment, demand, protest and notices of every kind and assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of Collateral, and to the addition or release of any other Person primarily or secondarily liable.

      None of the terms or provisions of this Note may be excluded, modified, or amended except by a written instrument duly executed on behalf of the Lender expressly referring hereto and setting forth the provision so excluded, modified or amended.  This Note shall be binding upon the successors and assigns of the Borrower and inure to the benefit of the Lender and its successors, endorsees and assigns.  If any term or provision of this Note shall be held to be invalid or unenforceable, in whole or in part in any jurisdiction, then such invalidity or unenforceability shall only effect such term or provision, and shall not effect such term or provision in any other jurisdiction or any other term or provision of this Note.

      All rights and obligations hereunder shall be governed by the laws of the State of New York (without giving effect to principles of conflicts or choice of laws) and this Note shall be deemed to be made under seal.

LEGAL_US_E # 104948841.2

IN WITNESS WHEREOF, the Borrower has executed this Note as of the date first above written.

**BORROWER:**

**[MBM][TCM] 2011 DOH GRANTOR RETAINED ANNUITY TRUST**

By: _____

Name:
Title:

**EXHIBIT B**

**Notice of Borrowing**

Goldman Sachs Bank USA
222 S. Main Street
Salt Lake City, Utah 84101
Facsimile: 212-428-1474
Attention: Private Lending Services

Re:     MBM 2011 DOH GRANTOR RETAINED ANNUITY TRUST and TCM 2011 DOH GRANTOR RETAINED
        ANNUITY TRUST (collectively and severally, the "**Borrower**")

        Reference is made to that certain Loan Agreement dated as of ***[July 5]***, 2013 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**") between the Borrower and Goldman Sachs Bank USA (the "**Lender**").  Capitalized terms used herein and not otherwise defined herein are used herein as defined in the Loan Agreement.

        This is a Notice of Borrowing being delivered in accordance with the Loan Agreement.  The Borrower requests that the Lender make an advance under the Loan Agreement in the amount of $minimum of $100,000] to be advanced on [***[July 5]***, 2013] [must be a Business Day at least two (2) Business Days from the date of this notice if a LIBOR Loan is requested] and that the proceeds be paid to the following account:

Bank Name:              _____

ABA Number:             _____

Account Name:           _____

Account #:              _____

For Credit To:          _____

Purpose of the Funding:

_____

_____

To the best of my knowledge, these funds will not be used to benefit the Lender or any of its affiliates.
☐ I Agree        ☐ I Disagree

If the purpose of draw is real estate related, please provide the name of the seller and/or the address of the property:

_____

        The undersigned hereby certifies that no Event of Default currently exists under the Loan Agreement or any other Loan Documents and all representations and warranties under the Loan Agreement and such other Loan Documents are true and correct as of the date hereof.  If any portion of the advance requested is being used to purchase or carry margin stock, a revised Federal Reserve Form U-1 is attached hereto.

Date: _____, 2013

**MBM 2011 DOH GRANTOR RETAINED ANNUITY TRUST**        **TCM 2011 DOH GRANTOR RETAINED ANNUITY TRUST**


By: _____        By: _____

Name:  Michel B. Moreno                    Name:  Tiffany C. Moreno
Title.                                     Title:

**EXHIBIT C**

**Form of Guaranty**

**and/or**

**Form of Guaranty and Security Agreement**

N/A

**EXHIBIT D**

**Form of Security Agreement**

See Attached

EXHIBIT 8.16

**DISCLOSURE STATEMENT FOR**
**LOANS MADE BY GOLDMAN SACHS BANK USA THAT ARE**
**SECURED BY INTERESTS IN CERTAIN GOLDMAN SACHS-MANAGED INVESTMENT FUNDS**

This disclosure statement (this "Disclosure Statement") identifies, in general terms, certain of the risks and other information related to Goldman Sachs Bank USA ("Lender") making a loan to you that is secured by interests in one or more hedge funds, funds of hedge funds or similar investment vehicles (each, a "Fund") managed, directly or indirectly, by Goldman Sachs Asset Management, L.P. or Goldman Sachs Hedge Fund Strategies, L.L.C. (each, a "Manager"), each of which is an affiliate of Lender (collectively, a "Financed Investment"). This Disclosure Statement does not purport to identify risks associated with a Financed Investment in any particular Fund and you should carefully review the offering document for the each Fund in which you will be making a Financed Investment before making a decision to do so.

Entering into a Financed Investment involves a high degree of risk, including the risk that any losses with respect to your investment in the Fund will be greater than if no leverage was used. No guarantee or representation is made that entering into a Financed Investment will be successful.

Before entering into a Financed Investment, you should ensure that you fully understand the terms of the financing transaction, relevant risks associated with the transaction, the nature and extent of your risk of loss and the nature of the contractual relationship into which you are entering. You should also carefully evaluate whether the transaction is appropriate for you in light of your experience, objectives, financial resources, and other relevant circumstances.

You are urged to consult with your own advisers to determine the suitability of a Financed Investment and the relationship of such an investment to your overall investment program and financial and tax positions.

**CERTAIN RISKS**

In determining whether a Financed Investment in a Fund is a suitable investment, you should consider, among others, the following risks in addition to the risks regarding an investment in the Fund that are described in the offering document for the applicable Fund.

**Risk Associated with Increased Leverage**

Although the increased leverage provided by a Financed Investment in a Fund may result in a total return as a percentage of your equity in the interests in such Fund ("Fund Interests") that is greater than an unleveraged investment in such Fund Interests, it may also result in a total loss as a percentage of your equity in such Fund Interests that is greater than that of an unleveraged investment. In addition, the interest expense that you bear in connection with the Financed Investment will reduce the returns on your investment. Moreover, should the Fund Interests decline in value, you may be required to either deposit additional funds or securities with Lender or one of its affiliates as collateral for your loan or suffer mandatory liquidation of the Fund Interests in order to compensate for the decline in value. In the event of a sudden precipitous drop in the value of the Fund Interests, you may be required to liquidate the Fund Interests more quickly than otherwise desirable in order to satisfy your obligation to Lender, which may result in adverse tax or other consequences to you.

In addition to the leverage obtained through the making of a Financed Investment, a Fund may employ leverage in furtherance of its investment objective. This added layer of leverage will result in a higher degree of overall leverage and will further increase the potential risk of loss in a Financed Investment, particularly in the event of an economic downturn or underperformance of the Fund's underlying investments.

**Additional Risk Associated with Securing a Loan with Fund Interests**

Fund Interests are subject to significant restrictions on redemption and transfer as described in the offering document provided for each Fund. You will not receive any additional or special rights of redemption with respect to your Fund Interests which coincide with obligations which may arise under the loan agreement (with all other ancillary documents executed together therewith, the "Loan Agreement") with Lender in connection with your Financed Investment, including the obligation to make interest payments to Lender. Restrictions on redemption increase the risk that the value of Fund Interests may decrease between an event of default under the Loan Agreement and the disposition of such Fund Interests in order to satisfy a liability under the Loan Agreement.

The fact that Lender has accepted the Fund Interests as collateral under the Loan Agreement should not be taken as an indication that the Fund Interests may not lose value. You should not make a Financed Investment unless you can sustain a partial or total loss of your investment in the Fund in addition to the obligation to repay the amounts of principal and interest owed to Lender pursuant to the Loan Agreement.

**No Fiduciary Duty**

While the Manager of a Fund has certain fiduciary duties to the investors in a Fund under applicable law in addition to any contractual obligations it may have, Lender will not owe you any fiduciary duties in connection with the loan it will be making to you and it will only be bound by the terms of the Loan Agreement.

**Limits of Risk Disclosure**

The above discussions relating to various risks associated with a Financed Investment are not, and are not intended to be, a complete enumeration or explanation of the risks involved in the purchase of the Financed Investment. You should read the Loan Agreement, Security Documents, and other agreements related to the Financed Investment, and the Private Placement Memoranda of the Funds and should consult with your own advisers before deciding whether to make a Financed Investment. In addition, as market conditions change or develop over time, the purchase of the Financed Investment may be subject to risk factors not currently contemplated or described in such documents.

**POTENTIAL CONFLICTS OF INTEREST**

The Goldman Sachs Group, Inc., Lender, the Manager and their affiliates, directors, partners, trustees, managers, members, officers and employees (collectively, for purposes of this *"POTENTIAL CONFLICTS OF INTEREST"* section, "Goldman Sachs"), are engaged in businesses unrelated to the Financed Investment. Certain potential conflicts of interest may arise, directly or indirectly, from such engagement that you should consider.

The activities of each Fund, and its respective affiliates, directors, trustees, managers, members, partners, officers and employees, may give rise to conflicts of interest that could disadvantage you and the value of the Financed Investment. A description of certain of such potential conflicts of interest is set forth under *"POTENTIAL CONFLICTS OF INTEREST"* or a similarly titled section in the Fund's offering document. By making a Financed Investment, you will be deemed to have acknowledged and assented to the existence of potential conflicts of interest relating to a Fund, its Manager, and Lender, and to your purchase of the Financed Investment in the face of these conflicts.

Goldman Sachs and its sales personnel have interests in promoting Financed Investments. With respect to Goldman Sachs and its sales personnel, the remuneration and profitability of activity relating to the Financed Investments may be greater than the provision of other services and sales of other products that might be provided or offered. For example, Goldman Sachs and its sales personnel will directly or indirectly receive fees and commissions in connection with your Financed Investment. Such fees and commissions may be higher than for other products or services, and the remuneration and profitability to Goldman Sachs and such personnel resulting from such transaction may be greater than the remuneration and profitability resulting from other products. In particular, it is expected that remuneration and profitability to Goldman Sachs and its sales personnel resulting from Financed Investments will be greater than the remuneration and profitability resulting from sales of Fund Interests that are not Financed Investments.

Annex I

**Privacy Notice**

*The Goldman Sachs financial services companies endeavor to maintain the highest standards of confidentiality and to respect the privacy of our client relationships. In that regard, we are providing this Privacy Notice to our clients in accordance with Title V of the Gramm-Leach-Bliley Act of 1999 and its implementing regulations. This notice supplements any privacy policies or statements that we may provide in connection with specific products or services.*

**This Privacy Notice is being provided for information purposes only. Individual, Joint and IRA accountholders will shortly be receiving a second copy of this notice which can be used to communicate privacy preferences to us.**

## THE INFORMATION WE COLLECT ABOUT YOU

The non-public personal information we collect about you (your "Information") comes primarily from the account applications or other forms you submit to us. We may also collect Information about your transactions and experiences with us, our affiliates, or others relating to the products or services we provide. Also, depending on the products or services you require, we may obtain additional Information from consumer reporting agencies.

## OUR INFORMATION SECURITY POLICIES

Your privacy is very important to us, and we take the responsibility to safeguard you Information very seriously. We limit access to your Information to those of our employees and service providers who are involved in offering or administering the products or services that we offer. We maintain physical, electronic, and procedural controls that are designed to comply with federal standards to safeguard your Information.

If our relationship ends, we will continue to treat your Information as described in this Privacy Notice.

## OUR DISCLOSURE POLICIES

We do not disclose your Information to anyone, except as permitted by law. The types of Information disclosures permitted by law include sharing your Information with non-affiliated companies that perform support services for your account or process your transactions with us or our affiliates, disclosing your Information pursuant to your express consent, disclosing your Information to fulfill your instructions, or disclosures of your Information that are required for us to be in compliance with applicable regulations.

Unless you indicate that you would not like us to do so (i.e., unless you "opt out"), federal law also permits us to share your Information with our affiliates for their use in the marketing of their products and services to you.

## USE OF INFORMATION FOR AFFILIATE MARKETING

Sharing your Information with our affiliates enables us to better provide you with the full range of services and products available from Goldman Sachs to its private clients. This is the case because the core private client offering – investment management, brokerage, wealth advisory services, trust services and banking services – is actually delivered through a variety of affiliated legal entities that are all part of the Goldman Sachs family of financial services companies.

Our affiliates use your Information to evaluate whether the products or services they offer match your specific needs and, if so, to subsequently market those products or services to you. The affiliates that we would most often share your Information for marketing purposes are: Goldman Sachs Bank USA, The Goldman Sachs Trust Company, N.A., The Goldman Sachs Trust Company of Delaware, and The Ayco Company, L.P.

## INFORMATION SHARING WITH NON-AFFILIATES

We do not license your Information to anyone. We only disclose your Information to non-affiliated third-parties that perform support services for your account or process your transactions, or as otherwise permitted by the law. We require any non-affiliated third parties to whom we disclose your Information to adhere to confidentiality agreements and to maintain appropriate safeguards to protect your Information.

## HOW TO EXERCISE YOUR OPT-OUT RIGHTS

If you do not want us to share your Information with our affiliates as described above and / or you want to limit its use for marketing, you may either: i) fill out the opt-out form which will be sent to you shortly and return it to us at the address indicated on the form, or ii) opt out via the Client Web at www.goldman.com, at anytime.

Once we receive your opt-out election, we will, within a reasonable time, stop sharing the Information, or if applicable, prevent its use for marketing. Your choices will apply until you tell us to change those choices. If you already made choices about the use and sharing of your Information, you do not need to act again.

All opt-outs described above that are exercised by any party to a joint account will apply to all parties on that account.

Please contact your Private Wealth Advisor if you have any questions.

*This notice is being provided on behalf of the following affiliates of The Goldman Sachs Group, Inc.: Goldman, Sachs & Co., Goldman Sachs Bank USA, The Goldman Sachs Trust Company, N.A. and The Goldman Sachs Trust Company of Delaware.*

**Annex II**

**Conflicts of Interest**

GS&Co. is a major participant in global financial markets and as such has activities and interests that include potential multiple advisory, transactional and financial and other interests in accounts, securities, instruments and companies that may be purchased or sold in your GS&Co. accounts (such accounts, the "Account"). GS&Co. acts as an investor, investment banker, research provider, investment manager, financer, advisor, market maker, trader, prime broker, lender, agent and principal, and has other direct or indirect interests, in the global fixed income, currency, commodity, equity and other markets in which your Account may invest. GS&Co. and its personnel, including Private Wealth Advisors assigned to your Account, may take positions in securities or take actions for their own accounts which conflict with positions in your Account, and GS&Co. may act as counterparty to any transaction executed for your Account, subject to applicable law. Additionally, GS&Co. may on a proprietary basis sell, redeem, purchase, take short positions in or take similar actions with respect to securities, currencies, funds or other investments in which your Account may be invested ("underlying assets") without having to notify you of such investment or activity. GS&Co. may also create, write, sell or issue, or act as placement agent or distributor of derivatives and structured investment products whose value may be linked to the value of underlying assets. To the extent permitted by applicable law, GS&Co. may hedge its derivative positions by buying or selling such underlying assets, and reserves the right to sell or redeem some or all of these underlying assets without notice to you. Such actions may have an adverse effect on the amount of fees, expenses and other costs incurred directly or indirectly in connection with your Account. For instance, GS&Co. may for its own account, have long or short positions in, and actively buy or sell, the products or related securities purchased or sold for your Account, or derivatives of these products or related securities. In addition, GS&Co. may act as adviser to clients in investment banking, financial advisory, asset management and other capacities in advisory, transactional, financial or other assignments of all types including those related to instruments that may be purchased, sold or held in your Account. Further, GS&Co. may issue, or be engaged as underwriter, financial advisor or the issuer of, instruments that your Account may purchase, sell or hold. In its market making activities, occasionally, GS&Co. may enter the market in anticipation of a likely client transaction or order to "set up for" or "pre-hedge" the transaction and it is possible that such trading could impact the market price of securities purchased or sold in your Account. Substantially all transactions for brokerage accounts will be effected by GS&Co. Employees will generally receive referral or brokerage compensation in connection with these transactions and GS&Co. and employees each have an interest in recommending brokerage execution with GS&Co. GS&Co. receives compensation when brokerage accounts invest in products managed by GS&Co. such as mutual funds, hedge funds or other alternative investments. GS&Co. and its employees will generally directly or indirectly receive a portion of fees and commissions paid by you. Such fees and commissions vary according to the type of product or service and may be higher for certain products or services. The present and future activities of GS&Co. may give rise to additional conflicts of interest with you. You agree that GS&Co., in its sole discretion, may refrain from recommending or effecting transactions including due to (a) regulatory requirements, (b) GS&Co 's internal policies and procedures, and (c) its determinations regarding instruments actual or potential conflicts of interest or the appearance of such conflicts. However, you also agree that GS&Co. may determine to recommend or effect transactions notwithstanding the existence of such conflicts. You acknowledge that you understand the risks.

In this Annex II, "GS&Co." means Goldman, Sachs & Co., its present and future affiliates, and their respective partners, officers, directors, employees and agent.

# EXHIBIT C

## CONSOLIDATED, AMENDED AND RESTATED NOTE

Principal Amount:  $52,370,000                                                                                      October 11, 2013

THIS CONSOLIDATED, AMENDED AND RESTATED NOTE (this "**Note**") is made by the undersigned Borrowers (the "**Borrower**") to the favor of Goldman Sachs Bank USA (the "**Lender**").  Capitalized terms used herein and not otherwise defined herein are used with the respective meanings attributed to them in that certain Amended and Restated Loan Agreement of even date herewith between the Borrower and the Lender (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**").

### RECITALS:

WHEREAS, the Lender is the payee under, and holder of, those certain notes made by the Borrower, as original obligors under such notes as described on Schedule 1, annexed hereto and made a part hereof (collectively, the "**Existing Notes**");

WHEREAS, the Lender and Borrower desire to consolidate, modify, amend and restate the terms and conditions of the Existing Notes so as to create solely one promissory note in the consolidated principal sum of FIFTY-TWO MILLION THREE HUNDRED SEVENTY THOUSAND DOLLARS ($52,370,000), to be secured, *inter alia*, by the Collateral (as defined in that certain Amended and Restated Security and Pledge Agreement dated as of the hereof, by and among the Borrower, the Lender, Goldman Sachs & Co. and Moreno Properties, L.L.C.);

NOW THEREFORE, by Borrower's execution and delivery, and the Lender's acceptance of delivery from Borrower, of this Note, it is hereby agreed that:  (a) the foregoing recitals are made a part of this Note, (b) the Existing Notes are hereby combined, consolidated, and amended and restated in their entirety, so that all the terms and conditions contained in this Note shale supersede and control the terms and conditions of the Existing Notes (it being understood and agreed that such combination, consolidation and amendment and restatement shall not extinguish or otherwise impair the debt evidenced by the Existing Notes, but shall only replace and substitute the terms and conditions with respect to such debt), and that together the Existing Notes shall constitute one not, replace and presented by this Note, evidencing the same principal amount as follows:

FOR VALUE RECEIVED, each of the undersigned Borrower promises to pay to the Lender, at the Lending Office or such other place as the Lender or any holder hereof may from time to time designate, the principal sum of SIX MILLION ONE HUNDRED EIGHTY-FIVE THOUSAND DOLLARS ($6,185,000), or such lesser principal amount which has been advanced and remains outstanding from time to time, in United States Dollars and in immediately available funds as provided in the Loan Agreement, together with interest on the unpaid principal amount hereof from time to time outstanding, at the rates and on the dates set forth in the Loan Agreement.  Interest shall be calculated on the basis of a three hundred sixty (360) day year and actual days elapsed.

This Note is issued pursuant to, and is entitled to the benefits of, the Loan Agreement.  Reference hereby is made thereto for a statement of the terms and conditions under which this Note may be prepaid or its maturity date accelerated.  This Note is secured pursuant to the terms of the Loan Agreement and certain other Loan Documents and reference is made thereto for a statement of the terms and provisions thereof.

The Borrower acknowledges and agrees that the aggregate principal indebtedness of the Borrower, as evidenced by this Note, constitutes a single Loan in the aggregate principal amount of FIFTY-TWO MILLION THREE HUNDRED SEVENTY THOUSAND DOLLARS ($52,370,000) and that such Loan shall be divided into three (3) separate tranches as more particularly described on Schedule 2, annexed hereto and made a part hereof.

If any payment of principal or interest is not made when due hereunder (after giving effect to any applicable grace period), or if any other Event of Default shall occur for any reason, or if the Loan Agreement shall be terminated or not renewed for any reason whatsoever, then and in any such event, in addition to all rights and remedies of the Lender under the Loan Agreement or any other Loan Document, applicable law or otherwise, all such rights and remedies being cumulative and enforceable alternatively, successively and concurrently, the Lender may, at its option, declare any and all of the Borrower's obligations, liabilities and indebtedness owing by Borrower under this Note, the Loan Agreement and any other Loan Document (collectively, the "**Obligations**") to be due and payable, whereupon the then unpaid balance thereof, together with all interest accrued thereon or expenses incurred in connection therewith shall forthwith become due and payable, together with all interest accruing thereafter at the rate set forth in the Loan Agreement until the Obligations, plus all costs and expenses of collection hereof, including, without limitation, reasonable attorneys' fees and expenses, are indefeasibly paid in full in cash.

The Borrower shall pay all of the Lender's costs and expenses (including, without limitation, all reasonable attorneys' fees and expenses) incurred in connection with the enforcement of or preservation of rights under this Note on the terms provided in the Loan Agreement.

No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Lender, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion.  The Borrower and every indorser or guarantor of this Note regardless of the time, order or place of signing waives presentment, demand, protest and notices of every kind and assents to any extension or

LEGAL_US_E # 105402490.3

postponement of the time of payment or any other indulgence, to any substitution, exchange or release of Collateral, and to the addition or release of any other Person primarily or secondarily liable.

None of the terms or provisions of this Note may be excluded, modified, or amended except by a written instrument duly executed on behalf of the Lender expressly referring hereto and setting forth the provision so excluded, modified or amended.  This Note shall be binding upon the successors and assigns of the Borrower and inure to the benefit of the Lender and its successors, endorsees and assigns.  If any term or provision of this Note shall be held to be invalid or unenforceable, in whole or in part in any jurisdiction, then such invalidity or unenforceability shall only effect such term or provision, and shall not effect such term or provision in any other jurisdiction or any other term or provision of this Note.

All rights and obligations hereunder shall be governed by the laws of the State of New York (without giving effect to principles of conflicts or choice of laws) and this Note shall be deemed to be made under seal.

IN WITNESS WHEREOF, the Borrowers have executed this Note as of the date first above written.

**BORROWER:**

By: _____

Name:   Michel B. Moreno

By: _____

Name:   Tiffany C. Moreno

IN WITNESS WHEREOF, the Borrowers have executed this Note as of the date first above written.

**BORROWER:**

**MBM 2011 MGH GRANTOR RETAINED ANNUITY TRUST**

By:
    Name:  Dalis M. Waguespack
    Title:  Managing Trustee

BORROWER:

TCM 2011 MGH GRANTOR RETAINED
ANNUITY TRUST

By: _____
Name:  Dalis M. Waguespack
Title:  Managing Trustee

**BORROWER:**

**MBM 2011 DOH GRANTOR RETAINED ANNUITY TRUST**

By: _____
    Name:  Dalis M. Waguespack
    Title:  Managing Trustee

Signature Page to Consolidated, Amended and Restated Note

BORROWER:

**TCM 2011 DOH GRANTOR RETAINED ANNUITY TRUST**

By: _____
Name:  Dalis M. Waguespack
Title:  Managing Trustee

**MORENO PROPERTIES TWO, L.L.C.,** a Louisiana
limited liability company

By: _____
    Name:  Michel B. Moreno
    Title:  Manager

# EXHIBIT D



**TERM (COMMITTED LOAN)**

**AMENDED AND RESTATED LOAN AGREEMENT**

between

GOLDMAN SACHS BANK USA,
as Lender

and

MICHEL B. MORENO and TIFFANY C. MORENO,

and

MBM 2011 DOH GRANTOR RETAINED ANNUITY TRUST,

and

TCM 2011 DOH GRANTOR RETAINED ANNUITY TRUST,

and

MBM 2011 MGH GRANTOR RETAINED ANNUITY TRUST,

and

TCM 2011 MGH GRANTOR RETAINED ANNUITY TRUST,

as Borrower

## AMENDED AND RESTATED LOAN AGREEMENT

This Amended and Restated Loan Agreement (this "**Agreement**"), is between GOLDMAN SACHS BANK USA (together with its successors and permitted assigns, the "**Lender**"), and the Borrower or Borrowers identified on the signature pages hereto (each a "**Borrower**" and collectively referred to as, the "**Borrowers**"), and is dated as of the date first written on the Lender's signature page hereto (the "**Effective Date**").

### RECITALS:

**WHEREAS**, the Lender made that certain Twenty-Five Million Dollar ($25,000,000) loan (the "**Tranche 1 Loan**") to Michel B. Moreno and Tiffany C. Moreno (collectively, jointly and severally, the "**Tranche 1 Borrowers**") and are parties to that certain Loan Agreement, dated as of May 15, 2013 (the "**Original Tranche 1 Loan Agreement**"), as amended by that certain Omnibus Amendment to Loan Documents, dated as of July 5, 2013 (the "**Omnibus Amendment**") and as may be further modified, amended, restated or supplemented from time to time, collectively, the "**Tranche 1 Loan Agreement**");

**WHEREAS**, the Tranche 1 Loan is evidenced by that certain Note, dated as of May 15, 2013, in the amount of the Tranche 1 Loan made by Tranche 1 Borrowers in favor of Lender (the "**Tranche 1 Note**"), and is secured by, among other things, that certain Security and Pledge Agreement, dated as of May 15, 2013, made by Tranche 1 Borrower, and Moreno Properties, L.L.C., collectively as pledgor, for the benefit of Lender, as secured party, and Securities Intermediary (as hereinafter defined) (the "**Original Tranche 1 Security Agreement**", as amended by the Omnibus Amendment, and as may be further modified, amended, restated or supplemented from time to time, collectively, the "**Tranche 1 Security Agreement**");

**WHEREAS**, the Lender made that certain Fifteen Million Dollar ($15,000,000) loan (the "**Tranche 2 Loan**") to MBM 2011 DOH Grantor Retained Annuity Trust ("**MBM DOH GRAT**") and TCM 2011 DOH Grantor Retained Annuity Trust ("**TCM DOH GRAT**"), collectively and severally, as borrowers (the "**Tranche 2 Borrowers**") and are parties to that certain Loan Agreement, dated as of July 5, 2013 (the "**Tranche 2 Loan Agreement**");

**WHEREAS**, the Tranche 2 Loan is evidenced by (i) that certain Note, dated as of July 5, 2013, in the amount of Seven Million Five Hundred Thousand Dollars ($7,500,000) made by MBM DOH GRAT in favor of Lender (the "**MBM DOH Note**") and (ii) that certain Note, dated as of July 5, 2013, in the amount of Seven Million Five Hundred Thousand Dollars $7,500,000 made by TCM DOH GRAT in favor of Lender (the "**TCM DOH Note**"; and together with the MBM DOH Note, collectively and severally, the "**Tranche 2 Notes**"), and the Tranche 2 Loan is secured by, among other things, that certain Security and Pledge Agreement, dated as of July 5, 2013, made by Tranche 2 Borrower, as pledgor, for the benefit of Lender, as secured party, and Securities Intermediary (the "**Tranche 2 Security Agreement**");

**WHEREAS**, MBM 2011 MGH Grantor Retained Annuity Trust ("**MBM MGH GRAT**"), TCM 2011 MGH Grantor Retained Annuity Trust ("**TCM MGH GRAT**"; and together with the MBM MGH GRAT, collectively and severally, the "**Tranche 3 Borrowers**"), have requested, and the Lender has agreed, subject to the terms and conditions contained in this Agreement, to extend a Twelve Million Three Hundred Seventy Thousand Dollar ($12,370,000) loan (the "**Tranche 3 Loan**") to the Tranche 3 Borrowers;

**WHEREAS**, the Tranche 3 Loan is evidenced by (i) that certain Note, dated as of the Effective Date, in the amount of Six Million One Hundred Eighty-Five Thousand Dollars ($6,185,000)made by MBM MGH GRAT in favor of Lender (the "**MBM MGH Note**"), and (ii) that certain Note, dated as of the Effective Date, in the amount of Six Million One Hundred Eighty-Five Thousand Dollars ($6,185,000)made by TCM MGH GRAT in favor of Lender (the "**TCM MGH Note**"; and together with the MBM MGH Note, collectively and severally, the "**Tranche 3 Notes**"), and the Tranche 3 Loan is secured by, among other things, that certain Amended and Restated Security and Pledge Agreement, dated as of the Effective Date, made by Tranche 1 Borrower, Moreno Properties, L.L.C., Tranche 2 Borrowers, Tranche 3 Borrowers and MOR MGH Holdings, L.L.C., collectively as pledgors, for the benefit of Lender, as secured party, and Securities Intermediary (as may be modified, amended, restated or supplemented from time to time, the "**Amended and Restated Security Agreement**");

**WHEREAS**, in connection with the foregoing, Borrowers and Lender hereby agree to amend and restate the Tranche 1 Loan Agreement and the Tranche 2 Loan Agreement each, in their entirety, which provides for, among other things, that the Collateral for the Tranche 1 Loan constitutes Collateral for the Tranche 2 Loan and the Tranche 3 Loan as more particularly set forth herewith; and

**NOW, THEREFORE**, in consideration of the foregoing premises, of the mutual covenants contained in this Agreement, and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties to this Agreement, intending to be legally bound, hereby agree as follows:

ARTICLE I

DEFINITIONS

As used in this Agreement:

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.

"**Agreement**" has the meaning given to that term in the Preamble of this Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"**Amended and Restated Security Agreement**" has the meaning given to that term in the Recitals of this Agreement.

"**Applicable Margin**" means a rate equal to eight percent (8.00%) per annum.

"**Assigned Regions Mortgage**" has the meaning given to that term in Section 3.1(b)(viii) of this Agreement.

"**Bank Official**" means an executive officer, director, or principal shareholder of the Lender or any Company of which the Lender is a subsidiary or any other subsidiary of such Company.

"**Base Rate**" means the rate of interest quoted in the print edition of The Wall Street Journal, Money Rates Section as the U.S. Prime Rate, as in effect from time to time.  The Base Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.  The Lender may make commercial loans or other loans at rates of interest at, above or below the Base Rate.

"**Base Rate Loan**" means a Loan which bears interest at a rate determined by reference to the Base Rate.

"**Borrowers**" has the meaning given to that term in the Preamble of this Agreement.

"**Business Day**" means, with respect to any borrowing or payment, a day other than Saturday or Sunday on which banks are open for business in New York, New York.

"**Co-Borrower**" has the meaning given to that term in Section 8.14 of this Agreement.

"**Collateral**" has the meaning given to such term in the applicable Security Document.

"**Company**" means any corporation, partnership, trust (business or otherwise), association, joint venture, pool syndicate, sole proprietorship, unincorporated organization, or any other form of business entity not specifically listed, provided that "Company" does not include: (1) an insured depository institution (as defined in 12 U.S.C. 1813); or (2) a corporation the majority of the shares of which are owned by the United States or by any State.

"**Constituent Instruments**" means the certificate of incorporation and by-laws of a corporation; the certificate of limited partnership and agreement of limited partnership of a limited partnership; the partnership agreement of a general partnership; the certificate of formation and operating or comparable agreement of a limited liability company; and the comparable instruments for any other entity, including, with respect to a trust, any agreement or instrument creating such trust.

"**Default Interest**" has the meaning given to that term in Section 2.2 of this Agreement.

"**Effective Date**" has the meaning given to that term in the Preamble of this Agreement.

"**Environmental Indemnity**" means collectively (i) that certain Environmental Indemnity, dated as of the date hereof, by Nicholson Estates, L.L.C., Michel B. Moreno and Tiffany C. Moreno in favor of Lender; and (ii) that certain Environmental Indemnity, dated as of the date hereof, by Moreno Properties Two, L.L.C., Michel B. Moreno and Tiffany C. Moreno in favor of Lender.

"**Event of Default**" has the meaning given to that term in Section 6 of this Agreement.

"**Goldman Affiliated Group**" means the Lender and GS&Co., together with their present and future Affiliates.

"**GS&Co.**" means Goldman, Sachs & Co., a broker-dealer registered with the United States Securities and Exchange Commission, acting in its capacity as Securities Intermediary and custodian with respect to the Securities Account.

"**Guaranty**" means that certain Amended and Restated Guaranty and Indemnity, dated as of the Effective Date, made by Michel B. Moreno and Tiffany C. Moreno, jointly and severally as Indemnitors, in favor of Lender.

"**Indemnified Liabilities**" has the meaning given to that term in Section 8.10 of this Agreement.

"**Indemnified Person**" has the meaning given to that term in Section 8.10 of this Agreement.

"**Indenture**" means that certain Indenture, dated November 15, 2011, among Green Field Energy Services, Inc., as issuer, HUB City Tools, Inc., as guarantor, and Wilmington Trust, National Association, as trustee and collateral agent, relating to the 13% Senior Notes due 2016, as modified by that Certain Supplemental Indenture, dated October 23, 2012, and as the same may be further amended, modified, restated, or supplemented from time to time.

"**Interest Payment Date**" means with respect to any Loan (whether a Base Rate Loan or a LIBOR Loan), the tenth (10th) day of each month commencing on the tenth (10th) day of the month immediately following the month in which the Effective Date occurs.

"**Interest Reserve Account**" has the meaning given to such term in Section 2.4 of this Agreement.

"**Interest Reserve Funds**" has the meaning given to such term in Section 2.4 of this Agreement.

"**Insurer**" has the meaning given to that term in Section 3.1(b)(v) of this Agreement.

"**Lender**" has the meaning given to that term in the Preamble of this Agreement.

"**Lending Office**" means the Lender's office at 200 West Street, New York, NY 10282-2198, or such other office as Lender may designate in writing from time to time to the Borrowers.

"**LIBOR**" means, with respect to any LIBOR Reset Period, the rate of interest at which deposits in U.S. dollars are offered to major banks in the London interbank market for a **thirty (30)** day period on the day that is two (2) LIBOR Business Days prior to the commencement of such LIBOR Reset Period, based on information presented by any interest rate reporting service of recognized standing selected by the Lender, or if Lender determines that no interest rate reporting service has presented such information, the rate of interest at which deposits in Dollars are offered to major banks in the London interbank market for a **thirty (30)** day period on the day that is two (2) LIBOR Business Days prior to the commencement of such LIBOR Reset Period by any bank reasonably selected by Lender. Under the terms of this Agreement, the applicable "LIBOR" rate is used by the Lender as a reference rate.  The use of **thirty (30)** day LIBOR as a reference rate does not mean the Borrowers will actually pay interest on the Loan pursuant to a **thirty (30)** day contract or any other interest rate contract.  Instead, the effective interest rate under this Agreement will adjust at the beginning of each LIBOR Reset Period as described further in Section 2.2.

"**LIBOR Business Day**" means a Business Day on which commercial banks are open for dealings in U.S. dollar deposits in the London interbank market.

"**LIBOR Loan**" means any Loan which bears interest at a rate determined by reference to LIBOR.

"**LIBOR Reset Period**" means (i) as to the initial LIBOR Loan and any other LIBOR Loan made during the same month as the initial LIBOR Loan, the period commencing on the date the first LIBOR Loan is made under this Agreement and ending on the last calendar day of the month during which such initial LIBOR Loan is made, and (ii) as to any LIBOR Loan made or continued after such month, the period commencing on the first calendar day of the month during which such subsequent LIBOR Loan is made or, with respect to a LIBOR Loan that is continued, the period commencing on the first calendar day of the month immediately following the end of the prior LIBOR Reset Period, and ending on the earlier of (a) the last calendar day of the month during which such LIBOR Loan is made or most recently continued and (b) the Maturity Date.

"**Life Insurance Policy**" has the meaning given to that term in Section 3.1(b)(v) of this Agreement.

"**Loan**" has the meaning given to that term in Section 2.1 of this Agreement.

"**Loan Documents**" means this Agreement, the Note, the Guaranty, the Environmental Indemnity, each of the agreements listed on Schedule I hereto (if any), any other Security Documents and each certificate, agreement or document made or entered into by any Loan Party with or in favor of the Lender in connection with or pursuant to any of the foregoing.

"**Loan Party**" means collectively, (i) any Borrower or Pledgor under this Agreement or any other Loan Document; and (ii) any mortgagor or grantor under any mortgage, deed of trust or any other Loan Document.

"**Maintenance Value**" has the meaning given to such term in the applicable Security Document.

"**Maturity Date**" means the earlier to occur of (i) April  11, 2014 and (ii) the date the Obligations become due and payable pursuant to Section 7.1 hereof.

"**MBM DOH GRAT**" has the meaning given to that term in the Recitals of this Agreement.

"**MBM DOH Note**" has the meaning given to that term in the Recitals of this Agreement.

"**MBM MGH GRAT**" has the meaning given to that term in the Recitals of this Agreement.

"**MBM MGH Note**" has the meaning given to that term in the Recitals of this Agreement.

"**Monthly PIK Amount**" shall mean, with respect to each Interest Payment Date, a portion of the interest due pursuant to Section 2.2 of this Agreement, in an amount equal to the product of (a) the actual number of days elapsed in such Interest Period, multiplied by (b) a rate of three percent (3.0%) based on a three hundred sixty (360) day year, multiplied by (c) the outstanding principal balance of the Loan.

"**Note**" has the meaning given to that term in Section 2.1 of this Agreement.

"**Notice of Borrowing**" has the meaning given to that term in Section 3.1(a)(1)(iv) of this Agreement.

"**Obligations**" means all unpaid principal of, and accrued and unpaid interest due on, the Note and all other obligations, interest, fees, charges and expenses of the Borrowers to the Lender arising under or in connection with the Loan Documents.

"**OFAC**" has the meaning given to that term in Section 4.7 of this Agreement.

"**Omnibus Amendment**" has the meaning given to that term in the Recitals of this Agreement.

"**Original Tranche 1 Loan Agreement**" has the meaning given to that term in the Recitals of this Agreement.

"**Original Tranche 1 Security Agreement**" has the meaning given to that term in the Recitals of this Agreement.

"**Person**" means any corporation, natural person, firm, joint venture, partnership, trust, unincorporated organization, enterprise, government or any department or agency of any government.

"**Pledgor**" means the one or more Persons, if any, that executes and delivers a Security Agreement in connection with this Agreement. See Schedule I for the definition of "Security Agreement".

"**Regulation U**" means Federal Reserve Board Regulation U, 12 CFR Part 221, as amended from time to time, and any successor regulation or statute.

"**Returned Payment**" has the meaning given to that term in Section 8.15 of this Agreement.

"**Securities**" means stocks, bonds, securities entitlements, financial assets or other securities or investment property (as such terms are defined in the UCC).

"**Securities Account**" has the meaning given to the term "Brokerage Account" in the applicable Security Document, if any.

"**Securities Intermediary**" has the meaning given to such term in the applicable Security Document, if any.

"**Security Documents**" means, collectively, each of the agreements listed on Schedule I hereto and any other agreements, instruments, documents, financing statements, notices of assignment of accounts, schedules of accounts assigned, mortgages, deeds of trust and other written matter necessary or reasonably requested by the Lender to perfect, and maintain perfected, the Lender's security interest in the Collateral.

"**Solvent**" means, when used with respect to any Person, that at the time of determination: (i) the fair value of the assets of such Person, at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise, (ii) the present fair saleable value of the property of such Person will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, and (iii) such Person will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured. For the purposes of determining whether a Person is Solvent, the amount of any contingent liability shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that reasonably can be expected to become an actual or matured liability.

"**TCM DOH GRAT**" has the meaning given to that term in the Recitals of this Agreement.

"**TCM DOH Note**" has the meaning given to that term in the Recitals of this Agreement.

"**TCM MGH GRAT**" has the meaning given to that term in the Recitals of this Agreement.

"**TCM MGH Note**" has the meaning given to that term in the Recitals of this Agreement.

"**Tranche 1 Borrowers**" has the meaning given to that term in the Recitals of this Agreement.

"**Tranche 1 Loan**" has the meaning given to that term in the Recitals of this Agreement.

"**Tranche 1 Loan Agreement**" has the meaning given to that term in the Recitals of this Agreement.

"**Tranche 1 Loan Amount**" has the meaning given to that term in Section 2.1(a) of this Agreement.

"**Tranche 1 Note**" has the meaning given to that term in the Recitals of this Agreement.

"**Tranche 1 Security Agreement**" has the meaning given to that term in the Recitals of this Agreement.

"**Tranche 2 Borrowers**" has the meaning given to that term in the Recitals of this Agreement.

"**Tranche 2 Loan**" has the meaning given to that term in the Recitals of this Agreement.

"**Tranche 2 Loan Agreement**" has the meaning given to that term in the Recitals of this Agreement.

"**Tranche 2 Loan Amount**" has the meaning given to that term in Section 2.1(b) of this Agreement.

"**Tranche 2 Notes**" has the meaning given to that term in the Recitals of this Agreement.

"**Tranche 2 Security Agreement**" has the meaning given to that term in the Recitals of this Agreement.

"**Tranche 3 Borrowers**" has the meaning given to that term in the Recitals of this Agreement.

"**Tranche 3 GRAT Mortgage**"   has the meaning given to that term in Section 3.1(b)(viii) of this Agreement.

"**Tranche 3 Loan**" has the meaning given to that term in the Recitals of this Agreement.

"**Tranche 3 Loan Amount**" has the meaning given to that term in Section 2.1(c) of this Agreement.

"**Tranche 3 Notes**" has the meaning given to that term in the Recitals of this Agreement

"**Trust**" means collectively, MBM 2011 MGH Grantor Retained Annuity Trust, MBM 2011 DOH Grantor Retained Annuity Trust, TCM 2011 MGH Guarantor Retained Annuity Trust and TCM 2011 DOH Grantor Retained Annuity Trust.

"**Turbine Generation**" has the meaning given to that term in Section 2.9 of this Agreement.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York.

"**USA Patriot Act**" has the meaning given to that term in Section 4.7 of this Agreement.

All undefined terms contained in this Agreement shall, unless the context indicates otherwise, have the meanings provided for by the UCC to the extent the same are used or defined therein.  The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole, including the Exhibits and Schedules hereto, as the same may from time to time be amended, modified or supplemented, and not to any particular section, subsection or clause contained in this Agreement.

Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter.

ARTICLE II

THE LOAN

2.1      Loan.  Subject to satisfaction of the conditions set forth in Article III hereof, the Lender agrees, on the terms and conditions set forth in this Agreement, to make a term loan in the aggregate principal amount up to Fifty-Two Million Three Hundred Seventy Thousand Dollars ($52,370,000) (each advance of such principal amount or amounts, a "**Loan**" and collectively, the "**Loans**") to the Borrowers and allocated as follows and as described on Schedule II, attached hereto and made a part hereof:

(a)     Tranche 1 Loan.  The Tranche 1 Loan shall be in the aggregate amount of Twenty-Five Million Dollars ($25,000,000) (the "**Tranche 1 Loan Amount**"), which was advanced to the Tranche 1 Borrowers on May 15, 2013.

(b)     Tranche 2 Loan.   The Tranche 2 Loan is in the aggregate amount of Fifteen Million Dollars ($15,000,000) (the "**Tranche 2 Loan Amount**"), Seven Million Five Hundred Thousand Dollars ($7,500,000) of which was advanced to MBM DOH GRAT on July 5, 2013 and Seven Million Five Hundred Thousand Dollars ($7,500,000) of which was advanced to TCM DOH GRAT on July 5, 2013.

(c)     Tranche 3 Loan.   The Tranche 3 Loan shall be in the amount of Twelve Million Three Hundred Seventy Thousand Dollars ($12,370,000) (the "**Tranche 3 Loan Amount**"), to the Tranche 3 Borrowers in equal amounts following the satisfaction of the conditions set forth in Article III hereof and the satisfaction of other conditions contained herein and in the other Loan Documents. Each of the Tranche 3 Borrowers shall execute and deliver a Tranche 3 Note, each substantially in the form of Exhibit A hereto.

On the Maturity Date the Borrowers shall repay in full in cash the then outstanding balance of the Loan.  The obligation of each Borrower to repay the principal amount of the Loan, and any and all interest which accrues thereon, shall be evidenced an amended, restated and consolidated promissory note executed and delivered by the Borrowers and Moreno Properties Two, L.L.C., which shall consolidate and amend and restate the Tranche 1 Note, the Tranche 2 Notes and Tranche 3 Notes, in the form of Exhibit A-1 hereto (the "**Note**").  Amounts of the Loan prepaid may not be reborrowed.  The Loan hereunder shall be made upon submission by the applicable Borrower to Lender of a completed Notice of Borrowing.

2.2     Interest.  Except as otherwise expressly set forth herein, all Loans hereunder shall be LIBOR Loans.

(a)  Interest on LIBOR Loans shall accrue at a per annum rate equal to the sum of (i) LIBOR for the then-current LIBOR Reset Period plus (ii) the Applicable Margin.

(b)  To the extent any LIBOR Loan is converted to a Base Rate Loan or any Base Rate Loan is made to any Borrower, in each case, whether pursuant to Sections 2.2(e) or 2.6 or by mutual agreement between the Lender and such Borrower, interest on such Base Rate Loans shall accrue at a per annum rate equal to (i) the Base Rate Plus (ii) the Applicable Margin.

(c)  Notwithstanding the foregoing, during any period in which an Event of Default shall exist, the principal balance of all Obligations shall bear interest at a rate that is fifteen percent (15%) per annum in excess of the interest rate otherwise applicable to such Obligations from time to time until such Event of Default is cured or waived as provided for herein.  Any interest payable pursuant to the foregoing proviso ("**Default Interest**") which is not paid when due may be added to the outstanding principal sum of the Loans and itself bear interest accordingly to the extent permitted by applicable law.

(d)  Notwithstanding anything herein to the contrary, the Borrower has requested, and the Lender has agreed that to defer payment of any Monthly PIK Amount and each such deferred Monthly PIK Amount shall accrue, monthly, at the rate per annum as set forth in Section 2.2 and shall be deferred and added to the outstanding principal balance of the Loan until the Maturity Date.

(e)  Accrued interest on the Loans shall be payable in arrears on (i) each applicable Interest Payment Date and (ii) on the Maturity Date, provided that any time an Event of Default exists, all accrued interest on the Loans, including, without limitation, Default Interest, shall be payable on demand by the Lender.  Each determination made by the Lender pursuant to the provisions hereof shall be conclusive and binding on the Borrowers in the absence of manifest error.  Provided no Event of Default exists at the end of a LIBOR Reset Period, each LIBOR Loan shall automatically continue as a LIBOR Loan for an additional LIBOR Reset Period.  Interest shall be calculated for actual days elapsed on the basis of a 360-day year. Notwithstanding anything contained herein to the contrary, Lender shall never be entitled to receive, collect or apply as interest on the Loans any amount in excess of the maximum rate of interest permitted to be charged by applicable law.

(f)  If the Lender determines that for any reason adequate and reasonable means do not exist for determining LIBOR for any LIBOR Reset Period, the Lender will promptly so notify the Borrowers.  Thereafter, the obligation of the Lender to make or maintain LIBOR Loans hereunder shall be suspended until the Lender revokes such notice in writing and all LIBOR Loans, on the Interest Payment Date, shall automatically convert into Base Rate Loans.  Upon the revocation of such notice by the Lender, unless there then exists an Event of Default, all such Base Rate Loans shall automatically convert into LIBOR Loans on the Interest Payment Date following the revocation of such notice.

2.3     Method of Payment.  All payments hereunder for principal, interest and other amounts shall be made in lawful money of the United States of America and in immediately available funds to the Lending Office, or such other account as the Lender may designate in writing from time to time to the Borrowers no later than noon (New York City time) on the date when due. The Borrowers and Lender agree that on each Interest Payment Date, Lender shall debit the amount of accrued interest due hereunder from the Securities Account, or such other account designated by the Lender from time to time and apply such amounts in payment and satisfaction of such amounts due.  In the event that there are insufficient funds on deposit in the Securities Account (or such other designated account) on any Interest Payment Date, the Borrowers shall make such funds immediately available to the Lending Office or such other account as Lender may designate.  If any principal payment hereunder becomes due and payable on a day other than a Business Day, such payment date shall be extended to the next succeeding Business Day, and interest

6

thereon shall be payable at the then applicable rate during such extension. The Borrowers agree that interest amounts payable hereunder which are not paid when due may be added to the outstanding principal sum of the Loans and itself bear interest accordingly to the extent permitted by applicable law.

2.4     **Interest Reserve**.  The Borrower shall deposit with the Lender on the date hereof, an amount equal to Three Million Dollars ($3,000,000) to be held in an account (the "**Interest Reserve Account**").  Amounts on deposit in the Interest Reserve Account shall be referred to as the "**Interest Reserve Funds**."  The Lender shall be permitted to apply Interest Reserve Funds in its sole discretion and the Interest Reserve Funds shall be pledged to the Lender as additional Collateral for the Loan pursuant to and in accordance with the Security Agreement.  Upon the occurrence, and during the continuance of, an Event of Default, the Lender may apply any Interest Reserve Funds in repayment of the outstanding Obligations hereunder in the order and priority as determined by the Lender in its sole discretion.  Upon the repayment in full and satisfaction of all outstanding Obligations, any Interest Reserve Funds remaining on deposit shall be released to the Borrower.

2.5     Optional Prepayments.  The Borrowers may, at their option, upon notice as provided below, prepay at any time, or from time to time, in whole or in part, the Loan in an amount not less than $100,000; provided, however, any prepayment made prior to the Maturity Date, shall require a payment equal to the sum of the remaining scheduled interest payments from the date of such prepayment, through and including the Maturity Date.

The Borrowers will give the Lender written notice of each optional prepayment under this Section 2.5 not less than two (2) Business Days prior to the proposed date of such prepayment.  Each such notice shall specify such requested prepayment date and the aggregate principal amount of the Loan to be prepaid on such date.   Once notice is given, the payment amount specified in such notice shall be due and payable on the date specified, together with any other amounts then due, if any.

2.6     Illegality.  If the Lender determines that the introduction of any requirement of law, or any change in any requirement of law, or in the interpretation or administration of any requirement of law, has made it unlawful, or that any central bank or other governmental authority has asserted that it is unlawful, for the Lender to make LIBOR Loans, then the Borrowers shall, upon its receipt of notice of such fact and demand from the Lender, prepay in full such LIBOR Loans then outstanding, together with interest accrued thereon, either on the last day of the LIBOR Reset Period thereof, if the Lender may lawfully continue to maintain such LIBOR Loans to such day, or immediately (together with any amount payable pursuant to Section 2.7), if the Lender may not lawfully continue to maintain such LIBOR Loans.  If the Borrowers are required to so prepay the LIBOR Loans, then concurrently with such prepayment, the Lender shall make available to the Borrowers a Base Rate Loan in the amount of such repayment.  Each Base Rate Loan shall remain a Base Rate Loan until the Borrowers receive notice to the contrary from the Lender.

2.7     Funding Costs.  Without limiting any other provisions contained herein, the Borrowers shall reimburse the Lender and hold it harmless from any loss, increased costs or expense which the Lender may sustain or incur as a consequence of:

(a)     the failure by the Borrower to make on a timely basis any payment of principal of the Loan;

(b)     the prepayment or other payment (including after acceleration thereof) of all or part of any LIBOR Loan to the extent the Lender actually incurs any breakage costs associated with such prepayment or payment; or

(c)     the introduction of or any change in the interpretation of any law or regulation (other than in each case any introduction or change in interpretation relating to withholding taxes, which is governed by Section 2.8) or the compliance by the Lender with any guideline or request from any central bank or other governmental authority (whether or not having the force of law), including, without limitation, the introduction of, change of, change by any central bank or other governmental authority in the interpretation or administration of, or compliance by the Lender or corporation or other entity controlling the Lender with, any capital adequacy regulation.

2.8     Taxes.  All payments by the Borrowers under this Agreement shall be made free and clear of any restrictions or conditions, without set off or counterclaim, and free and clear of, and without any deduction or withholding whether for or on account of tax or otherwise.  If any such deduction or withholding is required by law to be made by the Borrowers or any other Person (whether or not a party to, or on behalf of a party to this Agreement) from any sum paid or payable by, or received or receivable from, the Borrowers, the Borrowers shall pay in the same manner and at the same time such additional amounts as will result in the Lender's receiving and retaining (free from any liability other than tax on its overall net income) such net amount as would have been received by it had no such deduction or withholding been required to be made.

2.9     Purpose.  The Borrowers shall use the proceeds of the Loan to make an equity investment in (i) Green Field Energy Services, Inc. ("**Green Field**") which shall be used as working capital to fulfill equipment orders and to make and equity investment in Turbine Generation Services, L.L.C. ("**Turbine Generation**") and (ii) to refinance the current indebtedness secured by the real properties located in Baton Rouge, Louisiana and New Iberia, Louisiana.  The Borrowers will not, directly or indirectly, use any part of such proceeds for the purpose of (a) purchasing, improving, or otherwise investing in residential real estate, whether a primary residence of the Borrowers or otherwise; or (b) purchasing or carrying any margin stock within the meaning of Regulation U or to extend credit to any Person for the purpose of purchasing or carrying any such margin stock in contravention of Regulation U. THE BORROWERS MUST OBTAIN THE PRIOR APPROVAL OF THE LENDER IF THE INTENDED PURPOSE OF THE FACILITY IS DIFFERENT FROM THE PURPOSE DISCLOSED BY THE BORROWERS IN THIS SECTION 2.9 OR IN ANY FEDERAL RESERVE FORM U-1 SUBMITTED BY THE BORROWERS TO THE LENDER.

(b) Unless disclosed to the Lender in the Notice of Borrowing and approved by the Lender, the Borrowers agree that the funds received from the Lender hereunder shall not be used for the benefit of, or transferred to, any affiliate of the Lender and, in particular, that such funds shall not be used for the acquisition of equity or the refinancing of the indebtedness of companies in which affiliates of the Lender hold debt or equity positions.

2.10     Application of Payments.  All payments received by or on behalf of (a) the Tranche 1 Borrower, (b) the Tranche 2 Borrower or (c) the Tranche 3 Borrower with respect to the Obligations shall be applied (i) first, to repayment of the Tranche 3 Loan, (ii) second, to repayment of the Tranche 2 Loan and (iii) third, to repayment of the Tranche 1 Loan.  Borrower acknowledges and agrees that the Tranche 1 Loan, the Tranche 2 Loan and the Tranche 3 Loan collectively comprise one (1) loan in the aggregate principal amount of Fifty-Two Million Three Hundred Seventy Thousand Dollars ($52,370,000).  Notwithstanding the full repayment of the Tranche 1 Loan Amount, Tranche 1 Borrower acknowledges and agrees that it shall remain jointly and severally obligated as primary obligor and/or surety for the repayment of the Tranche 2 Loan and the Tranche 3 Loan, together with all principal, interest, fees and costs of collection accrued thereon in the order and manner Lender determines in its sole discretion.

2.11     Loan Accounts.  In accordance with ordinary procedures, the Lender shall record on its books and records the amount of the Loan made, the interest rate applicable, all payments of principal and interest thereon and the principal balance thereof from time to time outstanding.  Such record shall, absent demonstrable error, be conclusive evidence of the amount of the Loan made by the Lender to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder (and under the Note) to pay any amount owing with respect to the Loan or provide the basis for any claim against the Lender.

2.12     Substitution of Collateral.  If the Lender in its sole and absolute discretion determines that any shares, membership interests, or units pledged by the Tranche 2 Borrowers or the Tranche 3 Borrowers are no longer acceptable Collateral due to limitations or restrictions on, or adverse consequences resulting from, the pledge thereof to the Lender or the ability of the Lender to acquire such interests after an Event of Default, then, in any such case, the Lender may promptly notify the Borrowers thereof and the Borrowers shall, within five (5) Business Days of receipt of such notice from the Lender, substitute alternative Collateral acceptable to the Lender in its sole discretion.


ARTICLE III

CONDITIONS PRECEDENT

3.1     Deliveries.

(a)     The obligation of the Lender to make any Loan hereunder shall be subject to satisfaction of the following conditions precedent:

(i)     The Borrowers shall have furnished to the Lender, or caused to be furnished to the Lender (unless otherwise waived by the Lender in writing), the following, each in form and substance satisfactory to the Lender and its counsel, each dated as of the Effective Date (or such other date as shall be acceptable to the Lender) and duly executed by each Loan Party that is a party thereto:

1.     this Agreement;

2.     the Tranche 3 Notes and the Note;

3.     each of the Security Documents and Loan Documents;

4.     a written notice of borrowing substantially similar to the form of Exhibit B attached hereto signed by the Borrower (a "**Notice of Borrowing**");

5.     if the Loan is to be secured directly or indirectly by margin stock, the appropriate "Federal Reserve Form, Statement of Purpose for an Extension of Credit Secured by Margin Stock," completed in a manner satisfactory to the Lender; and

6.     such other documents and information as the Lender or its counsel may reasonably request to enable the Lender to obtain final credit approval.

(b)     The obligation of the Lender to make the Tranche 3 Loan hereunder shall be subject to satisfaction of the following conditions precedent:

(i)     The Lender shall have received evidence of the Borrowers' use of proceeds and the Borrowers shall have provide any additional documents, certificates or instruments required by Lender, in its sole discretion, to secure any additional Collateral related thereto.

(ii)   The Lender shall have received a favorable opinion of counsel addressed to the Lender covering such matters relating to the transactions contemplated hereby, as reasonably requested by the Lender and substantially in a form acceptable to the Lender.

(iii)   The Lender shall have received and be satisfied in its sole discretion with its review and the results of the Constituent Instruments of each Loan Party (if applicable) and all state and federal UCC, bankruptcy, litigation, judgment and lien searches relating to each Loan Party, and each subsidiary thereof, as applicable and any portion of the Collateral, as applicable.

(iv)   The Lender shall have received evidence of Michel B. Moreno's life insurance policy (the "**Life Insurance Policy**") with American General Life Insurance Company (the "**Insurer**"), in the amount of $15,000,000, and an executed Assignment to be filed with the Insurer, together with any other instrument that the Insurer may require with respect to the assignment of such policy to Lender.

(v)   The Lender shall have determined in its sole discretion that no material adverse effect has occurred with respect to any of the Loan Parties' (and/or any subsidiaries thereof) financial condition or any of their respective assets (owned directly or indirectly).

(vi)   The Lender shall have determined in its sole discretion that there are no pending or ongoing investigations of any Loan Party or any of the entities that are owned directly or indirectly by any Loan Party, by any federal or state governmental authority having jurisdiction over the ownership, licensing or operations of any of such entities.

(vii)   The Lender shall have received and approved, in its sole discretion, a survey, engineering report, environmental report and zoning report relating to the each of the properties that are to be included as Collateral hereunder.

(viii)   The Borrower shall have caused (i) a first priority mortgage to be recorded against the property commonly referred to as the "Nicholson" property; (ii) with respect to the property commonly referred to as the "Port Road" property: (A) an assignment of the existing Regions Bank first lien mortgage (the "**Assigned Regions Mortgage**") in original principal amount of such mortgage, (B) a second lien mortgage in an amount equal to the Assigned Regions Mortgage less the sum of the Tranche 1 Loan and Tranche 2 Loan, (C) a third lien mortgage (the "**Tranche 3 GRAT Mortgage**") made by the Tranche 1 Borrowers in favor of TCM MGH GRAT and MBM MGH GRAT, and (D) an assignment of each Tranche 3 Mortgage to the Lender; and (iii) a supplemental second lien mortgage (or deed of trust, as applicable) to be recorded against each of the residential properties comprising a portion of the Tranche 1 Collateral, in each case, with a title insurance policy in such amount as determined by Lender, in its sole discretion and insuring the Lender's first (or second or third, as applicable) priority lien in form and substance satisfactory to the Lender, subject to only such encumbrances and exceptions to title as Lender determines in its sole discretion.

(ix)   The Borrower shall have caused the Three Million Dollars ($3,000,000) of cash and/or cash-equivalent collateral pledged to Regions Bank to have been released to Lender to be held in escrow and shall provide evidence of such release and deposit satisfactory to Lender in Lender's sole discretion.

(x)   The Borrower shall have caused Regions Bank to deliver that certain original Promissory Note related to the Assigned Regions Mortgage, dated as of September 10, 2010, in the original principal amount of Sixteen Million Five Hundred Thousand Dollars ($16,500,000) to the Lender or its designee, together with any and all assignment documentation related to the assignment of such promissory note to the Lender.

3.2   <u>Fees and Expenses</u>.  On the Effective Date, the Borrowers shall have paid all fees and expenses incurred or payable by the Lender (including, without limitation, reasonable fees and expenses of counsel for the Lender), arising in connection with the negotiation, preparation and execution of this Agreement and the other Loan Documents and all other instruments and documents to be delivered hereunder or thereunder or arising in connection with the transactions contemplated hereunder or thereunder, and the Borrowers hereby authorize the Lender to deduct all such amounts from the aggregate proceeds of the Loan. The structuring fee due at closing shall be Two Hundred Sixty-Two Thousand Five Hundred Dollars ($262,500).

ARTICLE IV

REPRESENTATIONS AND WARRANTIES

Each Borrower represents and warrants to the Lender solely in respect of itself and not in respect of any other Borrower, that on the date hereof:

4.1   <u>Name, Etc.</u>  The Borrower's legal name is correctly set forth on the signature page hereto and the other information regarding the Borrower set forth in this Agreement, including without limitation, below Borrower's signature hereto is true, correct and complete on the date hereof.

9

4.2     Enforceable Obligations.  Each Borrower (a)  if an individual, is competent to enter into this Agreement and the other Loan Documents to which such Borrower is a party and to perform such Borrower's obligations hereunder and thereunder and (b) if a corporation, limited liability company, partnership, trust or other legal entity, is duly organized and validly existing in good standing under the laws of its jurisdiction of formation, is duly qualified and in good standing in all such foreign jurisdictions where its business or property so requires and has the power and authority to enter into this Agreement and the other Loan Documents to which it is a party.  The execution, delivery and performance by such Borrower of the Loan Documents to the extent it is a party thereto and the consummation of the transactions contemplated by this Agreement and the other Loan Documents have been duly authorized by all necessary action, including necessary actions by directors, members, shareholders or trustees, as the case may be and: (i) will not violate any law or regulation, or any order or decree of any court or governmental instrumentality (including Regulations U and X of the Board of Governors of the Federal Reserve System); (ii) if any Borrower is a corporation, limited liability company, partnership, trust or other legal entity, will not violate any Constituent Instruments of such Borrower, (iii) will not conflict with or result in the breach or termination of, constitute a default under, or accelerate any performance required by, any indenture, mortgage, deed of trust, lease, agreement or other instrument to which the Borrower is a party or by which any Borrower or any of its property is bound; (iv) will not result in the creation or imposition of any lien upon any of the property of any Loan Party other than those in favor of the Lender, all pursuant to the Loan Documents; and (v) do not require the consent or approval of any governmental body, agency, authority or any other Person, except such consents as have been obtained.  Each of the Loan Documents to which each Borrower is a party when delivered hereunder shall constitute a legal, valid and binding obligation of the Borrower, enforceable against it in accordance with its terms.

4.3     Taxes; Compliance with Laws.  Each Borrower has filed or caused to be filed all federal, state and local tax returns that are required to be filed by such Borrower, which returns were true, accurate and complete in all material respects, and has paid or caused to be paid all taxes shown to be due and payable on such returns or on any assessments received by each Borrower.  No Borrower is in violation in any material respect of any applicable law, rule, regulation, order, judgment, writ or decree of any governmental authority applicable to any Borrower or its property.

4.4     Solvency.  After giving effect to the Loan, each Borrower shall be Solvent.

4.5     Complete Disclosure.  All factual information including, without limitation, all financial statements, furnished by or on behalf of each Borrower to the Lender for purposes of or in connection with this Agreement and the other Loan Documents is, and all other such factual information hereafter furnished by or on behalf of each Borrower will be, true and accurate in all material respects on the date as of which such information is furnished and not incomplete by omitting to state any fact necessary to make such information not misleading at such time in light of the circumstances under which such information is provided. Since the date of each Borrower's most recent financial statements, tax returns or other financial representations delivered or made to the Lender, there has been no material adverse change in the business, condition (financial or otherwise), obligations, performance, properties, or prospects of any Borrower.

4.6     Absence of Undisclosed Liabilities.  No Borrower has any material liabilities or obligations, either accrued, absolute, contingent or otherwise, other than (a) the Obligations and (b) the liabilities and obligations set forth in the financial statements and financial representations previously delivered or made to the Lender.

4.7     Foreign Assets Control Regulations, Etc.  No Borrower is (i) in violation of the Trading with the Enemy Act of the United States of America (50 U.S.C. App. §§ 1 et seq.), as amended; (ii) on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("**OFAC**"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation; (iii) in violation of the USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 ("**USA Patriot Act**"); (iv) a Person designated under Section 1(b), (c) or (d) or Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders; or (v) to the best of its knowledge, engaging in any dealings or transactions, or is otherwise associated, with any of the foregoing blocked Persons.

4.8     No Default.  No Borrower is and after giving effect to this Agreement shall be, in default in the payment or performance of any contractual obligation.

4.9     No Litigation.  There are no actions, suits, litigations, arbitrations, administrative or other legal proceedings, or investigations, pending or threatened, against any Borrower or any of the Collateral in which any Borrower has rights that will or could (a) have a material adverse effect on the business or affairs, condition (financial or otherwise), obligation, operations, performance, properties or prospects of any Borrower, or (b) affect any Borrower's ability to enter into and perform its obligations under this Agreement or any of the transactions contemplated by this Agreement.  There have not been any judgment(s) or other legal proceedings against any Borrower in the past seven (7) years.

4.10     Investment Company Act.  If any Borrower is organized as a corporation, limited liability company, partnership or other legal entity, such Borrower is not an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.  No Borrower is subject to regulation under any federal or state statute or regulation which limits its ability to borrow money.

4.11     Transact Business.  If any Borrower is organized as a corporation, limited liability company, partnership or other legal entity, such Borrower has all the necessary right, power and authority to own Borrower's property and assets and to transact the business in which such Borrower is engaged.

4.12     Employee Retirement Income Security Act of 1974.  No Loan Party is (x) an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), subject to Title I of ERISA or a "plan" subject to the prohibited transaction provisions of Section 4975 of the Internal Revenue Code of 1986, as amended (an "ERISA Plan"), (y) a Person acting on behalf of any ERISA Plan, or (z) a Person the assets of whom constitutes assets of any ERISA Plan.

4.13     Bank Official.

(a)     No Borrower is (i) a Company controlled by a Bank Official or by the spouse or child of a Bank Official, (ii) a political or campaign committee that benefits or is controlled by a Bank Official or by the spouse or child of a Bank Official or (iii) the spouse or child of a Bank Official.

(b)     If any Borrower is organized as a trust or an estate vehicle, neither the trustee nor the beneficiary of such trust or estate vehicle is a Bank Official or the spouse or the child of a Bank Official.

4.14     Organizational and Collateral Chart.  The organizational and collateral chart attached hereto as Exhibit 4.14, represents a true, complete and accurate description of the ownership structure of the Borrower's and Pledgors and the Collateral securing the Loan.


ARTICLE V

COVENANTS


For so long as the Loan remains outstanding under this Agreement, unless the Lender shall otherwise consent in writing, the Borrowers shall, or shall cause:

5.1     Events of Default.  Give the Lender prompt written notice of any Event of Default under this Agreement or any other default under any other Loan Document or any other agreement that could, in the opinion of the Lender, have a material adverse effect on any Borrower.

5.2     Execution of Supplemental Instruments.  Execute and deliver to the Lender from time to time, upon demand, such supplemental agreements, statements, assignments, transfers, instructions, instruments or documents as the Lender may reasonably request, in order that the full intent of this Agreement may be carried into effect, including, without limitation, instruments to effectuate liens on any underlying assets owned by the entities in which the Borrower or any Pledgor has pledged interests to the Lender under the Security Agreement as Collateral for the Loan.

5.3     Obligations and Taxes.  Pay and discharge promptly when due all taxes, assessments and governmental charges or levies imposed upon it or upon its income or assets before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise, which, if unpaid, might give rise to liens or charges upon such assets or any part thereof; provided, however, that the Borrowers shall not be required to pay and discharge or to cause to be paid and discharged any such tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings.

5.4     Litigation.  Give the Lender prompt written notice of the filing or commencement of any action, suit or proceeding against any Borrower, whether at law or in equity or by or before any court or any governmental authority, in each case, that could, in the opinion of the Lender, have a material adverse effect on any Borrower or where the amount demanded is in excess of $250,000.

5.5     USA Patriot Act, OFAC Compliance.  Provide such information and take such actions as are reasonably requested by the Lender in order to assist the Lender with compliance with the USA Patriot Act; and each Borrower shall at all times comply with OFAC and the USA Patriot Act.

5.6     Solvency.  At all times be Solvent.

5.7     Indebtedness.

(a)     Not, nor shall it permit any Borrower to, create, incur, assume, guarantee or be or remain liable for, contingently or otherwise, or suffer to exist any indebtedness, except the Obligations and the existing indebtedness described in the financial statements and financial representations previously delivered or made to the Lender and other indebtedness not exceeding $1,000,000 in aggregate principal amount at any one time outstanding unless the prior written consent of the Lender is obtained.

(b)     Not permit Green Field to create, incur, assume, guarantee or be or remain liable for, contingently or otherwise, or suffer to exist any indebtedness, except the existing indebtedness described in the financial statements and financial

representations previously delivered or made to the Lender and other indebtedness not exceeding $100,000,000 in aggregate principal amount at any one time outstanding unless the prior written consent of the Lender is obtained.

5.8     No Permitted Pledges.

(a)     Not permit the sale, transfer, assignment, exchange, pledge or other conveyance of any of the Collateral, including, without limitation, (i) outstanding shares in Green Field; (ii) outstanding equity interests in Turbine Generation; and (iii) outstanding equity interests in Dynamic Group Holdings, LLC ("**Dynamic**").

(b)     Not permit, either directly or indirectly the assignment, pledge or other encumbrance of any of the Borrower's direct or indirect ownership interest in Integrated Pro Services, LLC ("**Integrated**").

(c)     Not permit the sale, transfer, assignment, exchange, pledge or other conveyance of, or permit the imposition of any encumbrance or lien on the properties known as (i) "Curtis Lane" located at is 3508 Curtis Lane, New Iberia, LA, and (B) "Ingleside" located at 1074 FM 2725, Ingleside, TX.

5.9     Anti-Dilution.  Without the Lender's prior written consent, the Borrower shall not cause, nor shall it permit (to the extent the applicable Borrower has such right with respect to its ownership interests in the Collateral), either directly or indirectly, any issuance of additional units, ownership interests or shares (or the equivalent), which could result in the diminution of value and/or percentage ownership interest in the Collateral.  For the avoidance of doubt, the prohibitions set forth in this Section 5.9 shall include, without limitation, the Borrower's right, either directly or indirectly, to provide its election of, consent to, or waiver of, any such action permitted under the applicable constituent document, including without limitation with respect to put or call options, redemption rights or obligations, buy-sell options, co-sale rights, "tag-a-long" or "drag-a-long" rights.

5.10    No Permitted Amendments.  Without the prior written consent of the Lender no Borrower shall alter, amend, modify, terminate, or change any material provision of any constituent document of any Borrower, nor shall it permit or cause any such material alteration of any subsidiary's constituent documents, in each case in any way relating to the Collateral.  With respect to any such proposed amendment, modification or change to any constituent document, the applicable Borrower shall notify the Lender of such proposal.

5.11    Securities Accounts.  If applicable, except as permitted by the applicable Security Document, without the prior consent of the Lender, not close or cause to be closed, the Securities Account or withdraw, or cause to be withdrawn, any securities or other funds from the Securities Account.

5.12    Name, Etc.  Without the prior written consent of the Lender, such consent not to be unreasonably withheld, not change (a) any Borrower's legal name, (b)  any Borrower's address or (c) if any Borrower is an individual, his or her principal residence, or if the Borrower is a corporation, limited liability company, partnership, trust or other legal entity, its principal place of business, chief executive office, jurisdiction of organization or situs for administration.

5.13    Use of Proceeds.  Use all proceeds of the Loan only as permitted under Section 2.9 hereof.

5.14    Compliance with Laws.  Comply in all material respects, with all applicable laws, statutes, codes, ordinances, regulations, rules, orders, awards, judgments, decrees, injunctions, approvals and permits.

5.15    Financial Information.

(a)     Monthly.  Borrower shall deliver to Lender copies of the monthly financial statements of Green Field, Turbine Generation and Dynamic within ten (10) days of the end of each calendar month.

(b)     Quarterly.  Borrower shall deliver to Lender, within sixty (60) days of the end of each calendar quarter, financial statements of Green Field, Turbine Generation and Dynamic.

(c)     Annual.  Borrower shall deliver to Lender copies of the annual audited financial operating statements of Green Field, Turbine Generation and Dynamic within one hundred eighty (180) days of the end of each calendar year.

(d)     Additional Financial Deliverables.  Promptly upon the request of the Lender, but in any event no later than thirty (30) days after receipt of such request, deliver to the Lender copies of each Borrower's most recently filed federal tax returns, bank and brokerage statements and other financial statements or information reasonably requested by the Lender.

Each financial statement delivered to Lender pursuant to, and in accordance with, this Section 5.15, shall be accompanied by an officer's certificate of the applicable company.

5.16    Sale or Transfer.  Shall not sell or transfer, either directly or indirectly, any direct or indirect ownership interest in Integrated, unless such sale or transfer is on an arms' length basis, as determined by the Lender in its commercially reasonable discretion.  The Borrower shall provide at least fifteen (15) day's prior written notice of any proposed sale or transfer and upon the

consummation of any transfer or sale of such interests, the Borrower shall deposit the net proceeds into a designated account, where such proceeds shall be held by the Lender as additional Collateral and upon the occurrence and continuance of an Event of Default, the Lender may, in its sole discretion, apply such proceeds in repayment of the Obligations hereunder.

5.17    Life Insurance Policy.  Within thirty (30) days of Lender advancing the Tranche 3 Loan, the delivery of evidence that Life Insurance Policy has been increased from Fifteen Million Dollars ($15,000,000) to Twenty Million Dollars ($20,000,000) and shall deliver an additional Assignment to the Insurer, and shall provide the Lender with proof of delivery thereof, with respect to such increased amount.

5.18    Supplemental Covenants and Reserves.  Comply with any additional covenants, including the imposition of required reserves, which Lender may require based upon the "Port Road" property environmental report.  In the event that Lender notifies Borrower of any additional covenants, reserves or other requirements, Borrower shall promptly execute and deliver any required amendments, instruments or other documents necessary to effectuate the foregoing.

ARTICLE VI

EVENTS OF DEFAULT

The occurrence of any one or more of the following events shall constitute a default hereunder (each, an "**Event of Default**"):

6.1    The Borrowers (a) shall fail to pay any principal of any Loan hereunder or under the Note when due and payable; or (b) shall fail to pay any accrued interest on any Loan or any other amount owed hereunder or under any other Loan Document when due and such failure under this clause (b) continues for a period of five (5) days after such interest or other amount becomes due and payable.

6.2    The breach by any Loan Party of any other covenant contained in any Loan Document.

6.3    Any representation or warranty made in any Loan Document by any Loan Party shall be materially false or misleading as of the date such representation or warranty was made.

6.4    The occurrence of any default under any of the other Loan Documents or any other agreement between any Loan Party, on the one hand, and any member of the Goldman Affiliated Group, on the other hand or any other agreement that could have a material adverse effect on any Loan Party.

6.5    Any Loan Party shall (i) have an order for relief entered with respect to it under the Federal bankruptcy laws as now or hereafter in effect, (ii) make an assignment for the benefit of creditors, (iii) become insolvent or admit in writing its inability or refusal to pay debts as they become due, (iv) apply for, seek, consent to, acquiesce in, or have appointed for it or any substantial portion of its property a receiver, custodian, trustee, examiner, liquidator or similar official, or (v) institute, or have commenced against it, any proceeding seeking an order for relief under the Federal bankruptcy laws as now or hereafter in effect or seeking to adjudicate it bankrupt or insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it.

6.6    The Security Documents shall for any reason fail to create a valid lien and security interest in the Collateral, or this Agreement or any of the other Loan Documents shall fail to remain in full force or effect, or any action shall be taken to discontinue or to assert the invalidity or unenforceability thereof.

6.7    An attachment or garnishment writ or the like is levied against all or any portion of the Securities Account or any Collateral.

6.8    Any indebtedness of any Loan Party, (or any subsidiary thereof, including, without limitation, Turbine Generation, Green Field, Dynamic or Hub City Tools, Inc.) to any entity, lender or other person (including any member of the Goldman Affiliated Group) to whom such Loan Party is indebted:  (i) is not paid when due nor within any applicable grace period in any agreement relating to such indebtedness, or (ii) becomes due and payable before its normal maturity by reason of a default or event of default, however described.

6.9    Final judgment for the payment of money is rendered against any Loan Party and within thirty (30) days from the entry of such judgment has not been discharged or stayed pending appeal or has not been discharged within thirty (30) days from the entry of a final order of affirmance on appeal.

6.10    The Lender otherwise deems its security interest in any of the Collateral insufficient, invalid or otherwise unenforceable or the Lender believes in good faith that the prospect of payment or other performance by any Loan Party is impaired, whether due to market volatility or liquidity of the Collateral or otherwise.

6.11     With respect to any Loan Party that is an individual, such Loan Party dies or becomes or is declared (by an appropriate legal authority) incompetent or of unsound mind. With respect to any Loan Party that is a corporation, limited liability company, partnership, trust or other legal entity, any event or circumstance shall occur which could reasonably result in the dissolution or liquidation of such Loan Party.

6.12     The occurrence of (a) the breach of any covenant set forth in Article IV of the Indenture, or (b) any Event of Default (as defined in the Indenture) under the Indenture.

6.13     In the event that the ratio of Turbine's total indebtedness to total equity exceeds:

(a)     3:1 during the 2013 fiscal year (which begins January 1st and ends December 31st); and

(b)     2:1 from the first day of the 2014 fiscal year (January 1st), through the Maturity Date.


ARTICLE VII

ACCELERATION, WAIVERS, AMENDMENTS AND REMEDIES

7.1     Acceleration.  If any Event of Default described in Section 6.5 or Section 6.11 occurs with respect to the Borrowers, the Obligations shall immediately become due and payable without any election, notice or action on the part of the Lender.  If any other Event of Default occurs, the Lender may declare the Obligations to be due and payable, whereupon the Obligations shall become immediately due and payable, without presentment, demand, protest or notice of any kind, all of which the Borrowers hereby expressly waive.

7.2     Other Remedies.  Upon the occurrence and during the continuance of an Event of Default, the Lender (i) shall have, in addition to all other rights of the Lender, the rights and remedies of a secured party under the UCC, (ii) may proceed to protect and enforce the Lender's rights by suit in equity, action of law and/or other appropriate proceeding either for specific performance of any covenant or condition contained in this Agreement, any other Loan Document or in any instrument or document delivered to the Lender pursuant hereto or thereto, (iii) in the exercise of any rights, remedies or powers granted in this Agreement, any other Loan Document and/or any such instrument or document, may proceed to declare the Obligations to be due and payable pursuant to Section 7.1 hereof and the Lender may proceed to enforce payment of such Obligations as provided herein or in any Loan Document, and may offset and apply toward the payment of such amount any indebtedness of the Lender to the Borrowers, and (iv) shall have, in addition to all other rights of Lender, the right to record a mortgage or deed of trust, as applicable, against the properties known as (A) "Curtis Lane" located at is 3508 Curtis Lane, New Iberia, LA, and (B) "Ingleside" located at 1074 FM 2725, Ingleside, TX.

Upon the occurrence and during the continuance of an Event of Default, the Lender in its discretion may also set-off any or all of the Obligations against any securities, cash or other property of the Borrowers in the possession of the Lender or any other member of the Goldman Affiliated Group and against any obligations owed to the Borrowers by the Lender or any other member of the Goldman Affiliated Group to the extent that it does not impact the Lender's ability to recover amounts owed to the Lender.  THE BORROWERS UNDERSTAND THAT PURSUANT TO THE TERMS OF THIS AGREEMENT THE BORROWERS ARE ALLOWING THE LENDER TO SET-OFF ANY OR ALL OBLIGATIONS OF THE BORROWERS TO THE LENDER OR ANY OTHER MEMBER OF THE GOLDMAN AFFILIATED GROUP AND BY ALLOWING FOR SUCH AFFILIATE SET-OFF, THE BORROWERS ARE WAIVING ALL OF THEIR RIGHTS TO LIMIT SET-OFF TO THOSE OBLIGATIONS WHICH ARE MUTUAL AS BETWEEN THE LENDER AND THE BORROWERS.

7.3     Amendments.  The Lender and the Borrowers may enter into written agreements supplemental hereto or the Loan Documents for the purpose of adding or modifying any provisions to the Loan Documents or changing in any manner the rights of the Lender or the Borrowers hereunder or waiving any Event of Default hereunder.  To be effective, any such amendment or waiver must be in writing and signed by the Lender and the Borrowers.

7.4     Preservation of Rights; No Adverse Impact.  No delay or omission of the Lender to exercise any right under this Agreement or any of the Loan Documents shall impair such right or be construed to be a waiver of any Event of Default or an acquiescence therein.  Any single or partial exercise of any such right shall not preclude other or further exercise thereof or the exercise of any other right.  All remedies contained in the Loan Documents, or afforded by law, shall be cumulative and all shall be available to the Lender until the Obligations have been indefeasibly paid in full in cash.


ARTICLE VIII

GENERAL PROVISIONS

8.1     Survival of Representations.  All representations and warranties of the Borrowers contained in this Agreement shall survive delivery of the Loan Documents and the making of the Loan.

8.2     Headings.  Section headings in the Loan Documents are for convenience of reference only and shall not govern the interpretation of any of the provisions of the Loan Documents.

8.3     Entire Agreement.  The Loan Documents embody the entire agreement and understanding between the Borrowers and the Lender and supersede all prior agreements and understandings between the Borrowers and the Lender relating to the subject matter thereof.

8.4     No Third Party Beneficiary.  This Agreement shall not be construed so as to confer any right or benefit upon any Person other than the parties to this Agreement and their respective successors and assigns.

8.5     Expenses.  Upon the occurrence of an Event of Default, the Borrowers shall pay to the Lender on demand all expenses reasonably incurred in connection with the collection and enforcement of all Obligations under the Loan Documents and in connection with any proceeding commenced by or against the Borrowers under Title 11 of the U.S. Code including, without limitation, all attorneys' fees and expenses.

8.6     Severability of Provisions.  Any provision in any Loan Document that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions of the Loan Documents in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction, and to this end the provisions of all Loan Documents are declared to be severable.

8.7     Nonliability of the Lender.  The relationship between the Borrowers and the Lender shall be solely that of borrower and lender.  The Lender shall have no fiduciary responsibilities to the Borrowers under this Agreement, any other Loan Document or in connection with the transactions contemplated hereby or thereby.

8.8     CHOICE OF LAW.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN THOSE CONTAINING A CONTRARY EXPRESS CHOICE OF LAW PROVISION) SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS (AND NOT THE LAW OF CONFLICTS) OF THE STATE OF NEW YORK.

8.9     BINDING ARBITRATION.

(a)     THE PARTIES HERETO HEREBY WAIVE ALL RIGHTS TO A COURT TRIAL OR TRIAL BY JURY WITH RESPECT TO ANY DISPUTE, CONTROVERSY OR CLAIM UNDER THIS AGREEMENT AND THE BORROWERS AGREE TO SETTLE BY ARBITRATION ANY CONTROVERSY BETWEEN THE BORROWERS AND THE LENDER OR ITS AFFILIATES ARISING OUT OF OR RELATING TO THIS AGREEMENT.  THE ARBITRATION WILL BE CONDUCTED IN ACCORDANCE WITH THE RULES THEN IN EFFECT OF THE AMERICAN ARBITRATION ASSOCIATION.  ANY DISPUTE OR CLAIM INVOLVING A DOLLAR AMOUNT OF $50,000 OR LESS WILL BE BEFORE ONE ARBITRATOR, AND ALL OTHER DISPUTES AND CLAIMS WILL BE BEFORE A PANEL OF AT LEAST THREE ARBITRATORS.  THE AWARD OF THE ARBITRATOR OR A MAJORITY OF THE ARBITRATORS, AS THE CASE MAY BE, WILL BE FINAL, AND JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT HAVING JURISDICTION.

(b)     NO PARTY HERETO WILL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST THE OTHER PARTY WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION OR WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL:  (I) THE CLASS CERTIFICATION IS DENIED; (II) THE CLASS IS DECERTIFIED; OR (III) THE OTHER PARTY IS EXCLUDED FROM THE CLASS BY THE COURT.  SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

(c)     THE BORROWERS AGREE TO HOLD HARMLESS THE SECURITIES INTERMEDIARY AND ITS AFFILIATES AND ITS DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS FROM ANY AND ALL CLAIMS, LIABILITIES, AND/OR DAMAGES, IN ANY WAY RELATED TO, OR ARISING OUT OF, OR IN CONNECTION WITH, THE BORROWER'S GRANTING OF THE SECURITY INTEREST OR THE LENDER'S EXERCISE OF RIGHTS UNDER THIS AGREEMENT OR THE SECURITY DOCUMENTS, INCLUDING ANY ACTION OR INACTION BY THE SECURITIES INTERMEDIARY IN FOLLOWING THE LENDER'S INSTRUCTIONS REGARDING THE SECURITIES ACCOUNT IN ACCORDANCE WITH THIS AGREEMENT OR ANY OTHER SECURITY DOCUMENT.

(d)     THE BORROWERS AND THE LENDER HEREBY FURTHER AGREE AS FOLLOWS:

EACH OF THE BORROWERS AND THE LENDER IS EACH GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT, INCLUDING THE RIGHT TO A TRIAL BY JURY, EXCEPT AS PROVIDED BY THE RULES OF  THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED.

ARBITRATION AWARDS ARE GENERALLY FINAL AND BINDING; A PARTY'S ABILITY TO HAVE A COURT REVERSE OR MODIFY AN ARBITRATION AWARD IS VERY LIMITED.

LEGAL_US_E # 105363940.11

THE ABILITY OF THE PARTIES HERETO TO OBTAIN DOCUMENTS, WITNESS STATEMENTS AND OTHER DISCOVERY IS GENERALLY MORE LIMITED IN ARBITRATION THAN IN COURT PROCEEDINGS.

THE ARBITRATOR(S) DO NOT HAVE TO EXPLAIN THE REASON(S) FOR THEIR AWARD UNLESS, IN AN ELIGIBLE CASE, A JOINT REQUEST FOR AN EXPLAINED DECISION HAS BEEN SUBMITTED BY ALL PARTIES TO THE PANEL AT LEAST 20 DAYS PRIOR TO THE FIRST SCHEDULED HEARING DATE.

ANY PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES AND/OR BANKING INDUSTRY.

THE RULES OF SOME ARBITRATION FORUMS MAY IMPOSE TIME LIMITS FOR BRINGING A CLAIM IN ARBITRATION. IN SOME CASES, A CLAIM THAT IS INELIGIBLE FOR ARBITRATION MAY BE BROUGHT IN COURT.

THE RULES OF THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED, AND ANY AMENDMENTS THERETO, SHALL BE INCORPORATED INTO THIS AGREEMENT.

8.10    <u>Indemnity</u>.  The Borrowers hereby agree to indemnify, defend and hold harmless the Lender and its officers, directors, employees, agents, representatives, successors and assigns (each, an "**Indemnified Person**") in connection with any losses, claims, damages, liabilities, obligations, penalties, actions, suits, costs, charges and expenses, including reasonable attorneys' fees, (i) of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement and any other Loan Document, or the transactions contemplated hereby or thereby, and with respect to any investigation, litigation or proceeding (including any bankruptcy, insolvency or appellate proceeding) related to this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby or the use of the proceeds of the Loan, whether or not any Indemnified Party is a party thereto and (ii) which may be incurred by or asserted against such Indemnified Person in connection with or arising out of any pending or threatened investigation, litigation, or proceeding (including any bankruptcy or insolvency proceeding) or any action taken by any Person, with respect to any environmental claim or suit arising out of or related to any property of the Borrowers (all of the foregoing, the "**Indemnified Liabilities**").  Notwithstanding the foregoing, the Borrowers shall have no obligation to any Indemnified Person for any Indemnified Liabilities to the extent arising from the gross negligence or willful misconduct of such Indemnified Person as determined in a final, non-appealable decision of a court of competent jurisdiction or of an arbitration panel. The Borrowers hereby acknowledge and agree that any member of the Goldman Affiliated Group that grants a security interest in any of its assets as collateral security for the Loan shall have all rights of subrogation against the Borrowers.

8.11    <u>Assignment, Etc.</u>

(a)      The Lender may sell, assign, transfer or negotiate its rights and obligations under this Agreement and the other Loan Documents, in whole or in part at any time (i) to any other member of the Goldman Affiliated Group without notice to or consent of the Borrowers or any other Person or (ii) to any other bank or entity with net assets in excess of $100,000,000 so long as the Borrowers consent to such sale, assignment, transfer or negotiation in writing (which consent shall not be unreasonably conditioned, withheld or delayed); <u>provided</u> that any such consent shall not be required if an Event of Default is then continuing. The Borrowers agree to execute any additional or replacement Notes requested by Lender to further document any such sale, assignment, transfer or negotiation.  Any assignee or transferee of the Lender's rights and/or obligations shall be entitled to the full benefit of this Agreement to the same extent as if it were an original party in respect of the rights or obligations assigned or transferred to it.

(b)      The Lender may sell participating interests in the Loan owing to Lender, any Note held by such Lender or any other interest of such Lender under this Agreement and the other Loan Documents to one or more banks or other entities with net assets in excess of $100,000,000 ("**Participants**").  In the event of any such sale by the Lender of participating interests to a Participant, the Lender's obligations under this Agreement and the other Loan Documents shall remain unchanged, the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, the Lender shall remain the owner of its Loan and the holder of any Note issued to it in evidence thereof for all purposes under the Loan Documents, all amounts payable by the Borrowers under this Agreement shall be determined as if the Lender had not sold such participating interests, and the Borrowers shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under the Loan Documents.

(c)      The Borrowers may not assign their rights or obligations under this Agreement.  This Agreement shall be binding upon and inure to the benefit of the respective heirs, successors and permitted assigns of all the parties to this Agreement.  The Lender may at any time change the office through which it is acting for the purpose of this Agreement and may at any time act for this purpose through more than one office. The Lender may disclose to an assignee or transferee permitted by this Agreement such information about the Borrowers and the Loan Documents as it may deem appropriate.

(d)      Nothing herein shall prohibit Lender from pledging or assigning Loans to any Federal Reserve Bank in accordance with applicable law.

8.12    <u>Giving Notice</u>.  Unless otherwise provided herein, all notices and other communications provided to any party hereto under this Agreement or any other Loan Document shall be in writing or by facsimile and addressed or delivered to such party at its address as follows (unless otherwise designated in writing to the other parties):  (i) if to the Borrowers, at the address set

forth below each Borrower's name on the signature page hereto and (ii) if to the Lender, at the address set forth below the Lender's name on the signature page hereto.  Unless otherwise provided herein, any notice, if mailed and properly addressed with postage prepaid, shall be deemed given three (3) Business Days after being sent; any notice, if transmitted by facsimile, shall be deemed given when transmitted; any notice, if hand delivered, shall be deemed given on the date of such delivery; any notice, if mailed by overnight courier, shall be deemed given on the date of such delivery.

8.13     Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart.  Facsimiled and photocopied signatures to this Agreement shall be valid.  This Agreement shall be effective when it has been executed by the Borrowers and the Lender.

8.14     Co-Borrowers; Joint and Several and Several Liability.

(a)     If the Borrowers consist of more than one individual (each a "**Co-Borrower**"), references herein to "the Borrower" shall be read as "each Co-Borrower", "all Co-Borrowers", or "any or all Co-Borrowers", jointly and severally, whichever reading maximizes the Lender's rights and the Co-Borrowers' Obligations under this Agreement.  Each Co-Borrower agrees that each Co-Borrower will have authority on behalf of all Co-Borrowers to deal with the Lender as fully and completely as if each was the sole Borrower under this Agreement, all without notice to the other Co-Borrower(s).  Notwithstanding the foregoing, each Co-Borrower agrees that the Lender may, at its discretion, (a) require joint instruction from some or all of the Co-Borrowers before taking action under this Agreement and (b) if the Lender received instructions from any Co-Borrower that are, in the Lender's opinion, in conflict with instructions received from any other Co-Borrower, comply with any of these instructions and/or advise each Co-Borrower of the apparent conflict and/or take no action as to any of these instructions until it receives instructions from any or all of the Co-Borrowers that are satisfactory to the Lender.  Notice provided by the Lender to any Co-Borrower will be deemed notice to all Co-Borrowers.

(b)     Notwithstanding anything to the contrary contained in this Agreement the several and/or joint and several liability among the Borrowers is set forth on Schedule II attached hereto, and made a part hereof.

8.15     Reinstatement of Obligations.  If and to the extent the Lender or the Securities Intermediary receives any payment with respect to the Obligations or this Agreement and all or any part of such payment is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid by the Lender or the Securities Intermediary or paid over to a trustee, receiver, or any other entity, whether under any bankruptcy law or otherwise (any such payment is referred to as a "**Returned Payment**"), then this Agreement shall continue to be effective or shall be reinstated, as the case may be, to the extent of such payment or repayment by the Lender or the Securities Intermediary, and the indebtedness or part thereof intended to be satisfied by such Returned Payments shall be revived and continued in full force and effect as if the Returned Payment had not been made.

8.16     Certain Risks and Potential Conflicts of Interest.

(a)     (This Section 8.16(a) is applicable to the extent the Collateral includes "Funds" and "Fund Interests" (as such terms are defined in the Security Document) and such "Fund Interests" are issued by a member of the Goldman Affiliated Group.)  There are certain risks and potential conflicts of interest relating to the various capacities in which the Lender and its affiliates are acting in connection with the Funds (as defined in the applicable Security Document), the Collateral and acting as Lender, a summary description of which is set forth on Exhibit 8.16.  Each Borrower acknowledges that it has received, read and understood the disclosure set forth on Exhibit 8.16.

(b)     Each Borrower acknowledges that, to the extent the Collateral includes municipal securities, shares of municipal bond funds or shares of mutual funds invested in municipal securities, a ratable portion of otherwise tax deductible interest expense incurred on the Loans may not be tax deductible.

8.17     USA Patriot Act.  The Lender hereby notifies the Borrowers that, pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of the Borrowers and other information that will allow such Lender to identify the Borrowers in accordance with the USA Patriot Act.

8.18     Other Disclosures.

(a)     Each Loan Party acknowledges that it has received, read and understood the privacy notice set forth on Annex I.

(b)     Each Loan Party acknowledges that it has received, read and understood the notice of potential conflicts of interest set forth on Annex II.

[Remainder of page intentionally left blank; signature page follows]

LEGAL_US_E # 105363940.11

IN WITNESS WHEREOF, the Borrower and the Lender have executed this Agreement as of the date set forth below the Lender's signature.

**LENDER:**

GOLDMAN SACHS BANK USA

By: _____

    Name: Rod Colburn

    Title : Vice President

Effective Date: _____

Address:    200 West Street
                New York, NY 10282-2198

Facsimile:   212-428-1474

October 11, 2013

Signature Page to Moreno Term (Commited Loan) Amended and Restated Loan Agreement

**BORROWER:**

By: _____

Name:    Michel B. Moreno

Notice Address:    4023 Ambassador Caffery Pkwy

Suite 200

Lafayette, LA 70503

Facsimile:    337. 988. 6693

By: _____

Name:    Tiffany C. Moreno

Notice Address:    4023 Ambassador Caffery Pkwy

Suite 200

Lafayette, LA 70503

Facsimile:    337. 988. 6693

MBM 2011 MGH GRANTOR RETAINED ANNUITY TRUST

By: *Dalis M Waguespack*

Name: Dalis M. Waguespack

Title: Trustee

Notice Address:     4023 Ambassador Caffery Pkwy

Suite 200

Lafayette, LA 70503

Facsimile:     337.988.6693

TCM 2011 MGH GRANTOR RETAINED ANNUITY TRUST

By: *Dalis M Waguespack*

Name: Dalis M. Waguespack

Title: Trustee

Notice Address:     4023 Ambassador Caffery Pkwy

Suite 200

Lafayette, LA 70503

Facsimile:     337.988.6693

MBM 2011 DOH GRANTOR RETAINED ANNUITY TRUST

By: *Dalis M Waguespack*

Name: Dalis M. Waguespack

Title: Trustee

Notice Address:     4023 Ambassador Caffery Pkwy

Suite 200

Lafayette, LA 70503

Facsimile:     337.988.6693

Signature Page to Moreno Term (Commited Loan) Amended and Restated Loan Agreement

TCM 2011 DOH GRANTOR RETAINED ANNUITY TRUST

By: _____

Name: Dalis M. Waguespack

Title: Trustee

Notice Address:      4023 Ambassador Caffery Pkwy

Suite 200

Lafayette, LA 70503

Facsimile:           337.988.6693

Signature Page to Moreno Term (Commited Loan) Amended and Restated Loan Agreement

## SCHEDULE I

1.     Amended and Restated Security and Pledge Agreement dated as of the Effective Date between the Pledgors party thereto and the Lender, as amended, restated, supplemented or otherwise modified from time to time, securing the Obligations, substantially in the form of Exhibit D hereto (the "Security Agreement").

2.     Second Lien Mortgage, dated as of May 15, 2013 between Borrower and Lender, recorded in the Parish of Lafayette in the State of Louisiana on May 20, 2013 as file number 2013-00020377, as the same may be amended, restated, consolidated, supplemented or otherwise modified from time to time.

3.     Second Lien Deed of Trust, dated as of May 15, 2013 between Borrower and Lender, recorded in Harris County in the State of Texas on May 30, 2013 as file number 20130262978, as the same may be amended, restated, consolidated, supplemented or otherwise modified from time to time.

4.     Acknowledgment and Consent dated as of May 15, 2013 between ("Managing Trustee") and Borrower and acknowledged and agreed to by Lender.

5.     Irrevocable Direction Letter regarding MBM 2011 MGH Grantor Annuity Trust dated as of May 15, 2013, by Michel B. Moreno ("MBM"), as settlor, and acknowledged and agreed by Lender and Managing Trustee.

6.     Irrevocable Direction Letter regarding MBM 2011 DOH Grantor Annuity Trust dated as of May 15, 2013, by MBM, as settlor, and acknowledged and agreed by Lender and Managing Trustee.

7.     Irrevocable Direction Letter regarding TCM 2011 MGH Grantor Annuity Trust dated as of May 15, 2013, by Tiffany C. Moreno ("TCM"), as settlor, and acknowledged and agreed by Lender and Managing Trustee.

8.     Irrevocable Direction Letter regarding TCM 2011 DOH Grantor Annuity Trust dated as of May 15, 2013, by TCM, as settlor, and acknowledged and agreed by Lender and Managing Trustee.

9.     Irrevocable Direction Letter regarding Notes Receivable dated as of May 15, 2013, by MBM, and acknowledged and agreed to by Lender and MOR MGH Holdings, L.L.C ("MOR MGH Holdings").

10.    Supplement to Second Lien Mortgage, to be entered into, between Borrower and Lender to be recorded in the Parish of Lafayette in the State of Louisiana.

11.    Supplement to Second Lien Deed of Trust, to be entered into, between Borrower and Lender to be recorded in Harris County in the State of Texas.

12.    In connection with the "Port Road" property Assigned Regions Mortgage executed an delivered by Regions Bank, together with a Second Lien Mortgage, Assignment of Rents and Leases, Collateral Assignment of Property Agreements, Material Agreements and Security Agreement, executed and delivered by Moreno Properties, Two L.L.C. and the Assignment of Tranche 3 GRAT Mortgage, executed and delivered by each of the Tranche 3 Borrowers, to be recorded in Iberia Parish, Clerk of Court, in the State of Louisiana.

13.    Mortgage, Assignment of Rents and Leases, Collateral Assignment of Property Agreements, Material Agreements and Security Agreement, to be executed and delivered by Nicholson Estates, L.L.C. and to be recorded in the East Baton Rouge, Clerk of Court, in the State of Louisiana, in connection with the "Nicholson Estates" property.

14.    Irrevocable Direction Letter, dated as of the date hereof, by MBM 2011 MGH Grantor Annuity Trust and acknowledged and agreed by Lender and MBM 2011 DOH Grantor Annuity Trust regarding amounts receivable pursuant to that certain Six Million One Hundred Eighty-Five Thousand Dollars ($6,185,000) Note, dated as of the date hereof.

15.    Irrevocable Direction Letter, dated as of the date hereof, by TCM 2011 MGH Grantor Annuity Trust and acknowledged and agreed by Lender and TCM 2011 DOH Grantor Annuity Trust regarding amounts receivable pursuant to that certain Six Million One Hundred Eighty-Five Thousand Dollars ($6,185,000) Note, dated as of the date hereof.

16.    Irrevocable Direction Letter, dated as of the date hereof, by MBM 2011 DOH Grantor Annuity Trust and acknowledged and agreed by Lender and MOR MGH Holdings regarding amounts receivable pursuant to that certain $6,848,996.81 Promissory Note, dated July 31, 2013.

17.    Irrevocable Direction Letter, dated as of the date hereof, by TCM 2011 TCM Grantor Annuity Trust and acknowledged and agreed by Lender and MOR MGH Holdings regarding amounts receivable pursuant to that certain $6,848,996.82 Promissory Note, dated July 31, 2013.

18.    Assignment in connection with that certain American General Life insurance policy no.YS00028319 in the amount of $15,000,000, dated as of the date hereof, executed by Michel B. Moreno, as owner, in favor of the Lender, as assignee, and filed with American General Life.

**Schedule II**

<u>Tranche Allocations and Joint and Several Obligations</u>

| Tranche | Allocated Loan Amount | Borrower | Liability |
|---|---|---|---|
| Tranche 1 | $25,000,000 | Michel B. Moreno and Tiffany C. Moreno | Joint and several liability<br><br>(i) between each Tranche 1 Borrower;<br><br>(ii) with respect to the Tranche 2 Borrowers' Obligations; and<br><br>(iii) with respect to the Tranche 3 Borrowers' Obligations. |
| Tranche 2 | $7,500,000 | MBM 2011 DOH Grantor Retained Annuity Trust | Several liability<br><br>(i) between each Tranche 2 Borrower;<br><br>(ii) with respect to the Tranche 1 Borrowers' Obligations; and<br><br>(iii) with respect to the Tranche 3 Borrowers' Obligations. |
|  | $7,500,000 | TCM 2011 DOH Grantor Retained Annuity Trust | Several liability<br><br>(i) between each Tranche 2 Borrower;<br><br>(ii) with respect to the Tranche 1 Borrowers' Obligations; and<br><br>(iii) with respect to the Tranche 3 Borrowers' Obligations. |
| Tranche 3 | $6,185,000 | MBM 2011 MGH Grantor Retained Annuity Trust | Several liability<br><br>(i) between each Tranche 3 Borrower;<br><br>(ii) with respect to the Tranche 1 Borrowers' Obligations; and<br><br>(iii) with respect to the Tranche 2 Borrowers' Obligations. |
|  | $6,185,000 | TCM 2011 MGH Grantor Retained Annuity Trust | Several liability<br><br>(i) between each Tranche 3 Borrower;<br><br>(ii) with respect to the Tranche 1 Borrowers' Obligations; and<br><br>(iii) with respect to the Tranche 2 Borrowers' Obligations. |
| Aggregate consolidated loan amount secured by the Collateral | $52,370,000 |  |  |

**EXHIBIT A**

**NOTE**

Principal Amount:  $6,185,000.00                                              October __, 2013

FOR VALUE RECEIVED, each of the undersigned Borrowers (jointly and severally if more than one Borrower) (the "**Borrower**") promises to pay to Goldman Sachs Bank USA (the "**Lender**"), at the Lending Office or such other place as the Lender or any holder hereof may from time to time designate, the principal sum of Six Million One Hundred Eighty-Five Thousand Dollars ($6,185,000), or such lesser principal amount which has been advanced and remains outstanding from time to time, in United States Dollars and in immediately available funds as provided in that certain Amended and Restated Loan Agreement of even date herewith between the Borrower and the Lender (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), together with interest on the unpaid principal amount hereof from time to time outstanding, at the rates and on the dates set forth in the Loan Agreement.  Interest shall be calculated on the basis of a three hundred sixty (360) day year and actual days elapsed.

This Note is issued pursuant to, and is entitled to the benefits of, the Loan Agreement.  Reference hereby is made thereto for a statement of the terms and conditions under which this Note may be prepaid or its maturity date accelerated.  This Note is secured pursuant to the terms of the Loan Agreement and certain other Loan Documents and reference is made thereto for a statement of the terms and provisions thereof.  Capitalized terms used herein and not otherwise defined herein are used with the respective meanings attributed to them in the Loan Agreement.

If any payment of principal or interest is not made when due hereunder (after giving effect to any applicable grace period), or if any other Event of Default shall occur for any reason, or if the Loan Agreement shall be terminated or not renewed for any reason whatsoever, then and in any such event, in addition to all rights and remedies of the Lender under the Loan Agreement or any other Loan Document, applicable law or otherwise, all such rights and remedies being cumulative and enforceable alternatively, successively and concurrently, the Lender may, at its option, declare any and all of the Borrower's obligations, liabilities and indebtednesses owing by Borrower under this Note, the Loan Agreement and any other Loan Document (collectively, the "**Obligations**") to be due and payable, whereupon the then unpaid balance thereof, together with all interest accrued thereon or expenses incurred in connection therewith shall forthwith become due and payable, together with all interest accruing thereafter at the rate set forth in the Loan Agreement until the Obligations, plus all costs and expenses of collection hereof, including, without limitation, reasonable attorneys' fees and expenses, are indefeasibly paid in full in cash.

The Borrower shall pay all of the Lender's costs and expenses (including, without limitation, all reasonable attorneys' fees and expenses) incurred in connection with the enforcement of or preservation of rights under this Note on the terms provided in the Loan Agreement.

No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Lender, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion.  The Borrower and every indorser or guarantor of this Note regardless of the time, order or place of signing waives presentment, demand, protest and notices of every kind and assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of Collateral, and to the addition or release of any other Person primarily or secondarily liable.

None of the terms or provisions of this Note may be excluded, modified, or amended except by a written instrument duly executed on behalf of the Lender expressly referring hereto and setting forth the provision so excluded, modified or amended.  This Note shall be binding upon the successors and assigns of the Borrower and inure to the benefit of the Lender and its successors, endorsees and assigns.  If any term or provision of this Note shall be held to be invalid or unenforceable, in whole or in part in any jurisdiction, then such invalidity or unenforceability shall only effect such term or provision, and shall not effect such term or provision in any other jurisdiction or any other term or provision of this Note.

All rights and obligations hereunder shall be governed by the laws of the State of New York (without giving effect to principles of conflicts or choice of laws) and this Note shall be deemed to be made under seal.

IN WITNESS WHEREOF, the Borrowers have executed this Note as of the date first above written.

**BORROWER:**

[MBM 2011 MGH GRANTOR RETAINED ANNUITY TRUST]

By: _____

Name: _____

Title (if applicable): _____]

[TCM 2011 MGH GRANTOR RETAINED ANNUITY TRUST]

By: _____

Name: _____

Title (if applicable): _____]

**EXHIBIT A-1**

**CONSOLIDATED, AMENDED AND RESTATED NOTE**

Principal Amount: $52,370,000.00                                                          October __, 2013

THIS CONSOLIDATED, AMENDED AND RESTATED NOTE (this "**Note**") is made by the undersigned Borrowers (the "**Borrower**") to the favor of Goldman Sachs Bank USA (the "**Lender**"). Capitalized terms used herein and not otherwise defined herein are used with the respective meanings attributed to them in that certain Amended and Restated Loan Agreement of even date herewith between the Borrower and the Lender (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**").

**RECITALS:**

WHEREAS, the Lender is the payee under, and holder of, those certain notes made by the Borrower, as original obligors under such notes as described on <u>Schedule 1</u>, annexed hereto and made a part hereof (collectively, the "**Existing Notes**");

WHEREAS, the Lender and Borrower desire to consolidate, modify, amend and restate the terms and conditions of the Existing Notes so as to create solely one promissory note in the consolidated principal sum of FIFTY-TWO MILLION THREE HUNDRED SEVENTY THOUSAND DOLLARS ($52,370,000), to be secured, *inter alia*, by the Collateral (as defined in that certain Amended and Restated Security and Pledge Agreement dated as of the hereof, by and among the Borrower, the Lender, Goldman Sachs & Co. and Moreno Properties, L.L.C.);

NOW THEREFORE, by Borrower's execution and delivery, and the Lender's acceptance of delivery from Borrower, of this Note, it is hereby agreed that:  (a) the foregoing recitals are made a part of this Note, (b) the Existing Notes are hereby combined, consolidated, and amended and restated in their entirety, so that all the terms and conditions contained in this Note shale supersede and control the terms and conditions of the Existing Notes (it being understood and agreed that such combination, consolidation and amendment and restatement shall not extinguish or otherwise impair the debt evidenced by the Existing Notes, but shall only replace and substitute the terms and conditions with respect to such debt), and that together the Existing Notes shall constitute one not, replace and presented by this Note, evidencing the same principal amount as follows:

FOR VALUE RECEIVED, each of the undersigned Borrower promises to pay to the Lender, at the Lending Office or such other place as the Lender or any holder hereof may from time to time designate, the principal sum of FIFTY-TWO MILLION THREE HUNDRED SEVENTY THOUSAND DOLLARS ($52,370,000), or such lesser principal amount which has been advanced and remains outstanding from time to time, in United States Dollars and in immediately available funds as provided in the Loan Agreement, together with interest on the unpaid principal amount hereof from time to time outstanding, at the rates and on the dates set forth in the Loan Agreement.  Interest shall be calculated on the basis of a three hundred sixty (360) day year and actual days elapsed.

This Note is issued pursuant to, and is entitled to the benefits of, the Loan Agreement.  Reference hereby is made thereto for a statement of the terms and conditions under which this Note may be prepaid or its maturity date accelerated.  This Note is secured pursuant to the terms of the Loan Agreement and certain other Loan Documents and reference is made thereto for a statement of the terms and provisions thereof.

The Borrower acknowledges and agrees that the aggregate principal indebtedness of the Borrower, as evidenced by this Note, constitutes a single Loan in the aggregate principal amount of FIFTY-TWO MILLION THREE HUNDRED SEVENTY THOUSAND DOLLARS ($52,370,000) and that such Loan shall be divided into three (3) separate tranches as more particularly described on <u>Schedule 2</u>, annexed hereto and made a part hereof.

If any payment of principal or interest is not made when due hereunder (after giving effect to any applicable grace period), or if any other Event of Default shall occur for any reason, or if the Loan Agreement shall be terminated or not renewed for any reason whatsoever, then and in any such event, in addition to all rights and remedies of the Lender under the Loan Agreement or any other Loan Document, applicable law or otherwise, all such rights and remedies being cumulative and enforceable alternatively, successively and concurrently, the Lender may, at its option, declare any and all of the Borrower's obligations, liabilities and indebtedness owing by Borrower under this Note, the Loan Agreement and any other Loan Document (collectively, the "**Obligations**") to be due and payable, whereupon the then unpaid balance thereof, together with all interest accrued thereon or expenses incurred in connection therewith shall forthwith become due and payable, together with all interest accruing thereafter at the rate set forth in the Loan Agreement until the Obligations, plus all costs and expenses of collection hereof, including, without limitation, reasonable attorneys' fees and expenses, are indefeasibly paid in full in cash.

The Borrower shall pay all of the Lender's costs and expenses (including, without limitation, all reasonable attorneys' fees and expenses) incurred in connection with the enforcement of or preservation of rights under this Note on the terms provided in the Loan Agreement.

LEGAL_US_E # 105363940.11

No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Lender, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion. The Borrower and every indorser or guarantor of this Note regardless of the time, order or place of signing waives presentment, demand, protest and notices of every kind and assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of Collateral, and to the addition or release of any other Person primarily or secondarily liable.

None of the terms or provisions of this Note may be excluded, modified, or amended except by a written instrument duly executed on behalf of the Lender expressly referring hereto and setting forth the provision so excluded, modified or amended. This Note shall be binding upon the successors and assigns of the Borrower and inure to the benefit of the Lender and its successors, endorsees and assigns. If any term or provision of this Note shall be held to be invalid or unenforceable, in whole or in part in any jurisdiction, then such invalidity or unenforceability shall only effect such term or provision, and shall not effect such term or provision in any other jurisdiction or any other term or provision of this Note.

All rights and obligations hereunder shall be governed by the laws of the State of New York (without giving effect to principles of conflicts or choice of laws) and this Note shall be deemed to be made under seal.

IN WITNESS WHEREOF, the Borrowers have executed this Note as of the date first above written.

**BORROWER:**

By: _____

Name:   Michel B. Moreno

By: _____

Name:   Tiffany C. Moreno

MBM 2011 MGH GRANTOR RETAINED ANNUITY TRUST

By: _____

Name: _____

Title (if applicable): _____

TCM 2011 MGH GRANTOR RETAINED ANNUITY TRUST

By: _____

Name: _____

Title (if applicable): _____

MBM 2011 DOH GRANTOR RETAINED ANNUITY TRUST

By: _____

Name: _____

Title (if applicable): _____


TCM 2011 DOH GRANTOR RETAINED ANNUITY TRUST


By: _____

Name: _____

Title (if applicable): _____


**Moreno Properties Two, L.L.C.,**

a Louisiana limited liability company


By: _____

Name: _____

Title (if applicable): _____

**SCHEDULE 1**

Description of Existing Notes

1.  That certain Note, dated May 15, 2013, by Michel B. Moreno and Tiffany C. Moreno, collectively, jointly and severally, as borrower, in favor of the Lender, in the principal amount of Twenty-Five Million Dollar ($25,000,000);

2.  That certain Note, dated as of July 5, 2013, by MBM 2011 DOH Grantor Retained Annuity Trust, severally, as borrower, in favor of the Lender, in the principal amount Seven Million Five Hundred Thousand Dollars ($7,500,000);

3.  That certain Note, dated as of July 5, 2013, by TCM 2011 DOH Grantor Retained Annuity Trust, severally, as borrower, in favor of the Lender, in the principal amount Seven Million Five Hundred Thousand Dollars ($7,500,000);

4.  That certain Note, dated as the date hereof, by MBM 2011 MGH Grantor Retained Annuity Trust, severally, as borrower, in favor of the Lender, in the principal amount of Six Million One Hundred Eighty-Five Thousand Dollars ($6,185,000);

5.  That certain Note, dated as the date hereof, by TCM 2011 MGH Grantor Retained Annuity Trust, severally, as borrower, in favor of the Lender, in the principal amount of Six Million One Hundred Eighty-Five Thousand Dollars ($6,185,000); and

6.  That certain Promissory Note, dated as of September 10, 2010, by Moreno Properties Two, L.L.C., in favor of Regions Bank, in the principal amount of  Eleven Million Seven Hundred Sixty-Seven Thousand Eight Hundred Forty-Six Dollars and Eighty Cents ($11,767,846.80), as endorsed to Lender by Regions Bank pursuant to that certain Allonge, dated as of the date hereof.

**SCHEDULE 2**

Tranche Allocations and Joint and Several Obligations

| Tranche | Allocated Loan Amount | Borrower | Liability |
|---|---|---|---|
| Tranche 1 | $25,000,000 | Michel B. Moreno and Tiffany C. Moreno | Joint and several liability<br><br>(i) between each Tranche 1 Borrower;<br><br>(ii) with respect to the Tranche 2 Borrowers' Obligations; and<br><br>(iii) with respect to the Tranche 3 Borrowers' Obligations. |
| Tranche 2 | $7,500,000 | MBM 2011 DOH Grantor Retained Annuity Trust | Several liability<br><br>(i) between each Tranche 2 Borrower;<br><br>(ii) with respect to the Tranche 1 Borrowers' Obligations; and<br><br>(iii) with respect to the Tranche 3 Borrowers' Obligations. |
| | $7,500,000 | TCM 2011 DOH Grantor Retained Annuity Trust | Several liability<br><br>(i) between each Tranche 2 Borrower;<br><br>(ii) with respect to the Tranche 1 Borrowers' Obligations; and<br><br>(iii) with respect to the Tranche 3 Borrowers' Obligations. |
| Tranche 3 | $6,185,000 | MBM 2011 MGH Grantor Retained Annuity Trust | Several liability<br><br>(i) between each Tranche 3 Borrower;<br><br>(ii) with respect to the Tranche 1 Borrowers' Obligations; and<br><br>(iii) with respect to the Tranche 2 Borrowers' Obligations. |
| | $6,185,000 | TCM 2011 MGH Grantor Retained Annuity Trust | Several liability<br><br>(i) between each Tranche 3 Borrower;<br><br>(ii) with respect to the Tranche 1 Borrowers' Obligations; and<br><br>(iii) with respect to the Tranche 2 Borrowers' Obligations. |
| Aggregate consolidated loan amount secured by the Collateral | $52,370,000 | | |

EXHIBIT B

**Notice of Borrowing**

Goldman Sachs Bank USA
222 S. Main Street
Salt Lake City, Utah 84101
Facsimile: 212-428-1474
Attention: Private Lending Services

Re:      Michel B. Moreno and Tiffany C. Moreno, jointly and severally, MBM 2011 MGH Grantor Retained Annuity Trust, severally, TCM 2011 MGH Grantor Retained Annuity Trust, severally, MBM 2011 DOH Grantor Retained Annuity Trust, severally, and TCM 2011 DOH Grantor Retained Annuity Trust, severally, collectively, the "**Borrower**"

Reference is made to that certain Amended and Restated Loan Agreement dated as of October 11, 2013 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**") between the Borrower and Goldman Sachs Bank USA ("**Lender**").  Capitalized terms used herein and not otherwise defined herein are used herein as defined in the Loan Agreement.

This is a Notice of Borrowing being delivered in accordance with the Loan Agreement.  The Borrower requests that Lender make an advance under the Loan Agreement in the amount of $[minimum of $100,000] to be advanced on [_____, 2013] [must be a Business Day at least two (2) Business Days from the date of this notice if a LIBOR Loan is requested] and that the proceeds be paid to the following account:
:

Bank Name:          _____

ABA Number:        _____

Account Name:      _____

Account #:            _____

For Credit To:        _____

Purpose of the Funding:

_____

_____

To the best of my knowledge, these funds will not be used to benefit the Lender or any of its affiliates.
☐ I Agree        ☐ I Disagree

If the purpose of draw is real estate related, please provide the name of the seller and/or the address of the property:

_____

The undersigned hereby certifies that no Event of Default currently exists under the Loan Agreement or any other Loan Documents and all representations and warranties under the Loan Agreement and such other Loan Documents are true and correct as of the date hereof.  If any portion of the advance requested is being used to purchase or carry margin stock, a revised Federal Reserve Form U-1 is attached hereto.

Date: _____, 2013

By: _____          By: _____

Name:  Michel B. Moreno                                  Name:  Tiffany C. Moreno

[Signatures continue on following page]

MBM 2011 MGH Grantor Retained Annuity Trust

By: _____
      Name:
      Title:

TCM 2011 MGH Grantor Retained Annuity Trust

By: _____
      Name:
      Title:

MBM 2011 DOH Grantor Retained Annuity Trust

By: _____
      Name:
      Title:

TCM 2011 DOH Grantor Retained Annuity Trust

By: _____
      Name:
      Title:

**EXHIBIT C**

**Form of Guaranty**

**and/or**

**Form of Guaranty and Security Agreement**

N/A

**EXHIBIT D**

**Form of Security Agreement**

See Attached



**EXHIBIT 8.16**

**DISCLOSURE STATEMENT FOR**
**LOANS MADE BY GOLDMAN SACHS BANK USA THAT ARE**
**SECURED BY INTERESTS IN CERTAIN GOLDMAN SACHS-MANAGED INVESTMENT FUNDS**

This disclosure statement (this "Disclosure Statement") identifies, in general terms, certain of the risks and other information related to Goldman Sachs Bank USA ("Lender") making a loan to you that is secured by interests in one or more hedge funds, funds of hedge funds or similar investment vehicles (each, a "Fund") managed, directly or indirectly, by Goldman Sachs Asset Management, L.P. or Goldman Sachs Hedge Fund Strategies, L.L.C. (each, a "Manager"), each of which is an affiliate of Lender (collectively, a "Financed Investment").  This Disclosure Statement does not purport to identify risks associated with a Financed Investment in any particular Fund and you should carefully review the offering document for the each Fund in which you will be making a Financed Investment before making a decision to do so.

Entering into a Financed Investment involves a high degree of risk, including the risk that any losses with respect to your investment in the Fund will be greater than if no leverage was used.  No guarantee or representation is made that entering into a Financed Investment will be successful.

Before entering into a Financed Investment, you should ensure that you fully understand the terms of the financing transaction, relevant risks associated with the transaction, the nature and extent of your risk of loss and the nature of the contractual relationship into which you are entering.  You should also carefully evaluate whether the transaction is appropriate for you in light of your experience, objectives, financial resources, and other relevant circumstances.

You are urged to consult with your own advisers to determine the suitability of a Financed Investment and the relationship of such an investment to your overall investment program and financial and tax positions.

**CERTAIN RISKS**

In determining whether a Financed Investment in a Fund is a suitable investment, you should consider, among others, the following risks in addition to the risks regarding an investment in the Fund that are described in the offering document for the applicable Fund.

**Risk Associated with Increased Leverage**

Although the increased leverage provided by a Financed Investment in a Fund may result in a total return as a percentage of your equity in the interests in such Fund ("Fund Interests") that is greater than an unleveraged investment in such Fund Interests, it may also result in a total loss as a percentage of your equity in such Fund Interests that is greater than that of an unleveraged investment.  In addition, the interest expense that you bear in connection with the Financed Investment will reduce the returns on your investment.  Moreover, should the Fund Interests decline in value, you may be required to either deposit additional funds or securities with Lender or one of its affiliates as collateral for your loan or suffer mandatory liquidation of the Fund Interests in order to compensate for the decline in value.  In the event of a sudden precipitous drop in the value of the Fund Interests, you may be required to liquidate the Fund Interests more quickly than otherwise desirable in order to satisfy your obligation to Lender, which may result in adverse tax or other consequences to you.

In addition to the leverage obtained through the making of a Financed Investment, a Fund may employ leverage in furtherance of its investment objective.  This added layer of leverage will result in a higher degree of overall leverage and will further increase the potential risk of loss in a Financed Investment, particularly in the event of an economic downturn or underperformance of the Fund's underlying investments.

**Additional Risk Associated with Securing a Loan with Fund Interests**

Fund Interests are subject to significant restrictions on redemption and transfer as described in the offering document provided for each Fund.  You will not receive any additional or special rights of redemption with respect to your Fund Interests which coincide with obligations which may arise under the loan agreement (with all other ancillary documents executed together therewith, the "Loan Agreement") with Lender in connection with your Financed Investment, including the obligation to make interest payments to Lender.  Restrictions on redemption increase the risk that the value of Fund Interests may decrease between an event of default under the Loan Agreement and the disposition of such Fund Interests in order to satisfy a liability under the Loan Agreement.

The fact that Lender has accepted the Fund Interests as collateral under the Loan Agreement should not be taken as an indication that the Fund Interests may not lose value.  You should not make a Financed Investment unless you can sustain a partial or total loss of your investment in the Fund in addition to the obligation to repay the amounts of principal and interest owed to Lender pursuant to the Loan Agreement.

**No Fiduciary Duty**

While the Manager of a Fund has certain fiduciary duties to the investors in a Fund under applicable law in addition to any contractual obligations it may have, Lender will not owe you any fiduciary duties in connection with the loan it will be making to you and it will only be bound by the terms of the Loan Agreement.

**Limits of Risk Disclosure**

The above discussions relating to various risks associated with a Financed Investment are not, and are not intended to be, a complete enumeration or explanation of the risks involved in the purchase of the Financed Investment.  You should read the Loan Agreement, Security Documents, and other agreements related to the Financed Investment, and the Private Placement Memoranda of the Funds and should consult with your own advisers before deciding whether to make a Financed Investment.  In addition, as market conditions change or develop over time, the purchase of the Financed Investment may be subject to risk factors not currently contemplated or described in such documents.

**POTENTIAL CONFLICTS OF INTEREST**

The Goldman Sachs Group, Inc., Lender, the Manager and their affiliates, directors, partners, trustees, managers, members, officers and employees (collectively, for purposes of this "*POTENTIAL CONFLICTS OF INTEREST*" section, "Goldman Sachs"), are engaged in businesses unrelated to the Financed Investment.  Certain potential conflicts of interest may arise, directly or indirectly, from such engagement that you should consider.

The activities of each Fund, and its respective affiliates, directors, trustees, managers, members, partners, officers and employees, may give rise to conflicts of interest that could disadvantage you and the value of the Financed Investment.  A description of certain of such potential conflicts of interest is set forth under "*POTENTIAL CONFLICTS OF INTEREST*" or a similarly titled section in the Fund's offering document.  By making a Financed Investment, you will be deemed to have acknowledged and assented to the existence of potential conflicts of interest relating to a Fund, its Manager, and Lender, and to your purchase of the Financed Investment in the face of these conflicts.

Goldman Sachs and its sales personnel have interests in promoting Financed Investments.  With respect to Goldman Sachs and its sales personnel, the remuneration and profitability of activity relating to the Financed Investments may be greater than the provision of other services and sales of other products that might be provided or offered.  For example, Goldman Sachs and its sales personnel will directly or indirectly receive fees and commissions in connection with your Financed Investment.  Such fees and commissions may be higher than for other products or services, and the remuneration and profitability to Goldman Sachs and such personnel resulting from such transaction may be greater than the remuneration and profitability resulting from other products.  In particular, it is expected that remuneration and profitability to Goldman Sachs and its sales personnel resulting from Financed Investments will be greater than the remuneration and profitability resulting from sales of Fund Interests that are not Financed Investments.

**Annex I**

**Privacy Notice**

*The Goldman Sachs financial services companies endeavor to maintain the highest standards of confidentiality and to respect the privacy of our client relationships. In that regard, we are providing this Privacy Notice to our clients in accordance with Title V of the Gramm-Leach-Bliley Act of 1999 and its implementing regulations. This notice supplements any privacy policies or statements that we may provide in connection with specific products or services.*

**This Privacy Notice is being provided for information purposes only. Individual, Joint and IRA accountholders will shortly be receiving a second copy of this notice which can be used to communicate privacy preferences to us.**

## THE INFORMATION WE COLLECT ABOUT YOU

The non-public personal information we collect about you (your "Information") comes primarily from the account applications or other forms you submit to us. We may also collect Information about your transactions and experiences with us, our affiliates, or others relating to the products or services we provide. Also, depending on the products or services you require, we may obtain additional Information from consumer reporting agencies.

## OUR INFORMATION SECURITY POLICIES

Your privacy is very important to us, and we take the responsibility to safeguard you Information very seriously. We limit access to your Information to those of our employees and service providers who are involved in offering or administering the products or services that we offer. We maintain physical, electronic, and procedural controls that are designed to comply with federal standards to safeguard your information.

If our relationship ends, we will continue to treat your Information as described in this Privacy Notice.

## OUR DISCLOSURE POLICIES

We do not disclose your Information to anyone, except as permitted by law. The types of Information disclosures permitted by law include sharing your Information with non-affiliated companies that perform support services for your account or process your transactions with us or our affiliates, disclosing your Information pursuant to your express consent, disclosing your Information to fulfill your instructions, or disclosures of your information that are required for us to be in compliance with applicable regulations.

Unless you indicate that you would not like us to do so (i.e., unless you "opt out"), federal law also permits us to share your Information with our affiliates for their use in the marketing of their products and services to you.

## USE OF INFORMATION FOR AFFILIATE MARKETING

Sharing your Information with our affiliates enables us to better provide you with the full range of services and products available from Goldman Sachs to its private clients. This is the case because the core private client offering – investment management, brokerage, wealth advisory services, trust services and banking services – is actually delivered through a variety of affiliated legal entities that are all part of the Goldman Sachs family of financial services companies.

Our affiliates use your Information to evaluate whether the products or services they offer match your specific needs and, if so, to subsequently market those products or services to you. The affiliates that we would most often share your Information for marketing purposes are: Goldman Sachs Bank USA, The Goldman Sachs Trust Company, N.A., The Goldman Sachs Trust Company of Delaware, and The Ayco Company, L.P.

## INFORMATION SHARING WITH NON-AFFILIATES

We do not license your Information to anyone. We only disclose your Information to non-affiliated third-parties that perform support services for your account or process your transactions, or as otherwise permitted by the law. We require any non-affiliated third parties to whom we disclose your Information to adhere to confidentiality agreements and to maintain appropriate safeguards to protect your Information.

## HOW TO EXERCISE YOUR OPT-OUT RIGHTS

If you do not want us to share your Information with our affiliates as described above and / or you want to limit its use for marketing, you may either: i) fill out the opt-out form which will be sent to you shortly and return it to us at the address indicated on the form, or ii) opt out via the Client Web at www.goldman.com, at anytime.

Once we receive your opt-out election, we will, within a reasonable time, stop sharing the Information, or if applicable, prevent its use for marketing. Your choices will apply until you tell us to change those choices. If you already made choices about the use and sharing of your Information, you do not need to act again.

All opt-outs described above that are exercised by any party to a joint account will apply to all parties on that account.

Please contact your Private Wealth Advisor if you have any questions.

*This notice is being provided on behalf of the following affiliates of The Goldman Sachs Group, Inc.:* Goldman, Sachs & Co., Goldman Sachs Bank USA, The Goldman Sachs Trust Company, N.A. and The Goldman Sachs Trust Company of Delaware.

**Annex II**

**Conflicts of Interest**

GS&Co. is a major participant in global financial markets and as such has activities and interests that include potential multiple advisory, transactional and financial and other interests in accounts, securities, instruments and companies that may be purchased or sold in your GS&Co. accounts (such accounts, the "Account"). GS&Co. acts as an investor, investment banker, research provider, investment manager, financer, advisor, market maker, trader, prime broker, lender, agent and principal, and has other direct or indirect interests, in the global fixed income, currency, commodity, equity and other markets in which your Account may invest. GS&Co. and its personnel, including Private Wealth Advisors assigned to your Account, may take positions in securities or take actions for their own accounts which conflict with positions in your Account, and GS&Co. may act as counterparty to any transaction executed for your Account, subject to applicable law. Additionally, GS&Co. may on a proprietary basis sell, redeem, purchase, take short positions in or take similar actions with respect to securities, currencies, funds or other investments in which your Account may be invested ("underlying assets") without having to notify you of such investment or activity. GS&Co. may also create, write, sell or issue, or act as placement agent or distributor of derivatives and structured investment products whose value may be linked to the value of underlying assets. To the extent permitted by applicable law, GS&Co. may hedge its derivative positions by buying or selling such underlying assets, and reserves the right to sell or redeem some or all of these underlying assets without notice to you. Such actions may have an adverse effect on the amount of fees, expenses and other costs incurred directly or indirectly in connection with your Account. For instance, GS&Co. may for its own account, have long or short positions in, and actively buy or sell, the products or related securities purchased or sold for your Account, or derivatives of these products or related securities. In addition, GS&Co. may act as adviser to clients in investment banking, financial advisory, asset management and other capacities in advisory, transactional, financial or other assignments of all types including those related to instruments that may be purchased, sold or held in your Account. Further, GS&Co. may issue, or be engaged as underwriter, financial advisor or the issuer of, instruments that your Account may purchase, sell or hold. In its market making activities, occasionally, GS&Co. may enter the market in anticipation of a likely client transaction or order to "set up for" or "pre-hedge" the transaction and it is possible that such trading could impact the market price of securities purchased or sold in your Account. Substantially all transactions for brokerage accounts will be effected by GS&Co. Employees will generally receive referral or brokerage compensation in connection with these transactions and GS&Co. and employees each have an interest in recommending brokerage execution with GS&Co. GS&Co. receives compensation when brokerage accounts invest in products managed by GS&Co. such as mutual funds, hedge funds or other alternative investments. GS&Co. and its employees will generally directly or indirectly receive a portion of fees and commissions paid by you. Such fees and commissions vary according to the type of product or service and may be higher for certain products or services. The present and future activities of GS&Co. may give rise to additional conflicts of interest with you. You agree that GS&Co., in its sole discretion, may refrain from recommending or effecting transactions including due to (a) regulatory requirements, (b) GS&Co.'s internal policies and procedures, and (c) its determinations regarding actual or potential conflicts of interest or the appearance of such conflicts. However, you also agree that GS&Co. may determine to recommend or effect transactions notwithstanding the existence of such conflicts. You acknowledge that you understand the risks.

In this Annex II, "GS&Co." means Goldman, Sachs & Co., its present and future affiliates, and their respective partners, officers, directors, employees and agent.

# EXHIBIT E

## FIRST AMENDMENT TO AMENDED AND RESTATED LOAN AGREEMENT

THIS FIRST AMENDMENT TO AMENDED AND RESTATED LOAN AGREEMENT (this "**Amendment**"), dated as of June 30, 2014, is made by and among GOLDMAN SACHS BANK USA (together with its successors and assigns, "**Lender**"), and (i) Michel B. Moreno, (ii) Tiffany C. Moreno, (iii) MBM 2011 MGH GRANTOR RETAINED ANNUITY TRUST, (iv) TCM 2011 MGH GRANTOR RETAINED ANNUITY TRUST, (v) MBM 2011 DOH GRANTOR RETAINED ANNUITY TRUST and (vi) TCM 2011 DOH GRANTOR RETAINED ANNUITY TRUST (parties (i) through (vi) collectively, the "**Borrower**").

### WITNESSETH:

WHEREAS, in connection with that certain $52,370,000 loan (the "**Loan**") made by Lender to Borrower, the Borrower is a party to and has executed and delivered to the Lender that certain $52,370,000 Consolidated, Amended and Restated Note and that certain Amended and Restated Loan Agreement (as the same may be amended, modified or restated, the "**Loan Agreement**"), each dated as of October 11, 2013.  All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement;

WHEREAS, the Loan matured and was fully due and payable in on April 11, 2014, and the Borrower failed to repay same as required by the Loan Agreement, which resulted in an Event of Default thereunder;

WHEREAS, concurrently with the execution of this Amendment, Borrower and Lender have entered into that certain Forbearance Agreement (the "**Forbearance Agreement**"), dated as of the date hereof, whereby Lender has agreed to forbear from exercising its enforcement rights and remedies against the Borrower and the existing Collateral for the Loan under the Loan Documents, at law or in equity during the Forbearance Period (as defined in the Forbearance Agreement) in accordance with the terms of the Forbearance Agreement;

WHEREAS, Borrower has requested, and Lender has agreed, to extend the Maturity Date to July 11, 2014; and

WHEREAS, in consideration for the extension of the Maturity Date to July 11, 2014, Borrower shall provide additional Collateral to secure the Loan as more particularly described herein.

NOW, THEREFORE, in pursuance of such agreement and for good and valuable consideration, Borrower and Lender hereby agree as follows:

1.    **Modifications to Loan Agreement.**  The definition of "Maturity Date" is hereby deleted in its entirety and      replaced with the following:

""**Maturity Date**" means the earlier to occur of (i) July 11, 2014 and (ii) the date the Obligations become due and payable pursuant to Section 7.1 of the Loan Agreement."

2.    **Additional Collateral and Conditions Subsequent**.  In consideration for the extension of the Maturity Date as set forth above, concurrently with the execution of this Amendment, Borrower granted additional Collateral to secure the Loan by (a) causing an assignment of proceeds (the "**Assignment of Proceeds**") to be executed and delivered to Lender granting to Lender all of Borrower's direct and indirect right, title and interest in and to the Proceeds (as defined in the

Assignment of Proceeds) relating to the property located at 4246 Columbine Drive, Vail, Colorado 81657 (the "**Vail Residence**"); and (b) executing and delivering a second lien deed of trust (the "**Deed of Trust**"), granting in favor of Lender a second lien on the Vail Residence.

In connection with the foregoing, Borrower covenants and agrees that:

(c)     the Borrower shall (i) grant a first priority security interest in favor of the Lender in all of the Borrower's rights, title and interest in and to its ownership interests (whether direct or indirect) in TRG Growth II LP, Fortress Special Investments LP and Fortress LP, which are currently held in account number 60-909186-877 at Morgan Stanley Bank; (ii) obtain any and all required third-party consents (or written waivers thereof) and shall provide written evidence of such consents to the reasonable satisfaction of the Lender; and (iii) execute and deliver of any and all documents, certificates and instruments that the Lender deems necessary to effectuate the foregoing; and

(d)     the Lender shall be permitted, and Borrower hereby authorizes and irrevocably instructs Lender, to cause the Deed of Trust to be recorded in the County of Eagle, Colorado; provided, that the Lender shall not cause such Deed of Trust to be recorded until the earlier of (i) the Borrower's receipt of an extension of maturity from the Borrower's Vail Residence first lien lender, which shall be evidenced in writing and promptly (but in no event later than one (1) day following execution thereof) delivered to the Lender; and (ii) July 11, 2014;

(e)     the Borrower shall purchase a title insurance policy relating to the Lender's lien on the Vail Residence, in form and substance satisfactory to Lender in its sole discretion and execute and delivery any and all other related documents, instruments or certificates and Lender may require to effectuate the foregoing;

(f)     Borrower shall deliver (i) any and all corporate documentation and officer's certificates requested by Lender, in each case satisfactory to Lender in its sole discretion; and (ii) authorization, enforceability and perfection legal opinion letters, as required by Lender in its sole discretion related to Sections 2(c) through (e) above; and

(g)     The Borrower shall pay, upon receipt of invoices therefor, to the Lender all out-of-pocket costs, fees and expenses incurred in connection with the preparation, negotiation, execution and delivery of this Agreement and any documents and instruments relating hereto pursuant to and consistent with the provisions of Loan Documents, including, but not limited to any legal, consultant, title, search fees, and appraisal fees.

Borrower acknowledges and agrees that failure to fulfill its obligations under this Section 2 shall be an Event of Default under the Loan Documents.

3.     **Counterparts**.  This Amendment may be executed by one or more of the parties hereto on any number of separate counterparts, each of which shall be an original and all of which taken together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Amendment in Portable Document Format (PDF) or by facsimile transmission shall be effective as delivery of a manually executed original counterpart thereof.

4.     **Amendments**.  This Amendment may not be modified or amended except by a writing signed by all parties hereto.  This Amendment shall inure to the benefit of and be binding upon Borrower and Lender, and their respective successors and assigns.

5.    **Governing Law**.  This Amendment shall be governed by, and construed in accordance with, the law of the State of New York.

6.    **Incorporation**.  All references to "Loan Agreement" contained in the other Loan Documents shall be deemed to hereinafter refer to the Loan Agreement, as amended by this Amendment, and as the same may be further amended, restated, supplemented or otherwise modified from time to time.

7.    **Ratification**.  As amended by this Amendment, all terms, covenants and provisions of the Loan Agreement and the Loan Documents are ratified and confirmed and shall remain in full force and effect in accordance with their terms.  In addition, any and all guaranties and indemnities for the benefit of Lender and agreements subordinating rights and liens to the rights and liens of Lender are hereby ratified and confirmed and shall not be released, diminished, impaired, reduced or adversely affected by this Amendment, and each party indemnifying Lender, and each party subordinating any right or lien to the rights and liens of Lender, hereby consents, acknowledges and agrees to the modifications set forth in this Amendment and waives any common law, equitable, statutory or other rights which such party might otherwise have as a result of or in connection with this Amendment.

8.    **Severability**.  The provisions of this Amendment are severable, and if any one clause or provision hereof shall be held invalid or unenforceable in whole or in part, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, and not any other clause or provision of this Amendment.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to Amended and Restate Loan Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**LENDER:**

**GOLDMAN SACHS BANK USA**

By: _____
Name: GOSIA LEWIS
Title: VICE PRESIDENT

*[Signatures continue on following page.]*

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the date first written above.

**BORROWER:**

_____

Michel B. Moreno, an individual

_____

Tiffany C. Moreno, an individual

**MBM 2011 MGH GRANTOR RETAINED ANNUITY TRUST**

By:
    Name: Dalis M. Waguespack
    Title: Managing Trustee

**TCM 2011 MGH GRANTOR RETAINED ANNUITY TRUST**

By:
    Name: Dalis M. Waguespack
    Title: Managing Trustee

**MBM 2011 DOH GRANTOR RETAINED ANNUITY TRUST**

By:
    Name: Dalis M. Waguespack
    Title: Managing Trustee

**TCM 2011 DOH GRANTOR RETAINED ANNUITY TRUST**

By:
    Name: Dalis M. Waguespack
    Title: Managing Trustee

# EXHIBIT F

After Recording Return To:

Paul Hastings, LLP
75 East 55th Street
New York, New York 10022
Attn: Lisa A. Chaney, Esq.

_____**[Space Above This Line For Recording Data]**_____

# SECOND LIEN MORTGAGE

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)**    **"Security Instrument"** means this document, which is dated May 15, 2013, together with all Riders to this document.
**(B)**    **"Borrower"** is Michel D. Moreno and Tiffany C. Moreno. Borrower is the mortgagor under this Security Instrument.
**(C)**    **"Lender"** is Goldman Sachs Bank USA. Lender is a New York Chartered Bank organized and existing under the laws of New York State.  Lender's address is 200 West Street, New York, NY, 10282-2198. Lender is the mortgagee under this Security Instrument.
**(D)**    **"Note"** means the promissory note signed by Borrower and dated of even date herewith. The Note states that Borrower owes Lender $SIX MILLION SEVEN THOUSAND AND FORTY-ONE AND NO/100 Dollars (U.S. $6,007,041.00) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than February 15, 2014.
**(E)**    **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(F)**    **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(G)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. All Riders to this Security Instrument are deemed to be a part of this Security Instrument as if fully incorporated herein.  The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Other(s) [specify] _____ |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

**(H)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(I)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(J)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)** **"Escrow Items"** means those items that are described in Section 3.

**(L)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the Parish of Lafayette: which currently has the address of 409 Worth Avenue, Lafayette, Louisiana 70508 ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and hypothecate the Property and that the Property is unencumbered, except for encumbrances of record.  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:
1.      **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note.  Borrower shall also pay funds for Escrow Items pursuant to Section 3.  Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15.  Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current.  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted.  If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds.  Lender may hold such unapplied funds until Borrower makes payment to bring the Loan

current.  If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower.  If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure.  No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2.** **Application of Payments or Proceeds.**  Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:  (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3.  Such payments shall be applied to each Periodic Payment in the order in which it became due.  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge.  If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.  Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.** **Intentionally Omitted.**

**4.** **Charges; Liens.**  [Other than the First Lien Mortgage of that certain mortgage in the amount of $1,690,000.00 from Michel B. Moreno and Tiffany Cutrone Moreno, to Chase Manhattan Mortgage Corporation, dated December 10, 2004, filed December 13, 2004, under File No.: 04-55384 of the records of Lafayette Parish, Louisiana.] Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  **Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either:  (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices.  If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender.  Lender may make proof of loss if not made promptly by Borrower.  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay

Borrower any interest or earnings on such proceeds.  Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters.  If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim.  The 30-day period will begin when the notice is given.  In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property.  Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.      Intentionally Omitted.**

**7.      Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property.  Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property.  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.      Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.   Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.      Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's

interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10.     Intentionally Omitted.**

**11.     Assignment of Miscellaneous Proceeds; Forfeiture.**     All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument

immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value.  Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12.    Borrower Not Released; Forbearance By Lender Not a Waiver.**  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower.  Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower.  Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13.    Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several.  However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and

convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14.    Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15.    Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have

been given to Lender until actually received by Lender.  If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16.    Governing Law; Severability; Rules of Construction.**  This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.  In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17.    Borrower's Copy.**  Borrower shall be given one copy of the Note and of this Security Instrument.

**18.    Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19.    Borrower's Right to Reinstate After Acceleration.**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument.  Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d)

takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred.  However, this right to reinstate shall not apply in the case of acceleration under Section 18.

 **20.** **Sale of Note; Change of Loan Servicer; Notice of Grievance.**  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

 Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.  If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph.  The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

 **21.** **Hazardous Substances.**  As used in this Section 21:  (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials;  (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection;  (c) "Environmental Cleanup" includes any response action, remedial

action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Notice of Default; Right to Cure. Lender shall give notice to Borrower prior to acceleration following Borrower's failure to pay principal, interest, and other fees and charges as provided in the Note, or following Borrower's breach of any covenant or agreement in this Security Instrument. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and the sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure as available under Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may accelerate and require immediate payment in full of all sums secured by this Security Instrument without further demand for payment.**

**23. Foreclosure.** Following Lender's acceleration of payment, Lender may commence appropriate foreclosure proceedings under this Security Instrument under ordinary or executory process, under which Lender may cause the Property to be immediately seized and sold, with or without appraisal, in regular session of court or in vacation, in accordance with Applicable Law. For purposes of foreclosure under executory process procedures, Borrower confesses judgment and acknowledges to be indebted to Lender for all sums secured by this

Security Instrument, in principal, interest, costs, expenses, attorneys' fees and other fees and charges.  To the extent permitted by Applicable Law, Borrower waives:  (a) the benefit of appraisal as provided in Articles 2332, 2336, 2723 and 2724 of the Louisiana Code of Civil Procedure, and all other laws with regard to appraisal upon judicial sales; (b) the demand and three days' delay as provided in Articles 2639 and 2721 of the Louisiana Code of Civil Procedure; (c) the notice of seizure as provided under Articles 2293 and 2721 of the Louisiana Code of Civil Procedure; (d) the three days' delay provided under Articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and (e) all other benefits provided under Articles 2331, 2722 and 2733 of the Louisiana Code of Civil Procedure and all other articles not specifically mentioned above.  Borrower agrees that any declaration of fact made by an authentic act before a notary public and two witnesses by a person declaring such facts to be within his or her knowledge, will constitute authentic evidence of such facts for purposes of foreclosure under Applicable Law and for purposes of La. R.S. § 9:3504(D)(6).

**24.    Cumulative Remedies.**  Lender shall have such additional default remedies as may be available under then Applicable Law.  All of Lender's remedies shall be cumulative, and nothing under this Security Instrument shall limit or restrict the remedies available to Lender following default.

**25.    Keeper.**  Should the Property be seized as an incident to an action for recognition or enforcement of this Security Instrument by executory process, sequestration, attachment, writ of *fieri facias*, or otherwise, Borrower agrees that the court issuing such an order shall, if requested by Lender, appoint Lender, or any person or entity designated by Lender, as keeper of the Property as provided in La. R.S. §§ 9:5136, *et. seq.*  Borrower agrees to pay the reasonable fees of such a keeper, which fees shall be secured by this Security Instrument as an additional expense.

**26.    Cancellation.**  This Security Instrument shall remain in effect until canceled from the public records.  Following the full payment and satisfaction of all sums secured by the Security Instrument, Borrower may request in writing that Lender provide Borrower with the original paraphed Note marked "paid in full", or with an appropriate mortgage cancellation certificate, for submission to the Clerk of Court or Recorder of Mortgages for the Parish of Orleans for the purpose of canceling this Security Instrument. Lender may delay providing Borrower with the canceled Note or with a mortgage cancellation certificate for up to 60 days following Lender's receipt of Borrower's request.  Unless Lender agrees to cancel this Security Instrument from the public records, Borrower shall be responsible for doing so.  Borrower shall pay all cancellation costs.

**27.    Waiver of Homestead Rights.**  Borrower (and Borrower's spouse to the extent applicable) waive any homestead rights and other exemptions from seizure with respect to the Property as may be provided under Applicable Law.

**28.    Savings and Loan Association.**  If Lender is a savings and loan association or thrift institution, the Note and all sums secured by this Security Instrument shall have the benefits of La. R.S. § 6:830.

**29.    Future Advances.**  Lender may, but shall not be required to, make advances to protect the security of this Security Instrument pursuant to Section 9.  At no time shall the principal amount of the indebtedness secured by this Security Instrument, including advances made pursuant to Section 9, exceed 150% of the original amount of the indebtedness set forth in the Note.

**30.     Late Charges.**   Should Borrower fail to pay any installment of principal and interest under the Note within _____ days of when due, Borrower agrees to pay Lender a late charge in an amount equal to _____.

**31.     Marital Status.**  Borrower's marital status is: _____.

**32.     Additional Defined Terms.**   As used in this Security Instrument, "Lender" additionally includes any successors and assigns of the Lender first named above, as well as any subsequent holder or holders of the Note, or of any indebtedness secured by this Security Instrument.

As used in this Security Instrument, "Note" additionally includes any substitute note or notes issued in replacement of Note first described above.  It is Borrower's intent that this Security Instrument secure all renewals, extensions, refinancings, and modifications of the Note, to the extent provided by La. R.S. § 9:5390.

As used in this Security Instrument, "Lien" also means a privilege, mortgage, Security Instrument, assignment or other encumbrance.  "Real Property" means "immovable property" as that term is used in the Louisiana Civil Code.  "Condemnation" includes "expropriation" as that term is used in Louisiana law.

**33.     Property Includes Servitudes and Component Parts.**  The Property subject to this Security Instrument additionally includes servitudes and component parts now or hereafter attached to or incorporated into the Property.

**34.    Full Ownership.**  Borrower is the full and lawful owner of the Property.  If the Security Instrument is on a leasehold interest, and Borrower subsequently acquires ownership of the Property, Borrower's leasehold and ownership interests in the Property shall not merge unless Lender agrees to the merge in writing.

**35.    Modification of Section 13 of this Security Instrument.**  Section 13 of this Security Instrument is hereby modified to the following extent.

Each Borrower covenants and agrees that Borrower's obligations and liabilities under this Security Instrument and under the Note shall be joint, several and solidary with all other Borrowers and with each guarantor of the Note (if applicable).  However, to the extent that the Property is community-owned immovable (real) property, and Borrower's spouse co-signs this Security Instrument, but does not co-sign the Note, Borrower's spouse is co-signing this Security Instrument for purpose of:  (a) concurring with the granting of this Security Instrument on the community-owned Property (to the extent required under Civil Code Article 2347), without obligating the separate property of Borrower's spouse; and (b) waiving any homestead rights to which Borrower's spouse may be entitled under Applicable Law.  Notwithstanding the fact that Borrower's spouse did not co-sign the Note, and further notwithstanding the language of Section 13 of this Security Instrument, Borrower's spouse is obligated for payment of the Note and all other sums secured by this Security Instrument to the extent of the spouse's community property interest, and to the extent that the Note is a community obligation.

**36.    Additional Waivers.**  Borrower hereby waives production of mortgage, conveyance and other certificates with respect to the Property, and relieves and releases the Notary Public before whom this Security Instrument was passed from all responsibility and liability in connection therewith.

THUS DONE, AND PASSED, on this _15_ day of May, 2013, in the presence of the undersigned Notary Public, and in the presence of the undersigned competent witnesses, who hereinto sign their names, along with Borrower, after being duly sworn and after reading of the whole.

**WITNESS(ES) (as to all signatures):**        **BORROWER(S):**

Print Name Christina M. Moore

Michel B. Moreno

Print Name Caroline McCaa Thomas

Tiffany C. Moreno

STATE OF LOUISIANA

PARISH OF LAFAYETTE

BEFORE ME, the undersigned, a Notary Public in and for the aforesaid State and Parish, this day personally appeared Michel B Moreno and Tiffany CMoreno, to me personally known to be the identical person whose name is subscribed to the foregoing Agreement, and acknowledged to me in the presence of Christina M. Moore and Caroline McCaa Thomas, competent witnesses, that [he][she] executed the same on the date hereof and that it was executed for the uses, purposes and considerations therein expressed and that [he][she] executed said instrument of [his][her] own free will and accord.

**SWORN TO AND SUBSCRIBED** before me, Notary, on the date listed at the top of this document.

Notary Public (# )

My Commission Expires: _____

FRANK S. SLAVICH, III
Notary Public, State of Louisiana
Bar Roll #27087
Commission For Life

Signature Page to Second Lien Mortgage (LA)

Exhibit A

Legal Description

**Exhibit "A"**

Real property in the City of **Lafayette**, Parish of **LAFAYETTE**, State of **LOUISIANA**, described as follows:

**THAT CERTAIN TRACT OR PARCEL OF GROUND, TOGETHER WITH ALL IMPROVEMENTS THEREON, AND ALL RIGHTS, WAYS, PRIVILEGES AND SERVITUDES THEREUNTO PERTAINING, AND ALL APPURTENANCES THEREOF, TOGETHER WITH ALL ACCRETION AND ALLUVION PERTAINING THERETO, SITUATED IN SECTIONS 62 & 65, TOWNSHIP 10 SOUTH, RANGE 4 EAST, IN THE CORPORATE LIMITS OF THE CITY OF LAFAYETTE, LAFAYETTE PARISH, LOUISIANA, BEING KNOWN AND DESIGNATED AS LOT C-126A OF THE VILLAGE OF RIVER RANCH, PHASE XIII-B, SAID LOT HAVING SUCH SHAPE, FORM, DIMENSIONS, METES AND BOUNDS AS ARE MORE FULLY SHOWN ON THAT CERTAIN PLAT OF SURVEY TITLED "FINAL PLAT OF THE VILLAGE OF RIVER RANCH PHASE XIII-B (A RESIDENTIAL & COMMERCIAL DEVELOPMENT) LOCATED IN SECTIONS 62 & 65, T-10-S, R-4-E, CITY OF LAFAYETTE, LAFAYETTE PARISH, LOUISIANA" PREPARED BY BARRY J. BLEICHNER, PE, PLS DATED JANUARY 6, 2005, AND RECORDED UNDER FILE NO. 2005-00008223 OF THE RECORDS OF THE CLERK OF COURT FOR LAFAYETTE PARISH, LOUISIANA.**

**Being all of that certain property conveyed to MICHEL B. MORENO AND TIFFANY CUTRONE MORENO, HUSBAND AND WIFE from RIVER RANCH DEVELOPMENT, L.L.C., by deed dated 06/05/2008 and recorded 06/06/2008 as Instrument no. 2008-00024134 of official records.**

APN #: **6128580**

**Exhibit "A"**

Real property in the City of **Lafayette**, Parish of **LAFAYETTE**, State of **LOUISIANA**, described as follows:

**THAT CERTAIN LOT OR PARCEL OF LAND, TOGETHER WITH ALL BUILDINGS AND IMPROVEMENTS THEREON AND ALL RIGHTS, WAYS, PRIVILEGES AND SERVITUDES THERETO APPERTAINING AND ALL APPURTENANCES THEREOF, LYING AND BEING SITUATED IN SECTION 62, T10S-R4E, LAFAYETTE PARISH, LOUISIANA, AND BEING MORE PARTICULARLY KNOWN, DESIGNATED AND DESCRIBED AS LOT C-126 OF THE VILLAGE OF RIVER RANCH, PHASE II, AS SHOWN ON A PLAT PREPARED BY BARRY J. BLEICHER, PLS, OF DATE JULY 19, 2002 A COPY OF WHICH WAS RECORDED UNDER LAFAYETTE PARISH ENTRY NO. 02-034153.**

**Being all of that certain property conveyed to MICHEL B. MORENO AND TIFFANY CUTRONE MORENO, HUSBAND AND WIFE from RIVER RANCH DEVELOPMENT, LLC, by deed dated 07/31/2002 and recorded 08/05/2002 of official records.**

APN #: **6106777**

Commonly known as: 409 Worth Avenue, Lafayette, LA 70508

# EXHIBIT G

_____ | _____

Space above this line for recorder's use only

**Sec. 11.008.  PERSONAL INFORMATION IN REAL PROPERTY RECORDS.  (a)  In this section, "instrument" means a deed or deed of trust.**

**(b)  An instrument submitted for recording is not required to contain an individual's social security number, and the social security number of an individual is not obtained or maintained by the clerk under this section.  The preparer of a document may not include an individual's social security number in a document that is presented for recording in the office of the county clerk.**

**(c)  Notwithstanding Section 191.007(c), Local Government Code, an instrument transferring an interest in real property to or from an individual must include a notice that appears on the top of the first page of the instrument in 12-point boldfaced type or 12-point uppercase letters and reads substantially as follows:**

**NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## SUPPLEMENT
### TO
### SECOND LIEN DEED OF TRUST

**THIS SUPPLEMENT TO SECOND LIEN DEED OF TRUST** (hereinafter, this **"*Supplement*"**) is entered into this 11th day of October, 2013, by and between

**Michel B. Moreno and Tiffany C. Moreno,** whose address is 4023 Ambassador Caffery Pkwy, Suite 200, Lafayette, LA 70503 (hereinafter "Grantor"),

First American Title Insurance Company, whose address is 633 Third Avenue, New York, New York 10017 (hereinafter "Trustee"),

and

**Goldman Sacks Bank USA**, a New York chartered bank, having an address at 200 West Street, New York, New York, 10282-2198 (hereinafter "Grantee").

**WHEREAS**, Grantee made that certain Twenty-Five Million Dollar ($25,000,000) loan (the "Tranche 1 Loan") to Grantor which are parties to that certain Loan Agreement, dated as of May 15, 2013 (the "Original Tranche 1 Loan Agreement"), as amended by that certain Omnibus Amendment to Loan Documents, dated as of July 5, 2013 (the "Omnibus Amendment") and as may be further modified, amended, restated or supplemented from time to time, collectively, the "Tranche 1 Loan Agreement");

**WHEREAS**, in consideration for the Tranche 1 Loan, Grantor executed a certain promissory note (hereinafter, the "Tranche 1 Note") dated as of May 15, 2013, in the original principal amount of Twenty-Five Million and 00/100 Dollars ($25,000,000.00);

**WHEREAS**, the Tranche 1 Note was secured by, among other things, a certain SECOND LIEN DEED OF TRUST (the "DOT") dated as of May 15, 2013 and recorded in Harris County on May 30, 2013 as File Number: 20130262978.

**WHEREAS**, Grantee made that certain Fifteen Million Dollar ($15,000,000) loan (the "Tranche 2 Loan") to MBM 2011 DOH Grantor Retained Annuity Trust ("MBM DOH GRAT") and TCM 2011 DOH Grantor Retained Annuity Trust ("TCM DOH GRAT"), collectively and severally, as borrowers (the "Tranche 2 Borrowers") and are parties to that certain Loan Agreement, dated as of July 5, 2013 (the "Tranche 2 Loan Agreement");

**WHEREAS**, MBM 2011 MGH Grantor Retained Annuity Trust ("MBM MGH GRAT"), TCM 2011 MGH Grantor Retained Annuity Trust ("TCM MGH GRAT"; and together with the MBM MGH GRAT, collectively and severally, the "Tranche 3 Borrowers"; and together with Grantor and the Tranche 2 Borrowers, collectively, the "Borrowers"), have requested, and Grantee has agreed, subject to the terms and conditions contained in the Loan Agreement (defined below), to extend a TWELVE MILLION THREE HUNDRED SEVENTY THOUSAND DOLLARS ($12,370,000) loan (the "Tranche 3 Loan") to the Tranche 3 Borrowers pursuant to the Loan Agreement;

**WHEREAS**, the Tranche 3 Loan is evidenced by (i) that certain Note, dated as of the Effective Date, in the amount of SIX MILLION ONE HUNDRED EIGHTY-FIVE THOUSAND DOLLARS ($6,185,000) made by MBM MGH GRAT in favor of Grantee (the "MBM MGH Note"), and (ii) that certain Note, dated as of the Effective Date, in the amount of SIX MILLION ONE HUNDRED EIGHTY-FIVE THOUSAND DOLLARS ($6,185,000) made by TCM MGH GRAT in favor of Grantee (the "TCM MGH Note"; and together with the MBM MGH Note, collectively and severally, the "Tranche 3 Notes");

**WHEREAS**, the Tranche 1 Loan, the Tranche 2 Loan and the Tranche 3 Loan collectively comprises one (1) FIFTY-TWO MILLION THREE HUNDRED SEVENTY THOUSAND DOLLARS ($52,370,000) loan (the "Loan");

**WHEREAS**, the Loan is evidenced by that certain consolidated, Amended Restated Note (the "Note"), dated as of the date hereof, in the amount of the Loan (the "Consolidated Note Amount") made by the Tranche 1 Borrowers, the Tranche 2 Borrowers, the Tranche 3 Borrowers, and Moreno Properties Two, L.L.C, in favor of Mortgagee, which amends, restates and consolidates the Tranche 1 Note, the Tranche 2 Note and the Tranche 3 Notes, to be in the aggregate amount of the Consolidated Note Amount;

**WHEREAS**, the Loan is secured by, among other things, that certain Amended and Restated Security and Pledge Agreement, dated as of the Effective Date, made by Grantor, Moreno Properties, L.L.C., Tranche 2 Borrowers, Tranche 3 Borrowers and MOR MGH Holdings, L.L.C., collectively as pledgors, for the benefit of Grantee, as secured party, and Goldman Sachs & Co., as securities intermediary (as may be modified, amended, restated or supplemented from time to time, the "Amended and Restated Security Agreement");

**WHEREAS**, Grantor acknowledges that as a condition to making the Loan to the Borrowers, Grantor is required to execute and deliver this Supplement; and

**WHEREAS**, Grantor acknowledges that the Property (as defined herein) shall be Collateral for the entire Loan and shall be cross-collateralized with the additional properties identified on Exhibit A, attached hereto, and those properties shall be cross-collateralized with the DOT, and the DOT and the DOT shall be cross-defaulted with the mortgages recorded against such additional properties in favor of Grantee as Collateral for the Loan and those mortgages shall be cross-defaulted with the DOT;

**NOW, THEREFORE**, in consideration of the foregoing, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor hereby agrees as follows:

1) **Agreement to Cross-Collateralization and Cross-Default as Security for the Indebtedness**. To secure the Obligations (as defined in the Loan Agreement) and the other obligations secured by the Amended and Restated Security Agreement, Grantor by these presents does hereby agree that the Property shall be Collateral for the entire Loan and shall be cross-collateralized with the additional properties identified on **Exhibit A** attached hereto, and the DOT, as modified by this Supplement, shall be cross-defaulted with the security instruments recorded against such additional properties in favor of Grantee as additional Collateral for the Loan.

2) **Warranties Covenants and Agreements**. The representations, warranties, covenants and agreements contained in the original DOT are and remain in full force and effect as of the date hereof, are incorporated in this Supplement by this reference with such changes thereto mutatis mutandis and shall apply to this Supplement.

3)      **Ratification of DOT**.  This Supplement is as an amendment and supplement to the original DOT; and, except as expressly amended and supplemented hereby, the other terms, covenants and provisions of the DOT shall remain unmodified and in full force and effect and Grantor and Grantee hereby ratify, approve, accept and confirm all of the terms and conditions of the original DOT and any amended, modification, waiver or compromise of the DOT, as supplemented by this Supplement must be in writing and executed by Grantor and Grantee.

4)      **Continuation of Mortgage Lien and Security Interest**.  Grantor and Grantee hereby expressly intend that this Supplement shall not in any manner affect or impair mortgage lien or security interest granted in the DOT, which Grantor hereby acknowledges to be valid and existing liens on the property described therein, and said mortgage lien or security interest is hereby agreed to be continued in full force and effect from the date hereof until the Obligations and all the other obligations secured thereby and hereby are indefeasibly repaid and fully satisfied.

5)      **No Course of Dealing: Waiver**.  Grantor expressly acknowledges and agrees that the execution of this Supplement shall not constitute a waiver of, and shall not preclude the exercise of, any right, power or remedy granted to Trustee or Grantee in any document evidencing the Obligations of Grantor to Trustee or Grantee, or as otherwise provided by law.  No previous modification, extension or compromise entered into with respect to any Obligations of Grantor to Trustee or Grantee shall constitute a course of dealing or be inferred or construed as constituting an express or implied understanding to enter into any future modification, extension or compromise.   No delay on the part of Trustee or Grantee in exercising any right, power or remedy shall operate as a waiver thereof or otherwise prejudice Trustee's or Grantee's rights, powers or remedies.

6)      **Setoff Claim and Defenses**.  Grantor represents, warrants and covenants to Trustee and Grantee that as of the date hereof Grantor has no cause of action at law or in equity against Trustee or Grantee (including, without limitation, any deduction, defense, counterclaim or offset) with respect to the DOT, as modified hereby, the Loan Agreement, the Obligations (as defined in the Loan Agreement) or any document executed or delivered in connection with the Loan Agreement or the DOT.

7)      **Governing Law**.  THE PROVISIONS OF THIS SUPPLEMENT REGARDING THE CREATION, PERFECTION AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS HEREIN GRANTED SHALL BE GOVERNED AND CONSTRUED UNDER THE LAWS OF THE STATE IN WHICH THE MORTGAGED PROPERTY IS LOCATED.  ALL OTHER PROVISIONS OF THIS SUPPLEMENT AND THE RIGHTS AND OBLIGATIONS OF GRANTOR, TRUSTEE AND GRANTEE SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.   Further, the parties hereto intend that this Supplement shall be in

compliance with all applicable laws and shall be enforceable in accordance with its terms. If any provision of this Supplement shall be illegal or unenforceable with respect to any such mortgage deed or security agreement, such provision shall be deemed cancelled as though it had never been set forth herein, and a comparable provision which is legal and enforceable shall be inserted in lieu thereof, but the remaining provisions shall not he affected thereby.

8)   **Further Assurances**.  This Supplement is executed and delivered by Grantor pursuant to the Loan Agreement.  Grantor further agrees to execute and deliver, or cause to be executed and delivered, any and all other documents and take any and all other steps or actions reasonably deemed necessary by Trustee or Grantee to effectuate this Supplement.

9)   **Costs and Expenses**.  Grantor agrees to reimburse Trustee and Grantee for all costs and expenses incurred in the preparation, execution, delivery and recording of this Supplement, including any costs of Trustee's or Grantee's legal department and for mortgage title insurance or other evidence of title.

10)  **Successors and Assigns**.  This Supplement shall be binding upon the parties hereto and their respective successors and assigns, and shall inure to the benefit of Trustee, Grantee and their respective successors and assigns.

11)  **Execution in Counterparts**.  This Supplement may be executed in any number of counterparts, each of which shall for all purposes be deemed to be an original and all of which are identical.

12)  **Titles and Headings**. The titles and headings herein are intended to promote convenience and are not a part of this Supplement for purposes of interpreting and applying the provisions hereof.

.   **THUS DONE AND PASSED** in the County of _Lafayette_ State of _Louisiana_, on the ___ day of _October_, 2013, in the presence of the undersigned competent witnesses who hereunto sign their names with Mortgagor and me, Notary, after due reading of the whole.

_____
MICHEL B. MORENO

_____
TIFFANY C. MORENO

WITNESSES:

_____
Print Name: _Hunter Robicheaux_

_____
Print Name: _Meredith Miller_

_____
NOTARY PUBLIC
Printed Name: _Angie Faulk_
_Lafayette_ ~~County,~~ Parish
My Commission Expires: _upon death_
Notarial Identification/Bar Roll No. (If Applicable): _054010_

ANGIE FAULK
NOTARY PUBLIC ID #054010
VERMILION PARISH LOUISIANA
My Commission is for Life

Signature Page to Supplement to Second Lien Deed of Trust (Texas)

**GRANTEE**:

GOLDMAN SACHS BANK USA

By: _____
    Name: Gosia Lewis
    Title: Vice President

[INSERT PROPER NOTARY BLOCK]

This Instrument Prepared By:
Paul Hastings LLP
75 East 55th Street
New York, NY 10022
<u>Attention</u>:  Lisa A. Chaney, Esq.

**GRANTEE**:

GOLDMAN SACHS BANK USA

By: _Gregore L_

Name: Gosia Lewu

Title: VP

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

On the 9th day of October in the year 2013 before me, the undersigned, a Notary Public in and for said State, personally appeared Gosia Lewis , personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_Ian Tyler Ross_
Notary Public

My Commission expires:

**IAN TYLER ROSS**
Notary Public, State of New York
No. 01RO6279225
Qualified in New York County
Commission Expires 04/08/2017

This Instrument Prepared By:
Paul Hastings LLP
75 East 55th Street
New York, NY 10022
Attention: Lisa A. Chaney, Esq.

Signature Page to Supplement to Second Lien Deed of Trust (Texas)

**EXHIBIT A**

Additional Properties

## LEGAL DESCRIPTIONS FOR PORT ROAD PARCELS

**[See Attached]**

TRACT I

A CERTAIN TRACT OF LAND, CONTAINING 9.96 ACRES, MORE OR LESS, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON, AND ALL RIGHTS, WAYS, PRIVILEGES, SERVITUDES AND APPURTENANCES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF IBERIA, STATE OF LOUISIANA, BEING LOCATED IN SECTION 34, TOWNSHIP 12 SOUTH, RANGE 6 EAST, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT ALONG THE WESTERLY RIGHT-OF-WAY LINE OF CURTIS ROAD, THENCE NORTH 89 DEGREES 52 MINUTES 00 SECONDS WEST, (APPROXIMATELY PARALLEL TO PORT ROAD, PARISH ROAD NO. 202) FOR A DISTANCE OF 2104.2 FEET A ½ INCH IRON ROD BEING THE POINT OF BEGINNING.

THENCE NORTH 86 DEGREES 34 MINUTES 14 SECONDS WEST, FOR A DISTANCE OF 10.02 FEET TO A ½ INCH IRON ROD;

THENCE NORTH 86 DEGREES 51 MINUTES 26 SECONDS WEST FOR A DISTANCE OF 79.16 FEET TO A ½ INCH IRON ROD;

THENCE NORTH 89 DEGREES 42 MINUTES 22 SECONDS WEST FOR A DISTANCE OF 141.96 FEET TO A ½ INCH IRON ROD;

THENCE SOUTH 89 DEGREES 55 MINUTES 38 SECONDS WEST FOR A DISTANCE OF 58.69 FEET TO A POINT IN THE CENTER OF RODERE CANAL;

THENCE ALONG THE CENTERLINE OF RODERE CANAL NORTH 13 DEGREES 34 MINUTES 48 SECONDS WEST FOR A DISTANCE OF 101.96 FEET TO A POINT;

THENCE NORTH 2 DEGREES 13 MINUTES 11 SECONDS WEST FOR A DISTANCE OF 160.83 FEET TO A POINT;

THENCE NORTH 33 DEGREES 30 MINUTES 16 SECONDS WEST FOR A DISTANCE OF 140.69 FEET TO A POINT;

THENCE NORTH 72 DEGREES 14 MINUTES 08 SECONDS WEST FOR A DISTANCE OF 140.34 FEET TO A POINT;

THENCE LEAVING THE CENTERLINE OF THE RODERE CANAL NORTH 59 DEGREES 56 MINUTES 35 SECONDS WEST FOR A DISTANCE OF 57.30 FEET TO A POINT;

THENCE NORTH 00 DEGREES 13 MINUTES 53 SECONDS WEST FOR A DISTANCE OF 467.04 FEET TO A 3 INCH IRON PIPE;

THENCE NORTH 89 DEGREES 36 MINUTES 01 SECONDS EAST FOR A DISTANCE OF 587.67 FEET TO A ½ INCH IRON ROD;

THENCE SOUTH 00 DEGREES 18 MINUTES 35 SECONDS WEST FOR A DISTANCE OF 925.39 FEET TO THE POINT OF BEGINNING.

PARCEL ID NO. 0105264000

TRACT II

A CERTAIN TRACT OF LAND, CONTAINING 5.00 ACRES, MORE OR LESS, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON, AND ALL RIGHTS, WAYS, PRIVILEGES, SERVITUDES AND APPURTENANCES THEREUNTO

BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF IBERIA, STATE OF LOUISIANA, BEING LOCATED IN SECTION 4, TOWNSHIP 13 SOUTH, RANGE 6 EAST, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE EAST RIGHT-OF-WAY LINE OF PORT ROAD (PARISH ROAD NO. 202) AND THE CENTERLINE OF UNIFAB ROAD (PARISH ROAD NO. 917) AT A ¾ INCH IRON PIPE; THENCE SOUTH 89 DEGREES 50 MINUTES 02 SECONDS EAST FOR A DISTANCE OF 429.46 FEET TO A ½ INCH IRON ROD BEING THE POINT OF BEGINNING.

THENCE NORTH 00 DEGREES 06 MINUTES 23 SECONDS WEST, FOR A DISTANCE OF 488.15 FEET TO A ½ INCH IRON ROD;

THENCE SOUTH 89 DEGREES 50 MINUTES 02 SECONDS EAST FOR A DISTANCE OF 215.00 FEET TO A ½ INCH IRON ROD;

THENCE NORTH 00 DEGREES 06 MINUTES 23 SECONDS WEST FOR A DISTANCE OF 121.85 FEET TO A ½ INCH IRON ROD;

THENCE SOUTH 89 DEGREES 50 MINUTES 02 SECONDS EAST FOR A DISTANCE OF 185.00 FEET TO A ½ INCH IRON PIPE;

THENCE SOUTH 00 DEGREES 06 MINUTES 23 SECONDS EAST FOR A DISTANCE OF 610.00 FEET TO A ¾ INCH IRON PIPE AND THE CENTERLINE OF UNIFAB ROAD;

THENCE NORTH 89 DEGREES 50 MINUTES 02 SECONDS WEST FOR A DISTANCE OF 400.00 FEET TO THE POINT OF BEGINNING.

PARCEL ID NO. 0105261990

AND

A CERTAIN TRACT OF LAND, CONTAINING 12.67 ACRES, MORE OR LESS, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON, AND ALL RIGHTS, WAYS, PRIVILEGES, SERVITUDES AND APPURTENANCES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF IBERIA, STATE OF LOUISIANA, BEING LOCATED IN SECTION 4, TOWNSHIP 13 SOUTH, RANGE 6 EAST, MORE FULLY-DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE EAST RIGHT-OF-WAY LINE OF PORT ROAD (PARISH ROAD NO. 202) AND THE CENTERLINE OF UNIFAB ROAD (PARISH ROAD NO. 917) AT A ¾ INCH IRON PIPE; BEING THE POINT OF BEGINNING.

THENCE NORTH 06 DEGREES 09 MINUTES 58 SECONDS WEST, FOR A DISTANCE OF 884.27 FEET TO A ¾ INCH IRON PIPE;

THENCE SOUTH 89 DEGREES 50 MINUTES 02 SECONDS EAST FOR A DISTANCE OF 922.81 FEET TO A 1-INCH IRON PIPE;

 THENCE SOUTH 00 DEGREES 06 MINUTES 23 SECONDS EAST FOR A DISTANCE OF 268.88 FEET TO A ½ INCH IRON ROD;

THENCE NORTH 89 DEGREES 50 MINUTES 02 SECONDS WEST FOR A DISTANCE OF 185.00 FEET TO A ½ INCH IRON ROD;

THENCE SOUTH 00 DEGREES 06 MINUTES 23 SECONDS EAST FOR A DISTANCE OF 121.85 FEET TO A ½ INCH IRON ROD;

THENCE NORTH 89 DEGREES 50 MINUTES 02 SECONDS WEST FOR A DISTANCE OF 215.00 FEET TO A ½ INCH IRON ROD;

THENCE SOUTH 00 DEGREES 06 MINUTES 23 SECONDS EAST FOR A DISTANCE OF 488.15 FEET TO A ½ INCH IRON ROD AND THE CENTERLINE OF UNIFAB ROAD;

THENCE NORTH 89 DEGREES 50 MINUTES 02 SECONDS WEST FOR A DISTANCE OF 429.46 FEET THE POINT OF BEGINNING.

PARCEL ID NO. 0105261990A

TRACT III

A CERTAIN TRACT OF LAND, CONTAINING 79.088 ACRES, MORE OR LESS, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON, AND ALL THE RIGHTS, WAYS, PRIVELEGES, SERVITUDES AND APPURTENANCES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF IBERIA, STATE OF LOUISIANA, BEING LOCATED IN SECTIONS 3 & 4, TOWNSHIP 13 SOUTH, RANGE 6 EAST, MORE FULLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE LOUISIANA COAST AND GEODETIC SURVEY MONUMENT NO. B-4096 (LAMBERT LOUISIANA SOUTH ZONE COORDINATES VALUES OF X = 1,833,945.73 FEET AND Y = 466,596.81 FEET) THENCE SOUTH 77 DEGREES 24 MINUTES 00 SECONDS EAST, FOR A DISTANCE OF 163.1 FEET TO A POINT;

THENCE SOUTH 00 DEGREES 10 MINUTES 00 SECONDS WEST, FOR A DISTANCE OF 60.00 FEET TO A ¾ INCH IRON PIPE ON THE APPARENT SOUTH RIGHT-OF-WAY LINE OF PORT ROAD (PARISH ROAD NO. 202); THENCE SOUTH 89 DEGREES 47 MINUTES 12 SECONDS EAST ALONG THE APPARENT RIGHT-OF-WAY LINE OF PORT ROAD FOR A DISTANCE OF 569.62 FEET TO A ¾ INCH IRON PIPE;

THENCE LEAVING THE AFOREMENTIONED RIGHT-OF-WAY LINE SOUTH 00 DEGREES 12 MINUTES 06 SECONDS WEST, FOR A DISTANCE OF 789.47 FEET TO A ¾ INCH IRON PIPE AND THE POINT OF BEGINNING.

FROM THE POINT OF BEGINNING SOUTH 89 DEGREES 50 MINUTES 02 SECONDS EAST, FOR A DISTANCE OF 271.49 FEET TO A ½ INCH IRON ROD;

 THENCE SOUTH 00 DEGREES 11 MINUTES 23 SECONDS WEST FOR A DISTANCE OF 45.00 FEET TO A ½ INCH IRON ROD;

THENCE SOUTH 89 DEGREES 50 MINUTES 00 SECONDS EAST ALONG AN EXISTING SLIP FOR A DISTANCE OF 893.00 FEET TO A POINT ON THE WEST SIDE OF RODERE CANAL;

THENCE ALONG THE WEST SIDE OF RODERE CANAL IN A SOUTHEASTERLY DIRECTION THE FOLLOWING COURSES, SOUTH 15 DEGREES 44 MINUTES 00 SECONDS EAST FOR A DISTANCE OF 207.70 FEET TO A POINT, SOUTH 09 DEGREES 28 MINUTES 00 SECONDS EAST FOR A DISTANCE OF 215.00 FEET TO A POINT, SOUTH 8 DEGREES 24 MINUTES 00 SECONDS EAST FOR A DISTANCE OF 91.00 FEET TO A POINT, SOUTH 03 DEGREES 41 MINUTES 00 SECONDS EAST FOR A DISTANCE OF 333.70 FEET TO A POINT, SOUTH 00 DEGREES 00 MINUTES 00 SECONDS EAST FOR A DISTANCE OF 45.85 FEET TO A POINT, SOUTH 16 DEGREES 11 MINUTES 00 SECONDS EAST FOR A DISTANCE OF 423.27 FEET TO A POINT, SOUTH 35 DEGREES 21 MINUTES 00 SECONDS EAST FOR A DISTANCE OF 181.10 FEET TO A POINT, SOUTH 58 DEGREES 48 MINUTES 00 SECONDS EAST FOR A DISTANCE OF 129.80 FEET TO A POINT, SOUTH 82 DEGREES 38 MINUTES 00 SECONDS EAST FOR A DISTANCE OF 262.80 FEET TO A POINT, SOUTH 68 DEGREES 47 MINUTES 00 SECONDS EAST FOR A DISTANCE OF 231.10 FEET TO A POINT, SOUTH 51 DEGREES 22 MINUTES 00 SECONDS EAST FOR A DISTANCE OF 163.80 FEET, SOUTH 36 DEGREES 54 MINUTES 58 SECONDS EAST FOR A DISTANCE OF 677.09 FEET TO A POINT, THENCE LEAVING THE WEST SIDE OF RODERE CANAL SOUTH 89 DEGREES 52 MINUTES 59 SECONDS WEST FOR A DISTANCE OF 403.75 FEET TO A ¾ INCH IRON PIPE;

THENCE CONTINUING SOUTH 89 DEGREES 52 MINUTES 59 SECONDS WEST FOR A DISTANCE OF 500.22 FEET TO A ¾ INCH IRON PIPE;

THENCE CONTINUING SOUTH 89 DEGREES 52 MINUTES 59 SECONDS WEST FOR A DISTANCE OF 617.97 FEET TO A ½ INCH IRON ROD BEING A TOTAL OF 1,521.94 FEET FROM RODERE CANAL;

THENCE NORTH 00 DEGREES 06 MINUTES 23 SECONDS WEST FOR A DISTANCE OF 275.00 FEET TO A ½ INCH IRON ROD;

THENCE SOUTH 89 DEGREES 52 MINUTES 59 SECONDS WEST FOR A DISTANCE OF 1,109.00 FEET TO A ½ INCH IRON ROD;

THENCE NORTH 00 DEGREES 06 MINUTES 23 SECONDS WEST FOR A DISTANCE OF 267.56 FEET TO A ½ INCH IRON PIPE;

THENCE CONTINUING NORTH 00 DEGREES 06 MINUTES 23 SECONDS WEST FOR A DISTANCE OF 895.59 FEET TO A ½ INCH GALVANIZED IRON PIPE, BEING A TOTAL OF 1,163.15 FEET TO THE CENTERLINE OF UNIFAB ROAD;

THENCE CONTINUING NORTH 00 DEGREES 06 MINUTES 23 SECONDS WEST FOR A DISTANCE 878.88 FEET TO A ¾ INCH IRON PIPE BEING THE POINT OF BEGINNING.

PARCEL ID NO. 0105262000

## LEGAL DESCRIPTIONS FOR 409 WORTH AVENUE

**[See Attached]**

**AS TO PARCEL I:**

Real property in the City of Lafayette, Parish of LAFAYETTE, State of LOUISIANA, described as follows:

THAT CERTAIN TRACT OR PARCEL OF GROUND, TOGETHER WITH ALL IMPROVEMENTS THEREON, AND ALL RIGHTS, WAYS, PRIVILEGES AND SERVITUDES THEREUNTO PERTAINING, AND ALL APPURTENANCES THEREOF, TOGETHER WITH ALL ACCRETION AND ALLUVION PERTAINING THERETO, SITUATED IN SECTIONS 62 & 65, TOWNSHIP 10 SOUTH, RANGE 4 EAST, IN THE CORPORATE LIMITS OF THE CITY OF LAFAYETTE, LAFAYETTE PARISH, LOUISIANA, BEING KNOWN AND DESIGNATED AS LOT C-126A OF THE VILLAGE OF RIVER RANCH, PHASE XIII-B, SAID LOT HAVING SUCH SHAPE, FORM, DIMENSIONS, METES AND BOUNDS AS ARE MORE FULLY SHOWN ON THAT CERTAIN PLAT OF SURVEY TITLED "FINAL PLAT OF THE VILLAGE OF RIVER RANCH PHASE XIII-B (A RESIDENTIAL & COMMERCIAL DEVELOPMENT) LOCATED IN SECTIONS 62 & 65, T-10-S, R-4-E, CITY OF LAFAYETTE, LAFAYETTE PARISH, LOUISIANA" PREPARED BY BARRY J. BLEICHNER, PE, PLS DATED JANUARY 6, 2005, AND RECORDED UNDER FILE NO. 2005-00008223 OF THE RECORDS OF THE CLERK OF COURT FOR LAFAYETTE PARISH, LOUISIANA.

Being all of that certain property conveyed to MICHEL B. MORENO AND TIFFANY CUTRONE MORENO, HUSBAND AND WIFE from RIVER RANCH DEVELOPMENT, L.L.C., by deed dated 06/05/2008 and recorded 06/06/2008 as Instrument no. 2008-00024134 of official records.

APN #:6128580

**AS TO PARCEL II**:

Real property in the City of Lafayette, Parish of LAFAYETTE, State of LOUISIANA, described as follows:

THAT CERTAIN LOT OR PARCEL OF LAND, TOGETHER WITH ALL BUILDINGS AND IMPROVEMENTS THEREON AND ALL RIGHTS, WAYS, PRIVILEGES AND SERVITUDES THERETO APPERTAINING AND ALL APPURTENANCES THEREOF, LYING AND BEING SITUATED IN SECTION 62, T10S-R4E, LAFAYETTE PARISH, LOUISIANA, AND BEING MORE PARTICULARLY KNOWN, DESIGNATED AND DESCRIBED AS LOT C-126 OF THE VILLAGE OF RIVER RANCH, PHASE II, AS SHOWN ON A PLAT PREPARED BY BARRY J. BLEICHER, PLS, OF DATE JULY 19, 2002 A COPY OF WHICH WAS RECORDED UNDER LAFAYETTE PARISH ENTRY NO. 02-034153.

Being all of that certain property conveyed to MICHEL B. MORENO AND TIFFANY CUTRONE MORENO, HUSBAND AND WIFE from RIVER RANCH DEVELOPMENT, LLC, by deed dated 07/31/2002 and recorded 08/05/2002 of official records.

APN #: 6106777

## LEGAL DESCRIPTIONS FOR NICHOLSON ESTATES

**[See Attached]**

## 1. 1766 NICHOLSON, BATON ROUGE, LA 70802

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

LOT A, SQUARE 307, SOUTH BATON ROUGE SUBDIVISION, EAST BATON ROUGE PARISH, LA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE SUBDIVISION, AND BEING DESIGNATED AS LOT A OF A RESUBDIVISION OF LOT 1, SQUARE 307, OF SAID SUBDIVISION, SAID LOT IS SHOWN ON A MAP ENTITLED" FINAL PLAT OF SUBDIVISION OF LOT 1, SQUARE 307, SOUTH BATON ROUGE SUBDIVISION IN THE CITY OF BATON ROUGE, EAST BATON ROUGE PARISH, LOUISIANA FOR MRS. BERTHA SIMON, OWNER" BY TOXIE CRAFT, C. E. AND SURVEYOR, DATED MARCH 4, 1953 A BLUEPRINT OF WHICH IS ANNEXED TO ORIG. 89 BUNDLE 3109 OF THE OFFICIAL RECORDS OF THE CLERK AND RECORDER OF EAST BATON ROUGE PARISH, LOUISIANA SAID LOT MEASURING 125.35 FEET FRONT ON THE WEST SIDE OF NICHOLSON DRIVE, A WIDTH IN THE REAR OF 124.04 FEET, BY A DEPTH ON THE NORTH LINE OF 162.75 FEET AND A DEPTH ON THE SOUTH LINE AND ALONG THE SIDE OF GARNER STREET OF 150.00 FEET.

TAX ID NO: 006-3658-4

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR: MORENO PROPERTIES, L.L.C.
GRANTEE: NICHOLSON ESTATES, L.L.C. DATED: 04/22/2008
RECORDED: 04/29/2008
DOC#/BOOK-PAGE: 386-12051

## 2.  924 GARNER STREET, BATON ROUGE, LA 70802

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

LOT B, SQUARE 307, SOUTH BATON ROUGE SUBDIVISION, EAST BATON ROUGE PARISH, LA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE AND BEING DESIGNATED AS LOT B OF A RESUBDIVISION OF LOT 1, SQUARE 307, OF SAID SUBDIVISION, SAID SOUTH BATON ROUGE ACCORDING TO A MAP BY TOXIC CRAFT, C. E. AND SURVEYOR, DATED MARCH 4, 1953, WHICH IS ON FILE AT ORIG. 89 BUNDLE 3108 IN THE OFFICE OF THE CLERK AND RECORDER OF EAST BATON ROUGE PARISH, LOUISIANA, WHICH SAID LOT B MEASURES 100 FEET FRONT ON THE NORTH SIDE OF GARNER STREET, A WIDTH IN THE REAR OF 100 FEET, BY A DEPTH ON THE EAST SIDELINE OF 124.04 FEET AND A DEPTH ON THE WEST SIDELINE OF 123.5 FEET.

TAX ID NO: 005-9361-3

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:     MORENO PROPERTIES, L.L.C.
GRANTEE:     NICHOLSON ESTATES, L.L.C.
 DATED:        04/22/2008
RECORDED:     04/29/2008
DOC#/BOOK-PAGE: 386-12051
NOTE: ACT OF DEPOSIT/NOTARIAL AFFIDAVIT, DATED 04/22/2008, RECORDED 05/12/2008, IN BOOK 8 PAGE 12055.

### 3.  926 GARNER, BATON ROUGE, LA 70802

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

LOT 2-A, SQUARE 307, SOUTH BATON ROUGE.

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE51PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE SUBDIVISION, ALSO KNOWN AS NICHOLSON DRIVE ESTATES, AND BEING DESIGNATED ACCORDING TO A MAP ENTITLED" FINAL PLAT OF RESUBDIVISON OF LOTS 2 AND 3 INTO LOTS 2A & 3A, SQUARE 307, SOUTH BATON ROUGE SUBDIVISION IN THE PARISH OF EAST BATON ROUGE, LOUISIANA FOR MRS. MARY MATHIS CREAMER" BY ROBERT A HART, III & ASSOCIATES, CONSULTING ENGINEERS, RECORDED AS ATTACHMENT TO ORIG. 62 BUNDLE 4105, AS LOT 2-A, SQUARE 307, SOUTH BATON ROUGE SUBDIVISION, SAID LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID MAP.

LESS AND EXCEPT: A STRIP OF LAND 6 FEET IN WIDTH BY A DEPTH OF 122.9 FEET TAKEN FROM THE WESTERLY SIDE OF LOT 2-A DESCRIBED ABOVE.

TAX ID NO: 005-5705-6

BEING THE SAME PROPERTY CONVEYED BY CASH SALE
GRANTOR:      STEVEN SHANE SCOTT AND WIFE, KATHRYN COLLISON SCOTT
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:        04/08/2008
RECORDED:     04/29/2008
DOC#/BOOK-PAGE: 283-12051

**4.  955 GARNER, BATON ROUGE, LA 70802**

SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, AND STATE OF LOUISIANA:

PROPERTY 22

LOT 3A, SQUARE 307, TOGETHER WITH A 6-FOOT STRIP TAKEN ON THE WESTERN PORTION OF LOT 2A, NICHOLSON DRIVE ESTATES, EAST BATON ROUGE PARISH, LA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, BEING MORE PARTICULARLY DESCRIBED AS LOT 3-A, OF SQUARE 307, NICHOLSON DRIVE ESTATES, TOGETHER WITH A 6 FOOT STRIP TAKEN ON THE WESTERN PORTION OF LOT 2-A, SAID STRIP MEASURING 6 FEET ON THE NORTH SIDE OF GARNER STREET AND RUNNING BACK A DEPTH AT RIGHT ANGLES AND BETWEEN EQUAL AND PARALLEL LINES OF 122.9 FEET.

TAX ID NO: 005-1595-7

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:     MORENO PROPERTIES, L.L.C.
GRANTEE:     NICHOLSON ESTATES, L.L.C.
DATED:     04/22/2008
RECORDED:     04/29/2008
DOC#/BOOK-PAGE: 386-12051

NOTE: ACT OF DEPOSIT / NOTARIAL AFFIDAVIT DATED 05/05/2008, RECORDED 05/12/2008 IN BOOK 8 PAGE 12055, TO DEPOSIT SAID LIMITED LIABILITY CERTIFICATE INTO THE OFFICIAL RECORDS OF EAST BATON ROUGE PARISH

**5.  1812 NICHOLSON DR, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS NICHOLSON DRIVE ESTATES (FORMERLY SUBURB SOUTH BATON ROUGE), DESIGNATED ON MAP OR PLAT OF SAID SUBDIVISION BY R. SWART, C. E., DATED DECEMBER 20, 1949, WHICH IS ATTACHED TO ORIG. 82 BUNDLE 2830 AS LOT 1 OF SQUARE 308 WHICH FRONTS 100.5 FEET ON THE WEST SIDE OF NICHOLSON DRIVE, BY A DEPTH ALONG ITS NORTHERN SIDELINE OF 478.07 FEET AND A DEPTH ON THE SOUTHERN SIDELINE OF 467.99 FEET AND A WIDTH IN THE REAR OF 100 FEET.

TAX ID NO: 005-9339-7

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED

GRANTOR:      MORENO PROPERTIES, L.L.C.
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:      04/22/2008
RECORDED:      04/29/2008
DOC#/BOOK-PAGE: 386-12051

NOTE: ACT OF DEPOSIT / NOTARIAL AFFIDAVIT RECORDED 05/12/2008, BK/PG 8/12055, TO ADD LIBILITY LIABILITY COMPANY CERTIFICATE.

**6.  1820 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

PROPERTY 2

LOT 2, SQUARE 308, NICHOLSON DRIVE ESTATES, EAST BATON ROUGE PARISH, LA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS NICHOLSON DRIVE ESTATES, DESIGNATED ON MAP OR PLAT OF SAID SUBDIVISION BY R. SWART, C. E., DATED DECEMBER 20, 1949, WHICH IS ATTACHED TO ORIG. 82 BUNDLE 2830 AS LOT 2 OF SQUARE 308 WHICH SAID LOT FRONTS 100.5 FEET ON THE WEST SIDE OF NICHOLSON DRIVE, BY A DEPTH ALONG ITS NORTHERN SIDELINE OF 467.99 FEET AND A DEPTH ON THE SOUTHERN SIDELINE OF 457.91 FEET AND A WIDTH IN THE REAR OF 100 FEET.

TAX ID NO: 005-5526-6

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:      MORENO PROPERTIES, L.L.C.
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:      04/22/2008
RECORDED:      04/29/2008
DOC#/BOOK-PAGE: 386-12051
NOTE: COVERS PREMISES AND MORE

**7.  1836 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, CITY OF BATON ROUGE IN NICHOLSON DRIVE ESTATES (FORMERLY SUBURB SOUTH BATON ROUGE), DESIGNATED ON MAP OR PLAT OF SAID SUBDIVISION BY R. SWART, C. E., DATED DECEMBER 20, 1949, WHICH IS ATTACHED TO ORIG. 82 BUNDLE 2830 AS LOT 3 OF SQUARE 308 WHICH FRONTS 100.5 FEET ON THE WEST SIDE OF NICHOLSON DRIVE, BY A DEPTH ALONG ITS NORTHERN SIDELINE OF 457.91 FEET AND A DEPTH ON THE SOUTHERN SIDELINE OF 447.83 FEET AND A WIDTH IN THE REAR OF 100 FEET.

TAX ID NO: 005-9360-5

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:      MORENO PROPERTIES, L.L.C.
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:      04/22/2008
RECORDED:      04/29/2008
DOC#/BOOK-PAGE: 386-12051

NOTE:  COVERS PREMISES AND MORE

**8.  1852 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, AS LOT NUMBER 4 OF NICHOLSON DRIVE ESTATES, AS DESIGNATED ACCORDING TO A MAP ON FILE AND OF RECORD AS ORIGINAL 84 BUNDLE 2830 OF THE OFFICIAL RECORDS OF THE CLERK AND RECORDER FOR THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA SAID LOT 4, MEASURING 447.83 FEET ALONG ITS NORTH SIDELINE AND 440.27 FEET ALONG ITS SOUTH SIDELINE, MEASURING 75.38 FEET FRONT ON THE WEST SIDE OF NICHOLSON DRIVE AS SHOWN ON SAID MAP.

TAX ID NO: 005-1743-7

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:      MORENO PROPERTIES, L.L.C.
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:         04/22/2008
RECORDED:      04/29/2008
DOC#/BOOK-PAGE: 386-12051

**9.  1870 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS NICHOLSON DRIVE ESTATES, AND DESIGNATED ON THE OFFICIAL PLAN THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER OF THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA AS LOT NUMBER 5, SAID LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID MAP.

TAX ID NO: 009-1533-5

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED GRANTOR: MORENO PROPERTIES, L.L.C.
GRANTEE:    NICHOLSON ESTATES, L.L.C. DATED:      04/22/2008
RECORDED:      04/29/2008
DOC#/BOOK-PAGE: 386-12051

**10. 1880 NICHOLSON, BATON ROUGE, LA 70802**

SITUATE IN THE PARISH OF EAST BAON ROUGE, STATE OF LOUISIANA:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THE SUBDIVISION KNOWN AS NICHOLSON DRIVE ESTATES, AND BEING DESIGNATED ON THE OFFICIAL PLAN BY R. SWART, DATED DECEMBER 20, 1949, A COPY OF WHICH IS ON FILE AND OF RECORD AT ORIGINAL 83 BUNDLE 2830, IN THE OFFICE OF THE CLERK AND RECORDER FOR EAST BATON ROUGE, AS LOT NO. 6, MEASURING 75.38 FEET FRONT ON THE WEST SIDE OF NICHOLSON DRIVE BY A DEPTH ALONG ITS SOUTHERN SIDELINE OF 425.15 FEET AND A DEPTH ON THE NORTHERN SIDELINE OF 432.71 FEET AND A WIDTH IN THE REAR OF 75 FEET.

TAX ID NO: 005-9342-7

BEING THE SAME PROPERTY CONVEYED BY DEED
GRANTOR:      MORENO PROPERTIES, LLC
GRANTEE:      NICHOLSON ESTATES, LLC
DATED:      04/22/2008
RECORDED:      04/29/2008
DOC#/BOOK-PAGE: 386-12051

CORRECTED BY ACT OF DEPOSIT, DATED 5/5/2008 RECORDED 5/12/2008 AS 8-12055.

## 11. 1890 NICHOLSON DRIVE, BATON ROUGE, LA 70802

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS NICHOLSON DRIVE ESTATES, AND DESIGNATED ACCORDING TO THE OFFICIAL PLAN OF SAID SUBDIVISION BY R. SWART, C. E., SURVEYOR, DATED DECEMBER 20, 1949, ON FILE AND OF RECORD IN CONVEYANCE BOOK 944 PAGE 393, AS LOT NUMBER 7 OF SAID NICHOLSON DRIVE ESTATES, SAID LOT NO. 7 MEASURES 80.7 FEET FRONT ON THE WESTERN SIDE OF NICHOLSON DRIVE, BY A DEPTH ON THE NORTHERN SIDELINE OF 425.15 FEET AND A DEPTH ON THE OPPOSITE SIDELINE OF 417.05 FEET AND WIDTH IN THE REAR OF 80.3 FEET.

TAX ID NO: 006-9189-5

BEING THE SAME PROPERTY CONVEYED BY CASH SALE
GRANTOR:      GLENN ALAN KOEPP, MARRIED, GREGORY REED KOEPP, MARRIED, JAN KOEPP BOLLINGER, NOT MARRIED, AND KARYN KOEPP TAYLOR, MARRIED
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:      12/19/2008
RECORDED:      01/07/2009
DOC#/BOOK-PAGE: 174-12116

**12. LOT 8 SQ 308, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

LOT 8, NICHOLSON DRIVE ESTATES, EAST BATON ROUGE PARISH, LA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, KNOWN AS NICHOLSON DRIVE ESTATES, AND BEING LOT 8 AND MEASURING 60.5 FEET FRONT ON THE WEST SIDE OF NICHOLSON DRIVE, BY A DEPTH ALONG ITS NORTHERLY SIDELINE OF 417.05 FEET AND A DEPTH ON THE SOUTHERLY SIDELINE OF 411.00 FEET AND A WIDTH IN THE REAR OF 60 FEET, AS SHOWN ION THE FINAL PLAT OF NICHOLSON DRIVE ESTATES BEING ESTATES 4 THROUGH 24 INCLUSIVE BY R. SWART, C. E., DATED DECEMBER 20, 1949, RECORDED IN CONVEYANCE BOOK 944 PAGE 393.

TAX ID NO: 008-2155-1

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:      MORENO PROPERTIES, L.L.C.
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:        04/22/2008
RECORDED:     04/29/2008
DOC#/BOOK-PAGE: 386-12051

**13. 1924 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

LOT 1, SQUARE 308, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ONE (1) CERTAIN LOT OR PARCEL OF GROUND, AND ALL OF THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS NICHOLSON DRIVE ESTATES, AND DESIGNATED ON THE OFFICIAL PLAN THEREOF, ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER FOR EAST BATON ROUGE PARISH, LA, AT PLAN BOOK 18, PAGE 32 AND ORIG 82, BUNDLE 2830, AS LOT NUMBER NINE (9), SAID SUBDIVISION, SAID LOTS HAVING SUCH MEASUREMENTS AND DIMENSIONS AS ARE MORE PARTICULARLY SHOWN ON SAID SUBDIVISION MAP.

TAX ID NO: 005-2551-0

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:        MORENO PROPERTIES, L.L.C.
GRANTEE:        NICHOLSON ESTATES, L.L.C.
DATED:          04/22/2008
RECORDED:       04/29/2008
DOC#/BOOK-PAGE: 386-12051
NOTE: COVERS PREMISES AND MORE

**14. 1944 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS NICHOLSON DRIVE ESTATES, AND BEING DESIGNATED ACCORDING TO THE OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER FOR THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA AS LOT 10, SAID LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID MAP.

TAX ID NO: 007-3254-0

BEING THE SAME PROPERTY CONVEYED BY CASH SALE
GRANTOR:     NORMAN SCOTT PRESLEY AND STEVEN EDWARD PRESLEY GRANTEE: NICHOLSON ESTATES, L.L.C.
DATED:        04/09/2008
RECORDED:        04/29/2008
DOC#/BOOK-PAGE: 278-12051

**15. 1964 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

LOT 11, NICHOLSON DRIVE ESTATES, EAST BATON ROUGE PARISH, LA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, KNOWN AS NICHOLSON DRIVE ESTATES, AND BEING DESIGNATED ON THE OFFICIAL SUBDIVISION MAP ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER FOR SAID PARISH AND STATE LOT 11, SAID SUBDIVISION LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID MAP.

TAX ID NO: 006-9207-7

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:     MORENO PROPERTIES, L.L.C.
GRANTEE:     NICHOLSON ESTATES, L.L.C. DATED:        04/22/2008
RECORDED:        04/29/2008
DOC#/BOOK-PAGE: 386-12051
**16. 2020 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

LOT 12, NICHOLSON DRIVE ESTATES, EAST BATON ROUGE PARISH, LA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THE SUBDIVISION KNOWN AS NICHOLSON DRIVE ESTATES, AND BEING DESIGNATED ON THE OFFICIAL PLAN BY R. SWART, CIVIL ENGINEER, DATED DECEMBER 20, 1949, A COPY OF WHICH IS ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER FOR SAID PARISH AND AS LOT 12, MEASURING 100.5 FEET FRONT ON THE WEST SIDE OF NICHOLSON DRIVE BY A DEPTH ALONG ITS NORTHERN SIDELINE OF 381.96 FEET AND A DEPTH ON THE SOUTHERN SIDELINE OF 371.88 FEET AND A WIDTH IN THE REAR OF 100 FEET.

TAX ID NO: 005-2602-9

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:        MORENO PROPERTIES, L.L.C.
GRANTEE:        NICHOLSON ESTATES, L.L.C.
DATED:        04/22/2008
RECORDED:        04/29/2008
DOC#/BOOK-PAGE: 386-12051
NOTE: COVERS PREMISES AND MORE

**17. 2042 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

LOT 13, NICHOLSON DRIVE ESTATES, EAST BATON ROUGE PARISH, LA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, KNOWN AS NICHOLSON DRIVE ESTATES, AND BEING DESIGNATED ON THE OFFICIAL PLAN THEREOF, ON FILE IN THE OFFICE OF THE CLERK AND RECORDER OF EAST BATON ROUGE PARISH, LOUISIANA AS ORIG. 82 BUNDLE 2838, AS LOT 13 SAID LOT MEASURES 99 FEET FRONT ON NICHOLSON DRIVE, BY A DEPTH ON ITS SOUTHERN SIDELINE OF 361.34 FEET AND A DEPTH ON ITS NORTHERN SIDELINE OF 371.27 FEET AND A WIDTH IN THE REAR OF 98.3 FEET.

TAX ID NO: 009-1608-0

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:        MORENO PROPERTIES, L.L.C.
GRANTEE:        NICHOLSON ESTATES, L.L.C.
DATED:        04/22/2008
RECORDED:        04/29/2008
DOC#/BOOK-PAGE: 386-12051
NOTE:  COVERS PREMISES AND MORE

**18. 2066 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

LOT 14, NICHOLSON DRIVE ESTATES, EAST BATON ROUGE PARISH, LA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THE SUBDIVISION KNOWN AS NICHOLSON DRIVE ESTATES, AND BEING DESIGNATED ON THE OFFICIAL PLAN BY R. SWART, CIVIL ENGINEER, DATED DECEMBER 20, 1949, A COPY OF WHICH IS ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER FOR SAID PARISH AND AS LOT 12, MEASURING 100.5 FEET FRONT ON THE WEST SIDE OF NICHOLSON DRIVE BY A DEPTH ALONG ITS NORTHERN SIDELINE OF 381.96 FEET AND A DEPTH ON THE SOUTHERN SIDELINE OF 371.88 FEET AND A WIDTH IN THE REAR OF 100 FEET.

TAX ID NO: 005-9231-5

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:      MORENO PROPERTIES, L.L.C.
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:        04/22/2008
RECORDED:     04/29/2008
DOC#/BOOK-PAGE: 386-12051

**19. LOT 15 SQ 308, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

LOT 15, NICHOLSON DRIVE ESTATES, EAST BATON ROUGE PARISH, LA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS NICHOLSON DRIVE ESTATES, AND BEING DESIGNATED ON THE OFFICIAL PLAN THEREOF AS LOT 15, SAID LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID MAP OF SUBDIVISION BY R. SWART, C. E. & SURVEYOR, DATED DECEMBER 20, 1949 ON FILE AND OF RECORD IN AS ORIGINAL 84 BUNDLE 2830 IN THE OFFICE OF THE CLERK AND RECORDER FOR THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA.

TAX ID NO: 005-9232-3

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:      MORENO PROPERTIES L.L.C.
GRANTEE:      NICHOLSON ESTATES, L.L.C. DATED:      04/22/2008
RECORDED:      04/29/2008
DOC#/BOOK-PAGE: 386-12051

**20. 2160 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

LOT 16, NICHOLSON DRIVE ESTATES, EAST BATON ROUGE PARISH, LA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS NICHOLSON DRIVE ESTATES, AND DESIGNATED ON THE OFFICIAL PLAN THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER FOR THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA AS LOT 16, SAID LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID MAP.

TAX ID NO: 005-5517-7

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:      MORENO PROPERTIES, L.L.C.
GRANTEE:      NICHOLSON ESTATES, L.L.C. DATED:      04/22/2008
RECORDED:      04/29/2008
DOC#/BOOK-PAGE: 386-12051

## 21. 2180 NICHOLSON, BATON ROUGE, LA 70802

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

LOTS 17 AND 18, NICHOLSON DRIVE ESTATES, EAST BATON ROUGE PARISH, LA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

TWO (2) CERTAIN LOTS OR PARCELS OF GROUND, AND ALL OF THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS NICHOLSON DRIVE ESTATES, AND DESIGNATED ON THE OFFICIAL PLAN THEREOF, ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK OF COURT AND RECORDER FOR EAST BATON ROUGE PARISH, LA, AT PLAN BOOK 18, PAGE 32 AND ORIG 82, BDLE 2830, AS LOT NUMBERS SEVENTEEN (17) AND EIGHTEEN (18), SAID SUBDIVISION, SAID LOTS HAVING SUCH MEASUREMENTS AND DIMENSIONS AS ARE MORE PARTICULARLY SHOWN ON SAID SUBDIVISION MAP.

TAX ID NO: 005-5494-4
TAX ID NO: 005-5495-2

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:       MORENO PROPERTIES, L.L.C.
GRANTEE:       NICHOLSON ESTATES, L.L.C.
DATED:        04/22/2008
RECORDED:      04/29/2008
DOC#/BOOK-PAGE: 386-12051

NOTE: ACT OF DEPOSIT/NOTARIAL AFFIDAVIT RECORDED 05/12/2008, IN BOOK 8 PAGE 12055, TO DEPOSIT LIMITED LIABILITY CERTIFICATE INTO THE OFFICIAL RECORDS OF EAST BATON ROUGE PARISH.

**22. 2240 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS NICHOLSON DRIVE ESTATES, AND BEING DESIGNATED ON THE OFFICIAL PLAN OF SAID SUBDIVISION ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER FOR SAID PARISH AND STATE AS LOT 19, SAID LOT HAVING SUCH SIZE, SHAPE AND DIMENSIONS AS SHOWN ON SAID MAP.

TAX ID NO: 007-0080-0

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:      MORENO PROPERTIES, L.L.C.
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:        04/22/2008
RECORDED:     04/29/2008
DOC#/BOOK-PAGE: 386-12051
ACT OF DEPOSIT/NOTARIAL AFFIDAVIT DATED 05/05/2008 RECORDED 05/12/2008, IN BOOK 8 PAGE 12055, TO ADD LLC CERTIFICATE.

**23. 2240 NICHOLSON DR, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, AND STATE OF LOUISIANA:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS NICHOLSON DRIVE ESTATES, AND BEING DESIGNATED ON THE OFFICIAL PLAN OF SAID SUBDIVISION ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER FOR SAID PARISH AND STATE AS LOT 20, SAID LOT HAVING SUCH SIZE, SHAPE AND DIMENSIONS AS SHOWN ON SAID MAP.

TAX ID NO: 007-0079-7

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED

GRANTOR:       MORENO PROPERTIES, L.L.C.
GRANTEE:       NICHOLSON ESTATES, L.L.C.
DATED:         04/22/2008
RECORDED:      04/29/2008
DOC#/BOOK-PAGE: 386-12051

NOTE: ACT OF DEPOSIT / NOTARIAL AFFIDAVIT RECORDED 05/12/2008, BK/PG 8/12055, TO ADD LIMITED LIABILITY COMPANY CERTIFICATE.

**24. 2320 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS NICHOLSON DRIVE ESTATES, AND BEING DESIGNATED ON THE OFFICIAL PLAN THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER FOR SAID PARISH AND STATE AS LOT 21, SAID LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID MAP.

TAX ID NO: 005-9488-1

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:      MORENO PROPERTIES, L.L.C.
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:          04/22/2008
RECORDED:      04/29/2008
DOC#/BOOK-PAGE: 386-12051

ACT OF DEPOSIT/NOTARIAL AFFIDAVIT DATED 05/05/2008 RECORDED 05/12/2008, IN BOOK 8 PAGE 12055, TO ADD LLC CERTIFICATE.

**25. 2344 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS NICHOLSON DRIVE ESTATES, AND BEING DESIGNATED ON THE OFFICIAL PLAN THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER FOR THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA AS LOT 22, SAID LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID MAP.

TAX ID NO: 005-3225-8

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:     MORENO PROPERTIES, L.L.C.
GRANTEE:     NICHOLSON ESTATES, L.L.C. DATED:      04/22/2008
RECORDED:      04/29/2008
DOC#/BOOK-PAGE: 386-12051

NOTE:  COVERS PREMISES AND MORE

**26. 2406 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS NICHOLSON DRIVE ESTATES, AND BEING DESIGNATED ON THE OFFICIAL PLAN THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER FOR SAID PARISH AND STATE AS LOT NUMBER 23, SAID LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID MAP.

TAX ID NO: 005-7024-9

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:      MORENO PROPERTIES, L.L.C.
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:      04/22/2008
RECORDED:      04/29/2008
DOC#/BOOK-PAGE: 386-12051

**27. 2424 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

LOT 24, NICHOLSON DRIVE ESTATES, EAST BATON ROUGE PARISH, LA

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS NICHOLSON DRIVE ESTATES, AND BEING DESIGNATED ON THE OFFICIAL PLAN THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER FOR SAID PARISH AND STATE AS LOT NUMBER 24, SAID LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID MAP.

TAX ID NO: 008-2714-2

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:        MORENO PROPERTIES, L.L.C.
GRANTEE:        NICHOLSON ESTATES, L.L.C.
DATED:        04/22/2008
RECORDED:        04/29/2008
DOC#/BOOK-PAGE: 386-12051

NOTE: ACT OF DEPOSIT/NOTARIAL AFFIDAVIT RECORDED 05/12/2008, IN BOOK 8 PAGE 12055, TO DEPOSIT LIMITED LIABILITY CERTIFICATE INTO THE OFFICIAL RECORDS OF EAST BATON ROUGE PARISH.

**28. LOT ESTATE D SQ 108, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

ONE CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING, SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE SUBDIVISION, AND DESIGNATED ON THE OFFICIAL MAP THEREOF FILED IN THE OFFICE OF THE CLERK AND RECORDER OF EAST BATON ROUGE, AS ESTATE D OF SQUARE 108, MADE BY SWART & HIGGINBOTHAM, ENGINEERS & SURVEYORS, DATED NOVEMBER, 1942, SAID ESTATE D MEASURES 101.3 FEET FRONT ON THE WEST SIDE OF NICHOLSON DRIVE BY A DEPTH ALONG THE NORTHERN SIDELINE ON WEST JOHNSON STREET OF 214.34 FEET, AND A DEPTH ALONG ITS NORTHERN BOUNDARY LINE PARALLEL TO THE ITS SOUTHERN BOUNDARY OF 198.54 FEET, A WIDTH IN THE REAR OF 100 FEET.

TAX ID NO: 006-5994-0

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:     MORENO PROPERTIES, L.L.C.
GRANTEE:     NICHOLSON ESTATES, L.L.C.
DATED:     04/22/2008
RECORDED:     04/29/2008
DOC#/BOOK-PAGE: 386-12051

ACT OF DEPOSIT/NOTARIAL AFFIDAVIT DATED 05/05/2008 RECORDED 05/12/2008 IN BOOK 8 PAGE 12055, TO ADD LLC CERTIFICATE.

**29. 964 WEST JOHNSON, BATON ROUGE, LA 70802**

SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

TWO CERTAIN LOTS OR PARCELS OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING SITUATED IN THE PARISH OF EAST BATON ROUGE, NOW IN THE CITY OF BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE, AND DESIGNATED ACCORDING TO THE OFFICIAL PLAN ON FILE IN THE OFFICE OF THE CLERK AND RECORDER OF THE PARISH OF EAST BATON ROUGE, LOUISIANA, AS LOTS NOS 44 AND 46 SQUARE 108, EACH OF THE LOTS MEASURING FORTY FEET (40 FEET) FRONT ON THE NORTH SIDE OF W. JOHNSON STREET BY DEPTH BETWEEN PARALLEL LINES OF 100 FEET.

TAX ID NO: 007-2665-6

BEING THE SAME PROPERTY CONVEYED BY CASH SALE
GRANTOR:      DAVID C. MARTIN, REPRESENTED BY MAUREEN MARTIN HAYTER, HIS AGENT AND ATTORNEY-IN-FACT, BY VIRTUE OF POWER OF ATTORNEY EXECUTED ON MARCH 13, 2008
GRANTEE:      NICHOLSON ESTATES, L.L.C
DATED:      04/09/2008
RECORDED:      04/29/2008
DOC#/BOOK-PAGE: 276-12051
NOTARIAL ACT OF CORRECTION: DATED 05/05/2008, RECORDED: 05/12/2008, IN BOOK 9 PAGE 12055.

**30. 968 WEST JOHNSON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

TWO CERTAIN LOTS OR PARCELS OF GROUND, TOGETHER WITH ALL THE BUILDINGS
AND IMPROVEMENTS THEREON AND ALL THE RIGHTS, WAYS, PRIVILEGES,
SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN
ANYWISE APPERTAINING SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE
OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE, AND
DESIGNATED ACCORDING TO THE OFFICIAL PLAN ON FILE IN THE OFFICE OF THE
CLERK AND RECORDER OF THE PARISH OF EAST BATON ROUGE, LOUISIANA, AS
LOTS NOS 48 AND 50 SQUARE 108, EACH OF THE LOTS MEASURING FORTY FEET (40
FEET) FRONT ON THE NORTH SIDE OF W. JOHNSON STREET BY A DEPTH BETWEEN
PARALLEL LINES OF 100 FEET.

TAX ID NO: 005-8692-7
TAX ID NO: 005-8693-5

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:      MORENO PROPERTIES, L.L.C.
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:        04/22/2008
RECORDED:      04/29/2008
DOC#/BOOK-PAGE: 386-12051

ACT OF DEPOSIT / NOTARIAL AFFIDAVIT: DATED 05/05/2008, RECORDED 05/12/2008,
BOOK 8, PAGE 12055.

## 31. 990 WEST JOHNSON, BATON ROUGE, LA 70802

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

LOTS 52 AND 54, SQUARE 108, SOUTH BATON ROUGE SUBDIVISION, EAST BATON ROUGE PARISH, LA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

TWO CERTAIN LOTS OR PARCELS OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE, AND DESIGNATED ON THE OFFICIAL PLAN ON FILE IN THE OFFICE OF THE CLERK AND RECORDER OF THE PARISH OF EAST BATON ROUGE, LOUISIANA, AS LOTS NOS 52 AND 54, SQUARE 108, EACH OF THE LOTS MEASURING FORTY FEET (40 FEET) FRONT ON THE NORTH SIDE OF W. JOHNSON STREET BY A DEPTH BETWEEN PARALLEL LINES OF 100 FEET.

TAX ID NO: 008-7675-3
TAX ID NO: 008-7676-3

BEING THE SAME PROPERTY CONVEYED BY QUIT CLAIM DEED
GRANTOR:       MORENO PROPERTIES, L.L.C.
GRANTEE:       NICHOLSON ESTATES, L.L.C.
DATED:       04/22/2008
RECORDED:       04/29/2008
DOC#/BOOK-PAGE: 386-12051
NOTE: COVERS PREMISES AND MORE

**32. 983 WEST JOHNSON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

ONE (1) CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON, AND ALL THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING AND SITUATED IN THAT SUBDIVISION OF THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, KNOWN AS SOUTH BATON ROUGE AND BEING DESIGNATED ON THE OFFICIAL SUBDIVISION MAP ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER FOR SAID PARISH AND STATE AS LOT 49, SQUARE 109, SAID SUBDIVISION AND SAID LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID MAP.

TAX ID NO: 005-4253-9

BEING THE SAME PROPERTY CONVEYED BY CASH SALE
GRANTOR:        DEMETRIS KENT WEATHERSPOON A/K/A DEMETRIS LYNETTE KENT
GRANTEE:        NICHOLSON ESTATES, L.L.C.
DATED:        05/29/2009
RECORDED:        06/16/2009
DOC#/BOOK-PAGE: 819-12158

## 33. 1755 NICHOLSON, BATON ROUGE, LA 70802

SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, AND STATE OF LOUISIANA:

PARCEL 1

THAT CERTAIN PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE, COMPRISED OF LOTS 20, 21 AND WEST 1/2 OF LOT 19 OF SQUARE 301 OF SAID SUBDIVISION, LOT 20 MEASURING 50 FEET FRONT ON THE NORTH SIDE OF GARNER STREET, BY A DEPTH ON ITS WEST SIDE OF 126.4 FEET, ON ITS EAST SIDE OF 126.8 FEET AND ON ITS NORTH SIDE OF 50 FEET. LOT 21 MEASURING 125.8 FEET FRONT ON THE EAST SIDE OF NICHOLSON DRIVE, BY A DEPTH ON ITS SOUTH SIDE ALONG GARNER STREET OF 162.3 FEET, ON ITS NORTH SIDE OF 150 FEET AND ON ITS EAST SIDE OF 126.4 FEET AND THE WEST 1/2 OF LOT 19 MEASURING 25 FEET ON THE NORTH SIDE OF GARNER STREET, BY A DEPTH ON ITS WEST SIDE OF 126.8 FEET, AND MEASURING 25 FEET ON ITS NORTH SIDE.

PARCEL 2

THAT CERTAIN PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, CONTAINING 1.4 ACRES, MORE OR LESS, LOCATED IN SECTION 52, T7S, R1W, EAST BATON ROUGE PARISH, LOUISIANA, AND BEING IN THE 1700 BLOCK OF NICHOLSON DRIVE, ADJACENT TO IMMOVABLE PROPERTY UPON WHICH WAS LOCATED FORMERLY BONANZA CAFETERIA AND NOW'S PANCHO'S MEXICAN BUFFET, INC. AND MEASURING 145.8 FEET FRONT ON NICHOLSON DRIVE AND RUNNING EAST FROM NICHOLSON DRIVE BETWEEN PARALLEL LINES TO THE CORPORATION CANAL, MEASURING 431 FEET ALONG THE NORTH LINE AND 448 FEET ALONG THE SOUTH LINES, AND BEING A PORTION OF A CERTAIN TRACT OR PARCEL OF LAND SITUATED IN SAID CITY, PARISH AND STATE, BOUNDED ON THE WEST BY NICHOLSON DRIVE, ON THE EAST BY CORPORATION CANAL, ON THE NORTH BY LANDS FORMERLY OF WEBB, AND ON THE SOUTH BY LAND FORMERLY OF MISS BLANCHE DUNCAN AND BEING ALL OF THAT CERTAIN 5 ACRE TRACT, MORE OR LESS, FORMERLY BELONGING TO MISS ELLEN M. BERTEAU LYING EAST OF NICHOLSON DRIVE, LESS AND EXCEPT THAT PORTION THEREOF WHICH WAS EXPROPRIATED BY THE PARISH OF EAST BATON ROUGE IN SUITE NO. 145, 059 OF THE 19TH JDC FOR THE PARISH OF EAST BATON ROUGE, LOUISIANA IN THE MATTER ENTITLED "PARISH OF EAST BATON ROUGE V. PHOEBE BRYAN SIMMONS, ET. AL ".

TAX ID NO: 024-1876-2
TAX ID NO: 024-1877-0
TAX ID NO: 024-1878-9

BEING THE SAME PROPERTY CONVEYED BY CASH SALE

GRANTOR:     LOUISIANA COMMUNITY DEVELOPMENT CAPITAL FUND, INC.
GRANTEE:     NICHOLSON ESTATES, L.L.C.
DATED:     09/30/2008
RECORDED:     10/29/2008
DOC#/BOOK-PAGE: 761-12103

**34. 1815 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, AND STATE OF LOUISIANA:

TWO CERTAIN LOTS OR PARCELS OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE, AND DESIGNATED ON THE OFFICIAL PLAN THEREOF, ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER OF THE PARISH OF EAST BATON ROUGE AS LOTS 16 AND 11 OF SQUARE 300 OF SAID SUBDIVISION, EACH LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID MAP.

TAX ID NO: 008-2716-9
TAX ID NO: 008-2717-7

BEING THE SAME PROPERTY CONVEYED BY CASH SALE
GRANTOR:      NATHAN P. DUCOTE
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:          08/20/2008
RECORDED:      09/10/2008
DOC#/BOOK-PAGE: 661-12091

**35. 1839 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, AND STATE OF LOUISIANA:

TWO CERTAIN LOTS OR PARCELS OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE, COMPRISED OF LOTS 18 AND 19 OF SQUARE 300 OF SAID SUBDIVISION, EACH LOT MEASURING 50.25 FEET FRONT ON NICHOLSON DRIVE, AND 50 FEET WIDTH IN THE REAR, LOT 18 HAVING A DEPTH OF 139.85 FEET ON ITS NORTHERN LINE AND 144.80 FEET ON ITS SOUTHERN LINE AND LOT 19 HAVING A DEPTH OF 144.80 FEET ON ITS NORTHERN LINE AND 149.75 FEET ON ITS SOUTHERN LINE.

TAX ID NO: 007-3170-6
TAX ID NO: 007-3643-0

BEING THE SAME PROPERTY CONVEYED BY CASH SALE
GRANTOR:          DONALD STOCKSTILL AND WIFE, PAULA BRIGHTWELL STOCKSTILL
GRANTEE:          NICHOLSON ESTATES, L.L.C.
DATED:          08/27/2008
RECORDED:          09/23/2008
DOC#/BOOK-PAGE: 573-12094

**36. 1845 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

THREE CERTAIN LOTS OR PARCELS OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN BATON ROUGE, AND DELINEATED ON A MAP OF SURVEYORS DATED NOVEMBER, 1942, SAID MAP BEING SIGNED BY R. SWART, CIVIL ENGINEER, BEING ORIGINAL 93 BUNDLE 1681 OF THE RECORDS OF THE CLERK OF COURT OF THE PARISH OF EAST BATON ROUGE, LOUISIANA, AS LOTS 20, 21 AND 22 OF SQUARE 300, EACH OF THE LOTS MEASURING 50.25 FEET FRONT ON THE EAST SIDE OF NICHOLOSON DRIVE, SAID LOT 20 MEASURING A DISTANCE OF 149.75 FEET ON ITS NORTH LINE, 154.70 FEET ON ITS SOUTH LINE, LOT 21 MEASURES 154.70 FEET ON ITS NORTH LINE AND 159.65 FEET ON ITS SOUTH LINE, AND LOT 22 MEASURES 159.65 FEET ON ITS NORTH LINE AND 164.60 FEET ON ITS SOUTH LINE.

TAX ID NO: 005-2541-3

BEING THE SAME PROPERTY CONVEYED BY CASH SALE
GRANTOR:          DAVID JUDE VERDOIS AND WIFE, MICHELE HARRIS VERDOIS
GRANTEE:     NICHOLSON ESTATES L.L.C.
DATED:       06/11/2008
RECORDED:      07/02/2008
DOC#/BOOK-PAGE: 295-12074

**37. 1875 NICHOLSON DR, BATON ROUGE, LA 70802**

SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, AND STATE OF LOUISIANA:

A CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE, AND BEING DESIGNATED ON A MAP OF SURVEY ENTITLED DATED AUGUST 14, 1996, BY M. GREGORY BREAUX, P.L.S. RECORDED AT ORIG. 500 BUNDLE 10718 OF THE RECORDS OF THE CLERK OF COURT OF THE PARISH OF EAST BATON ROUGE, LOUISIANA, AS LOT 1-A OF SQUARE 300, SAID LOT IS SITUATED AT THE CORNER OF NICHOLSON DRIVE AND VAN BUREN STREET AND MEASURES 125.38 FEET FRONT ON NICHOLSON DRIVE, 122.35 FEET ALONG VAN BUREN STREET, 125.00 FEET ON ITS EAST LINE AND 109.98 FEET ON ITS NORTH LINE.

TAX ID NO: 008-8941-5

BEING THE SAME PROPERTY CONVEYED BY CASH SALE DEED

GRANTOR:     MARY JOANNA ROBERTS SHELTON AND HUSBAND, JOSEPH S. SHELTON
GRANTEE:     NICHOLSON ESTATES, L.L.C.
DATED:       05/23/2008
RECORDED:     06/30/2008
DOC#/BOOK-PAGE: 666-12073

**38. 1921 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, AND STATE OF LOUISIANA:

A CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE, AND BEING DESIGNATED ON A MAP OF SURVEY SHOWING A RESUBDIVISION OF SQUARES 304 AND 305, SOUTH BATON ROUGE, BY R. SWART, CIVIL ENGINEER, DATED DECEMBER 20, 1947, WHICH MAP IS RECORDED AT CONVEYANCE BOOK 757 PAGE 115 IN THE OFFICE OF THE CLERK OF COURT AND EX-OFFICIO RECORDER FOR THE PARISH OF EAST BATON ROUGE, LOUISIANA, AS LOT D, WHICH SAID LOT HAS A FRONT ON THE EAST SIDE OF NICHOLSON DRIVE OF 100 FEET, BY A DEPTH BETWEEN PARALLEL LINES OF 250 FEET, THE NORTH LINE OF SAID LOT EXTENDING ALONG THE SOUTH SIDE OF VAN BURN STREET.

TAX ID NO: 008-0372-3

BEING THE SAME PROPERTY CONVEYED BY CASH SALE
GRANTOR:       ROSEMARY MEYERS BRUMFIELD
GRANTEE:       NICHOLSON ESTATES, L.L.C.
DATED:       07/28/2008
RECORDED:       08/14/2008
DOC#/BOOK-PAGE: 905-12085

**39. 1943 NICHOLSON, BATON ROUGE, LA 70802**

SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, AND STATE OF LOUISIANA:

A CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, KNOWN AS SUBURB SOUTH BATON ROUGE, AND SAID LOT IS DESIGNATED AS LOT E ON A PLAN SHOWING A RESUBDIVISION OF SQUARES 304 AND 305, SUBURB SOUTH BATON ROUGE, BY IT SWART, C. E., DATED DECEMBER 20, 1947, A COPY OF SAID PLAN IS ATTACHED TO ORIG. 11 BUNDLE 2182 IN THE OFFICE OF THE CLERK OF COURT AND RECORDER OF EAST BATON ROUGE, LOUISIANA, SAID LOT HEREIN CONVEYED MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCING AT A POINT ON THE EAST SIDE OF NICHOLSON DRIVE 100 FEET SOUTHERLY FROM THE SOUTHEAST CORNER OF THE INTERSECTION OF VAN BUREN STREET AND NICHOLSON DRIVE AS THE POINT OF BEGINNING WHICH SAID POINT IS THE NORTHWEST CORNER OF LOT E HEREIN CONVEYED AND FROM THE POINT OF BEGINNING RUN IN A SOUTHERLY DIRECTION ALONG THE EAST SIDE OF NICHOLSON DRIVE A DISTANCE OF 100 FEET AND CORNER; THENCE IN AM EASTERLY DIRECTION PARALLEL TO THE SOUTH LINE OF VAN BUREN SHEET A DISTANCE OF 250 FEET TO A POINT AND CORNER; THENCE IN A NORTHERLY DIRECTION OF 250 FEET TO A POINT AND CORNER, THENCE IN A NORTHERLY DIRECTION PARALLEL TO THE FRONT LINE OF SAID LOT ON NICHOLSON DRIVE DISTANCE OF 100 FEET AND CORNER; THENCE IN A WESTERLY DIRECTION PARALLEL TO THE SOUTH LINE OF SAID LOT E A DISTANCE OF 250 FEET TO THE POINT OF BEGINNING.

TAX ID NO: 006-1941-8

BEING THE SAME PROPERTY CONVEYED BY CASH SALE
GRANTOR:     SIMON M. BAXTER AND WIFE, VERA ELIZABETH LYONS
GRANTEE:     NICHOLSON ESTATES, L.L.C.
DATED:        08/27/2008
RECORDED:     09/23/2008
DOC#/BOOK-PAGE: 574-12094

**40. 1975 NICHOLSON DR, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

PARCEL 1:

ONE (1) CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON, SITUATED IN THAT SUBDIVISION OF THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, BEING MORE PARTICULARLY DESCRIBED AS LOT F-1-1 ON THE MAP ENTITLED "MAP SHOWING THE RESUBDIVISION OF LOT 37 MAGNOLIA TERRACE SUBDIVISION AND LOT F OF A RESUBDIVISION OF SQUARES 304 AND 305, SOUTH BATON ROUGE, IN THE CITY OF BATON ROUGE, EAST BATON ROUGE PARISH, LOUISIANA FOR GAYNOR L. GARDINER", MADE BY TOXI CRAFT, CIVIL ENGINEER, DATED JUNE 22, 1966, RECORDED AS ORIGINAL 57 BUNDLE 6233 OF THE OFFICIAL RECORDS OF THE PARISH OF EAST BATON ROUGE, LOUISIANA SAID LOT MEASURING 100 FEET FRONT ON NICHOLSON DRIVE AND HAVING MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID ABOVE CITED MAP.

PARCEL 2:

A CERTAIN LOT OR FRACTIONAL LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON, SITUATED IN THAT SUBDIVISION OF THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, KNOWN AS SOUTH BATON ROUGE AND BEING THE NORTHERN 10 FEET OF LOT G ON A MAP OR PLAN SHOWING THE RESUBDIVISION OF SQUARE NOS. 304 AND 305, SAID SOUTH BATON ROUGE, MADE BY R. SWART C. E., DATED DECEMBER 20, 1947, ON FILE AT ORIGINAL 11 BUNDLE 2182 IN THE OFFICE OF THE CLERK AND RECORDER OF EAST BATON ROUGE, LOUISIANA SAID LOT MEASURING 10 FEET OF SAID LOT G FRONT ON LINES.

PARCEL 3:

A CERTAIN LOT OR FRACTIONAL LOT OR PARCEL OR GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON, SITUATED IN THAT SUBDIVISION OF THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, KNOWN AS SOUTH BATON ROUGE AND BEING PARTICULARLY DESCRIBED ACCORDING TO PLAN THEREOF SHOWING THE RESUBDIVISION OF SQUARE NOS. 304 AND 305, SAID SOUTH BATON ROUGE, MADE BY R. SWART, C. E. & SURVEYOR, DATED DECEMBER 20, 1947, OF RECORD IN COB 757 FOLIO 115 OF THE RECORDS IN THE OFFICE OF THE CLERK AND RECORDER FOR THE PARISH OF EAST BATON ROUGE, MEASURING AS FOLLOWS: COMMENCE AT A POINT 10 FEET SOUTH OF THE NORTHWEST CORNER OF LOT G SQUARE 304, SAID SOUTH BATON ROUGE SUBDIVISION, HEREINAFTER REFERRED TO AS POINT OF BEGINNING; THENCE RUN SOUTH 50 FEET ALONG THE EAST SIDE OF NICHOLSON DRIVE TO A CORNER; THENCE RUN EAST IN A LINE PARALLEL WITH THE NORTHERN BOUNDARY OF LOT G, SQUARE 304 OF SAID SOUTH BATON ROUGE SUBDIVISION, A DISTANCE 250 FEET TO THE EAST LINE OF LOT G; THENCE RUN NORTH ALONG THE EAST LINE OF SAID LOT G A DISTANCE OF 50 FEET; THENCE RUN WEST IN A LINE PARALLEL WITH THE NORTHERN SIDE LINE OF SAID LOT G A DISTANCE OF 250 FEET TO THE POINT OF BEGINNING.

ALL IN ACCORDANCE WITH A SURVEY BY GOTECH, INC., DATED OCTOBER 2, 2008

TAX ID NO:    005-2545-6 (PARCEL 1)
              005-2544-8 (PARCEL 2)
              005-2542-1 (PARCEL 3)

BEING THE SAME PROPERTY CONVEYED BY CASH SALE DEED

GRANTOR:     BRIAN W. BROUSSARD AND WILLIAM RAY MERTENS JR.
GRANTEE:     NICHOLSON ESTATES, LLC
DATED:       10/09/2008
RECORDED:    10/29/2008
DOC#/BOOK-PAGE: 755-12103

**41. 1832 OREGON, BATON ROUGE, LA 70802**

SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, AND STATE OF LOUISIANA:

A CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS, WAYS, PRIVILEGES SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE, AND DESIGNATED ON THE OFFICIAL PLAN THEREOF, ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK OF COURT OF THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, AS LOT 13 & NORTH ½ OF LOT 12 OF SQUARE 300, SAID LOT HAVING THE SAME MEASUREMENT AND DIMENSIONS AS ARE MORE PARTICULARLY DESCRIBED ON SAID SUBDIVISION MAP.

TAX ID NO: 009-1565-3
TAX ID NO: 009-1564-5

BEING THE SAME PROPERTY CONVEYED BY CASH SALE
GRANTOR:     CAROLYN B. CHUN
GRANTEE:     NICHOLSON ESTATES, L.L.C.
DATED:       08/20/2008
RECORDED:    09/10/2008
DOC#/BOOK-PAGE: 659-12091

**42. 1842 OREGON, BATON ROUGE, LA 70802**

SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, AND STATE OF LOUISIANA:

A CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE, AND BEING MORE PARTICULARLY DESCRIBED ACCORDING TO THE OFFICIAL MAP OF SUBDIVISION ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER FOR THE PARISH OF EAST BATON ROUGE AS LOT 11 AND SOUTH 1/2 OF LOT 12 OF SQUARE 300 OF SAID SUBDIVISION, EACH LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID MAP.

TAX ID NO: 006-5473-6 &
TAX ID NO: 006-5474-4

BEING THE SAME PROPERTY CONVEYED BY CASH SALE
GRANTOR:      JOSEPH KELL MARTIN
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:        10/02/2008
RECORDED:     10/29/2008
DOC#/BOOK-PAGE: 760-12103

**43. 1860 OREGON ST, BATON ROUGE, LA 70802**

SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, AND STATE OF LOUISIANA:

A CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE, AND BEING MORE PARTICULARLY DESCRIBED ACCORDING TO THE OFFICIAL PLAN THEREOF, ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK OF COURT OF THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, AS LOT 10 AND NORTH 1/2 OF LOT 9 OF SQUARE 300, SAID LOT HAVING THE SAME MEASUREMENT AND DIMENSIONS AS ARE MORE PARTICULARLY DESCRIBED ON SAID SUBDIVISION MAP.

TAX ID NO: 008-8934-2

BEING THE SAME PROPERTY CONVEYED BY CASH SALE DEED

GRANTOR:      LESTER JAMES MALONEY
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:      07/28/2008
RECORDED:      08/14/2008
DOC#/BOOK-PAGE: 908-12085

NOTE: NOTARIAL ACT OF CORRECTION  RECORDED 09/18/2008, BK/PG 574/12093.

**44. 1874 OREGON, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

ONE (1) CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON, SITUATED IN THAT SUBDIVISION OF THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, KNOWN AS SOUTH BATON ROUGE SUBDIVISION AND BEING DESIGNATED ON THE OFFICIAL SUBDIVISION MAP ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER FOR SAID PARISH AND STATE AS LOT 8 AND THE SOUTH ONE HALF OF LOT 9, SQUARE 300, SAID SUBDIVISION AND SAID LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID MAP.

TAX ID NO: 005-7742-1

BEING THE SAME PROPERTY CONVEYED BY CASH SALE
GRANTOR:      LURLEIN JOHN GUIDRY AND WIFE, LISA OLIVER GUIDRY
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:        09/17/2008
RECORDED:     09/30/2008
DOC#/BOOK-PAGE: 288-12096

**45. 1880 OREGON ST, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

ONE (1) CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON, SITUATED IN THAT SUBDIVISION OF THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE SUBDIVISION AND BEING MORE PARTICULARLY DESCRIBED ACCORDING TO THE OFFICIAL SUBDIVISION MAP ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER FOR SAID PARISH AND STATE AS LOT 7, SQUARE 300, SAID SUBDIVISION AND SAID LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID MAP.

TAX ID NO: 005-6992-5

BEING THE SAME PROPERTY CONVEYED BY CASH SALE DEED

GRANTOR:      LAURENCE UDELL CARTER
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:        04/24/2009
RECORDED:     06/16/2009
DOC#/BOOK-PAGE: 822-12158

**46. 850 GARNER, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

THAT CERTAIN TRACT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE, AND BEING DESIGNATED AS LOT 18 AND THE EAST 1/2 OF LOT 19 OF SQUARE 301 AS PER PLAT OF R. SWARTZ, C. E. AND SURVEYOR, DATED MARCH 15, 1944, RECORDED UNDER ORIGINAL 58 BUNDLE 1881 OF THE RECORDS IN OF EAST BATON ROUGE PARISH, LOUISIANA, SAID TRACT LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID SUBDIVISION MAP.

TAX ID NO: 008-1669-8

BEING THE SAME PROPERTY CONVEYED BY CASH SALE
GRANTOR:      GERALD WATERS SCOFIELD AND WIFE, BRENDA SWEARINGEN SCOFIELD
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:        12/19/2008
RECORDED:     01/07/2009
DOC#/BOOK-PAGE: 176-12116

**47. 1813 OREGON ST, BATON ROUGE, LA 70802**

DOC#/BOOK-PAGE: 291-12096 SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, AND STATE OF LOUISIANA:

THAT CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS, WAYS, PRIVILEGES SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE, AND BEING DESIGNATED ON THE OFFICIAL PLAN OF SAID SUBDIVISION, ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK & RECORDER OF SAID PARISH AND STATE AS LOTS 15 AND SOUTH 1/2 OF LOT 16 OF SQUARE 301 OF SAID SUBDIVISION, SAID LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID SUBDIVISION MAP.

TAX ID NO: 005-5515-0

BEING THE SAME PROPERTY CONVEYED BY CASH SALE DEED

GRANTOR:      EVAN JAMES MORGAN
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:        09/17/2008
RECORDED:     09/30/2008

**48. 1839 OREGON ST, BATON ROUGE, LA 7080**

SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, AND STATE OF LOUISIANA:

THAT CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE, AND BEING DESIGNATED ON THE OFFICIAL PLAN OF SAID SUBDIVISION, ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK & RECORDER OF SAID PARISH AND STATE AS LOTS 12 AND SOUTH 1/2 OF LOT 13 OF SQUARE 301 OF SAID SUBDIVISION, SAID LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS SHOWN ON SAID SUBDIVISION MAP.

TAX ID NO: 007-1765-7

BEING THE SAME PROPERTY CONVEYED BY CASH SALE DEED

GRANTOR:      EVAN JAMES MORGAN
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:      09/17/2008
RECORDED:      09/30/2008
DOC#/BOOK-PAGE: 289-12096

**49. 811 VAN BUREN ST, BATON ROUGE, LA 70802**

SITUATED IN THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, AND STATE OF LOUISIANA:

A CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON, SITUATED IN THAT SUBDIVISION OF THE CITY OF BATON ROUGE, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT PORTION OF MAGNOLIA MOUND PLANTATION NOW KNOWN AS SOUTH BATON ROUGE SUBDIVISION AND BEING PARTICULARLY DESCRIBED ACCORDING TO THE OFFICIAL PLAN OR SURVEY OF SAID SOUTH BATON ROUGE SUBDIVISION BY R. SWART, DATED DECEMBER 20, 1947, WHICH PLAN OR SURVEY IS ATTACHED TO ORIGINAL 11 BUNDLE 2182 AND RECORDED IN COB 757 FOLIO 115 OF THE RECORDS IN THE OFFICE OF THE CLERK AND RECORDER FOR THE PARISH OF EAST BATON ROUGE, AS LOT B, SQUARE 304, SAID LOT B MEASURING 75 FEET FRONT ON THE SOUTH SIDE OF VAN BUREN STREET, BY A DEPTH OF 130 FEET BETWEEN EQUAL AND PARALLEL LINES.

TAX ID NO: 000-0664-5

BEING THE SAME PROPERTY CONVEYED BY CASH SALE DEED

GRANTOR:      DAVID LANCE PITRE AND WIFE, KELLY LEA WEST PITRE
GRANTEE:      NICHOLSON ESTATES, L.L.C.
DATED:        10/23/2008
RECORDED:     10/29/2008
DOC#/BOOK-PAGE: 749-12103

**50. 775 VAN BUREN ST, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

A CERTAIN LOT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON, SITUATED IN THAT SUBDIVISION OF THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS SOUTH BATON ROUGE AND DESIGNATED ON THE OFFICIAL PLAN THEREOF ON FILE IN THE OFFICE OF THE CLERK AND RECORDER FOR THE PARISH OF EAST BATON ROUGE, AS LOT A, SQUARE 304, SAID SUBDIVISION, SAID LOT HAVING SUCH MEASUREMENTS AND DIMENSIONS AS MORE PARTICULARLY DESCRIBED ON SAID SUBDIVISION MAP.

TAX ID NO: 005-2590-1

BEING THE SAME PROPERTY CONVEYED BY CASH SALE DEED

GRANTOR:      YVONNE JACKSON DORSEY WELCH
GRANTEE:      NICHOLSON ESTATES, LLC
DATED:        12/12/2008
RECORDED:      01/07/2009
DOC#/BOOK-PAGE: 173-12116

**51. 1950 IOWA STREET, BATON ROUGE, LA 70802**

SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA:

THAT CERTAIN TRACT OR PARCEL OF GROUND, TOGETHER WITH ALL THE BUILDINGS AND IMPROVEMENTS THEREON AND ALL THE RIGHTS, WAYS, PRIVILEGES, SERVITUDES, APPURTENANCES AND ADVANTAGES THEREUNTO BELONGING OR IN ANYWISE APPERTAINING SITUATED IN THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, IN THAT SUBDIVISION KNOWN AS MAGNOLIA TERRACE AND DESIGNATED ON THE OFFICIAL PLAN OF SUBDIVISION ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER OF THE PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, AS LOT NO. 37-A-1, SAID SUBDIVISION.

TAX ID NO: 005-2546-4

BEING THE SAME PROPERTY CONVEYED BY CASH SALE DEED

GRANTOR:          THERESA CHOW WILLIAMS AND HUSBAND, CHARLES EDWARD WILLIAMS
GRANTEE:      NICHOLSON ESTATES, LLC
DATED:        02/20/2009
RECORDED:      03/13/2009
DOC#/BOOK-PAGE: 306-12132